**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

LITTLE SISTERS OF THE POOR HOME FOR THE
AGED, DENVER, COLORADO, a Colorado non-profit
corporation, LITTLE SISTERS OF THE POOR,
BALTIMORE, INC., a Maryland non-profit corporation,
by themselves and on behalf of all others similarly situated,

CHRISTIAN BROTHERS SERVICES, a New Mexico
non-profit corporation, and

CHRISTIAN BROTHERS EMPLOYEE BENEFIT
TRUST,

      Plaintiffs,

  v.

KATHLEEN SEBELIUS, Secretary of the United States
Department of Health and Human Services,

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

THOMAS E. PEREZ, Secretary of the United States
Department of Labor,

UNITED STATES DEPARTMENT OF LABOR,

JACOB J. LEW, Secretary of the United States Department
of the Treasury, and

UNITED STATES DEPARTMENT OF THE
TREASURY,

      Defendants.

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs LITTLE SISTERS OF THE POOR HOME FOR THE AGED, DENVER,

COLORADO, a Colorado non-profit corporation, LITTLE SISTERS OF THE POOR,

BALTIMORE, INC., a Maryland non-profit corporation, by themselves and on behalf of all

others similarly situated, CHRISTIAN BROTHERS SERVICES, a New Mexico non-profit

corporation, and CHRISTIAN BROTHERS EMPLOYEE BENEFIT TRUST (collectively the "Plaintiffs"), by and through their attorneys, allege and state as follows:

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit on behalf of Catholic employers who participate in the Christian Brothers Employee Benefit Trust (the "Christian Brothers Trust").  These employers are forbidden by their religion from participating in the federal government's regulatory scheme to promote, encourage, and subsidize the use of sterilization, contraceptives, and drugs that cause abortions.

2.    The government defendants, however, have imposed regulatory requirements that require the class plaintiffs to provide health benefits for their employees that include coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling (the "Final Mandate").

3.    The government defendants have exempted thousands of plans, covering tens of millions of employees, from the Final Mandate.  These exemptions have been granted for a  wide variety of reasons, from the purely secular exemption for plans in existence before a certain date ("grandfathered plans") to a narrow religious exemption for certain "religious employers."  The class plaintiffs, however—despite their religious nature—do not qualify for these exemptions.

4.    For example, the Little Sisters of the Poor is a Congregation of Catholic Sisters who operate homes for the elderly poor of every race and religion, including the two homes named above as representative plaintiffs (the "Little Sisters Homes.").  Like the other members of the class, the Little Sisters Homes are guided by and operate in accordance with Catholic teachings.  Their religious beliefs forbid them from participating in the government's scheme to provide contraceptives, sterilizations, and abortion-inducing drugs.  Yet the government refuses to exempt the Little Sisters Homes and the other class members from its Final Mandate.

5.      The result is that the class members have been offered a stark choice:  they must either abandon their Catholic beliefs and participate in the Final Mandate, or they will be punished by the government with an array of fines and penalties unless and until they comply. The threat of such penalties imposes a substantial burden on the class members' religious exercise, because it "requires participation in an activity prohibited by a sincerely held religious belief," prevents participation in conduct motivated by a sincerely held religious belief, and "places substantial pressure on" the class members "to engage in conduct contrary to a sincerely held religious belief."  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1138 (10th Cir. 2013).

6.      The Final Mandate also impermissibly coerces the two Catholic entities that work together to provide health benefits for the class members:  the Christian Brothers Trust, and Christian Brothers Services, which administers the Trust.  Both the Christian Brothers Trust and Christian Brothers Services are operated according to Catholic religious principles—indeed, they *exist* precisely to provide benefits to the class members and other Catholic institutions in accordance with those religious principles.  Yet the Final Mandate effectively makes that mission largely illegal, and requires these entities to either participate in the government's scheme or dramatically reduce their work providing insurance to Catholic institutions.   In many circumstances, their religious exercise of providing health benefits in accordance with Catholic religious principles has been made illegal.

7.      Fortunately, federal law forbids the government from forcing the Plaintiffs to face such penalties and harm for exercising their religion.  In particular, the Religious Freedom Restoration Act forbids such burdens on religious exercise unless the government can demonstrate that the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §

2000bb-1(b).  The government cannot meet that standard, making it illegal to impose the Final Mandate on the Plaintiffs.  The Final Mandate is likewise invalid under the First Amendment's Religion and Speech Clauses, the Fifth Amendment's Due Process Clause, and the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").

8.      Without judicial relief, the Final Mandate will take effect against the Christian Brothers Trust when its new plan year begins on January 1, 2014.  Accordingly, all Plaintiffs— the Little Sisters Homes (on behalf of themselves and others similarly situated), the Christian Brothers Trust, and Christian Brothers Services—bring this action seeking injunctive and declaratory relief against the Final Mandate.  For decades, the class members, the Christian Brothers Trust, and Christian Brothers Services have worked together to provide health benefits to employees that are consistent with their mission as Catholic organizations.  The defendants' attempt to make such behavior illegal should be rejected.

## II.      JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.  This action arises under the Constitution and laws of the United States.  This Court has jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 2000bb-1.

10.     Venue lies in this district pursuant to 28 U.S.C. § 1391(e).  One of the Plaintiffs, Little Sisters of the Poor Home for the Aged, Denver, Colorado, resides in this district.  Additionally, a substantial part of the events or omissions giving rise to the claim occurred in this district.  Little Sisters of the Poor Home for the Aged, Denver, Colorado maintains a significant organizational presence in this district; Little Sisters of the Poor Home for the Aged, Denver, Colorado would be harmed by the application of the Final Mandate in this district by having to provide coverage for female sterilization, contraceptives, abortifacient drugs and devices, or

related counseling and education in violation of its religious beliefs and/or having to pay penalties as a result of its activities in this district; and application of the Final Mandate would violate Little Sisters of the Poor Home for the Aged, Denver, Colorado's religious beliefs, foreclose their religious exercise, and violate their Constitutional rights in this district.

III.     **IDENTIFICATION OF PARTIES**

   A.     **Plaintiffs**

      1.     **Little Sisters of the Poor**

11.     Little Sisters of the Poor Home for the Aged, Denver, Colorado, ("Little Sisters of Denver") is a Colorado non-profit corporation that qualifies as a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986 (the "Code").   It was originally incorporated in 1916.  S*ee*   http://www.littlesistersofthepoordenver.org/our-home/history (last visited Sept. 23, 2013).

12.     Little Sisters of the Poor, Baltimore, Inc. ("Little Sisters of Baltimore") is a Maryland non-profit corporation that qualifies as a tax-exempt organization under section 501(c)(3)     of     the     Code.     It     was     founded     in     1869.     *See* http://www.littlesistersofthepoorbaltimore.org/our-home/history (last visited Sept. 23, 2013).

13.     Both homes are controlled by and associated with the Little Sisters of the Poor, an international Congregation of Catholic Sisters serving needy elderly people in the United States (the "Little Sisters").

14.     Each Little Sister has chosen to follow Jesus Christ by taking lifetime vows to offer the poorest elderly of every race and religion a home where they will be welcomed as if they were Jesus himself, cared for as family, and treated with dignity until God calls them to his home. Because care for the dying is a focal point of the Little Sisters' ministry, they commit to constantly living out a witness that proclaims the unique, inviolable dignity of every person,

particularly those whom others regard as weak or worthless. To guide that commitment, the Little Sisters have vowed obedience to the Pope, and thus obey the ethical teachings of the Catholic Church.

15.     Both of the named Little Sisters Homes have adopted the Christian Brothers Employee Benefit Trust to provide medical coverage for their employees.  The Little Sisters Homes each employ more than 50 lay employees that are covered, along with their dependents, under the Christian Brothers Employee Benefit Trust health plan.

### 2.     Class Action Plaintiffs

16.     The Little Sisters Homes bring this action on behalf of themselves and all others similarly situated.  The class consists of employers that: (i) have adopted or in the future adopt the Christian Brothers Employee Benefit Trust to provide medical coverage for their "employees" or former employees and their dependents ("employees" for purposes of this requirement has the meaning set forth in Code section 414(e)(3)(B)); (ii) are or could be reasonably construed to be "eligible organizations" within the meaning of the Final Mandate (as hereinafter defined); and (iii) are not "religious employers" with the meaning of the Final Mandate.  The class members are all Catholic organizations operated in accordance with Catholic religious teachings, including teachings on abortion, contraception, sterilization, and cooperation with sin.

### 3.     Christian Brothers Employee Benefit Trust

17.     Christian Brothers Employee Benefit Trust (the "Christian Brothers Trust") provides health and other welfare benefits for current and former employees of various Catholic organizations throughout the United States that have adopted the Christian Brothers Trust.

18.     The Christian Brothers Trust covers employees and dependents of more than 200 non-exempt Catholic employers throughout the country.  The Christian Brothers Trust currently covers more than 5,000 active employees.

19.     Participation in the Christian Brothers Trust is limited to organizations that are: (i) operated under the auspices of the Roman Catholic Church, in good standing thereof, and currently listed, or approved for listing in The Official Catholic Directory, published by P.J. Kenedy & Sons; (ii) exempt from federal income taxes under section 501(c)(3) of the Code; and (iii) organized as a non-profit corporation, if the organization is a corporation.

20.     The Official Catholic Directory includes the names and addresses of the agencies and instrumentalities and the educational, charitable, and religious institutions operated by the Roman Catholic Church in the United States, its territories, and possessions.  Each year since 1946, the Internal Revenue Service has issued a Group Ruling affirmation letter affirming the exemption under section 501(c) of the Code from federal income taxes of all Catholic institutions listed in The Official Catholic Directory for that year.

21.     The Christian Brothers Trust is a "church plan" within the meaning of section 414(e) of the Code (26 U.S.C. § 414(e)) and has received a private letter ruling from the Internal Revenue Service confirming its status as such.

22.     The Christian Brothers Trust is not subject to the Employee Retirement Income Security Act of 1974 ("ERISA") because it has not made an election under section 410(d) of the Code.

23.     The Christian Brothers Trust is a self-insured health plan.  Therefore, the Christian Brothers Trust does not contract with an insurance company to provide the health benefits provided by the Christian Brothers Trust.

24.     The plan year for the Christian Brothers Trust begins on January 1st of each year.

25.     Consistent with Catholic teachings, the Christian Brothers Trust does not provide and has never provided coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling.  However, consistent with Catholic teachings, it does provide coverage for contraceptives prescribed by a physician for noncontraceptive purposes.

26.     The Christian Brothers Trust is managed by a Board of Trustees elected by participating employers in the Christian Brothers Trust.

27.     The trustees of the Christian Brothers Trust have not appointed an administrator of the Christian Brothers Trust that is willing to act as a "third party administrator" under the Final Mandate, because the Christian Brothers Trust would thereby be contracting for, arranging for or otherwise facilitating the provision of abortifacients, sterilizations and contraceptives in violation of Catholic teachings.

### B.   Christian Brothers Services

28.     The Christian Brothers Trust is administered by Christian Brothers Services, a New Mexico non-profit corporation affiliated with The Brothers of The Christian Schools (also known as the "Christian Brothers"), a male religious order of the Catholic Church.

29.     Christian Brothers Services is a Catholic organization designed to "serve the Catholic Church community and other faith-based organizations."  Because Christian Brothers Services "understand[s] the unique dynamics of Church organizations and institutions," it serves those institutions by helping them "to remain faithful to [their] mission and the universal mission of the Catholic Church."  Christian Brothers Services' "incentive is to serve the Church, not profit."  *See* https://www.cbservices.org/about-us.html (last visited Sept. 12, 2013) .

30.     It would be a violation of Christian Brothers Services' sincerely held Catholic beliefs for it to act as a "third party administrator" under the Final Mandate because it would

have to contract for, arrange for or otherwise facilitate the provision of abortifacients, sterilizations and contraception in violation of Catholic teachings.

**C.**    **Defendants**

31.    Defendants are appointed officials of the United States government and United States governmental agencies responsible for issuing and enforcing the challenged regulations.

32.    Defendant Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services ("HHS").  In this capacity, she has responsibility for the operation and management of HHS.  Secretary Sebelius is sued in her official capacity only.

33.    Defendant United States Department of Health and Human Services is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the challenged regulations.

34.    Defendant Thomas E. Perez is the Secretary of the United States Department of Labor.   In this capacity, he has responsibility for the operation and management of the Department of Labor.  Secretary Perez is sued in his official capacity only.

35.    Defendant United States Department of Labor is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the challenged regulations.

36.    Defendant Jacob J. Lew is the Secretary of the Department of the Treasury.  In this capacity, he has responsibility for the operation and management of the Department of the Treasury.  Secretary Lew is sued in his official capacity only.

37.    Defendant United States Department of the Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the challenged regulations.

## IV.   PLAINTIFFS' RELIGIOUS BELIEFS AND PRACTICES RELATED TO CONTRACEPTION COVERAGE

38.     The class members, Christian Brothers Trust, and Christian Brothers Services are all Catholic organizations operated in accordance with Catholic religious teachings, including teachings on abortion, contraception, sterilization, and cooperation with sin.

39.     Section 2270 of the Catechism of the Catholic Church (1994) teaches that life begins at conception.  It states:

> "Human life must be respected and protected absolutely from the moment of conception.  From the first moment of his existence, a human being must be recognized as having the rights of a person—among which is the inviolable right of every innocent being to life."

40.     Thus, the Catholic Church teaches that a post-conception contraceptive is an abortifacient and "gravely contrary to moral law."  Section 2271 of the Catechism of the Catholic Church (1994) provides:

> Since the first century the Church has affirmed the moral evil of every procured abortion.  This teaching has not changed and remains unchangeable.  Direct abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law.

The Catholic Church also teaches that contraception and sterilization are intrinsic evils.  For example, Section 2370 of the Catechism of the Catholic Church (1994) characterizes as "intrinsically evil" :

> "[e]very action which, whether in anticipation of the conjugal act, or in its accomplishment, or in the development of its natural consequences, proposes, whether as an end or as a means, to render procreation impossible."

41.     Section 234 of the Compendium of the Social Doctrine of the Church (2004) provides that "[a]ll programmes of economic assistance aimed at financing campaigns of sterilization and contraception . . . are to be morally condemned as affronts to the dignity of the person and the family."

42.     Section 91 of the papal encyclical *Evangelium Vitae* (1995) teaches that "[i]t is morally unacceptable to encourage, let alone impose, the use of methods such as contraception, sterilization, and abortion in order to regulate births."

43.     As a matter of religious faith, the Plaintiffs believe that these Catholic teachings are among the religious ethical teachings they must follow.

44.     Accordingly, the class members have selected an insurance plan—Christian Brothers Trust—that does not provide access to abortion, sterilization, and contraception.  The Trust is operated in accordance with Catholic religious teachings, is open only to Catholic organizations, and is operated by Christian Brothers Services in order to help Catholic organizations "to remain faithful to [their] mission and the universal mission of the Catholic Church."

45.     These Plaintiffs believe that it would be immoral and sinful for them to intentionally facilitate the provision of contraceptives, abortifacient drugs, sterilizations, and related education and counseling, as would be required by the Final Mandate.

## V.     STATUTORY AND REGULATORY BACKGROUND

### A.     Statutory Background

46.     In March 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Pub. L. 111-148, 124 Stat. 119 (March 23, 2010), *amended by* the Health Care & Education Reconciliation Act, Pub. L. 111-152, 124 Stat. 1029 (March 30, 2010) ("Affordable Care Act" or the "Act").

47.     The Affordable Care Act established many new requirements for "group health plan[s]" within the meaning of Code section 5000(b)(1), which include any "plan . . . of, or contributed to by, an employer . . . to provide health care (directly or otherwise) to the

employees, former employees, the employer associated with or formerly associated with the employer in a business relationship, or their families."  26 U.S.C. §§ 9815 & 9832.

48.     As relevant here, the Act requires an employer's group health plan to cover certain women's "preventive care." Specifically, it indicated that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum[,] provide coverage for and shall not impose any cost sharing requirements for—(4) with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph."  Pub. L. No. 111-148 § 1001(5), 124 Stat. 131 (codified at 42 U.S.C § 300gg-13(a)(4)).

49.     As discussed below, it is through these comprehensive guidelines supported by the Health Resources and Services Administration that the Departments are attempting to force Plaintiffs to provide, contract for or otherwise facilitate coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling in violation of their religious beliefs.

50.     The statute specifies that all of these services must be provided without "any cost sharing."  *See* 42 U.S.C. § 300gg-13(a).

51.     Violations of the Affordable Care Act can subject an employer to substantial monetary penalties.

52.     For employee benefit plans like the Christian Brothers Trust that are not subject to ERISA, these requirements are implemented through section 4980D of the Code, which requires "group health plans" to comply with 42 U.S.C. § 300gg-13(a)(4) and certain other provisions of the Public Health Services Act, as amended by the Affordable Care Act.

53.     An employer offering a group health plan to its employees that fails to provide certain required coverage, including required contraceptive coverage, will be subject to an assessment of $100 per day for each affected individual beginning with the first plan year beginning on or after January 1, 2014. *See* 26 U.S.C. § 4980D(b) & (e)(1).

54.     Additionally, certain employers that fail to offer "full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" will be exposed to significant annual excise tax penalties of $2,000 per full-time employee. *See id.* at § 4980H(a), (c)(1). The implementation of this requirement, which was required to take effect on January 1, 2014, has been delayed until 2015 by the Defendants.

**B.     Regulatory Background**

**1.     The Initial Interim Final Rules and the IOM Guidelines**

55.     On July 19, 2010, the Departments published interim final rules (the "Interim Final Rules") "implementing the rules for group health plans and health insurance coverage . . . under provisions of the . . . Affordable Care Act regarding preventive health services." 75 Fed. Reg. 41726 (July 19, 2010). Among other things, the Interim Final Rules required group health plans and health insurers to cover preventive care for women as provided for in "guidelines supported by the Health Resources and Services Administration." 75 Fed. Reg. at 41756-59 (codified at 26 C.F.R. §54.9815-2713T(a)(1)(iv); 29 C.F.R. §2590.715-2713(a)(1)(iv) and 45 C.F.R. §147.130(a)(1)(iv)).

56.     The Interim Final Rules were enacted without prior notice of rulemaking or opportunity for public comment. Even though federal law had never required coverage of abortion-inducing drugs, sterilization, or contraceptives, Defendants determined for themselves that "it would be impracticable and contrary to the public interest to delay putting the provisions

. . . in place until a full public notice and comment process was completed."  75 Fed. Reg. at 41730.

57.     Defendants stated they would later "provide the public with an opportunity for comment, but without delaying the effective date of the regulations," demonstrating their intent to impose the regulations regardless of the legal flaws or general opposition that might be manifest in public comments.  *Id.*

58.     In addition to reiterating the Affordable Care Act's preventive services coverage requirements, the Interim Final Rules provided further guidance concerning the Act's restriction on cost sharing.

59.     The Interim Final Rules made clear that "cost sharing" refers to "out-of-pocket" expenses for plan participants and beneficiaries.  *Id.* at 41731.

60.     The Interim Final Rules acknowledged that, without cost sharing, expenses "previously paid out-of-pocket" would "now be covered by group health plans and issuers" and that those expenses would, in turn, result in "higher average premiums for all enrollees."  *Id.*; *see also id.* at 41737 ("Such a transfer of costs could be expected to lead to an increase in premiums").

61.     In other words, HHS admitted that the prohibition on cost-sharing was simply a way "to distribute the cost of preventive services more equitably across the broad insured population."  *Id.* at 41730.

62.     After the Interim Final Rules were issued, numerous commenters warned against the potential conscience implications of requiring religious individuals and organizations to include certain kinds of services—specifically contraception, sterilization, and abortion services—in their health care plans.

63.     HHS directed a private health policy organization, the Institute of Medicine ("IOM"), to make recommendations regarding which drugs, procedures, and services should be considered in the development of comprehensive guidelines for preventive services for women. *See* http://www.hrsa.gov/womensguidelines (last visited Sept. 23, 2013) (attached as Exhibit A).

64.     IOM was not tasked with making insurance coverage recommendations and explicitly excluded cost considerations and other considerations relevant to coverage recommendations from its determinations regarding effective preventive care for women.

65.     In developing its guidelines, IOM invited a select number of groups to make presentations on preventive care.  These were the Guttmacher Institute, the American Congress of Obstetricians and Gynecologists, John Santelli, the National Women's Law Center, National Women's Health Network, Planned Parenthood Federation of America, and Sara Rosenbaum.

66.     No religious groups or other groups that opposed government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters.

67.     On July 19, 2011, the IOM published its preventive care guidelines for women, including a recommendation that preventive services include "the full range of Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for women with reproductive capacity."  Institute of Medicine, *Clinical Preventive Services for Women: Closing the Gaps*, 102-10 and Recommendation 5.5 (2011), *available at* http://www.nap.edu/catalog.php?record_id=13181 (last visited Sept. 23, 2013).

68.     On August 1, 2011, thirteen days after the IOM issued its recommendations, the Health Resources and Services Administration ("HRSA") issued guidelines tracking the language of the IOM report, defining preventive services exactly as the IOM report did.  *See* 77 Fed. Reg. 8725, 8725 (Feb. 15, 2012); *see also* Exhibit A,

http://www.hrsa.gov/womensguidelines.   HRSA did not explain how, if at all, its guidelines accounted for various factors relevant to insurance coverage decisions that IOM had declined to consider (including "cost effectiveness"; "established practice; patient and clinician preferences; availability; ethical, legal, and social issues; and availability of alternatives").

69.     Food and Drug Administration ("FDA") approved contraceptive methods include: birth-control pills; prescription contraceptive devices such as IUDs; Plan B (also known as the "morning-after pill"); ulipristal (also known as "ella" or the "week-after pill"); and other drugs, devices,                           and                           procedures.        *See* http://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm (last visited Sept. 23, 2013) (attached as Exhibit B).

70.     Some of these drugs and devices—including "emergency contraceptives" such as Plan B, ella, and certain IUDs—are known abortifacients, in that they can cause the death of an embryo by preventing it from implanting in the wall of the uterus.

71.     Indeed, the FDA's own Birth Control Guide states that both Plan B and ella can work by "preventing attachment (implantation) to the womb (uterus)."   Ex. B at 10-11, http://www.fda.gov/ForConsumers/ByAudience/ForWomen/FreePublications/ucm313215.htm.

72.     Neither the HRSA guidelines nor the Interim Final Rule mentioned or purported to apply the Religious Freedom Restoration Act.

### 2.     The Amended Interim Final Rules and the "Religious Employers" Exemption

73.     On August 1, 2011, the Departments promulgated an amendment to the Interim Final Rules.  *See* 76 Fed. Reg. 46621 (Aug. 3, 2011).

74.     As amended, the Interim Final Rules granted the Health Resources and Services Administration "*discretion* to exempt certain religious employers from the [IOM] Guidelines where contraceptive services are concerned." *Id.* at 46623 (emphasis added).

75.     The "religious employers" exemption was severely limited to formal churches, their integrated auxiliaries, and religious orders whose purpose is to inculcate faith and that hire and serve primarily people of their own faith tradition.   45 C.F.R.§ 147.130(a)(1)(iv)(B) at 76 Fed. Reg. 46626.

76.     The vast majority of religious organizations with conscientious objections to providing contraceptive or abortifacient services were excluded from the "religious employers" exemption.

77.     The Health Resources and Services Administration exercised its discretion under the amended Interim Final Rules to grant an exemption for defined "religious employers" via a footnote on its website listing the Women's Preventive Services Guidelines.  The footnote states that "guidelines concerning contraceptive methods and counseling described above do not apply to women who are participants or beneficiaries in group health plans sponsored by religious employers." *See* Ex. A at n.**, http://www.hrsa.gov/womensguidelines.

78.     Like the original Interim Final Rules, the amended Interim Final Rules were made effective immediately, without prior notice or opportunity for public comment.  76 Fed. Reg. at 46624.

### 3.     The Safe Harbor

79.     The public outcry for a broader religious employers exemption continued for many months and, on January 20, 2012, HHS issued a press release acknowledging "the important concerns some have raised about religious liberty" and stating that religious objectors would be "provided an additional year . . . to comply with the new law."  *See* Press Release, U.S.

Department of Health and Human Services, Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius (Jan. 20, 2012), http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last visited Sept. 23, 2013) (attached as Exhibit C).

80.     Defendants then created a "temporary enforcement safe harbor," which is a self-imposed stay of enforcement of the contraceptive services mandate for certain qualified organizations. This "safe harbor" would remain in effect for a qualified organization until its first plan year that began on or after August 1, 2013. *See* HHS Guidance on Temporary Enforcement Safe Harbor (Feb. 10, 2012); 77 Fed. Reg. 16501, 16504 (Mar. 21, 2012).

81.     The "temporary enforcement safe harbor" applied to "group health plans sponsored by nonprofit organizations that, on and after February 10, 2012, do not provide some or all of the contraceptive coverage otherwise required . . . because of the religious beliefs of the organization." *See* 77 Fed. Reg. at 16502-03.

82.     The Departments also indicated they would develop and propose changes to the regulations to accommodate the objections of non-exempt, nonprofit religious organizations following August 1, 2013. *Id.* at 16503.

### 4.     The Advance Notice of Proposed Rulemaking

83.     On March 21, 2012, the Departments issued an Advance Notice of Proposed Rulemaking ("ANPRM"), presenting "questions and ideas to help shape" a discussion of how to "maintain the provision of contraceptive coverage without cost sharing," while accommodating the religious beliefs of non-exempt religious organizations. *Id.* at 16503.

84.     The ANPRM recognized that forcing religious organizations to "contract, *arrange*, or pay for" the objectionable contraceptive and abortifacient servicers would infringe their "religious liberty interests." *Id.* (emphasis added).

### 5.     The Notice of Proposed Rulemaking

85.     On February 1, 2013, the Departments issued a Notice of Proposed Rulemaking ("NPRM") purportedly addressing the comments submitted in response to the ANPRM.  *See* 78 Fed. Reg. 8456 (Feb. 6, 2013).

86.     The NPRM proposed two changes to the then-existing Final Interim Rules.  *Id.* at 8458-59.

87.     First, it proposed revising the religious employers exemption to define a "religious employer" as one "that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code."  *Id.* at 8474.

88.     The Departments emphasized, however, that this proposal "would not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the [Interim Final Rules]."  *Id.* at 8461.

89.     In other words, religious organizations like the Class Action Plaintiffs that are not formal churches, their integrated auxiliaries, or religious orders would continue to be excluded from the exemption.

90.     Second, the NPRM reiterated the Departments' intention to "accommodate" non-exempt, nonprofit religious organizations by making them "designate" their insurers and third party administrators to provide plan participants and beneficiaries with free coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling.  *Id.* at 8474-75.

91.     The NPRM made no reference to the requirements of RFRA.

92.     The proposed "accommodation" did not resolve the concerns of religious organizations like the Class Action Plaintiffs because it continued to force them to deliberately

provide coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling.

93.     During the two months allowed for comments, "over 400,000 comments" were submitted in response to the NPRM, 78 Fed. Reg. at 39871, with religious organizations again overwhelmingly decrying the proposed "accommodation" as a gross violation of their religious liberty because it would conscript their health care plans as the main cog in the government's scheme for expanding access to contraceptive and abortifacient services.

94.     On April 8, 2013, the Church Alliance, of which Christian Brothers Services is a member, submitted a 20-page comment letter on the NPRM, detailing how the expanded definition of "religious employer" excluded bona fide religious organizations, and how the proposed accommodation for "eligible organizations" was unworkable, particularly for self-insured church plans like the Christian Brothers Employee Benefit Trust.  The Church Alliance is an organization composed of the chief executives of thirty-eight church benefit boards, covering mainline and evangelical Protestant denominations, two branches of Judaism, and Catholic schools and institutions.  A copy of the Church Alliance's comment letter is available at http://church-alliance.org/initiatives/comment-letters (last visited September 23, 2013).

95.     The Little Sisters also submitted comments on the NPRM on April 8, 2013, stating essentially the same objections stated in this complaint.  The Little Sisters asserted that "[t]he federal government should not force us to counteract through the health benefits for our employees the very same Gospel of Life that we attempt to live out in communion and solidarity with the needy elderly.  But under the proposed exemption and proposed accommodation, there is no way that we can comply with the Final Mandate without taking affirmative steps to change our health coverage arrangements to ensure coverage of female sterilization and all FDA-

approved contraceptives, including abortifacient drugs and devices." *See* Comments of the Little Sisters of the Poor (attached as Exhibit D).

96.     On April 8, 2013, the same day the notice-and-comment period ended and the day the Church Alliance and the Little Sisters submitted their comments, Defendant Secretary Sebelius answered questions about the contraceptive and abortifacient services requirement in a presentation at Harvard University.

97.     In her remarks, Secretary Sebelius stated:

> We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception.  Churches and church dioceses as employers are exempted from this benefit.  But Catholic hospitals, Catholic universities, other religious entities *will be providing coverage* to their employees starting August 1st . . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese *will be included* in the benefit package.

*See* Kathleen Sebelius, Remarks at The Forum at Harvard School of Public Health (Apr. 8, 2013),   *available   at*   http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius (starting at 51:20) (last visited Sept. 23, 2013) (emphasis added).

98.     It is clear from the timing of these remarks that Defendants gave no consideration to the comments submitted by Plaintiffs or others in response to the NPRM's proposed "accommodation."

### 6.     The Final Mandate

99.     On June 28, 2013, Defendants issued final rules that ignore the objections repeatedly raised by religious organizations and continues to require objecting religious employers to participate in the government's scheme of expanding free access to contraceptive and abortifacient services.  *See* 78 Fed. Reg. 39870.  The Final Rules assert, without explanation or analysis, that the mandate and the narrow exemption comply with the requirements of RFRA.

For convenience, we will refer to these rules, together with the comprehensive guidelines regarding preventive services for women supported by the Health Resources and Services Administration as the "Final Mandate."

100.     Under the Final Mandate, the discretionary "religious employers" exemption, which is still implemented via footnote on the Health Resources and Services Administration website, *see* Ex. A, http://www.hrsa.gov/womensguidelines, is limited to formal churches and religious orders "organized and operate[d]" as nonprofit entities and "referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." 78 Fed. Reg. at 39896 (codified at 45 C.F.R.§ 147.131(a)).

101.     All other religious organizations, including the Class Action Plaintiffs, are excluded from the exemption.

102.     Although religious organizations like the Class Action Plaintiffs share the same religious beliefs and concerns as Catholic churches, their integrated auxiliaries, and Catholic religious orders that are exempt as "religious employers," the Departments deliberately ignored the regulation's impact on their religious liberty, stating that the "simplified and clarified definition of religious employer continues to respect the religious interests of houses of worship and their integrated auxiliaries in a way that does not undermine the governmental interests furthered by the contraceptive coverage requirement." 78 Fed. Reg. at 39874.

103.     The Final Mandate creates a separate "accommodation" for certain non-exempt religious organizations defined as "eligible organizations". 78 Fed. Reg. at 39874 (codified at 45 C.F.R. § 147.131(b)&(c)).

104.     An organization is an "eligible organization" and therefore eligible for the "accommodation" if it (1) "[o]pposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a

religious organization"; and (4) "self-certifies that it satisfies the first three criteria." 78 Fed. Reg. at 39874 (codified at 45 C.F.R.§ 147.131(b)).

105.    The purpose or, at the very least, the impact of the Final Mandate, including the restrictively narrow scope of the religious employers exemption, is to discriminate against religious organizations that oppose contraception and abortion and to violate the Plaintiffs' rights to the free exercise of religion, the freedom of speech, expressive association under the First Amendment, the Establishment Clause of the First Amendment, equal protection of the law guaranteed by the Fifth Amendment, and rights under RFRA and the APA.  The Final Mandate is also generally invalid because its adoption violated the APA.

106.    The Final Mandate applies to group health plans and health insurance issuers for plan years beginning on or after January 1, 2014, except that the amendments to the religious employers exemption apply to plan years beginning on or after August 1, 2012.  *See* 78 Fed. Reg. at 39870.  Defendants also extended the "temporary enforcement safe harbor" to encompass plan years beginning on or after August 1, 2013, and before January 1, 2014.  *Id*. at 39872.

107.    An eligible organization seeking an "accommodation" must execute a self-certification "prior to the beginning of the first plan year to which an accommodation is to apply", and deliver it to the organization's insurer or, if the organization has a self-insured plan, to the plan's third party administrator.  *Id.* at 39875.

108.    Thus, an eligible organization would need to execute the self-certification prior to its first plan year that begins on or after January 1, 2014.  *Id.*

## VI.    APPLICATION OF THE FINAL MANDATE TO THE PLAINTIFFS

### A.    Class Action Plaintiffs

109.    By definition, none of the Class Action Plaintiffs are "religious employers" eligible for exemption under the Final Mandate.  Therefore, the Final Mandate forces the Class

Action Plaintiffs to choose between incurring severe financial hardship or violating their religious beliefs in one of the four following courses of action.

### 1. Incur Financial Hardship or Violate Religious Beliefs By Continuing Participation in the Christian Brothers Trust

110.    First, a Class Action Plaintiff could continue its participation in the Christian Brothers Trust.  Doing so, however, would force the Class Action Plaintiffs to choose between two unacceptable actions.   The Class Action Plaintiffs could act consistently with the requirements of their religion and refuse to designate Christian Brothers Services or Christian Brothers Trust to provide the required contraceptive coverage.  For such refusal, however, each Class Action Plaintiff, regardless of its size, will be discriminated against for exercising its religious beliefs by being subject to a penalty beginning on January 1, 2014, under section 4980D of the Code, of $100 per day with respect to each individual to whom the failure to provide contraceptive services relates.  *See* 26 U.S.C. §§ 4980D & 9815 (the latter section implements the preventive services requirements set forth in 42 U.S.C. § 300gg-13(a)(4)).  The alternative course – to designate Christian Brothers Services or Christian Brothers Trust to provide the required contraceptive coverage – would require the Class Action Plaintiffs to violate the requirements of their religion both by facilitating the coverage at issue, and by pressuring Christian Brothers Services and Christian Brothers Trust to provide that coverage in violation of their shared Catholic faith.

### 2. Violate Religious Beliefs and Incur Financial and Competitive Hardship By Discontinuing All Coverage

111.    Second, a Class Action Plaintiff could discontinue participation in the Christian Brothers Trust and not seek replacement coverage.  However, this choice would require the Class Action Plaintiffs to compromise their beliefs and place themselves at a disadvantage because of the Final Mandate.  The Class Action Plaintiffs' Catholic faith compels them to promote the

spiritual and physical well-being of their employees by providing them with health benefits within the construct of Catholic beliefs; however, the Act and Final Mandate would require them to act against those beliefs.

112.    Similarly, by being forced to discontinue all coverage, the Class Action Plaintiffs would be placed at a severe competitive disadvantage in their efforts to hire and retain employees.

113.    Additionally, discontinuing coverage would impose on a Class Action Plaintiff with an average of 50 or more full-time employees an excise tax penalty of $2,000 annually beginning in 2015 for each full-time employee if at least one full-time employee enrolls for and receives subsidized coverage on a Health Insurance Marketplace formed in response to the Act (commonly referred to as an "exchange").

**3.    Violate Their Religious Beliefs by Replacing Coverage Under the Christian Brothers Trust With Group Insurance**

114.    Third, to avoid any penalties, a Class Action Plaintiff could discontinue participation in the Christian Brothers Trust and seek other coverage for its employees through group insurance that provides coverage for contraception, sterilization, abortifacients, and related education and counseling under the Act and Final Mandate.  However, this would not be an acceptable alternative for a Class Action Plaintiff because it would require it to contract for, facilitate or pay for the provision of contraception, sterilization, abortifacients, and related education and counseling in violation of Catholic teaching.

**a.    Contracting For**

115.    The Class Action Plaintiffs' religious convictions equally forbid them from contracting with an insurance company that will provide free coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling.

116.   Even if group insurance were an acceptable alternative, it is not a practical alternative.   A change in coverage effective January 1, 2014, would require a Class Action Plaintiff to: (i) budget for the new coverage; (ii) select an insurer; (iii) negotiate a group contract with the insurer; and (iv) communicate the changes to their employees.   There is insufficient time in which to do so.

117.   The Affordable Care Act requires that participants in a group health plan be given a Summary of Benefits and Coverage that "accurately describes the benefits and coverage" of the plan.   Pub. L. No. 111-148 § 1001(5), 124 Stat. 131 (codified at 42 U.S.C § 300gg-9).

118.   Additionally, plan participants must be given a written notice of any material change in the Summary of Benefits and Coverage at least 60 days' in advance notice of any such change.   *See* 77 Fed. Reg. 8668, 8698-8705 (Feb. 14, 2012) (codified at 26 C.F.R. § 54.9815-2715(b), 29 C.F.R. § 2590.715-2715(b) and 45 C.F.R. § 147.200(b)).

119.   Any change to a fully insured plan would likely constitute a material change in the information previously provided to covered employees of a Class Action Plaintiff in the Summary of Benefits and Coverage, which would require 60 days' advance notice to the participants.   77 Fed. Reg. at 8698-8705.   However, because of the lateness of the Final Mandate, there is inadequate time in which to change coverage within the law.

### b.   <u>Facilitating</u>

120.   By having to take active steps to identify an insurance company that provides contraceptive and abortifacient services, to contract with that insurer, and to supply and adopt plan documentation and information that triggers coverage for those services (including the self-certification form), the Class Action Plaintiffs would be required to actively facilitate and promote the distribution of these services in ways that are forbidden by their religion.

c.    **Paying For**

121.    Defendants state that they "continue to believe, and have evidence to support," that providing payments for contraceptive and abortifacient services will be "cost neutral for issuers," because "[s]everal studies have estimated that the costs of providing contraceptive coverage are balanced by cost savings from lower pregnancy-related costs and from improvements in women's health."  78 Fed. Reg. at 39877.

122.    On information and belief, the studies Defendants rely upon to support this claim are severely flawed.

123.    Nevertheless, even if the payments were—over time—to become cost neutral, it is undisputed that there will be up-front costs for making the payments.  *See*, *e.g.*, *id.* at 39877-78 (addressing ways insurers can cover up-front costs).

124.    Moreover, if cost savings arise that make insuring an employer's employees cheaper, the savings would have to be passed on to employers through reduced premiums, not retained by insurance issuers.

125.    The Departments suggest that to maintain cost neutrality issuers may simply ignore this fact and "set the premium for an eligible organization's large group policy as if no payments for contraceptive services had been provided to plan participants." *Id.* at 39877.

126.    This encourages issuers to artificially inflate the eligible organization's premiums.

127.    Under this methodology—even assuming its legality—the eligible organization would still bear the cost of the required payments for contraceptive and abortifacient services in violation of its conscience, as if the accommodation had never been made.

**4.      Violate Religious Beliefs by Adopting a Self-Insured Plan With a Third Party Administrator Willing to Provide or Arrange for Contraception Benefits**

128.    Fourth, a Class Action Plaintiff could discontinue participation in the Christian Brothers Trust and adopt a self-insured employee benefit plan for its employees and appoint a "third party administrator" under the Final Mandate to provide or arrange for the provision of abortifacients, sterilizations and contraceptives, and related education and counseling.

129.    As with the third option, this, too, would not be an acceptable alternative to the Class Action Plaintiffs because it would involve them in contracting for, facilitating or paying for the provision of abortifacients, sterilizations and contraceptives, and related education and counseling.

### a.      Contracting For

130.    By delivering its self-certification to the third party administrator of the Christian Brothers Trust, a Class Action Plaintiff would trigger the third party administrator's obligation to "provide or arrange separate payments for contraceptive services directly for plan participants and beneficiaries." *Id.* at 39880.

131.    The self-certification must specifically notify the third party administrator of its "obligations set forth in the[] final regulations, and will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." *Id.* at 39879.

132.    Because the designation makes the third party administrator a plan administrator with fiduciary duties under a Class Action Plaintiff's plan, the payments for contraceptive and abortifacient services would be payments made under the new plan.

133.    The third party administrator would be also be required to provide the contraceptive benefits "in a manner consistent" with the provision of other covered services. *Id.*

at 39876-77.  Thus, any payment or coverage disputes presumably would be resolved under the terms of the Class Action Plaintiff's plan documents.

134.    As previously discussed, even if this alternative were an acceptable option, this would not be a practical alternative for a Class Action Plaintiff effective January 1, 2014.  Class Action Plaintiffs would be required to: (i) budget for the new coverage; (ii) select a third party administrator willing to provide for or arrange contraceptive coverage; (iii) negotiate an administrative services agreement with the third party administrator; and (iv) communicate the plan changes to their employees.

135.    For budgeting purposes, new self-insured coverage may not be practical for a Class Action Plaintiff because it would impose a potential uncapped liability on the Class Action Plaintiff in light of the Act's prohibition on annual and lifetime limits.  Pub. L. No. 111-148 § 1001(5), 124 Stat. 131 (codified at 42 U.S.C. § 300gg-11).

136.    A Class Action Plaintiff may have difficulty in finding a third party administrator willing to provide or arrange for contraception and other objectionable benefits.  Defendants acknowledge "there is no obligation for a third party administrator to enter into or remain in a contract with the eligible organization if it objects to any of these responsibilities."  78 Fed. Reg. at 39880.

137.    Additionally, there is inadequate time to provide any changes in plan documentation, including any Summary of Benefits and Coverage and notices of any material change in the Summary of Benefits and Coverage.  *See* 77 Fed. Reg. at 8698-8705 (codified at 26 C.F.R. § 54.9815-2715(b), 29 C.F.R. § 2590.715-2715(b) and 45 C.F.R. § 147.200(b)).

### b.    Facilitating

138.    Under this option, the Class Action Plaintiffs would be required to actively facilitate and promote the distribution of these services in ways that are forbidden by their

religion.  Initially, a Class Action Plaintiff would have to identify its employees to the third party administrator for the distinct purpose of enabling the government's scheme.  Thereafter, a Class Action Plaintiff would have to coordinate with the third party administrator regarding when it was adding or removing employees and beneficiaries from its healthcare plan and, as a result, from the contraceptive and abortifacient services payment scheme.  A Class Action Plaintiff would also have to coordinate with third party administrators to provide notice to plan participants and beneficiaries of the contraceptive payment benefit "contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment" in a group health plan, under the auspices of the Class Action Plaintiff's own self-funded plan.  78 Fed. Reg. at 39876.

### c.   Paying For

139.   The Final Rule sets forth complex means through which a third party administrator may seek to recover its costs incurred in making payments for contraceptive and abortifacient services.

140.   The third party administrator must identify an issuer who participates in the federal exchanges established under the Affordable Care Act and who would be willing to make payments on behalf of the third party administrator.

141.   Cooperating issuers would then be authorized to obtain refunds from the user fees they have paid to participate in the federal exchange as a means of being reimbursed for making payments for contraceptive and abortifacient services on behalf of the third party administrator.

142.   Issuers would be required to pay a portion of the refund back to the third party administrator to compensate it for any administrative expenses it has incurred.

143.   These extreme machinations, ostensibly employed only to shift the *cost* of the Final Mandate, are severely flawed.

144.    There is no way to ensure that the cost of administering the coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling would not be passed on to the Class Action Plaintiffs through the third party administrator's fees.

145.    Moreover, taking the user fees intended for funding the federal exchanges and using them to provide contraceptive and abortifacient services to employees not participating in the federal exchanges would violate the statute authorizing the user fees.  *See* 78 Fed. Reg. 15410, 15412 (Mar. 11, 2013); 31 U.S.C. § 9701.

146.    For all these reasons, the accommodation does nothing to relieve non-exempt religious organizations like the Class Action Plaintiffs with self-insured plans from facilitating free access to contraception, sterilization, abortifacients, and related education and counseling.

### B.    Christian Brothers Employee Benefit Trust

147.    The Christian Brothers Trust does not meet the definition of a "grandfathered" plan under the Affordable Care Act for multiple reasons, including, but not limited to, the following: (1) the Christian Brothers Trust does not include the required "disclosure of grandfather status" statement; (2) neither the Christian Brothers Trust nor the participating employers in the Christian Brothers Trust take the position that the Christian Brothers Trust is a grandfathered plan and thus they do not maintain the records necessary to verify, explain, or clarify its status as a grandfathered plan; and (3) in certain cases the Christian Brothers Trust has increased the percentage cost-sharing requirement measured from March 23, 2010, in excess of certain permitted limits.  *See* 26 C.F.R. § 54.9815-1251T.

148.    It is not clear whether Christian Brothers Services, the administrator for the Christian Brothers Trust, is a "third party administrator" under the Final Mandate.  If it is, by the terms of the "accommodation," the Class Action Plaintiffs participating in the Christian Brothers Trust seeking to comply with the requirements for an "accommodation" under the Final Mandate

will be required to execute the self-certification and deliver it to Christian Brothers Services before January 1, 2014.

149.    The Final Mandate forces the Christian Brothers Trust to choose between violating the shared religious beliefs of its participating employers or suffering financial consequences.  The Christian Brothers Trust has only four courses of action with respect to the coverage for employees of the Class Action Plaintiffs after December 31, 2013.

### 1.    Continue Refusal to Provide Coverage for Contraceptives

150.    First, the Christian Brothers Trust could continue to refuse to do anything that would provide coverage under the Christian Brothers Trust for contraceptives and related services.  However, as discussed earlier, this would expose Class Action Plaintiffs that remain in the Christian Brothers Trust to the financially ruinous penalties under Code section 4980D of $100 per day for each affected individual.  Alternatively, Class Action Plaintiffs may be financially forced to cancel their health care coverage for their employees, and this would have a substantial adverse financial impact on the Christian Brothers Trust and the remaining employers because there would be fewer participating employers to share the fixed costs of administration.

151.    Pursuing this course would force the Trust to dramatically scale back its religious ministry of providing health insurance benefits to Catholic organizations.

### 2.    Provide Coverage for Contraceptive Coverage Through an Accommodation

152.    Second, at least in theory the Christian Brothers Trust could provide, either directly or through an "accommodation," coverage for contraceptives, sterilization, abortifacients, and related education and counseling services.  However, doing so would violate the religious beliefs it shares with its participating employers, including the Class Action Plaintiffs.  Furthermore, Class Action Plaintiffs may be forced to cancel their health care

coverage for their employees for religious reasons to avoid the provision of objectionable coverage, and this would have a substantial adverse financial impact on the Christian Brothers Trust and the remaining employers because there would be fewer participating employers to share the fixed costs of administration.

### 3.   Drop Coverage for Class Action Plaintiffs

153.   Third, effective January 1, 2014, the Christian Brothers Trust could limit its coverage to only "religious employers" that are exempt from the Final Mandate.  This would cause a severe disruption to the Class Action Plaintiffs who would be dropped from the Christian Brothers Trust, since unless they wanted to drop employee health coverage altogether, they would be forced at this late date to seek other coverage beginning January 1, 2014.  Doing so would also require the Trust to case its ongoing religious exercise of providing health benefits to Catholic non-profits in accordance with Catholic teachings.  Finally, limiting coverage would also force the Christian Brothers Trust to give up an important part of its ministry, and impose substantial financial burdens on both the Trust and the remaining "religious employers" because there would be fewer participating employers to share the fixed costs of administration.

### 4.   Attempt to Avail Itself of the Safe Harbor from Enforcement for Self-Insured Plans Without Third Party Administrators

154.   Fourth, the Christian Brothers Trust could consider itself a self-administered plan without a third party administrator.

155.   The Supplementary Information section of the Final Mandate, but not the final regulations adopted in the Final Mandate, suggests that a self-insured plan without a third party administrator may apply for a "safe harbor from enforcement of the contraceptive coverage requirement" contingent upon several conditions.  78 Fed. Reg. at 39880.

156.    However, the Defendants apparently do not consider the Christian Brothers Trust a self-insured plan without a third party administrator.

157.    In the Final Mandate the Defendants indicated they "continue to believe that no self-insured plans" without third party administrators exist. *Id.* This statement was issued despite the fact that, prior to the issuance of the Final Mandate, the Defendants were aware of employee benefit plans like the Christian Brothers Trust that were administered by religious organizations that were separate from—but nevertheless affiliated with—employers participating in the plan.

158.    In the comment submitted by the Church Alliance on April 8, 2013, on the NPRM, the Church Alliance noted:

> The Departments noted in the Supplementary Information to the NPRM that "[n]o comments were submitted in response to the ANPRM on the extent to which there are plans without a third party administrator." 78 Fed. Reg. at 8464. The absence of comments does not mean there are no such plans, especially since there was no guidance issued defining what constitutes a third party administrator. The Church Alliance did comment that the third party administrator approach for self-insured plans would not accommodate the religious objections of self-insured church plans using an affiliated religious organization as an administrator. If a religious organization cannot provide contraception coverage without violating its religious tenets and beliefs, neither can an affiliated religious organization.

A copy of the Church Alliance's comment letter is available at http://church-alliance.org/initiatives/comment-letters (last visited September 23, 2013).

159.    In any event, any attempt by the Christian Brothers Trust to avail itself of the safe harbor from enforcement suggested for self-insured plans without third party administrators would be futile as the safe harbor would only be available "while an additional accommodation is considered." 78 Fed. Reg. at 39881.

C.    **Christian Brothers Services**

160.    The Final Mandate also forces Christian Brother Services to choose between violating the shared religious beliefs of the Class Action Plaintiffs or suffering financial consequences and, in turn, suffering its own financial consequences.  Christian Brother Services has only two courses of action.

1.    **Provide or Arrange for Contraceptive Benefits**

161.    First, Christian Brother Services can treat itself as a "third party administrator" under the Final Mandate and provide for or arrange for payments for contraceptives services provided to employees of Class Action Plaintiffs and their beneficiaries "on its own, or it can arrange for an issuer or other entity to provide such payments."  78 Fed. Reg. at 39880.

162.    However, doing so would violate Christian Brother Services' religious beliefs because it would cause Christian Brother Services directly to "contract, arrange, pay or refer for contraception coverage" for contraceptive services through the contract between the Christian Brothers Trust and Christian Brother Services, and require the Class Action Plaintiffs to facilitate that coverage.[1]  *Id.* at 39874.

_____

[1]    As an initial matter, it is not clear whether Christian Brother Services is a "third party administrator" under the Final Mandate.  The Final Mandate does not define "third party administrator."  Even if Christian Brother Services is a third party administrator under the Final Mandate, there is no way to obligate Christian Brother Services to provide or arrange for such coverage other than through its contract with the Christian Brothers Trust.  The Final Mandate apparently assumes that the obligation to provide contraceptive and other services can be imposed on third party administrators without any formal acceptance on the part of the third party administrator.

In the case of a third party administrator to an ERISA-covered plan, the Final Mandate apparently assumes this obligation is imposed on the third party administrator by virtue of ERISA, because the third party administrator is already required to comply with the provisions of ERISA applicable to group health plans subject to ERISA, including section 715 of ERISA, which was added by the Affordable Care Act to impose the contraceptive coverage requirement on ERISA-covered plans.  78 Fed. Reg. at 39876-77 n. 28 and 39881 n. 42.  However, this

163.    Additionally, there would be a substantial adverse financial impact on the Christian Brothers Services as to the loss of the fee paying members who left because the provision of contraceptive and abortifacient coverage was contrary to their religious beliefs and the additional costs of providing such coverage.

2.    **Resign**

164.    Second, Christian Brothers Services can resign as administrator of the Christian Brothers Trust prior to January 1, 2014.  This would require Christian Brothers Services to cease its long-time exercise of administering health benefits for Catholic institutions in accordance with Catholic teachings.  Doing so would adversely and substantially affect Christian Brothers Services financially and disrupt the administration of the Christian Brothers Trust, thus penalizing the Class Action Plaintiffs and the other participating employers in the Christian Brothers Trust.  This course would also dramatically reduce the scope of Christian Brothers Services' religious ministry to provide health benefits to Catholic organizations.

## VII.    RELIGIOUS FREEDOM RESTORATION ACT

165.    Under RFRA the Federal Government is prohibited from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability," unless it "demonstrates that application of the burden to the person is (1) in furtherance of a compelling governmental interest; and (2) the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1.

---

assumption is inapplicable in the case of a plan like the Christian Brothers Trust that is not subject to ERISA.  Accordingly, there can be no other basis for Christian Brothers Services' obligation to provide for or arrange for payments for contraceptives services other than through its contract with Christian Brothers Trust.

A.     **The Mandate Substantially Burdens Plaintiffs' Exercise of Religion**

166.    Forcing Plaintiffs' to provide, contract for, pay for or otherwise facilitate access to contraception, sterilization, abortifacients, and related education and counseling or suffer substantial adverse economic effects is a substantial burden on their exercise of religion.

167.    For example, the Little Sisters Homes are dedicated to caring for the weak and the dying of all races and religions, and to doing so in accordance with Catholic religious principles.

168.    Accordingly, they strive to respect the uniqueness and dignity of each elderly person as they reach the end of their life.  They offer this respect both to honor the individual as loved by God and to convey a public witness of respect for life, in the hope that they can help build an international Culture of Life. *See* Little Sisters of the Poor, *Mission, Vision, and Values* (describing the Little Sisters' "VISION" as building a "Culture of Life by nurturing communities where each person is valued, the solidarity of the human family and the wisdom of age are celebrated, and the compassionate love of Christ is shared with all," and its "VALUES" as including "REVERENCE for the sacredness of human life and for the uniqueness of each person, especially those who are the poorest and/or weakest") (attached as Exhibit E).

169.    The Little Sisters have taken a vow of obedience to the Pope. They develop all of their programs, policies, and procedures to follow the ethical teachings of the Roman Catholic Church, with special emphasis on the sacredness of human life.

170.    The Little Sisters Homes are therefore religiously bound to follow the religious teachings on abortion, sterilization, and contraception set forth in paragraphs 38-45 above.

171.    For these reasons, the Little Sisters Homes are forbidden by their Catholic faith from participating in the government's system for providing coverage for contraceptives, sterilization, abortion-inducing drugs, and related counseling and education, for its lay, and other employees, both lay and clergy.  The Little Sisters Homes cannot pay for such benefits.  They

cannot provide paperwork that will trigger such benefits. They cannot designate another party to provide such benefits. They cannot make certifications that would create a duty for Christian Brothers Services to provide such benefits. Simply put, as a matter of religious faith, the Little Sisters Homes may not participate in any way in the government's program to provide access to these services.

172.     Nor can the Little Sisters Homes violate their commitment to Christian witness by being seen to participate in the government's program. Doing so would not only directly violate their obligations and vows, but also would risk leading others astray.

173.     Nor can the Little Sisters Homes violate Catholic teachings without jeopardizing their ministry to the poor, because nearly half of their operating revenue is provided by voluntary donations.

174.     The other class members—all of whom are official Catholic organizations, and all of whom have chosen to provide health benefits through the Trust, which is expressly designed to provide benefits in accordance with Catholic principles—likewise may not participate in the government's program without violating their religion. They are all religiously bound to follow the religious teachings on abortion, sterilization, and contraception set forth in paragraphs 38-45 above.

175.     Christian Brothers Trust itself is likewise operated in accordance with these Catholic teachings, and cannot participate in the government's program to provide access to these services. As described above, the Final Mandate would require the Trust to either violate Catholic teachings or dramatically reduce its religious exercise of providing health benefits in accordance with Catholic teachings.

176.     Christian Brothers Services is likewise operated in accordance with these Catholic teachings, and cannot participate in the government's program to provide access to these

services.  As described above, the Final Mandate would require Christian Brothers Services to either violate Catholic teachings or dramatically reduce its religious exercise of administering health benefits in accordance with Catholic teachings.

177.    As set forth above, refusing to comply with the Final Mandate will result in severe financial consequences for the class members (in the form of massive fines and penalties) and for Christian Brothers Trust and Christian Brothers Services (in the form of elimination of large portions of their ministries).

178.    For all Plaintiffs, therefore, the Final Mandate "requires participation in an activity prohibited by a sincerely held religious belief," prevents participation in conduct motivated by a sincerely held religious belief, and "places substantial pressure on" the class members "to engage in conduct contrary to a sincerely held religious belief." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1138 (10th Cir. 2013).  This is the essence of a substantial burden on religion.

**B.    There is No Compelling Interest for the Application of the Final Mandate to Plaintiffs**

179.    The government lacks any compelling interest in coercing the Plaintiffs to promote and facilitate access to contraception, sterilization, abortifacients, and related education and counseling.

180.    Many of these goods or services are already widely available at non-prohibitive costs.

181.    Among other things, the Departments claim that the "religious employers" exemption does not undermine its compelling interest in making contraceptive and abortifacient services available for free to women because "houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers

to employ people who are of the same faith and/or adhere to the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. Reg. at 39887. Under this reasoning, the Class Action Plaintiffs should also be exempt. Because the Class Action Plaintiffs share the well-known views of the Catholic Church on sterilizations and contraceptives, including abortifacient drugs and devices, the Class Action Plaintiffs' employees are just as likely as employees of exempt organizations to adhere to the same values, and thus are less likely than other people to use the objectionable drugs, devices, and services.

182.    In one form or another, the government also provides exemptions for: (i) grandfathered plans, 42 U.S.C. § 18011; 75 Fed. Reg. at 41731; (ii) small employers with fewer than 50 employees, 26 U.S.C. § 4980H(c)(2)(A)[2]; (iii) members of certain religious sects or divisions that conscientiously objects to acceptance of public or private insurance funds, 26 U.S.C. § 5000A(d)(2)(A)(i); and (iv) members of "health care sharing ministries" that meet certain criteria, 26 U.S.C. § 5000A(d)(2)(B)(i).

183.    Although there are many requirements for maintaining grandfathered status, *see* 26 C.F.R. § 54.9815-1251T(g), if those requirements are met a plan may be grandfathered for an indefinite period of time.

184.    According to the Departments' "mid-range estimate," 55% of large-employer plans would remain grandfathered and 34% of small-employer plans would remain grandfathered for 2013. Defendants assumed that large-employer plans accounted for 133

---

[2]    To be clear, although small employers are exempt from the penalties under Code section 4980H if they do not provide coverage, they are subject to the penalties under Code section 4980D if they do provide coverage that does not include coverage for abortifacient contraceptives and related services.

million enrollees, and small-employer plans accounted for 43 million enrollees, so their "mid-range" projections anticipated that roughly 88 million Americans would still be covered by grandfathered plans in 2013.  75 Fed. Reg. 34538, 34550 & 34553 (June 17, 2010); *see also* http://web.archive.org/web/20130620171510/http://www.healthcare.gov/news/ factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html (last visited Sept. 23, 2013) (attached as Exhibit F); *see also* https://www.cms.gov/CCIIO/Resources/Files/factsheet_grandfather_amendment.html (noting that amendment to regulations "will result in a small increase in the number of plans retaining their grandfathered status relative to the estimates made in the grandfathering regulation") (last visited Sept. 23, 2013) (attached as Exhibit G).

185.    In fact, these projections regarding the number of employees still covered by grandfathered plans may be low since they were based only on ERISA-covered plans and governmental plans, thus omitting non-ERISA church plans like the Christian Brothers Trust.  75 Fed. Reg. at 34550.

186.    According to the United States Small Business Administration, in 2010, more than 31 million individuals are employed by firms with fewer than 50 employees.  *See*, static_us(2).xlsx at http://www.sba.gov/advocacy/849/12162#susb (last visited September 12, 2013) (attached as Exhibit H).

187.    These broad exemptions demonstrate that the government has no compelling interest in refusing to include religious organizations like the Plaintiffs within its religious exemption.

188.    These broad exemptions also demonstrate that the Final Mandate is not a generally applicable law entitled to judicial deference, but rather is constitutionally flawed.

189.    The government's willingness to exempt various secular organizations and postpone the employer mandate, while adamantly refusing to provide anything but the narrowest of exemptions for religious organizations also shows that the Final Mandate is not neutral, but rather discriminates against religious organizations because of their religious commitment to promoting the sanctity of life.

190.    Indeed, the Final Mandate was promulgated by government officials, and supported by non-governmental organizations, who hold religious beliefs regarding contraception, sterilization, and abortion that are firmly contrary to the Plaintiffs' beliefs.

191.    Defendant Sebelius, for example, has long been a staunch supporter of abortion rights and a vocal critic of religious teachings and beliefs regarding abortion and contraception. On October 5, 2011, six days after the comment period for the original Interim Final Rules ended, Defendant Sebelius gave a speech at a fundraiser for NARAL Pro-Choice America.  She told the assembled crowd that "we are in a war."  *See* William McGurn, Op-Ed., *The Church of Kathleen Sebelius,* Wall St. J., Dec. 13, 2011, *available at* http://online.wsj.com/article/SB10001424052970203518404577094631979925326.html (last visited Sept. 23, 2013).

192.    She further criticized individuals and entities whose beliefs differed from those held by her and the others at the fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services? Not so much." *Id.*

193.    On July 16, 2013, Secretary Sebelius further compared opponents of the Affordable Care Act generally to "people who opposed civil rights legislation in the 1960s," stating that upholding the Act requires the same action as was shown "in the fight against lynching and the fight for desegregation." *See* Kathleen Sebelius, U.S. Secretary of Health and

Human Services, Address at the 104th NAACP Annual Conference (July 16, 2013), *available at* http://www.hhs.gov/secretary/about/speeches/sp20130716.html (last visited Sept. 23, 2013).

### C. The Final Mandate is Not the Least Restrictive Means of Providing Contraceptive Services

194.    There are multiple ways in which the government could provide access to contraceptives, sterilizations and related education and counseling without requiring religious employers such as the Class Action Plaintiffs, or religious benefits providers and administrators like Christian Brothers Trust and Christian Brothers Services, to provide for such benefits through their employee benefit plans in violation of their religious beliefs.

195.    For example, the government could: (i) directly provide contraceptive services to the few individuals who do not receive it under their health plans; (ii) offer grants to entities that already provide contraceptive services at free or subsidized rates and/or work with these entities to expand delivery of the services; (iii) directly offer insurance coverage for contraceptive services; or (iv) grant tax credits or deductions to women who purchase contraceptive services.

196.    Plaintiffs in no way recommend these alternatives, and, indeed, oppose many or all of them as a matter of policy.  But the fact that they remain available to the government demonstrates that the Final Mandate cannot survive the requirement of RFRA prohibiting the Federal Government from "substantially burden[ing] a person's exercise of religion," unless, among other things, it is the "least restrictive means of furthering" the government's compelling interest.  42 U.S.C. § 2000bb-1(b)(2).

## VIII.   CLASS ACTION ALLEGATIONS

197.    The Little Sisters Homes bring this action on behalf of themselves and all others similarly situated as members of a proposed plaintiff class pursuant to Sections (a), (b)(1), and (b)(2) of Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity,

commonality, typicality, adequacy, risk of incompatible standards, and cohesiveness requirements of those provisions.

198.    The class is defined as those employers that: (i) have adopted or in the future adopt the Christian Brothers Employee Benefit Trust to provide medical coverage for their "employees" or former employees and their dependents ("employees" for purposes of this requirement has the meaning set forth in Code section 414(e)(3)(B)); (ii) are or could be reasonably construed to be "eligible organizations" within the meaning of the Final Mandate; and (iii) are not "religious employers" with the meaning of the Final Mandate.  The class members are all Catholic organizations operated in accordance with Catholic religious teachings, including teachings on abortion, contraception, sterilization, and cooperation with sin.

199.    Currently, there are more than 200 class member employers located in approximately 40 states.  Accordingly, joinder is impracticable, and the disposition of the claims of these class members in a single class action will provide substantial benefits to all parties and to the Court.

200.    The claims of the representatives Little Sisters Homes are typical of the claims of the class in that the Little Sisters Homes and all class members will be equally and similarly harmed by the Defendants' enforcement of the Affordable Care Act and Final Mandate.  Furthermore, the factual bases of Defendants' actions are common to all class members.  The class members share in the same Catholic beliefs set forth in paragraphs 38-45 and, therefore, will suffer the same impact and violation of rights.

201.    Most if not all of the questions of law and fact are common to Little Sisters Homes and the class members.  By definition none of the Class Action Plaintiffs are eligible for the religious employers exemption under the Final Mandate.  As previously stated, the class members share in the same Catholic belief set forth in paragraphs 38-45 and will be subjected to

the application of the same Final Mandate.  The Final Mandate forces all of the Class Action Plaintiffs to choose between incurring severe financial hardship or violating their religious beliefs by taking steps to invoke the "accommodation."

202.    The Little Sisters Homes will fairly and adequately protect the interests of the Class.  The Little Sisters Homes have retained counsel with substantial experience in litigating class action cases and in litigating violations of religious and constitutional rights.  Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class, and have the resources to do so.  Upon information and belief, the Little Sisters Homes do not have an interest adverse to those of the class.

203.    This case is maintainable as a class action under Rule 23(b)(1) of the Federal Rules of Civil Procedure.   Because the Little Sisters Homes seek injunctive relief and corresponding declaratory relief for the entire class, the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to Defendants and with respect to individual members of the class which would establish incompatible standards of conduct for Defendants.  Further, separate adjudications with respect to individual class members would, as a practical matter, give rise to avoidable litigation over whether the separate adjudications are dispositive of the interests of other class members who are not parties and may impair and impede their ability to protect their interests.

204.    This case is also maintainable as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure because Defendants have acted and refused to act on grounds generally applicable to the entire class under the same statute and regulations.  All members of the class are entitled to a declaration that the Final Mandate violates the Class Action Plaintiffs' rights to the free exercise of religion, the freedom of speech, and expressive association under the First Amendment; violate the Establishment Clause of the First Amendment; deprive Class Action

Plaintiffs of the equal protection of the law guaranteed by the Fifth Amendment; and violate the Religious Freedom Restoration Act. Further, all members of the class will be entitled to an injunction prohibiting Defendants from enforcing the Final Mandate against the Class Action Plaintiffs and from charging or assessing penalties against the Class Action Plaintiffs for failure to offer or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling.

## IX.   CAUSES OF ACTION

### COUNT I

**Violation of the Religious Freedom Restoration Act**
**Substantial Burden**

205.    The Plaintiffs incorporate by reference all preceding paragraphs.

206.    Plaintiffs' sincerely held religious beliefs prohibit them from promoting or supporting—directly or indirectly—contraception, sterilization, abortifacients, abortion, and related education and counseling, including providing a health care plan that provides access to or the means of acquiring such products or services proscribed by their religious beliefs. Plaintiffs' compliance with these beliefs is a religious exercise.

207.    The Final Mandate substantially burdens Plaintiffs' sincerely held religious beliefs.

208.    The Final Mandate does not further any compelling governmental interest.

209.    The Final Mandate is not the least restrictive means to accomplish any permissible governmental interest.

210.    The Final Mandate creates government-imposed coercive pressure on the Plaintiffs to change or violate their religious beliefs.

211.    The Final Mandate chills the Plaintiffs' religious exercise.

212.    The Final Mandate exposes the Class Action Plaintiffs to substantial fines for their religious exercise.

213.    The Final Mandate forces Christian Brothers Employee Benefit Trust and Christian Brothers Services to choose between violating their religious beliefs or dramatically reducing the scope of their mission.

214.    The Final Mandate exposes the Plaintiffs to substantial competitive disadvantages.

215.    The Final Mandate imposes a substantial burden on the Class Action Plaintiffs' religious exercise.

216.    The Final Mandate is not the least restrictive means of furthering Defendants' stated interests.

*217.*    The Final Mandate and Defendants' threatened enforcement of the Final Mandate violate the Plaintiffs' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

218.    Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT II

**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Substantial Burden**

219.    The Plaintiffs incorporate by reference all preceding paragraphs.

220.    The Final Mandate compels the Plaintiffs to subsidize and/or provide access to education and counseling regarding contraceptive methods, sterilization procedures, and abortifacients in violation of their sincerely held religious beliefs.   Class Action Plaintiffs' compliance with these beliefs is a religious exercise.

221.    Neither the Affordable Care Act nor the Final Mandate is neutral.

222.    Neither the Affordable Care Act nor the Final Mandate is generally applicable.

223.    Defendants have created categorical and individualized exemptions to the Final Mandate.

224.    The Final Mandate furthers no compelling governmental interest.

225.    The Final Mandate is not the least restrictive means of furthering Defendants' stated interests.

226.    The Final Mandate creates government-imposed coercive pressure on the Plaintiffs to change or violate its religious beliefs.

227.    The Final Mandate chills Plaintiffs' religious exercise.

228.    The Final Mandate exposes Class Action Plaintiffs to substantial fines for their religious exercise.

229.    The Final Mandate exposes the Plaintiffs to substantial competitive disadvantages.

230.    The Final Mandate imposes a substantial burden on the Plaintiffs' religious exercise.

231.    The Final Mandate is not narrowly tailored to any compelling governmental interest.

232.    The Final Mandate and Defendants' threatened enforcement of the Final Mandate violate the Plaintiffs' rights secured to it by the Free Exercise Clause of the First Amendment of the United States Constitution.

233.    Absent injunctive and declaratory relief against the Final Mandate, the Class Action Plaintiffs have been and will continue to be harmed.

## COUNT III

**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause**
**Intentional Discrimination**

234.     The Plaintiffs incorporate by reference all preceding paragraphs.

235.     The Plaintiffs' sincerely held religious beliefs prohibit them from deliberately subsidizing and/or providing to their employees access to regarding contraceptive methods, sterilization procedures, and abortifacients.  The Plaintiffs' compliance with these beliefs is a religious exercise.

236.     Despite being informed in detail of these beliefs beforehand, Defendants designed the Final Mandate and the religious employers exemption therein to target religious organizations like the Plaintiffs because of their religious beliefs.

237.     Defendants promulgated both the Final Mandate and its religious employers exemption to suppress the religious exercise of the Plaintiffs and others.

238.     The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate the Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

239.     Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT IV

**Violation of the First Amendment to the United States Constitution**
**Free Exercise and Establishment Clauses**
**Discrimination Among Religions**

240.     The Plaintiffs incorporate by reference all preceding paragraphs.

241.    The Free Exercise Clause and Establishment Clause of the First Amendment mandate the equal treatment of all religious faiths and institutions without discrimination or preference.

242.    This mandate of equal treatment protects organizations as well as individuals.

243.    The Final Mandate's narrow exemption for "religious employers" but not others discriminates among religions on the basis of religious views or religious status.

244.    The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate the Plaintiffs' rights secured to them by the First Amendment of the United States Constitution.

245.    Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT V

### Violation of the First Amendment to the United States Constitution
### Establishment Clause
### Selective Burden/Denominational Preference (*Larson v. Valente*)

246.    The Plaintiffs incorporate by reference all preceding paragraphs.

247.    By design, Defendants imposed the Final Mandate on some religious organizations but not on others, resulting in a selective burden on the Plaintiffs.

248.    The Final Mandate and Defendants' threatened enforcement of the Final Mandate therefore violate the Plaintiffs' rights secured to them by the Establishment Clause of the First Amendment of the United States Constitution.

249.    Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT VI

**Interference in Matters of Internal Religious Governance
Free Exercise Clause and Establishment Clause**

250.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint.

251.    The Free Exercise Clause and the Establishment Clause protect the freedom of religious organizations to decide for themselves, free from state interference, matters of internal governance as well as those of faith and doctrine.

252.    Under these Clauses, the government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, leadership, or doctrine.

253.    Under these Clauses, the government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

254.    Each of the Plaintiffs has made an internal decision, dictated by its Catholic faith, that the health plans it makes available to its employer members and employees may not subsidize, provide, or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling.

255.    The Final Mandate interferes with the Plaintiffs' internal decisions concerning their structure and mission by requiring them to subsidize, provide, and facilitate practices that directly conflict with their Catholic beliefs.

256.    The Final Mandate's interference with the Plaintiffs' internal decisions affects their faith and mission by requiring them to subsidize, provide, and facilitate practices that directly conflict with their religious beliefs.

257.    Because the Final Mandate interferes with the Plaintiffs' internal decision making in a manner that affects their faith and mission, it violates the Establishment Clause and Free Exercise Clause of the First Amendment.

258.    Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT VII

**Religious Discrimination**
**Violation of the First and Fifth Amendments to the United States Constitution**
**Establishment Clause and Due Process**

259.    The Plaintiffs incorporate by reference all preceding paragraphs.

260.    By design, Defendants imposed the Final Mandate on some religious organizations but not on others, resulting in discrimination among religious objectors.

261.    Religious liberty is a fundamental right.

262.    The "religious employer" exemption in the Final Mandate protects many religious objectors, but not the Plaintiffs.

263.    The "accommodation" in the Final Mandate provides no meaningful protection for the Plaintiffs.

264.    The Final Mandate and Defendants' threatened enforcement of the Final Mandate therefore violate the Plaintiffs' rights secured to them by the Establishment Clause of the First Amendment and the Due Process Clause of the Fifth Amendment to the United States Constitution.

265.    Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT VIII

**Violation of the Fifth Amendment to the United States Constitution
Due Process and Equal Protection**

266.    The Plaintiffs incorporate by reference all preceding paragraphs.

267.    The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

268.    This mandate of equal treatment protects organizations as well as individuals.

269.    The Final Mandate's narrow exemption for "religious employers" but not others discriminates among religions on the basis of religious views or religious status.

270.    The Final Mandate and Defendants' threatened enforcement of the Final Mandate thus violate the Plaintiffs' rights secured to them by the Fifth Amendment of the United States Constitution.

271.    Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT IX

**Violation of the First Amendment to the United States Constitution
Freedom of Speech**

272.    The Plaintiffs incorporate by reference all preceding paragraphs.

273.    The Plaintiffs believe that that contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling violate their religious beliefs.

274.    The Final Mandate would compel the Plaintiffs to facilitate activities that the Plaintiffs sincerely believe would violate their religious beliefs.

275.     The Final Mandate would compel the Plaintiffs to provide self-certifications, designations, or other written or spoken statements which, by law, will trigger payments for contraceptives, sterilizations and abortion-inducing drugs.

276.     The Final Mandate also forbids the Plaintiffs from speaking to third party administrators and encouraging them not to provide access to contraceptives, sterilizations, and abortion-inducing drugs.

277.     The Final Mandate would compel the Plaintiffs to facilitate access to government-dictated education and counseling related to contraception, abortifacients and sterilizations.

278.     Defendants' actions thus violate the Plaintiffs' right to speak, and the Plaintiffs' right to be free from compelled speech, as secured to them by the First Amendment of the United States Constitution.

279.     The Final Mandate's speech restrictions are not narrowly tailored to a compelling governmental interest.

280.     Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT X

**Violation of the First Amendment to the United States Constitution**
**Freedom of Speech**
**Expressive Association**

281.     The Plaintiffs incorporate by reference all preceding paragraphs.

282.     The Plaintiffs sincerely believe that contraception, abortifacients and sterilization violate their religious beliefs.

283.     The Final Mandate would compel the Plaintiffs to facilitate activities that they sincerely believe are violations of their religious beliefs.

284.     The Final Mandate would compel the Plaintiffs to facilitate access to government-dictated education and counseling related to contraception, abortifacients and sterilizations.

285.     Defendants' actions thus violate the Plaintiffs' right of expressive association as secured to them by the First Amendment of the United States Constitution.

286.     Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT XI

### Violation of the First Amendment to the United States Constitution
### Free Exercise Clause and Freedom of Speech
### Unbridled Discretion

287.     The Plaintiffs incorporate by reference all preceding paragraphs.

288.     By stating that HHS, through the Health Resources and Services Administration, "may" grant an exemption to certain religious groups, the Final Mandate purports to vest HHS with unbridled discretion over which organizations can have their First Amendment interests accommodated.

289.     Defendants have ignored federal religious liberty law and have instead exercised unbridled discretion in a discriminatory manner by granting an exemption via footnote in a website for a narrowly defined group of "religious employers" but not for other religious organizations like the Plaintiffs.

290.     Defendants have further exercised unbridled discretion by indiscriminately waiving enforcement of some provisions of the Affordable Care Act while refusing to waive enforcement of the Final Mandate, despite its conflict with the free exercise of religion.

291.     Defendants' actions therefore violate the Plaintiffs' right not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

292.     Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT XII

### Violation of the Administrative Procedure Act
### Lack of Good Cause and Improper Delegation

293.     The Plaintiffs incorporate by reference all preceding paragraphs.

294.     The Affordable Care Act expressly delegates to HHS, through its agency Health Resources and Services Administration, the authority to establish guidelines concerning the "preventive care" that a group health plan and health insurance issuer must provide.

295.     Given this express delegation, Defendants were required to engage in formal notice-and-comment rulemaking in a manner prescribed by law before issuing the guidelines that group health plans and insurers must cover.  Proposed regulations were required to be published in the Federal Register and interested persons were required to be given an opportunity to participate in the rulemaking through the submission of written data, views, or arguments.

296.     Defendants promulgated the "preventive care" guidelines without engaging in formal notice-and-comment rulemaking in a manner prescribed by law.  Defendants, instead, wholly delegated their responsibilities for issuing preventive care guidelines to a non-governmental entity, the IOM.

297.     The IOM did not permit or provide for the broad public comment otherwise required under the APA concerning the guidelines that it would recommend.  The dissent to the IOM report noted both that the IOM conducted its review in an unacceptably short time frame, and that the review process lacked transparency.  Institute of Medicine, *Clinical Preventive Services for Women:  Closing the Gaps*, 231 (2011), *available at* http://www.nap.edu/openbook.php?record_id=13181&page=231 (last visited Sept. 23, 2013).

298.     Within two weeks of the IOM issuing its guidelines, Defendant HHS issued a press release announcing that the IOM's guidelines were required under the Affordable Care Act. *See* 77 Fed. Reg. at 8725; *see also* Ex. A, http://www.hrsa.gov/womensguidelines.

299.     Defendants have never adequately explained why they failed to enact these "preventive care" guidelines through notice-and-comment rulemaking as required by the APA.

300.     Defendants' stated reasons that public comments were unnecessary, impractical, and opposed to the public interest are false and insufficient, and do not constitute "good cause."

301.     Without proper notice and opportunity for public comment, Defendants were unable to take into account the full implications of the regulations by completing a meaningful "consideration of the relevant matter presented."

302.     Thereafter, Defendants did not consider or respond to the voluminous subsequent comments they received in opposition to the Interim Final Rules or the NPRM.

303.     Therefore, Defendants have taken agency action not in observance with procedures required by law, and the Class Action Plaintiffs are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

304.     Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT XIII

### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Action

305.     The Plaintiffs incorporate by reference all preceding paragraphs.

306.     In promulgating the Final Mandate, Defendants failed to consider the constitutional and statutory implications of the Final Mandate on the Plaintiffs and similar organizations.

307.    Defendants' explanation for their decision not to exempt the Plaintiffs and similar religious organizations from the Final Mandate runs counter to the evidence submitted by religious organizations during the comment periods.

308.    Defendant Secretary Sebelius, in remarks made at Harvard University on April 8, 2013, essentially conceded that the Defendants completely disregarded the religious liberty concerns submitted by thousands of religious organizations and individuals.  *See* Kathleen Sebelius, Remarks at The Forum at Harvard School of Public Health (Apr. 8, 2013), *available at* http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius (starting at 51:20) (last visited Sept. 23, 2013).

309.    Thus, Defendants' issuance of the Final Mandate was arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because they failed to consider the full implications of the Final Mandate and they did not take into consideration the evidence against it.

310.    Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT XIV

### Violation of the Administrative Procedure Act
### Agency Action Without Statutory Authority

311.    The Plaintiffs incorporate by reference all preceding paragraphs.

312.    Defendant's authority to enact regulations under the Affordable Care Act is limited to the authority expressly granted them by Congress.

313.    Defendants lack statutory authority to coerce third party administrators, including entities such as Christian Brothers Services, to pay or provide for contraceptive and abortifacient services for individuals with whom they have no contractual or fiduciary relationship.

314.    Defendants lack statutory authority to prevent insurance issuers and third party administrators from passing on the costs of providing contraceptive and abortifacient services via higher premiums or other charges that are not "cost sharing."

315.    Defendants lack statutory authority to allow user fees from the federal exchanges to be used to purchase contraceptive and abortifacient services for employees not participating in the exchanges.

316.    Because the Final Mandate's "accommodation" for non-exempt, nonprofit religious organizations lacks legal authority, it is arbitrary and capricious and provides no legitimate protection of Plaintiffs' First Amendment rights.

317.    Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT XV

**Violation of the Administrative Procedure Act**
**Agency Action Not in Accordance with Law**
**Weldon Amendment**
**Religious Freedom Restoration Act**
**First Amendment to the United States Constitution**

318.    The Plaintiffs incorporate by reference all preceding paragraphs.

319.    The Final Mandate is contrary to Weldon amendment, which has been included in every federal appropriations law since 2004.  Section 507 of the most recent Appropriations Act provides that "[n]one of the funds made available in this Act [making appropriations for Defendants Department of Labor and HHS] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  Consolidated Appropriations Act, Pub. L. No. 112-74, Division F, Title V, 125 Stat. 786, 1111 (2012).

320.     The Final Mandate requires certain employers, including the Class Action Plaintiffs, to deliberately provide health benefits for their employees that facilitates access to all Federal Drug Administration-approved contraceptives, and as a possible result requires Christian Brothers Trust and Christian Brothers Services to elect whether they must also facilitate those acts.

321.     Some FDA-approved contraceptives required to be provided by the Final Mandate cause abortions.

322.     As set forth above, the Final Mandate violates RFRA and the First Amendment.

323.     Under 5 U.S.C. § 706(2)(A), the Final Mandate is contrary to existing law, and is in violation of the APA.

324.     Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## COUNT XVI

**Violation of the Administrative Procedure Act
Agency Action Not in Accordance with the Affordable Care Act**

325.     The Plaintiffs incorporate by reference all preceding paragraphs.

326.     The Final Mandate is contrary to the provisions of the Affordable Care Act.

327.     Section 1303(b)(1)(A) of the Affordable Care Act states that "nothing in this title"—*i.e.*, title I of the Act, which includes the provision dealing with "preventive services"—"shall be construed to require a qualified health plan to provide coverage of [abortion] services . . . as part of its essential health benefits for any plan year."

328.     Section 1303 of the Affordable Care Act further states that it is "the issuer" of a plan that "shall determine whether or not the plan provides coverage" of abortion services.

329.    Under the Affordable Care Act, Defendants do not have the authority to decide whether a plan covers abortion; rather, only the issuer has that authority.

330.    The Final Mandate requires certain employers, including the Class Action Plaintiffs, to deliberately provide health benefits for their employers that would facilitate access to coverage of all Federal Drug Administration-approved contraceptives, and as a possible result requires Christian Brothers Trust and Christian Brothers Services to elect whether they must also facilitate those acts.

331.    Some FDA-approved contraceptives cause abortions.

332.    Under 5 U.S.C. § 706(2)(A), the Final Mandate is contrary to existing law, and is in violation of the APA.

333.    Absent injunctive and declaratory relief against the Final Mandate, the Plaintiffs have been and will continue to be harmed.

## Request for Preliminary Injunction

334.    Plaintiffs repeat and reallege the allegations contained in the paragraphs above as if fully set forth herein.

335.    Plaintiffs request a preliminary injunction prohibiting Defendants while this lawsuit is pending from enforcing the Final Mandate against the Plaintiffs, including Class Action Plaintiffs, Christian Brothers Services and the Christian Brothers Trust and any of its third party administrators, and prohibiting the Defendants from charging or assessing penalties against the Class Action Plaintiffs for failure to offer or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling, including those found in 26 U.S.C. §§ 4980D and 4980H, because (a) Plaintiffs and Class Action Plaintiffs will suffer immediate and irreparable injury, (b) other remedies available at law, such as monetary damages, are inadequate to fully compensate them for that injury, (c)

there is a substantial likelihood that Plaintiffs and Class Action Plaintiffs will prevail on the merits, (d) the harm faced by Plaintiffs and Class Action Plaintiffs outweighs the harm that would be sustained by Defendants if a preliminary injunction were granted; (e) the issuance of a preliminary injunction will not adversely affect the public interest and public policy, and (f) Plaintiffs are willing to post a bond in an amount the Court deems appropriate  FED. R. CIV. P. 65.

336.   Plaintiffs respectfully request that the Court set a hearing on this request for a preliminary injunction at the earliest possible time and, after hearing, grant Plaintiffs' request for preliminary injunction.

## **PRAYER FOR RELIEF**

Wherefore, the Plaintiffs, on behalf of themselves and all others similarly situated, request that the Court:

a.      Enter an order certifying the proposed plaintiff class, designating Little Sisters of the Poor Home for the Aged, Denver, Colorado, and Little Sisters of the Poor, Baltimore, Inc. as named representatives of the Class, and designating the undersigned as Class Counsel;

b.      Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against the Plaintiffs violate the Religious Freedom Restoration Act, and that no penalties can be charged or assessed against the Plaintiffs for failure to offer or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling, including any penalties under 26 U.S.C. §§ 4980D and 4980H;

c.      Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against the Plaintiffs violate the First Amendment of the United States Constitution, and that no penalties can be charged or assessed against the Plaintiffs for failure to offer or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling, including any penalties under 26 U.S.C. §§ 4980D and 4980H;

d.      Declare that the Final Mandate and Defendants' enforcement of the Final Mandate against the Plaintiffs violate the Fifth Amendment of the United States Constitution, and that no penalties can be charged or assessed against the Plaintiffs for failure to offer or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures that are or could be

63

abortifacients and related education and counseling, including penalties under 26 U.S.C. §§ 4980D and 4980H;

e.      Declare that the Final Mandate was issued in violation of the Administrative Procedure Act, and that no penalties can be charged or assessed against the Plaintiffs for failure to offer or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling, including any penalties under 26 U.S.C. §§ 4980D and 4980H;

f.      Issue a preliminary injunction and permanent injunction prohibiting Defendants from enforcing the Final Mandate against the Plaintiffs, including Class Action Plaintiffs, and prohibiting the Defendants from charging or assessing penalties against the Plaintiffs for failure to offer or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling;

g.      Award the Plaintiffs the costs of this action and reasonable attorney's fees; and

h.      Award such other and further relief as it deems equitable and just.

Respectfully submitted this 24th day of September, 2013.

 /s/ *Mark Rienzi*

Mark Rienzi
  D.C. Bar No. 494336
  mrienzi@becketfund.org
Daniel Blomberg
  Kansas Bar No. 23723
  dblomberg@becketfund.org
Adele Keim
  Virginia Bar No. 76476
  akeim@becketfund.org
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street NW, Suite 220
Washington, DC 20007
Tel.:    (202) 955-0095
Fax:    (202) 955-0090

Carl C. Scherz
  Texas Bar No. 00791609
  cscherz@lockelord.com
Seth Roberts
  Texas Bar No. 24051255
  sroberts@lockelord.com
Locke Lord LLP
2200 Ross Avenue, Suite 2200
Dallas, TX  75201
Tel.:    (214) 740-8583
Fax:    (214) 756-8583

COUNSEL FOR PLAINTIFFS LITTLE
SISTERS OF THE POOR HOME FOR
THE AGED, DENVER, COLORADO;
LITTLE SISTERS OF THE POOR,
BALTIMORE, INC.; CHRISTIAN
BROTHERS SERVICES; AND
CHRISTIAN BROTHERS EMPLOYEE
BENEFIT TRUST

Kevin C. Walsh
  Virginia Bar No. 70340
  kwalsh@richmond.edu
University of Richmond School of Law
28 Westhampton Way
Richmond, VA 23173
Tel.:    (804) 287-6018

COUNSEL    FOR    PLAINTIFFS
LITTLE SISTERS OF THE POOR
HOME    FOR    THE    AGED,
DENVER,    COLORADO;    AND
LITTLE SISTERS OF THE POOR,
BALTIMORE, INC.