**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:13-cv-02611-WJM-BNB

LITTLE SISTERS OF THE POOR HOME FOR THE AGED, DENVER, COLORADO, a Colorado non-profit corporation, LITTLE SISTERS OF THE POOR, BALTIMORE, INC., a Maryland non-profit corporation, by themselves and on behalf of all others similarly situated,

CHRISTIAN BROTHERS SERVICES, a New Mexico non-profit corporation, and

CHRISTIAN BROTHERS EMPLOYEE BENEFIT TRUST,

    Plaintiffs,

  v.

KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services,

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

THOMAS E. PEREZ, Secretary of the United States Department of Labor,

UNITED STATES DEPARTMENT OF LABOR,

JACOB J. LEW, Secretary of the United States Department of the Treasury, and

UNITED STATES DEPARTMENT OF THE TREASURY,

    Defendants.

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
AND MEMORANDUM IN SUPPORT**

# INTRODUCTION

Plaintiffs Little Sisters of the Poor Home for the Aged, Denver, Colorado ("Little Sisters of Denver"), and Little Sisters of the Poor, Baltimore, Inc. ("Little Sisters of Baltimore"), by themselves and on behalf of all others similarly situated, Christian Brothers Services, and Christian Brothers Employee Benefit Trust ("Trust") seek a preliminary injunction.

The Little Sisters of the Poor is a Congregation of Catholic Sisters whose Catholic faith inspires them to spend their lives tending to the needs of the sick and elderly poor. Their commitment to live that faith also precludes them from participating in the federal government's scheme to subsidize and promote use of sterilization, contraceptives, and abortifacients under group health plans (the "Mandate"). As a matter of religious exercise, the Little Sisters exclude such things from their employee health plans, which are provided through the Trust and administered by Christian Brothers Services.

Starting on January 1, 2014, Defendants will impose massive fines on the Little Sisters and other members of the Trust for this religious exercise unless and until they cooperate with the Mandate. The Mandate will also force the Christian Brothers entities to shrink their religious mission of offering health benefits to Catholic employers consistent with the Catholic faith.

The Mandate violates the Religious Freedom Restoration Act for the reasons recently set forth in *Hobby Lobby v. Sebelius*, 723 F.3d 1114, 1137-1145 (10th Cir. 2013). The Mandate also violates the First Amendment, both because it impermissibly prefers some religious organizations over others, and because it restricts Plaintiffs' speech. These openly religious Plaintiffs are currently in the process of arranging benefit plans for the coming year, and they should be free to do so without illegal coercion under the Mandate. The Plaintiffs therefore request a preliminary injunction protecting them and members of the Trust from Defendants' Mandate during the course of this litigation, and request expedited consideration of this motion.

## BACKGROUND

**The Contraception Mandate**

The Affordable Care Act ("ACA") mandates that any "group health plan" must provide coverage for certain "preventive care" without "any cost sharing." 42 U.S.C. § 300gg-13(a). The ACA allowed the Health Resources and Services Administration (HRSA), a division of Defendant HHS, to define "preventative care." 42 U.S.C. § 300gg-13(a)(4).

HRSA's definition includes FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling, including "emergency contraception" such as Plan B (the "morning-after" pill) and Ella (the "week-after" pill). Dkt. 1-2 (Ex. A); Dkt. 1-3 (Ex. B) at 11-12. The FDA's Birth Control Guide notes that these drugs and devices may work by preventing "attachment (implantation)" of a fertilized egg in the uterus. Dkt. 1-3 (Ex. B) at 11-12. HHS allowed HRSA "discretion" to create an exemption for "certain religious employers." 76 Fed. Reg. 46621-01 (published Aug. 3, 2011); 45 C.F.R. § 147.130(a)(1)(iv)(A)-(B).

On June 28, 2013, HHS issued the Mandate as a final rule. It treats as exempt "religious employers" only certain entities—institutional churches, their integrated auxiliaries and the exclusively religious activities of any religious order—that are "organized and operate[d]" as nonprofit entities and "referred to in section 6033" of the Internal Revenue Code. 78 Fed. Reg. at 39874(a); 45 C.F.R. § 147.131(a).[1] The Mandate creates a claimed "accommodation" for any "non-exempt" organization that (1) "[o]pposes providing coverage for some or all of the contraceptive services required"; (2) "is organized and operates as a nonprofit entity"; (3) "holds itself out as a religious organization"; and (4) "self-certifies that it satisfies the first three criteria." 78 Fed. Reg. at 39874; 45 C.F.R. § 147.131(b). Such "non-exempt" entities must

---

[1] Whether an entity is an "integrated auxiliary" of a church turns primarily on the degree of the church's control over and funding of the entity. *See* 26 C.F.R. § 1.6033-2(h)(2) & (3) (affiliation); *id.* § 1.6033-2(h)(4) (funding). The definition was for tax considerations, not religious conscience concerns, and thus can arbitrarily turn on whether a religious non-profit receives 49% or 50% of financial support from a formal church in a given year.

provide the certification to their insurer or third party administrator before "the beginning of the first plan year" beginning on or after January 1, 2014. 78 Fed. Reg. at 39875.

The non-exempt organization's required delivery of the certification triggers the insurer's or third party administrator's obligation to make "separate payments for contraceptive services directly for plan participants and beneficiaries." *Id.* at 39875-76; *see* 45 C.F.R. § 147.131(c)(2)(i)(B); 29 C.F.R. § 2590.715–2713A. If an administrator declines to provide the services, the religious organization must find one that is willing. 78 Fed. Reg. at 39880.

If a third party administrator is willing, the religious organization—via its self-certification—must expressly designate the third party administrator as its "plan administrator and claims administrator solely for the purpose of providing payments for contraceptive services for participants and beneficiaries." *Id.* at 39879. The self-certification must notify the third party administrator of its "obligations set forth in these final regulations." *Id.* at 39879.

By contrast to this convoluted "accommodation" for "non-exempt" religious organizations, many secular businesses are exempt from the Mandate. Employers who provide "grandfathered" health care plans, covering an estimated 87 million people, are exempt. *See* 42 U.S.C. § 18011 (2010); Dkt. 1-7 (Ex. F) at 7. Employers with fewer than fifty employees, covering an estimated 34 million individuals, also may avoid certain fines under the Mandate. *See* 26 U.S.C. § 4980H(c)(2)(A); 26 U.S.C. § 4980D(d); Dkt. 1-9 (Ex. H) at 2.

**The Parties and the Mandate's Impact on Them**

To assist in their religious mission of caring for the elderly poor of any race, sex, or religion, each of the two Little Sisters homes employs more than 50 lay employees and provides health benefits via the Trust. Mother Loraine Decl. ("Ex. I") ¶¶ 5, 17, 19-20.

The Trust is a self-insured non-ERISA "church plan" in which only non-profit organizations operated under the auspices of the Roman Catholic Church, in good standing thereof, and

3

approved for listing in The Official Catholic Directory may participate. Brother Quirk Decl. ("Ex. J") ¶ 6. The Trust is administered by Christian Brothers Services, a Catholic organization designed to serve the Catholic Church community. *Id.* ¶¶ 14-15. Together, the Christian Brothers entities provide health benefits for the employees of approximately 473 Catholic organizations that, like the Little Sisters, are "non-exempt" religious organizations. *Id.* ¶¶ 40-42.

All of the Plaintiffs and class members are Catholic organizations operated in accordance with Catholic religious teachings. These teachings instruct that abortion, contraception, and sterilization are intrinsic evils, and prohibit encouraging or supporting their use. Ex. I ¶¶ 29-43; Ex. J ¶¶ 17-26. Plaintiffs believe it would be sinful for them to intentionally facilitate the provision of contraceptives, abortifacients, sterilizations, and related education and counseling, as is required by the Mandate. Ex. I ¶ 42; Ex. J ¶¶ 27-34.

Although they share the same religious beliefs as exempt Catholic "religious employers," the Little Sisters and class members do not fall within the Mandate's exemption for "religious employers" because they are not formal churches, integrated auxiliaries, or the exclusively religious activities of religious orders. *See* 26 U.S.C. § 6033(a). Thus the Little Sisters are required to execute a self-certification prior to January 1, 2014, and either designate the Trust or some other third-party administrator that will pay for the objected-to services. *See* 29 C.F.R. § 2590.715-2713A(b). But doing this would make the Little Sisters morally complicit in providing the objected-to drugs and services. Ex. I ¶¶ 48-50.

The burden that the Mandate places on the Plaintiffs' religious beliefs is not just substantial—it is severe. For example, Little Sisters of Denver, which currently has approximately 67 full time employees, would incur penalties of approximately $6,700 per day and nearly $2.5 million per year unless they give up their religious exercise and comply with the Mandate. Ex. I ¶ 56**.** Little Sisters of Baltimore has approximately 54 full time employees and

4

would face penalties of approximately $5,400 per day and nearly $2 million per year. *Id.* ¶ 58. Likewise, class members face estimated penalties of $402,741,000 per year, while Christian Brothers Services and the Trust faces losses of $130,000,000 in medical plan contributions and $10,400,000 in net revenue per year if the class members are effectively forbidden from participating in the Trust because of their religious exercise. Ex. J ¶¶ 44, 53.

## ARGUMENT

A preliminary injunction is warranted in this case because (1) Plaintiffs have a likelihood of success on the merits, (2) there is a threat of irreparable harm, which (3) outweighs any harm to Defendants, and (4) the injunction would not adversely affect the public interest. *See, e.g., Awad v. Ziriax,* 670 F.3d 1111, 1125 (10th Cir. 2012).

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

#### A. The mandate violates the Religious Freedom Restoration Act ("RFRA").

Under RFRA, the federal government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §2000bb-1(b). The Mandate violates RFRA for the same reasons set forth by the Tenth Circuit in *Hobby Lobby*. 723 F.3d at 1137-1145; *see also Hobby Lobby*, No. CIV-12-1000-HE, 2013 WL 3869832, at *1 (W.D. Okla. July 19, 2013) (preliminary injunction on remand); *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1294-95 (D. Colo. 2012), *aff'd*, __ F.3d ____, 2013 WL 5481997, at **2-3 (10th Cir. Oct. 3, 2013); *Armstrong v. Sebelius*, 2013 WL 5213640, at *1 (D. Colo. Sept. 17, 2013), *Briscoe v. Sebelius*, 2013 WL 4781711, at *1, 5 (D. Colo. Sept. 6, 2013).

*Hobby Lobby* provides the required framework for RFRA analysis. First, a court must "identify the religious belief" at issue. 723 F.3d at 1140. Second, it must "determine whether this

belief is sincere." *Id*. Third, the court must determine "whether the government places substantial pressure on the religious believer." *Id*. Finally, if there is substantial pressure, the government action will be upheld only if it satisfies strict scrutiny—*i.e.*, the court concludes that forcing the religious believer to violate its own conscience is "'the least restrictive means of advancing a compelling interest.'" *Id*. at 1143 (citation omitted); 42 U.S.C. § 2000bb-1.

Under this rubric, the *Hobby Lobby, Newland*, *Armstrong*, and *Briscoe* courts concluded that the application of the Mandate to the plaintiffs in those cases violated RFRA, because it substantially pressured the plaintiffs to violate their sincere religious beliefs against facilitating access to contraceptive and abortion-inducing drugs and devices, without satisfying strict scrutiny. *See Hobby Lobby*, 723 F.3d at 1146-47; *Newland*, 2013 WL 5481997, at *2-3; *Armstrong*, 2013 WL 5213640, at *1, 3; *Briscoe*, 2013 WL 4781711, at *3-4. The same basic facts and religious beliefs are at issue here, and the same ruling is required.

### 1. *The Mandate Imposes a Substantial Burden on Religious Exercise*

Government action substantially burdens a religious belief when it "requires participation in an activity prohibited by a sincerely held religious belief," prevents participation in conduct motivated by a sincerely held religious belief," or "'places substantial pressure on an adherent . . . to engage in conduct contrary to a sincerely held religious belief." *Hobby Lobby*, 723 F.3d at 1138 (internal cite and quotation marks omitted). The Mandate does all of the above. As detailed in the attached declarations, the Plaintiffs have a sincere religious belief that their Catholic faith prohibits them from participating in the Mandate. Ex. I ¶¶ 30-52; Ex. J ¶¶ 27-34. They are forbidden by their Catholic faith from facilitating or promoting abortion, contraception, and sterilization. Ex. I ¶¶ 44-52; Ex. J ¶¶ 17-34. They cannot offer their employees a health benefit program that includes such services, and they cannot designate others to do so for them. *Id*.

6

These religious beliefs are deeply held, sincere, and well-documented parts of Plaintiffs' Catholic faith. *See, e.g.*, Ex. I ¶¶ 31-38; Ex. J ¶¶ 17-34.

As in *Hobby Lobby*, Plaintiffs engage in a religious exercise—refusing to facilitate certain healthcare services. In particular, Plaintiffs cannot include these services in their health plans, and cannot provide designations or certifications that will cause others to provide them. Ex. I ¶¶ 46-50; Ex. J ¶¶ 31-34. Yet the Mandate threatens Plaintiffs with enormous financial losses unless and until they cease this religious exercise. Under *Hobby Lobby*, the Mandate thereby imposes a substantial burden on Plaintiffs' religious exercise because it imposes "substantial pressure on the religious believer" to forego the exercise. 723 F.3d at 1141 (noting that Mandate put plaintiffs to a "Hobson's choice" of violating their beliefs or facing heavy consequences, which "established a substantial burden as a matter of law.").

### 2. *The Mandate Fails Strict Scrutiny*

Defendants thus must prove that the Mandate is the least restrictive means of advancing a compelling interest. *See O Centro Espirita Beneficiente Uniao do Vegetal v. Gonzales*, 546 U.S. 418, 423 (2006). If a less restrictive alternative would serve the government's purpose, "the legislature *must* use that alternative." *United States v. Playboy Ent'mt Grp., Inc.*, 529 U.S. 803, 813 (2000) (emphasis added). RFRA imposes "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Defendants cannot meet it here.

*Hobby Lobby* addressed Defendants' asserted interests in promoting "public health" and "gender equality" and concluded that they failed to satisfy strict scrutiny. *See* 723 F.3d at 1143-44. First, such interests are too "broadly formulated" to justify denying "specific exemptions to particular religious claimants." *Id.* at 1143. Second, the court held that these interests "cannot be compelling because the contraceptive-coverage requirement presently does not apply to tens of millions of people," including "those working for private employers with grandfathered plans,"

and those working "for employers with fewer than fifty employees." *Id*.; *see also* 77 Fed. Reg. 8725, 8726 (Feb. 15, 2012) (exempting other religious employers); 26 U.S.C. § 5000A(d)(2)(A),(B),(ii) and (2)(B)(i) (exempting certain religious sects that object to insurance). The Mandate "'cannot be regarded as protecting an interest of the highest order …[because] it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Hobby Lobby*, 723 F.3d 1143-44 (citations omitted). *Hobby Lobby* compels the same result here.

Nor can Defendants plausibly claim that crushing the Plaintiffs with fines is the least restrictive means of meeting a compelling need for contraceptive access. Defendants have acknowledged that "birth control . . . is the most commonly taken drug in America by young and middle-aged women" and that "contraceptive services are available at sites such as community health centers, public clinics, and hospitals with income-based support."[2] These services are widely available in part because the federal government already has an extensive funding network designed to increase contraceptive access, education, and use, including requested spending of almost $300 million in fiscal year 2013 through Title X funding.[3]

Such alternative means of addressing the claimed interest doom the Mandate. *See, e.g., U.S. v. Hardman*, 297 F.3d 1116, 1130 (10th Cir. 2002) (explaining that, under strict scrutiny, government must "demonstrate that *no alternative forms of regulation would combat such abuses without infringing First Amendment rights*") (quoting *Sherbert v. Verner,* 374 U.S. 398,

---

[2]   Statement by U.S. Department of Health and Human Services Secretary Kathleen Sebelius, *available at* http://www.hhs.gov/news/press/2012pres/01/20120120a.html (last visited Oct. 21, 2012). Statements on government websites are self-authenticating admissions under Federal Rules of Evidence 801(d)(2)(A) and 902(5).

[3]  *See* Department of Health and Human Services, *Announcement of Anticipated Availability of Funds for Family Planning Services Grants,* available at http://www.hhs.gov/opa/pdfs/fy-13-services-announcement.pdf at 9 (last visited Oct. 21, 2013) (announcing that "[t]he President[']s Budget for Fiscal Year (FY) 2013 requests approximately $297 million for the Title X Family Planning Program").

407 (1963)) (emphasis in original). In addition to such direct provision, Defendants could: allay the costs of the drugs through individual subsidies, reimbursements, tax credits or tax deductions; empower other *willing* actors to deliver the drugs and to sponsor education about them; or use their own healthcare exchanges to offer coverage they believe is needed, rather than forcing the Plaintiffs to do it for them. Because Defendants have not employed feasible, less restrictive alternatives instead of burdening religious objectors, the Mandate violates RFRA. *See, e.g., Playboy Ent'mt Grp.*, 529 U.S. at 813; *Newland*, 881 F. Supp. 2d at 129; *see also Grutter v. Bollinger*, 539 U.S. 306, 339 (2003) (narrow tailoring requires "serious, good faith consideration of workable . . . alternatives").

In sum, Plaintiffs are likely to prevail on their claim that the Mandate violates RFRA.

**B.     The Mandate Violates the First Amendment's Religion Clauses**

The Mandate's second-class treatment of the Little Sisters also violates the First Amendment. While the government has exempted other religious objectors from the Mandate (primarily, churches and their "integrated auxiliaries") it has refused to exempt the Little Sisters, even though the Sisters are engaged in the exact same religious exercise—and seek the exact same relief—as those preferred religious organizations the government has chosen to exempt. To put the matter bluntly: if the Little Sisters simply handed their homes over to Catholic bishops, to be funded and controlled directly by their local dioceses, the government would exempt them entirely. But because the Sisters instead fund, operate, and control their ministry themselves, they face millions of dollars in fines.

The Free Exercise and Establishment Clauses prohibit the government from making such "explicit and deliberate distinctions between different religious organizations." *Larson v. Valente*, 456 U.S. 228, 246 n.23 (1982) (striking down laws that created differential treatment between "well-established churches" and "churches which are new and lacking in a

9

constituency"). By preferring church-run organizations to other types of religious groups, the Mandate inappropriately "interfer[es] with an internal . . . decision that affects the faith and mission" of a religious organization, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 707 (2012), and engages in "discrimination . . . expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations[.]" *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1259 (10th Cir. 2008) (McConnell, J.) (applying *Larson* to invalidate distinction between "sectarian" and "pervasively sectarian" organizations). Such discrimination is forbidden by the Religion Clauses.

Defendants do not deny that they have engaged in this type of discrimination. Instead, they explained in the final regulations that they made assumptions about the likely religious beliefs of people who work for religious organizations like the Plaintiffs:

> Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are *more likely* than other employers to employ people of the same faith who share the same objection, and who would therefore be *less likely* than other people to use contraceptive services even if such services were covered under their plan.

78 Fed. Reg. at 39874 (emphases added). Defendants cite no factual authority for this assumption. The employees of the Plaintiffs all work for openly Catholic institutions that are listed in The Official Catholic Directory and that use a religious benefits provider. There is no reason to believe Plaintiffs' employees are less likely to share their religious beliefs. And Defendants cite no legal authority for the proposition that the government is permitted to discriminate among different religious institutions, giving religious liberty to some and not to others, based on government guesswork about the likely religious beliefs of individuals who work for various ministries. The government has no power to do so. *See Weaver*, 534 F.3d at 1259 (noting that distinguishing religious organizations based on their internal religious characteristics is "even more problematic than the Minnesota law invalidated in *Larson*" and that

10

government cannot engage in such "discrimination . . . expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations[.]").

**C.     The Mandate Violates the First Amendment's Free Speech Clause.**

The First Amendment protects Plaintiffs' rights to be free from governmentally compelled speech or silence. *Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796-97 (1988) ("[T]he First Amendment guarantees 'freedom of speech,' a term necessarily comprising the decision of both what to say and what not to say."). The Mandate violates both rights.

The Mandate's proposed accommodation requires Plaintiffs to make statements that will trigger payments for the use of contraceptive and abortion-inducing drugs and devices, and for "education and counseling" about using such products. Ex. I ¶¶ 49, 67; 29 C.F.R. § 2590.715-2713A (b)(2), (c)(2). This would compel Plaintiffs to engage in speech they wish to avoid: speech furthering a message and activities that contradict their public witness to their religious faith. The Mandate also expressly prohibits the Plaintiffs from engaging in speech with a particular content and viewpoint: they are barred by federal law from talking to a third party administrator and encouraging them not to provide contraceptive and abortion-inducing drugs and devices. *See* 29 C.F.R. § 2590.715-2713A ("must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements").

Each violation—compelled speech and compelled silence—triggers strict scrutiny, *TBS, Inc. v. FCC*, 512 U.S. 624, 642 (1994), which the Mandate fails for the reasons discussed above. *See also Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2331 (2013). (rejecting forced speech requirement, even for recipients of government funds, because it would render grantees able to express contrary beliefs "only at the price of evident hypocrisy").

## II. THE REMAINING PRELIMINARY INJUNCTION FACTORS

*Irreparable Harm.* It is settled in the Tenth Circuit that a potential violation of Plaintiffs' rights under RFRA constitutes irreparable harm. *See Hobby Lobby*, 723 F.3d at 1146; *Armstrong*, 2013 WL 5213640 *3. And more harms caused by the impending Mandate are occurring *now* as Plaintiffs undertake "the extensive planning involved in preparing and providing its employee [benefit] plan." *Newland,* 881 F. Supp. 2d at 1294-95, *aff'd* 2013 WL 5481997 at *2; Ex. J ¶ 61.

*The Balance of Harms.* The Tenth Circuit has recognized the considerable importance of an entity's religious liberty interests, the substantial burden that the Mandate places on those interests, and that the Defendants' interest in enforcing the Mandate in this context is not compelling. *See Hobby Lobby*, 723 F.3d at 1141, 43-44, 45-46. Thus, it has upheld determinations that the balance of harms favors religious claimants. *See Newland,* 2013 WL 5481997 at *3. Granting preliminary injunctive relief will merely preserve the status quo and extend to Plaintiffs what Defendants have already categorically given numerous other employers, *Newland,* 881 F. Supp. 2d at 1295, and have acquiesced to in many related cases. *See*, *e.g.*, Order, *Tyndale House Publishers v. Sebelius*, No. 13-5018 (D.C. Cir. May 3, 2013); Order, *Bick Holdings Inc. v. Sebelius*, No. 4:13-cv-00462 (E.D. Mo. April 1, 2013).

*Public Interest.* As courts have recognized when granting injunctions against the Mandate for similar religious objectors, "there is a strong public interest in the free exercise of religion even where that interest may conflict with" another statutory scheme. *Newland,* 881 F. Supp. 2d at 1295 (quoting *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 1010 (10th Cir. 2004) (en banc), *aff'd* 546 U.S. 418 (2006)). Indeed, "it is always in the public interest to prevent the violation of a party's constitutional rights" which are protected by RFRA. *Briscoe*, 2013 WL 4781711 *5; *Hobby Lobby*, 723 F.3d at 1147.

### III. SCOPE OF RELIEF

The scope of preliminary injunctive relief depends on the scope of the harm to be prevented during the pendency of the matter. *See O Centro*, 389 F.3d at 977. In this case, that harm is the government pressure to give up the religious exercise of providing, administering, and offering a health benefits plan consistent with Plaintiffs' Catholic faith.

Plaintiffs therefore request injunctive relief that maintains the status quo pending final resolution of the case: the provision of the Trust's health benefit plan that complies with Plaintiffs' Catholic faith without facing enormous financial penalties. For the Little Sisters, this requires an injunction permitting them to continue to offer the Trust as their health plan, and forbidding any application of the Mandate against them for that religious exercise during the course of this litigation. For the Trust and Christian Brothers Services, preserving the status quo requires an injunction permitting them to continue offering the Trust to Catholic employers, without offering or facilitating access to the services at issue, and concomitantly, permitting the other class members to continue to use the Trust without penalty. Otherwise, the Trust and Christian Brothers Services will suffer from the illegal coercion imposed by the Mandate: compromising their religious beliefs by dramatically reducing their religious ministry of providing health benefits in accordance with Catholic teaching, reducing member participation by an estimated $130 million in health payments from employers that are forced to leave the plan to avoid penalties, and, alternatively, causing those employers that remain in the plan to incur fines of approximately $402,741,000 per year. Ex. J ¶¶ 44, 53.

The benefits of the requested injunction extend beyond the named plaintiffs to encompass all members of the proposed class. But the court does not need to certify the proposed class now to provide adequate preliminary injunctive relief for the upcoming plan year. As the Tenth Circuit has explained, class certification before the entry of preliminary injunctive relief "is unnecessary

13

if all the class members will benefit from an injunction issued on behalf of the named plaintiffs." *Kansas Health Care Ass'n, Inc. v. Kansas Dep't of Soc. & Rehab. Servs.*, 31 F.3d 1536, 1548 (10th Cir. 1994); *see also Ill. League of Advocates v. Ill. Dep't of Human Servs.*, 2013 WL 3287145, at *3 (N.D. Ill. June 28, 2013) ("District courts have the power to order injunctive relief covering potential class members prior to class certification.").[4] The need of the parties for effective relief during the pendency of the action provides the measuring stick for preliminary injunctive relief. If an injunction must benefit nonparties in order to provide effective relief for the parties, then the court should issue an injunction that benefits nonparties. *See, e.g.*, 11A C. Wright, A. Miller, & M. Kane, Fed. Pract. & Proc. § 2947 (2d ed.) ("As described by the Supreme Court, 'it is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all—including the public—whose interests the injunction may affect.'").

A good example of this kind of injunction in a RFRA case is the injunction affirmed by the Supreme Court in *Gonzales*, 546 U.S. at 423. A church, its officers, and some of its members sought relief under RFRA to end the enforcement of importation restrictions on hoasca, a sacramental tea with hallucinogenic properties. The preliminary injunction affirmed by the Supreme Court not only protected the plaintiff church and its members, but also separately protected any other "bona fide participants in [church] ceremonies for religious use of hoasca." *O Centro Espirita Beneficiente Unaio Do Vegetal v. Ashcroft*, No. CV 00-1647, Document 100

---

[4] *See also Bresgal v. Brock*, 843 F.2d 1163, 1165, 1169-71 (9th Cir. 1987) ("There is no general requirement that an injunction affect only the parties in the suit."); *Washington v. Reno*, 35 F.3d 1093, 1103-04 (6th Cir. 1994) (upholding a nationwide injunction because the "relief to be granted to the plaintiffs … necessarily implicate[d] nationwide relief" and would otherwise be "illusory"); *Richmond Tenants Org. v. Kemp*, 956 F.2d 1300, 1304-05, 1308-09 (4th Cir. 1992) (enjoining the eviction of public housing tenants without notice and a hearing beyond the named plaintiff); *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 19 (D.D.C. 2004) (issuing an injunction enjoining the government from using a vaccine without employee consent).

(D.N.M. Nov. 13, 2002) (attached as Exhibit K). So, too, the named plaintiffs here should receive an injunction prohibiting enforcement of the Mandate not only against them individually, but also against all other participants in the Trust. In the alternative, the Court could also certify the class, for the reasons set forth in Plaintiffs' forthcoming motion for class certification.

## CONCLUSION

The Court should prohibit Defendants from enforcing the Mandate against Plaintiffs and class members, including their third party administrators, and from charging or assessing penalties against them for failure to offer or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling, while this lawsuit is pending as set forth in Plaintiffs' proposed order. Plaintiffs are willing to post a bond in an amount the Court deems appropriate.

Respectfully submitted this 24th day of October, 2013.

 /s/ *Mark Rienzi*

Mark Rienzi
 mrienzi@becketfund.org
Daniel Blomberg
 dblomberg@becketfund.org
Adele Keim
 akeim@becketfund.org
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street NW, Suite 220
Washington, DC 20007
Tel.:   (202) 955-0095
Fax:   (202) 955-0090

Carl C. Scherz
 cscherz@lockelord.com
Seth Roberts
 sroberts@lockelord.com
Locke Lord LLP
2200 Ross Avenue, Suite 2200
Dallas, TX  75201
Tel.:   (214) 740-8583
Fax:   (214) 756-8583

COUNSEL FOR PLAINTIFFS LITTLE SISTERS OF THE POOR HOME FOR THE AGED, DENVER, COLORADO; LITTLE SISTERS OF THE POOR, BALTIMORE, INC.; CHRISTIAN BROTHERS SERVICES; AND CHRISTIAN BROTHERS EMPLOYEE BENEFIT TRUST

Kevin C. Walsh
 kwalsh@richmond.edu
University of Richmond School of Law
28 Westhampton Way
Richmond, VA 23173
Tel.:   (804) 287-6018

COUNSEL FOR PLAINTIFFS LITTLE SISTERS OF THE POOR HOME FOR THE AGED, DENVER, COLORADO; AND LITTLE SISTERS OF THE POOR, BALTIMORE, INC.

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed through the Court's ECF filing system on counsel for Defendants, Bradley Philip Humphreys, and that a copy was served via first-class mail, postage prepaid, on the following:

Bradley Philip Humphreys
U.S. Department of Justice
20 Massachusetts Avenue, N.W.
Washington, DC 20530

   /s/ *Mark Rienzi*
Mark Rienzi

**CERTIFICATE OF CONFERRAL**

Pursuant to D.C. COLO. LCivR Rule 7.1(A), I hereby certify that I conferred with counsel for Defendants in an effort to resolve the disputed matter before filing this motion. I contacted opposing counsel, asked for consent to this preliminary injunction, and was denied.

    /s/ *Mark Rienzi*
Mark Rienzi