# EXHIBIT I

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| LITTLE SISTERS OF THE POOR HOME FOR THE AGED, DENVER, COLORADO, a Colorado non-profit corporation, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>KATHLEEN SEBELIUS, *et al.*<br><br>*Defendants*. | Civil No. 1:13-cv-02611<br><br>**DECLARATION OF MOTHER LORAINE MARIE CLARE MAGUIRE** |

I, Mother Loraine Marie Claire Maguire, hereby declare as follows:

1. I am the Provincial Superior of the Province of Baltimore for the Little Sisters of the Poor.

2. I have been a Little Sister for 29 years, and have served in leadership positions in the order for 12 years.

3. I am also a registered nurse and licensed nursing home administrator. I have a B.A. from St. Joseph's College of Maine.

4. I make this declaration based on my personal knowledge and experience of the Little Sisters, our organization, our ministry, and our religious beliefs and practices. My statements about the history of the Little Sisters, the scope of our ministry internationally, and the founding dates of various homes are drawn from organizational and historical documents that I believe to be correct.

1

**I. History, Organization, and Structure of the Little Sisters of the Poor**

5. The Little Sisters of the Poor is an international Roman Catholic Congregation of Sisters that has provided loving care to needy elderly persons of any race, sex, or religion for 174 years.

6. The Little Sisters of the Poor were founded in France, in the winter of 1839, when St. Jeanne Jugan carried a blind elderly woman off the streets and into her home and laid the woman in her own bed. Over time, other women joined St. Jeanne in a religious ministry designed to protect and care for the elderly poor.

7. By the time St. Jeanne died forty years later, the Little Sisters of the Poor had established homes in eight countries, including the United States, where the first home was founded in 1868 in Brooklyn, New York.

8. Today, there are Little Sisters homes in over thirty countries around the world serving over 13,000 poor elderly people.

9. The Little Sisters of the Poor have founded and operate thirty homes in the United States, which are located in nineteen states and the District of Columbia. These homes are hosted by over 300 Little Sisters of various nationalities.

10. In the United States, our homes are divided into three provinces: the Baltimore Province, the Brooklyn Province, and the Chicago Province. The Superiors of the various homes in each province are under the authority of the province's Provincial Superior. All of the provinces are under the authority of the Superior General of the Little Sisters of the Poor, who resides in France.

11. Important policy decisions that will affect the Little Sisters of the Poor throughout the United States are typically made by the three Provincial Superiors, subject to the approval of the Superior General.

12. All Little Sisters homes share the same fidelity to the same Catholic beliefs. Every home is operated under the control of the Little Sisters, and every Little Sister takes a vow of obedience to God, which assumes obedience to the Pope, the Church's teaching, and the authority of the Church in her hierarchy.

13. While Catholic and committed to following Church teaching, the Little Sisters' homes are not under the civil legal ownership and control of the dioceses in which they are located. Instead, the Little Sisters of the Poor own and control the homes ourselves, through local corporations that are entirely within the civil legal control of the Little Sisters.

14. While Catholic and committed to following Church teaching, the Little Sisters' homes are not directly funded by the dioceses in which we are located. Instead, we take responsibility for funding our own operations. For most homes, about half of the budget comes from voluntary gifts, largely in response to the begging for funds and gifts in kind that the Little Sisters do to support our ministry. About half of the budget comes from the federal and state government payments we receive for the care we provide to the needy elderly (Medicaid and Medicare), as well as the residents' meager pensions.

**II. The Named Plaintiffs: Little Sisters of Baltimore and Little Sisters of Denver**

3

15. The two Little Sisters of the Poor homes that are the named Plaintiffs in this suit are the Little Sisters of the Poor Home for the Aged, Denver, Colorado, and the Little Sisters of the Poor, Baltimore, Inc.

16. Little Sisters of the Poor, Baltimore, Inc. ("Little Sisters of Baltimore"), is a Maryland non-profit corporation that qualifies as a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986 ("the Code"). The Baltimore Home is one of the ten homes that are under my direct authority as Provincial Superior of the Baltimore Province.

17. Little Sisters of Baltimore currently employs approximately 54 full-time employees.

18. The Little Sisters of the Poor Home for the Aged, Denver, Colorado ("Little Sisters of Denver"), is a Colorado non-profit corporation that qualifies as a tax-exempt organization under section 501(c)(3) of the Code. The Little Sisters of Denver Home is under the direct authority of the Provincial Superior of the Chicago Province. With the other two Provincial Superiors and the Superior General, I make important policy decisions affecting all of the U.S. homes, including the Denver home.

19. Little Sisters of Denver currently employs approximately 67 full-time employees.

20. Both Little Sisters of Baltimore and Little Sisters of Denver have adopted the Christian Brothers Employee Benefit Trust (the "Christian Brothers Trust") to provide medical benefits coverage for their employees.

4

21. It is my understanding that Christian Brothers Trust is a Catholic entity designed to serve the Catholic Church and related faith-based entities. It is my understanding that, like the Little Sisters, the Christian Brothers Trust operates in a manner consistent with our mutual Catholic beliefs. One of the reasons the Little Sisters chose to use the Christian Brothers Trust for our health benefits is because it shares and is administered in accordance with our religious beliefs and provide benefits accordingly.

### III. Religious Beliefs and Commitments of the Little Sisters of the Poor

22. Jesus taught that "in so far as you did it to the least of these brothers of mine, you did it to me." *See* Matthew 25:34. This teaching is a fundamental part of who the Little Sisters are. St. Jeanne urged her fellow Little Sisters, "Never forget that the poor are Our Lord; in caring for the poor say to yourself: This is for my Jesus—what a great grace!" Thus, each Little Sister makes a vow of Hospitality, through which she promises to care for the aged as if they were Christ himself.

23. As Little Sisters, we strive to witness to the value of the elderly by believing in their inviolable dignity, by recognizing their unique contributions to the Church and society, and by involving them in the activities of our Homes to develop their human potential.

24. Caring for the dying is the summit of the Little Sisters' service to the elderly poor. The Little Sisters maintain a constant presence with those who have entered the dying process and their families. We try to relieve their sufferings as much as possible, which includes giving emotional and prayerful support. Our

5

provision of spiritual support is always consistent with the faith of the person we are serving; we do not force religious observance on anyone.

25. Because the Little Sisters care for those who are weak and dying, we strive to emphasize our respect for the uniqueness and dignity of each elderly person as they reach the end of their life. We offer this respect for two reasons. First, to treat the individual with the dignity they are due as a person loved and created by God. Second, to convey a public witness of respect for life, in the hope that we can help build a Culture of Life in our society. *See* ECF No. 1-6, Exhibit E, which is a true and accurate copy of the Little Sisters of the Poor *Mission, Vision, and Values* (describing the Little Sisters' "VISION" as building a "Culture of Life by nurturing communities where each person is valued, the solidarity of the human family and the wisdom of age are celebrated, and the compassionate love of Christ is shared with all," and its "VALUES" as including "REVERENCE for the sacredness of human life and for the uniqueness of each person, especially those who are the poorest and/or weakest").

26. This commitment is also reflected in our vow to treat each person in our care with the same respect and compassion as if he or she was Jesus Christ.

27. We care for the elderly poor of all races and religions, or of no religion at all. We do not care for people because they are Catholic, but because we are Catholic.

28. We also hire employees of all races and religions, or of no religion at all. Because staff members are an important extension of our ministry to the elderly, they must support the Little Sisters' mission by welcoming the elderly poor, helping

to make them happy and caring for them with respect or dignity until death. Failure to do so is one of the relatively few explicit grounds for staff dismissal.

29. The Little Sisters have also taken a vow of obedience to God, which assumes obedience to the Pope. We carefully follow all of his guidance, and obey all the decisions of the Church. Thus, we develop all of our programs, policies, and procedures in accord with the teachings of the Catholic Church, including its ethical teachings on the inviolable dignity of every human life.

30. These teachings include Catholic religious teachings about abortion, contraception, sterilization, and cooperation with acts that are intrinsically immoral.

31. Authoritative Catholic teachings are located in sacred Scripture and sacred tradition, and are set forth and specified in the Catechism of the Catholic Church, documents of ecumenical councils (such as the Second Vatican Council), papal encyclicals, directives issued by bishops' conferences, and other teaching documents of the Church. *See generally* Catechism of the Catholic Church Nos. 888-892 (describing the teaching office of the Church); *Dei Verbum* No. 10 (describing how "[s]acred tradition and Sacred Scripture form one sacred deposit of the word of God, committed to the Church," and explaining that "the task of authentically interpreting the word of God, whether written or handed on, has been entrusted exclusively to the teaching office of the Church, whose authority is exercised in the name of Jesus Christ").

32. Sections 2270 and 2271 of the Catechism of the Catholic Church (1994) affirm that life begins at conception, that directly intending to take innocent human life is gravely immoral. Thus a post-conception contraceptive is an abortifacient and "gravely contrary to moral law." *See also* section 2274 ("Since it must be treated from conception as a person, the embryo must be defended in its integrity, cared for, and healed, as far as possible, like any other human being.")

33. The Catholic Church also teaches that contraception and sterilization are intrinsic evils. *Id.* at Section 2370.

34. The Church teaches that programs of "economic assistance aimed at financing campaigns of sterilization and contraception" are "affronts to the dignity of the person and the family." *See* Section 234 of the Compendium of the Social Doctrine of the Church (2004).

35. In a landmark encyclical, Blessed Pope John Paul II made clear that Catholics may never "encourage" the use of "contraception, sterilization, and abortion[.]" *See* Section 91 of *Evangelium Vitae* (1995).

36. Similarly, the United States Conference of Catholic Bishops ("USCCB") has issued a series of directives to inform the provision of health services in every U.S. Catholic health institution. These directives prohibit providing, promoting, or condoning abortions, abortion-inducing drugs, contraceptives, and sterilization. Exhibit L, USCCB Directives for Catholic Health Care Services at Nos. 45, 52, & 53.

37. The directives specifically warn against partnering with other entities in a manner that could involve Catholic health care services in the provision of such "intrinsically immoral" services. *Id.* at Nos. 67-72.

38. Rather, the USCCB Directives instruct us to "distinguish [ourselves] by service to and *advocacy for*" people who are "at the margins of society" and "particularly vulnerable to discrimination," such as "the poor, the uninsured and underinsured; children and the *unborn*; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees." *Id.* at No. 3 (emphasis added).

39. The Little Sisters are particularly concerned about the possibility that our conduct may lead others to do evil, or think that the Little Sisters condone evil. *See* Catechism No. 2284, 86 (instructing Catholic institutions to avoid "scandal" and defining "scandal" as "an attitude or behavior which leads another to do evil"; scandal can be caused "by laws or institutions"). The Little Sisters beg for funds and goods at Catholic parishes and elsewhere to support our ministry. Thus, participating in the provision of health benefits that violate Catholic teaching poses a grave risk for the Little Sisters as they interact with Catholic faithful and others who share our beliefs.

40. Even before entering the Little Sisters of the Poor, I was familiar with the Catholic religious requirement to avoid facilitating abortion, contraception, and sterilization. Early in my career as a nurse, I was required as part of my job to facilitate the signing of consent forms for abortions being performed at the hospital.

9

The documents were being processed in connection with abortion procedures being performed at the hospital. Although I was not being required to pay for or to physically perform or assist in performing the abortions, my Catholic religious beliefs compelled me to ask my employer to exempt me from this task. Even handling the forms that would facilitate the abortions was contrary to my religious beliefs.

41. The Little Sisters are also guided by Catholic teaching to provide for the health and welfare of our employees and their families by providing them with adequate health benefits. "In return for their labor, workers have a right to wages and other benefits sufficient to sustain life in dignity." *Economic Justice For All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy*, ¶ 103, available at http://www.usccb.org/upload/economic_justice_for_all.pdf (last visited September 28, 2013) ("The provision of wages and other benefits sufficient to support a family in dignity is a basic necessity to prevent this exploitation of workers. The dignity of workers also requires adequate health care . . .").

42. The Little Sisters believe that the health plans that each home offers should be consistent with Catholic teaching. Historically, the Provincial Superiors have sought to achieve that goal by having our homes either obtain health benefits coverage through a Catholic organization like the Christian Brothers or join the coverage provided by the local diocese.

43. The Little Sisters consider these religious ethical teachings binding on how we carry out our religious ministry of caring for the elderly poor.

**IV. The Impact of the Mandate on the Little Sisters**

44. The HHS contraceptive mandate (the "Mandate") places an enormous pressure on the Little Sisters to violate our religious beliefs.

45. Our vow of hospitality, which asks us to treat each person in our care as if he or she were Christ himself, commits us just as much to respecting the dignity of human life at its beginning as at its end. We can no more participate in the provision of insurance coverage for contraception, abortion, and sterilization than we could participate in insurance coverage for euthanasia or assisted suicide.

46. Because of the religious beliefs set forth above, the Little Sisters cannot participate in the government's program to promote and facilitate access to the use of sterilization, contraceptives, and abortion-inducing drugs and devices.

47. Because of the religious beliefs set forth above, we cannot provide health benefits to our employees that will include access to sterilization, contraception, and abortion-inducing drugs and devices.

48. Because of the religious beliefs set forth above, we cannot designate any third party to provide our employees with access to sterilization, contraception, and abortion-inducing drugs and devices.

49. Because of the religious beliefs set forth above, we cannot make the government-required certifications to a third party to require that third party to provide our employees with access to sterilization, contraception, and abortion-inducing drugs.

50. Because of the religious beliefs set forth above, we cannot take any action that would force Christian Brothers to violate its own religious beliefs in this regard.

51. Further, obeying the Mandate's requirement to participate in the provision of abortion-inducing drugs would violate our public witness to the respect for life and human dignity that we are committed to displaying at all times through our vow of hospitality and our fidelity to Church teaching. It would similarly violate our duty to "advoca[te] for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable," such as "the unborn." Ex. L, USCCB Directives, at No. 3.

52. The Little Sisters believe that our ministry and all of our resources are gifts from God that we must use to God's glory and for the good of all, to help bear the burdens and sufferings of others. ECF No. 1-6, Exhibit E, Little Sisters of the Poor *Mission, Vision, and Values*. We cannot allow those gifts to be co-opted to serve ends that we believe dishonor God and the dignity of the human person.

53. The Mandate threatens the Little Sisters with large fines and penalties if we continue to act in accordance with these religious beliefs.

54. For example, if we continue our practice of providing health benefits to our employees and their families without including free access to sterilization, contraception, and abortion-inducing drugs and devices, we will face fines of "$100 for each day in the noncompliance period with respect to each individual to whom such failure relates." 26 U.S.C. § 4980D(b)(1).

12

55. Depending on how the I.R.S. applies this penalty, the Little Sisters homes could face tens of millions of dollars of fines *each year* for our inability to facilitate the required coverage.

56. For example, Little Sisters of Denver currently employs 67 full-time employees. If the I.R.S. levies the fine on a per-full-time-employee basis, we would be facing daily fines of $6,700, and annual fines of $2,445,500. If the I.R.S. levies the fine on the basis of total number of employees and dependents receiving benefits, the fines would be orders of magnitude larger.

57. The entire operating budget for Little Sisters of Denver—which currently provides care for 69 needy elderly individuals—is $6,015,000.

58. Likewise, Little Sisters of Baltimore currently employs 54 full-time employees. If the I.R.S. levies the fine on a per-full-time-employee basis, we would be facing daily fines of $5,400, and annual fines of $1,971,000. If the I.R.S. levies the fine on the basis of total number of employees and dependents receiving benefits, the fines would be orders of magnitude larger.

59. The entire operating budget for Little Sisters of Baltimore—which currently provides loving care for 69 needy elderly individuals—is $7,015,417.

60. Nor can we avoid these fines by choosing not to provide health benefits at all. Cutting off all benefits for our employees would be unconscionable. We love and respect our employees and are dedicated to providing adequate health benefits.

61. Cutting off all employee benefits would also have a severe negative impact on our employees and their families.

62. Cutting off all employee benefits would also have a severe negative impact on our ability to hire and retain qualified medical staff and other employees. Benefits plans are, of course, an important reason that many employees make choices about which jobs to pursue, to keep, and to abandon.

63. Even if we could cut off all benefits in good conscience and without harming our employees or our homes, we would face large government fines for doing so. For example, Little Sisters of Denver would face annual fines of approximately $134,000 for dropping health benefits altogether. Little Sisters of Baltimore would face annual fines of approximately $108,000 for dropping health benefits.

64. For these reasons, the Mandate imposes enormous pressure on the Little Sisters to participate in activities prohibited by our sincerely held religious beliefs. We cannot provide the benefits in question ourselves, we cannot designate anyone else to provide them, we cannot hire a third party to provide them, and we cannot submit the certifications required to trigger the flow of these benefits.

65. Prior to the Mandate, we engaged in conduct motivated by our sincerely held religious beliefs: providing benefits plans that do not include sterilization, contraception, and abortion-inducing drugs and devices. The Mandate prevents our participation in that religious exercise.

66. The Mandate also places enormous pressure on the Little Sisters to engage in conduct contrary to our sincerely held religious beliefs. Our beliefs forbid us from participating, in any way, in the government's program to promote and facilitate access to sterilization, contraceptives, and abortion-inducing drugs and devices.

With the two other Provincial Superiors, I am charged with making decisions for the Little Sisters in the United States. The severe threats of fines and punishment create enormous pressure on us to violate our religious beliefs as the price of continuing our mission of helping the needy elderly.

67. The requirements of the Mandate—providing certain health benefits, designating other parties to provide those benefits, and filing certifications that will make those benefits flow—are highly religiously significant to us, and are forbidden by our religious beliefs, our Congregation's religious mission, and our commitments to God and the Roman Catholic Church. We object not because the Mandate makes us use drugs or devices against our religious beliefs, but because it forces us to participate as a necessary part of the government's scheme to provide those drugs and devices.

68. The Little Sisters of the Poor do not sue the federal government lightly. We would much prefer not to, which is why we made multiple public statements and filed a detailed public comment with the government to inform them of our sincere religious objection to incorporating us into their scheme. But the government refused to exempt us.

69. Even so, we were reluctant to file this lawsuit, in part because lawsuits are so unusual for us, and even more because we do not want to alarm in any way the elderly poor whom we serve, nor their families, our employees, or our benefactors. But to protect our ability to serve them as we always have, and to avoid violating

and publicly rejecting our religious beliefs, our only recourse is this lawsuit. We need and respectfully request immediate relief.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this _21_th day of October, 2013, in Washington, D.C.

*Mother Loraine Marie Clare Maguire, l.s.p.*
Mother Loraine Marie Clare Maguire, L.S.P.