## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-02611-WJM-BNB

LITTLE SISTERS OF THE POOR HOME FOR THE
AGED, DENVER, COLORADO, a Colorado non-profit
corporation, LITTLE SISTERS OF THE POOR,
BALTIMORE, INC., a Maryland non-profit corporation, by
themselves and on behalf of all others similarly situated,

CHRISTIAN BROTHERS SERVICES, a New Mexico
non-profit corporation, and

CHRISTIAN BROTHERS EMPLOYEE BENEFIT
TRUST,

      Plaintiffs,

  v.

KATHLEEN SEBELIUS, Secretary of the United States
Department of Health and Human Services,

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

THOMAS E. PEREZ, Secretary of the United States
Department of Labor,

UNITED STATES DEPARTMENT OF LABOR,

JACOB J. LEW, Secretary of the United States Department
of the Treasury, and

UNITED STATES DEPARTMENT OF THE TREASURY,

      Defendants.

## DECLARATION OF BROTHER MICHAEL QUIRK

    I, Brother Michael Quirk, FSC, do hereby state and declare as follows:

    1.     My name is Michael Quirk.  I am of sound mind and competent to make this

declaration and swear to the matters herein.  I am over the age of 21 years and have never been

convicted of a felony or crime of moral turpitude.  The statements here are true and correct, and

they are based on my personal knowledge and/or a review of the business records of Christian

Brothers Services and Christian Brothers Employee Benefit Trust (the "Christian Brothers Trust" or "Trust").  If I were called upon to testify to these facts, I could and would competently do so.

2.      I am the President of Christian Brothers Services, an Illinois not-for-profit corporation affiliated with The Brothers of the Christian Schools (also known as the "Christian Brothers"), a male religious order of the Catholic Church.  I have served in this capacity since 2008.

3.      I have been a member of The Brothers of the Christian Schools since 1981.  I received an MBA from Lewis University and my doctorate in Education from De Paul University. I served 24 years at De La Salle Institute of Chicago, beginning as a business education teacher and concluding as president.  After approximately 24 years in high school ministry, I returned to Christian Brothers Services in 2008 where I began my professional career.

4.      I am very familiar with the self-insured health benefit program provided to Catholic employers and their benefits-eligible employees and dependents through the Christian Brothers Trust.  The Christian Brothers Trust is administered by Christian Brothers Services which handles the day to day operations of the Christian Brothers Trust.  As President of Christian Brothers Services which serves as the administrator for the Christian Brothers Trust, I am familiar with the business processes of Christian Brothers Services and Christian Brothers Trust, including enrollment.  I am also familiar with the Catholic employers that utilize and participate in the Christian Brothers Trust.   I have been authorized by Christian Brothers Services and Christian Brothers Employee Benefit Trust to make this declaration.

5.      The Christian Brothers Trust provides health and other welfare benefits for current and former employees of Catholic organizations throughout the United States that have adopted the Christian Brothers Trust.

6.      Participation in the Christian Brothers Trust is limited to organizations that are: (I) operated under the auspices of the Roman Catholic Church, in good standing thereof, and currently listed, or approved for listing in <u>The Official Catholic Directory</u>, published by P.J. Kennedy & Sons; (ii) exempt from federal income taxes under section 501(c)(3) of the Code; and (iii) organized as a non-profit corporation, if the organization is a corporation.

7.      <u>The Official Catholic Directory</u> includes the names and addresses of the agencies and instrumentalities and the educational, charitable, and religious institutions under the auspices of the Roman Catholic Church in the United States, its territories, and possessions.  Each year since 1946, the Internal Revenue Service has issued a Group Ruling affirmation letter affirming the exemption under section 501(c) of the Code from federal income taxes of all Catholic institutions listed in <u>The Official Catholic Directory</u> for that year.

8.      The Christian Brothers Trust is a "church plan" within the meaning of section 414(e) of the Code (26 U.S.C. § 414(e)) and has received a private letter ruling from the Internal Revenue Service confirming its status as such.

9.      The Christian Brothers Trust is not subject to the Employee Retirement Income Security Act of 1974 ("ERISA") because it has not made an election under section 410(d) of the Code.

10.      The Christian Brothers Trust is a self-insured health plan.  Therefore, the Christian Brothers Trust does not contract with an insurance company to provide the health benefits provided by the Christian Brothers Trust.

11.      The plan year for the Christian Brothers Trust begins on January 1st of each year.

12.      The Christian Brothers Trust is managed by a Board of Trustees elected by participating employers in the Christian Brothers Trust.

13.     It is my understanding that the Patient Protection and Affordable Care Act ("Affordable Care Act" or "Act") requires an employer's group health plan to cover certain women's "preventive care and screenings."  Patient Protection & Affordable Care Act, Pub. L. 111-148 (March 23, 2010), amended by the Health Care & Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010).  It is my understanding that on June 28, 2013, Defendants issued final rules (the "Final Mandate"), *see* 78 Fed. Reg. 39870 (published July 2, 2013).  The trustees of the Christian Brothers Trust have not appointed an administrator of the Christian Brothers Trust that is willing to act as a "third party administrator" under the Final Mandate, because the Christian Brothers Trust would thereby be contracting for, arranging for or otherwise facilitating the provision of abortifacients, sterilizations and contraceptives in violation of Catholic teachings.

14.     The Christian Brothers Trust is administered by Christian Brothers Services, a New Mexico non-profit corporation that is also affiliated with The Brothers of The Christian Schools.

15.     Christian Brothers Services is a Catholic organization designed to "serve the Catholic Church community and other faith-based organizations."  Because Christian Brothers Services "understand[s] the unique dynamics of Church organizations and institutions," it serves those entities by helping them "to remain faithful to [their] mission and the universal mission of the Catholic Church."  Christian Brothers Services' "incentive is to serve the Church, not profit." *See* https://www.cbservices.org/about-us.html.

16.     Jesus taught that "in so far as you did it to the least of these brothers of mine, you did it to me." *See* Matthew 25:34.  This teaching is a fundamental part of how the Christian Brothers administer the Christian Brothers Trust.

17.     The Christian Brothers Trust and Christian Brothers carefully follow the decisions of the Catholic Church.  Thus, they develop their programs, policies, and procedures in accord with the teachings of the Catholic Church, including its ethical teachings on the inviolable dignity

of every human life.  These teachings include Catholic religious teachings about abortion, contraception, sterilization, and cooperation with acts that are intrinsically immoral.

18.     Authoritative Catholic teachings are located in sacred Scripture and sacred tradition, and are set forth and specified in the Catechism of the Catholic Church, documents of ecumenical councils (such as the Second Vatican Council), papal encyclicals, directives issued by bishops' conferences, and other teaching documents of the Church. *See generally* Catechism of the Catholic Church Nos. 888-892 (describing the teaching office of the Church); *Dei Verbum* No. 10 (describing how "[s]acred tradition and Sacred Scripture form one sacred deposit of the word of God, committed to the Church," and explaining that "the task of authentically interpreting the word of God, whether written or handed on, has been entrusted exclusively to the teaching office of the Church, whose authority is exercised in the name of Jesus Christ").

19.     Section 2270 of the Catechism of the Catholic Church (1994) teaches that life begins at conception.  It states:

> Human life must be respected and protected absolutely from the moment of conception.  From the first moment of his existence, a human being must be recognized as having the rights of a person—among which is the inviolable right of every innocent being to life.

20.     Thus, the Catholic Church teaches that a post-conception contraceptive is an abortifacient and "gravely contrary to moral law."  Section 2271 of the Catechism of the Catholic Church (1994) provides:

> Since the first century the Church has affirmed the moral evil of every procured abortion.  This teaching has not changed and remains unchangeable.  Direct abortion, that is to say, abortion willed either as an end or a means, is gravely contrary to the moral law.

21.     The Catholic Church also teaches that contraception and sterilization are intrinsic evils.  For example, Section 2370 of the Catechism of the Catholic Church (1994) characterizes as "intrinsically evil":

[e]very action which, whether in anticipation of the conjugal act, or in its accomplishment, or in the development of its natural consequences, proposes, whether as an end or as a means, to render procreation impossible.

22.     Section 234 of the Compendium of the Social Doctrine of the Church (2004) provides that "[a]ll programmes of economic assistance aimed at financing campaigns of sterilization and contraception . . . are to be morally condemned as affronts to the dignity of the person and the family."

23.     In a landmark encyclical, Blessed Pope John Paul II made clear that Catholics may never "encourage" the use of "contraception, sterilization, and abortion," teaching that "[I]t is morally unacceptable to encourage, let alone impose, the use of methods such as contraception, sterilization, and abortion in order to regulate births." *See* Section 91 of *Evangelium Vitae* (1995).

24.     Similarly, the United States Conference of Catholic Bishops ("USCCB") has issued a series of directives to inform the provision of health services in every U.S. Catholic health institution. These directives prohibit providing, promoting, or condoning abortions, abortion-inducing drugs, contraceptives, and sterilization. Exhibit 1, USCCB Directives for Catholic Health Care Services at Nos. 45, 52, & 53.

25.     The directives specifically warn against partnering with other entities in a manner that could involve Catholic health care services in the provision of such "intrinsically immoral" services. *Id.* at Nos. 67-72.

26.     Rather, the USCCB Directives instruct Catholic health care services to "distinguish [themselves] by service to and *advocacy for*" people who are "at the margins of society" and "particularly vulnerable to discrimination," such as "the poor, the uninsured and underinsured; children and the *unborn*; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees." *Id.* at No. 3 (emphasis added).

27.     The Christian Brothers Trust and Christian Brothers Services are both Catholic organizations operated in accordance with Catholic religious teachings, including teachings on abortion, contraception, sterilization, and cooperation with sin.   Consistent with Catholic teachings, the Christian Brothers Trust does not provide and has never provided coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling. (Consistent with Church teachings, it does provide coverage for medicinal contraceptives prescribed for non-contraceptive purposes.)   Christian Brothers Trust and Christian Brothers Services believe that it would be immoral and sinful for them to intentionally facilitate the provision of contraceptives, abortifacient drugs, sterilizations, and related education and counseling, as would be required by the Final Mandate.   Similarly, it would be a violation of Christian Brothers Services' sincerely held Catholic beliefs for it to act as a "third party administrator" under the Final Mandate because it would have to contract for, arrange for or otherwise facilitate the provision of abortifacients, sterilizations and contraception in violation of Catholic teachings.

28.     Christian Brothers Trust and Christian Brothers Services are particularly concerned about the possibility that their conduct may lead others to do evil, or think that the Christian Brothers condone evil.  *See* Catechism No. 2284, 86 (instructing Catholic institutions to avoid "scandal" and defining "scandal" as "an attitude or behavior which leads another to do evil"; scandal can be caused "by laws or institutions").   Thus, participating in the provision of health benefits that violate Catholic teaching poses a grave concern for them as they interact with Catholic faithful and others who share our beliefs.

29.     Obeying the Mandate's requirement to participate in the provision of abortion-inducing drugs would violate our public witness to the respect for life and human dignity that we are committed to displaying at all times through our fidelity to Church teaching.  It would

similarly violate our duty to "advoca[te] for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable," such as "the unborn." Ex. 1, USCCB Directives, at 8.

30.     Nor can the Christian Brothers Trust and Christian Brothers Services violate their commitment to Christian witness by being seen to participate in the government's program.  Doing so would not only directly violate their obligations and vows, but also would risk leading others astray.  Nor can the Christian Brothers Trust and Christian Brothers Services violate Catholic teachings without jeopardizing the ministries of the class members, because their operating revenue often includes substantial voluntary donations.

31.     Because of the religious beliefs set forth above, Christian Brothers Trust and Christian Brothers Services cannot provide health benefits that will include access to sterilization, contraception, and abortion-inducing drugs and devices.

32.     Because of the religious beliefs set forth above, Christian Brothers Trust and Christian Brothers Services cannot designate any third party to provide Trust participants or their employees with access to sterilization, contraception, and abortion-inducing drugs and devices.

33.     Because of the religious beliefs set forth above, Christian Brothers Trust and Christian Brothers Services cannot facilitate the government-required certifications to a third party to require that third party to provide Trust participants or their employees with access to sterilization, contraception, and abortion-inducing drugs.

34.     Because of the religious beliefs set forth above, Christian Brothers Trust and Christian Brothers Services cannot take any action that would coerce the Trust participants to violate their own religious beliefs in this regard.

35.     The Christian Brothers are also guided by Catholic teaching to provide for the health and welfare of the class members' employees and their families by providing them with

adequate health benefits.  "In return for their labor, workers have a right to wages and other benefits sufficient to sustain life in dignity." *Economic Justice For All:  Pastoral Letter on Catholic Social Teaching and the U.S. Economy*, ¶ 103, available at http://www.usccb.org/upload/economic_justice_for_all.pdf  ("The provision of wages and other benefits sufficient to support a family in dignity is a basic necessity to prevent this exploitation of workers. The dignity of workers also requires adequate health care . . . .").

36.     The Christian Brothers consider these religious ethical teachings binding on how we carry out our religious ministry of providing health benefits to Catholic organizations that are consistent with Catholic doctrine.

37.     Christian Brothers Trust and Christian Brothers Services understand the unique dynamics of Church organizations and institutions, they serve those institutions by helping them to remain faithful to their mission and the universal mission of the Catholic Church.  One of the reasons the Trust participants chose to use the Christian Brothers Trust, which does not provide access to abortion, sterilization, and contraception, for health benefits is because they share our religious beliefs and provide benefits accordingly.

38.     The class members—all of whom are official Catholic organizations, and all of whom have chosen to provide health benefits through the Trust, which is expressly designed to provide benefits in accordance with Catholic principles—likewise may not participate in the government's program without violating their religion.  They are all religiously bound to follow the religious teachings on abortion, sterilization, and contraception set forth above.

39.     Plaintiffs Little Sisters of the Poor Home for the Aged, Denver, Colorado ("Little Sisters of Denver"), and Little Sisters of the Poor, Baltimore, Inc. ("Little Sisters of Baltimore"), (collectively the "Little Sisters Homes") that bring this action do so on behalf of themselves and all others similarly situated.  The class consists of employers that: (I) have adopted or in the future

adopt the Christian Brothers Employee Benefit Trust to provide medical coverage for their "employees" or former employees and their dependents ("employees" for purposes of this requirement has the meaning set forth in Code section 414(e)(3)(B)); (ii) are or could be reasonably construed to be "eligible organizations" within the meaning of the Final Mandate; and (iii) are not "religious employers" with the meaning of the Final Mandate.  The class members are all Catholic organizations operated in accordance with Catholic religious teachings, including teachings on abortion, contraception, sterilization, and cooperation with sin, and the Christian Brothers Trust does not provide and has never provided coverage for, or access to, contraception, sterilization, abortifacients, and related education and counseling.

40.     Based upon my understanding of the criteria under the Final Mandate, Christian Brothers Trust participants currently include approximately 473 Catholic organizations, located in approximately 40 states, that are or could reasonably be construed to be "eligible organizations" under 45 C.F.R. § 147.131(b)&(c) at 78 Fed. Reg. 39870, 39874.  These organizations employ over approximately 11,034 employees.  Based on our records, I estimate that 5,806 employees now work for plan participants that are large employers (*i.e.*, that average 50 or more full time employees).

41.     To a large extent, the class members are small non-profit organizations operating on limited budgets and devoted to religious ministries serving the elderly, poor, infirm, and/or needy.  It would be impractical to have all of these class members joined in a single action in a distant locale taking away time and resources from their ministry, and having them incur the expense to do so.  Additionally, the proposed class includes unknown, future employers that join the Christian Brothers Trust at a later date or employers that currently qualify for the religious employer exemption as "integrated auxiliaries" of a church but later cease to be integrated

auxiliaries.  Disposition of the claims of these class members in a single class action will provide substantial benefits to all parties and to the Court.

42.     The Christian Brothers Trust encompasses both exempt religious non-profit entities and non-exempt religious non-profit entities.  The class definition only includes the religious non-profit entities that could reasonably be construed as non-exempt "eligible organizations." These entities include organizations that might fall within the definition of "integrated auxiliaries" except for the fact that more than 50% of their funding comes from sources other than the Catholic Church.

43.     Under the Final Mandate, the participants in the Christian Brothers Trust are faced with the impossible dilemma of (1) paying significant fines and providing their employees with health insurance that does not cover contraception, abortion-inducing drugs, sterilization, and related counseling; or (2) paying significant fines and eliminating their health insurance plans altogether.

44.     Based on the criteria that I understand apply under the Federal Regulations, if the Christian Brothers Trust employer plan members decide to continue providing health coverage that does not include contraception, abortion-inducing drugs, sterilization procedures and related counseling, they will incur a $100 per day per individual fine.  If Christian Brothers Trust continues to offer employee health insurance without the mandated items on January 1, 2013, I understand that each class member, regardless of its size, will be subject to a penalty beginning on January 1, 2014, of $100 per day "per affected individual."  Thus, the non-exempt participants could incur penalties of approximately $1,103,400 per day – $402,741,000 per year – assuming 11,034 employees.

45.     Additionally, I am advised that large employers (*i.e.,* those with 50 or more employees) that cancel coverage altogether will be exposed to significant annual excise tax

penalties of $2,000 per full-time employee.  Consequently, if the non-exempt participants in the Christian Brothers Trust dropped their health coverage altogether, they would face annual penalties of more than $11,612,000 per year, based on estimates of 5,806 employers working with large employers (*i.e.*, averaging 50 or more full time employees).

46.     If the Christian Brothers Trust refuses to do anything that would provide coverage for contraceptives and related services, it would expose non-exempt "eligible organizations" that remain in the Trust to financially ruinous penalties that could render them insolvent or foreclose their ability to provide health care coverage for their employees. Indeed, the some class members will likely be forced to curtail or eliminate community and ministry programs.

47.     By forcing non-exempt "eligible organizations" to make the difficult decision to leave the Christian Brother Trust either to avoid the penalties or to avoid providing contraception coverage because of their religious belief, the Final Mandate substantially burdens the Christian Brothers Trust's religious exercise and ministry of providing health insurance benefits to Catholic organizations that have adopted the Trust.

48.     If the Christian Brothers Trust employer plan members discontinue participation in the Christian Brothers Trust and do not seek replacement coverage, they would be required to compromise their religious beliefs in that the Catholic faith compels them to promote the spiritual and physical well-being of their employees by providing them with health benefits that are consistent with Catholic beliefs.  However, the Act and Final Mandate would require them to act against those beliefs.

49.     Similarly, by discontinuing all coverage, the Christian Brothers Trust employer plan members would be placed at a severe competitive disadvantage in their efforts to hire and retain employees, which would adversely impact their ministries.  In my experience, a key factor to an employer's ability to retain existing employees and recruit new ones is the ability to offer and

provide health benefits.  Any uncertainty regarding these factors undermines the class members' ability to retain existing employees and recruit new ones.

50.     If class members chose to violate their Catholic beliefs and eliminate their health care coverage for their employees' altogether, they would likely need to increase employee compensation so that employees could purchase their own health insurance and pay the additional income taxes resulting from the increased compensation.  Otherwise, they face the prospect of a mass exodus of employees.

51.     Non-Catholic employers who, unlike those participating in the Christian Brothers Trust, do not object to the Final Mandate on religious grounds do not face this dilemma.  The Final Mandate, therefore, is currently placing Christian Brothers Trust participants at a competitive disadvantage in their ability to recruit new and existing employees relative to employers who do not have religious objections to the Final Mandate.

52.     If non-exempt "eligible organizations" were forced to withdraw from the Christian Brothers Trust to avoid the provision of objectionable coverage, it would also have a substantial adverse financial impact on the Christian Brothers Trust and its remaining participating employers because there would be fewer participating employers to share the fixed costs of administration.

53.     Similarly, the financial impact on Christian Brothers Trust and Christian Brothers Services is substantial.  For "eligible organizations" over 50 employees, Christian Brothers Trust and Christian Brothers Services estimate a loss of $100 million in medical plan contributions for those locations that may be forced to leave the Christian Brother Trust health plan, resulting in an annual reduction in net income of approximately $8 million.  For "eligible organizations" under 50 employees, Christian Brothers Trust and Christian Brothers Services estimate a loss of another $30 million in medical plan contributions for those locations that may be forced to leave the Christian

Brother Trust health plan, resulting in an annual reduction in net income of approximately $2.4 million.

54.     Additionally, if Christian Brothers Services were to resign as administrator of the Christian Brothers Trust prior to January 1, 2014, it would disrupt the administration of the Christian Brothers Trust, thus penalizing the non-exempt "eligible organizations" and the other participating employers in the Christian Brothers Trust.  This course would also dramatically reduce the scope of Christian Brothers Services' religious ministry to provide health benefits to Catholic organizations.

55.     If Christian Brother Services were to treat itself as a "third party administrator" under the Final Mandate and provide for or arrange for payments for contraceptive services on its own or through another entity, Christian Brother Services would be violating its religious beliefs because it would, both for itself and the Trust, be contracting for, arranging, paying or otherwise facilitating the provision of contraceptive products and related services, and thus requiring the class members to facilitate that coverage.

56.     The Government's "accommodation" does not address Christian Brothers Trust and Christian Brothers Services' fundamental religious objection to improperly facilitating access to the objectionable products and services.  This arrangement still requires Christian Brothers Trust and Christian Brothers Services to facilitate the provision of products and services antithetical to the Catholic Faith, since the Trust participants' employees would only receive free contraceptives, sterilization, abortifacients, and related counseling by virtue of their participation in the Christian Brothers Trust.

57.     The class members would be required to actively facilitate and promote the distribution of these services in ways that are forbidden by their religion.  The Final Mandate forces Plaintiffs to contract for, facilitate, or pay for the provision of contraception, sterilization,

abortifacients, and related education and counseling in violation of their religious beliefs, by taking the following actions, among others:

- By delivering a self-certification, Plaintiffs take action for which the ultimate goal is to make contraception and abortifacient coverage available through their health plan.

- By delivering a self-certification, Plaintiffs facilitate the coverage at issue and pressure Christian Brothers Services and Christian Brothers Trust to provide that coverage in violation of their shared Catholic faith.

- Plaintiffs are required to be involved in the process by identifying its employees to the third party administrator for the purpose of enabling the Final Mandate's scheme.

- Plaintiffs would have to coordinate with the third party administrator when they add or remove employees and beneficiaries from their healthcare plans and, as a result, the Final Mandate's scheme.

- Plaintiffs would also have to coordinate with third party administrators to provide notice to plan participants and beneficiaries of the contraceptive payment benefit "contemporaneous with (to the extent possible) but separate from any application materials distributed in connection with enrollment" in a group health plan, under the auspices of the Plaintiffs self-funded plan. 78 Fed. Reg. at 39876. Plan participants must be given a written notice of any material change in the Summary of Benefits and Coverage at least 60 days' in advance notice of any such change. See 26 C.F.R. § 54.9815-2715(b), 29 C.F.R. § 2590.715-2715(b) and 45 C.F.R. § 147.200(b); published 77 Fed. Reg. 8668, 8698-8705 (Feb. 14, 2012). The Affordable Care Act requires that participants in a group health plan be given a Summary of Benefits and Coverage that "accurately describes the benefits and coverage" of the plan. Pub. L. No. 111-148 § 1001(5), 124 Stat. 131 (codified at 42 U.S.C § 300gg-9).

- If Plaintiffs must leave the Christian Brothers Trust to avoid penalties if Christian Brothers Trust does not provide the mandated coverage, Plaintiffs would be required to: (I) select another insurer or third party administrator willing to provide for or arrange contraceptive coverage; (ii) negotiate an administrative services agreement with the third party administrator; and (iii) communicate the plan changes to their employees.

- The third party administrator would also be required to provide the contraceptive benefits "in a manner consistent" with the provision of other covered services. 78 Fed. Reg. at 39876-77. Thus, any payment or coverage dispute would presumably be resolved under the terms of the Plaintiffs' plan documents, making them complicit. By delivering a self-certification to the

third party administrator, the designation makes the third party administrator a plan administrator with fiduciary duties under a Plaintiff's plan and payments for contraceptive and abortifacient services would be payments made under the auspices of the health plan.  Similarly, litigation claims relating to or arising from this coverage could theoretically implicate the Class Action Plaintiffs, Christian Brothers Trust, and Christian Brothers Services as parties−for coverage that the Plaintiffs oppose!

58.   The only way to provide effective relief for Christian Brothers Trust, Christian Brothers Services, and class members would be to enjoin enforcement of the Final Mandate with respect to all non-exempt "eligible organizations" in the Christian Brothers Trust; otherwise, they will be adversely affected by every penalty and application of the Final Mandate to these organizations.

59.   In the past year, Christian Brothers Trust and Christian Brothers Services have expended voluminous resources in studying, commenting on, and responding to every stage of the Final Mandate's administrative process.  In addition, they have expended further resources in considering what they would need to do to comply with the Mandate.

60.   Christian Brothers Trust and Christian Brothers Services are now planning for the 2014 plan year.  In addition to having the plan in place and funded by January 1, 2014, the class members must coordinate regarding the structure and provision of coverage well in advance of January 1, 2014.  This is a complex and time-consuming process and is occurring at this very moment and time.

61.   I believe there is inadequate time to provide any changes in plan documentation to class members, including any Summary of Benefits and Coverage and notices of any material change in the Summary of Benefits and Coverage.  A lapse in coverage would be disastrous for Plaintiffs' operations and for the employees and their families who depend on the Christian Brothers Trust for health care coverage.

62.     I believe the claims of the representatives Little Sisters Homes are typical of the claims of the class in that the Little Sisters Homes and all class members will be equally and similarly harmed by the Defendants' enforcement of the Affordable Care Act and Final Mandate. Furthermore, I believe the factual bases of Defendants' actions are common to all class members. The class members share in the same Catholic beliefs set forth above and, therefore, will suffer the same impact and violation of rights.

63.     By definition none of the class members are eligible for the religious employers exemption under the Final Mandate.  The Final Mandate forces all of the class members to choose between incurring severe financial hardship or violating their religious beliefs by taking steps to invoke the "accommodation."  All of the class claims require a common finding by the Court as to whether the Final Mandate's accommodation and requirement that the class members provide contraceptive coverage in their health plans violates their rights under the Religious Freedom Restoration Act and the First Amendment.

64.     I believe the Little Sisters Homes will fairly and adequately protect the interests of the Class.  Christian Brothers Trust, Christian Brothers Services, and the Little Sisters Homes have retained counsel with substantial experience in litigating class action cases and in litigating violations of religious and constitutional rights.   Christian Brothers Trust, Christian Brothers Services, and their counsel are committed to prosecuting this action vigorously on behalf of the class members, and have the resources to do so.  Christian Brothers Trust and Christian Brothers Services are financially committed to assist the Little Sisters Homes in litigating this matter to conclusion on behalf of the class members.  Christian Brothers Trust, Christian Brothers Services, and the Little Sisters Homes do not have an interest adverse to those of the class members.

65.     In this case, I believe the prosecution of separate actions by individual class members creates a risk of inconsistent or varying adjudications.  With an inconsistent application

of the same federal regulation, the courts may establish incompatible and controverting standards of conduct for Defendants.  Defendants, the class members, and the Christian Brothers entities would be subject to intense confusion of the applicability of the Final Mandate as to seemingly identical plan employers located in different forums.  The Christian Brothers entities would not know how to administer the health plan with certainty, and Defendants would not know how to enforce the Final Mandate with certainty.

66.     I believe that all members of the class, Christian Brothers Trust, and Christian Brothers Services are entitled to an injunction prohibiting Defendants from enforcing the Final Mandate against them and from charging or assessing penalties against them for failure to offer or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling.  Plaintiffs and class members will suffer immediate and irreparable injury if an injunction is not immediately issues, and any other remedies, such as monetary damages, are inadequate to prevent injury and fully compensate the class members, Christian Brothers Trust, and Christian Brothers Services from injury.

PURSUANT TO 28 U.S.C § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON OCTOBER 24, 2013

_Brother Michael Quirk_

_____

Br. Michael Quirk, FSC

**Exhibit 1**



*Issued by USCCB, November 17, 2009*

*Copyright © 2009, United States Conference of Catholic Bishops. All rights reserved.*

*To order a copy of this statement, please visit* www.usccbpublishing.org *and click on "New Titles."*

# Ethical and Religious Directives for Catholic Health Care Services

*Fifth Edition*

United States Conference of Catholic Bishops

# CONTENTS

Preamble

General Introduction

Part One: The Social Responsibility of Catholic Health Care Services

Part Two: The Pastoral and Spiritual Responsibility of Catholic Health Care

Part Three: The Professional-Patient Relationship

Part Four: Issues in Care for the Beginning of Life

Part Five: Issues in Care for the Seriously Ill and Dying

Part Six: Forming New Partnerships with Health Care Organizations and Providers

Conclusion

# PREAMBLE

Health care in the United States is marked by extraordinary change. Not only is there continuing change in clinical practice due to technological advances, but the health care system in the United States is being challenged by both institutional and social factors as well. At the same time, there are a number of developments within the Catholic Church affecting the ecclesial mission of health care. Among these are significant changes in religious orders and congregations, the increased involvement of lay men and women, a heightened awareness of the Church's social role in the world, and developments in moral theology since the Second Vatican Council. A contemporary understanding of the Catholic health care ministry must take into account the new challenges presented by transitions both in the Church and in American society.

Throughout the centuries, with the aid of other sciences, a body of moral principles has emerged that expresses the Church's teaching on medical and moral matters and has proven to be pertinent and applicable to the ever-changing circumstances of health care and its delivery. In response to today's challenges, these same moral principles of Catholic teaching provide the rationale and direction for this revision of the *Ethical and Religious Directives for Catholic Health Care Services.*

These Directives presuppose our statement *Health and Health Care* published in 1981.[1] There we presented the theological principles that guide the Church's vision of health care, called for all Catholics to share in the healing mission of the Church, expressed our full commitment to the health care ministry, and offered encouragement to all those who are involved in it. Now, with American health care facing even more dramatic changes, we reaffirm the Church's commitment to health care ministry and the distinctive Catholic identity of the Church's institutional health care services.[2] The purpose of these *Ethical and Religious*

*Directives* then is twofold: first, to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person; second, to provide authoritative guidance on certain moral issues that face Catholic health care today.

The *Ethical and Religious Directives* are concerned primarily with institutionally based Catholic health care services. They address the sponsors, trustees, administrators, chaplains, physicians, health care personnel, and patients or residents of these institutions and services. Since they express the Church's moral teaching, these Directives also will be helpful to Catholic professionals engaged in health care services in other settings. The moral teachings that we profess here flow principally from the natural law, understood in the light of the revelation Christ has entrusted to his Church. From this source the Church has derived its understanding of the nature of the human person, of human acts, and of the goals that shape human activity.

The Directives have been refined through an extensive process of consultation with bishops, theologians, sponsors, administrators, physicians, and other health care providers. While providing standards and guidance, the Directives do not cover in detail all of the complex issues that confront Catholic health care today. Moreover, the Directives will be reviewed periodically by the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops), in the light of authoritative church teaching, in order to address new insights from theological and medical research or new requirements of public policy.

The Directives begin with a general introduction that presents a theological basis for the Catholic health care ministry. Each of the six parts that follow is divided into two sections. The first section is in expository form; it serves as an introduction and provides the context in which concrete issues can be discussed from the perspective of the Catholic faith. The second section is

in prescriptive form; the directives promote and protect the truths of the Catholic faith as those truths are brought to bear on concrete issues in health care.

# GENERAL INTRODUCTION

The Church has always sought to embody our Savior's concern for the sick. The gospel accounts of Jesus' ministry draw special attention to his acts of healing: he cleansed a man with leprosy (Mt 8:1-4; Mk 1:40-42); he gave sight to two people who were blind (Mt 20:29-34; Mk 10:46-52); he enabled one who was mute to speak (Lk 11:14); he cured a woman who was hemorrhaging (Mt 9:20-22; Mk 5:25-34); and he brought a young girl back to life (Mt 9:18, 23-25; Mk 5:35-42). Indeed, the Gospels are replete with examples of how the Lord cured every kind of ailment and disease (Mt 9:35). In the account of Matthew, Jesus' mission fulfilled the prophecy of Isaiah: "He took away our infirmities and bore our diseases" (Mt 8:17; cf. Is 53:4).

Jesus' healing mission went further than caring only for physical affliction. He touched people at the deepest level of their existence; he sought their physical, mental, and spiritual healing (Jn 6:35, 11:25-27). He "came so that they might have life and have it more abundantly" (Jn 10:10).

The mystery of Christ casts light on every facet of Catholic health care: to see Christian love as the animating principle of health care; to see healing and compassion as a continuation of Christ's mission; to see suffering as a participation in the redemptive power of Christ's passion, death, and resurrection; and to see death, transformed by the resurrection, as an opportunity for a final act of communion with Christ.

For the Christian, our encounter with suffering and death can take on a positive and distinctive meaning through the redemptive power of Jesus' suffering and death. As St. Paul says, we are "always carrying about in the body the dying of Jesus, so that the life of Jesus may also be manifested in our body" (2 Cor 4:10). This truth does not lessen the pain and fear, but gives confidence and grace for bearing suffering rather than being overwhelmed by it. Catholic

health care ministry bears witness to the truth that, for those who are in Christ, suffering and death are the birth pangs of the new creation. "God himself will always be with them [as their God]. He will wipe every tear from their eyes, and there shall be no more death or mourning, wailing or pain, [for] the old order has passed away" (Rev 21:3-4).

In faithful imitation of Jesus Christ, the Church has served the sick, suffering, and dying in various ways throughout history. The zealous service of individuals and communities has provided shelter for the traveler; infirmaries for the sick; and homes for children, adults, and the elderly.[3] In the United States, the many religious communities as well as dioceses that sponsor and staff this country's Catholic health care institutions and services have established an effective Catholic presence in health care. Modeling their efforts on the gospel parable of the Good Samaritan, these communities of women and men have exemplified authentic neighborliness to those in need (Lk 10:25-37). The Church seeks to ensure that the service offered in the past will be continued into the future.

While many religious communities continue their commitment to the health care ministry, lay Catholics increasingly have stepped forward to collaborate in this ministry. Inspired by the example of Christ and mandated by the Second Vatican Council, lay faithful are invited to a broader and more intense field of ministries than in the past.[4] By virtue of their Baptism, lay faithful are called to participate actively in the Church's life and mission.[5] Their participation and leadership in the health care ministry, through new forms of sponsorship and governance of institutional Catholic health care, are essential for the Church to continue her ministry of healing and compassion. They are joined in the Church's health care mission by many men and women who are not Catholic.

Catholic health care expresses the healing ministry of Christ in a specific way within the local church. Here the diocesan bishop exercises responsibilities that are rooted in his office as pastor, teacher, and priest. As the center of unity in the diocese and coordinator of ministries in the local church, the diocesan bishop fosters the mission of Catholic health care in a way that promotes collaboration among health care leaders, providers, medical professionals, theologians, and other specialists. As pastor, the diocesan bishop is in a unique position to encourage the faithful to greater responsibility in the healing ministry of the Church. As teacher, the diocesan bishop ensures the moral and religious identity of the health care ministry in whatever setting it is carried out in the diocese. As priest, the diocesan bishop oversees the sacramental care of the sick. These responsibilities will require that Catholic health care providers and the diocesan bishop engage in ongoing communication on ethical and pastoral matters that require his attention.

In a time of new medical discoveries, rapid technological developments, and social change, what is new can either be an opportunity for genuine advancement in human culture, or it can lead to policies and actions that are contrary to the true dignity and vocation of the human person. In consultation with medical professionals, church leaders review these developments, judge them according to the principles of right reason and the ultimate standard of revealed truth, and offer authoritative teaching and guidance about the moral and pastoral responsibilities entailed by the Christian faith.[6] While the Church cannot furnish a ready answer to every moral dilemma, there are many questions about which she provides normative guidance and direction. In the absence of a determination by the magisterium, but never contrary to church teaching, the guidance of approved authors can offer appropriate guidance for ethical decision making.

8

Created in God's image and likeness, the human family shares in the dominion that Christ manifested in his healing ministry. This sharing involves a stewardship over all material creation (Gn 1:26) that should neither abuse nor squander nature's resources. Through science the human race comes to understand God's wonderful work; and through technology it must conserve, protect, and perfect nature in harmony with God's purposes. Health care professionals pursue a special vocation to share in carrying forth God's life-giving and healing work.

The dialogue between medical science and Christian faith has for its primary purpose the common good of all human persons. It presupposes that science and faith do not contradict each other. Both are grounded in respect for truth and freedom. As new knowledge and new technologies expand, each person must form a correct conscience based on the moral norms for proper health care.

PART ONE

## The Social Responsibility of Catholic Health Care Services

**Introduction**

Their embrace of Christ's healing mission has led institutionally based Catholic health care services in the United States to become an integral part of the nation's health care system. Today, this complex health care system confronts a range of economic, technological, social, and moral challenges. The response of Catholic health care institutions and services to these challenges is guided by normative principles that inform the Church's healing ministry.

First, Catholic health care ministry is rooted in a commitment to promote and defend human dignity; this is the foundation of its concern to respect the sacredness of every human life from the moment of conception until death. The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care.[7]

Second, the biblical mandate to care for the poor requires us to express this in concrete action at all levels of Catholic health care. This mandate prompts us to work to ensure that our country's health care delivery system provides adequate health care for the poor. In Catholic institutions, particular attention should be given to the health care needs of the poor, the uninsured, and the underinsured.[8]

Third, Catholic health care ministry seeks to contribute to the common good. The common good is realized when economic, political, and social conditions ensure protection for the fundamental rights of all individuals and enable all to fulfill their common purpose and reach their common goals.[9]

Fourth, Catholic health care ministry exercises responsible stewardship of available health care resources. A just health care system will be concerned both with promoting equity of care—to assure that the right of each person to basic health care is respected—and with promoting the good health of all in the community. The responsible stewardship of health care resources can be accomplished best in dialogue with people from all levels of society, in accordance with the principle of subsidiarity and with respect for the moral principles that guide institutions and persons.

Fifth, within a pluralistic society, Catholic health care services will encounter requests for medical procedures contrary to the moral teachings of the Church. Catholic health care does not offend the rights of individual conscience by refusing to provide or permit medical procedures that are judged morally wrong by the teaching authority of the Church.

**Directives**

1. A Catholic institutional health care service is a community that provides health care to those in need of it. This service must be animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church.

2. Catholic health care should be marked by a spirit of mutual respect among caregivers that disposes them to deal with those it serves and their families with the compassion of Christ, sensitive to their vulnerability at a time of special need.

3. In accord with its mission, Catholic health care should distinguish itself by service to and advocacy for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable to discrimination: the poor; the uninsured and the underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees. In particular, the person

11

with mental or physical disabilities, regardless of the cause or severity, must be treated as a unique person of incomparable worth, with the same right to life and to adequate health care as all other persons.

4. A Catholic health care institution, especially a teaching hospital, will promote medical research consistent with its mission of providing health care and with concern for the responsible stewardship of health care resources. Such medical research must adhere to Catholic moral principles.

5. Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel.

6. A Catholic health care organization should be a responsible steward of the health care resources available to it. Collaboration with other health care providers, in ways that do not compromise Catholic social and moral teaching, can be an effective means of such stewardship.[10]

7. A Catholic health care institution must treat its employees respectfully and justly. This responsibility includes: equal employment opportunities for anyone qualified for the task, irrespective of a person's race, sex, age, national origin, or disability; a workplace that promotes employee participation; a work environment that ensures employee safety and well-being; just compensation and benefits; and recognition of the rights of employees to organize and bargain collectively without prejudice to the common good.

8. Catholic health care institutions have a unique relationship to both the Church and the wider community they serve. Because of the ecclesial nature of this relationship, the relevant

requirements of canon law will be observed with regard to the foundation of a new Catholic health care institution; the substantial revision of the mission of an institution; and the sale, sponsorship transfer, or closure of an existing institution.

9. Employees of a Catholic health care institution must respect and uphold the religious mission of the institution and adhere to these Directives. They should maintain professional standards and promote the institution's commitment to human dignity and the common good.

PART TWO

## The Pastoral and Spiritual Responsibility of Catholic Health Care

**Introduction**

The dignity of human life flows from creation in the image of God (Gn 1:26), from redemption by Jesus Christ (Eph 1:10; 1 Tm 2:4-6), and from our common destiny to share a life with God beyond all corruption (1 Cor 15:42-57). Catholic health care has the responsibility to treat those in need in a way that respects the human dignity and eternal destiny of all. The words of Christ have provided inspiration for Catholic health care: "I was ill and you cared for me" (Mt 25:36). The care provided assists those in need to experience their own dignity and value, especially when these are obscured by the burdens of illness or the anxiety of imminent death.

Since a Catholic health care institution is a community of healing and compassion, the care offered is not limited to the treatment of a disease or bodily ailment but embraces the physical, psychological, social, and spiritual dimensions of the human person. The medical expertise offered through Catholic health care is combined with other forms of care to promote health and relieve human suffering. For this reason, Catholic health care extends to the spiritual nature of the person. "Without health of the spirit, high technology focused strictly on the body offers limited hope for healing the whole person."[11] Directed to spiritual needs that are often appreciated more deeply during times of illness, pastoral care is an integral part of Catholic health care. Pastoral care encompasses the full range of spiritual services, including a listening presence; help in dealing with powerlessness, pain, and alienation; and assistance in recognizing and responding to God's will with greater joy and peace. It should be acknowledged, of course, that technological advances in medicine have reduced the length of hospital stays dramatically. It

14

follows, therefore, that the pastoral care of patients, especially administration of the sacraments, will be provided more often than not at the parish level, both before and after one's hospitalization. For this reason, it is essential that there be very cordial and cooperative relationships between the personnel of pastoral care departments and the local clergy and ministers of care.

Priests, deacons, religious, and laity exercise diverse but complementary roles in this pastoral care. Since many areas of pastoral care call upon the creative response of these pastoral caregivers to the particular needs of patients or residents, the following directives address only a limited number of specific pastoral activities.

**Directives**

10. A Catholic health care organization should provide pastoral care to minister to the religious and spiritual needs of all those it serves. Pastoral care personnel—clergy, religious, and lay alike—should have appropriate professional preparation, including an understanding of these Directives.

11. Pastoral care personnel should work in close collaboration with local parishes and community clergy. Appropriate pastoral services and/or referrals should be available to all in keeping with their religious beliefs or affiliation.

12. For Catholic patients or residents, provision for the sacraments is an especially important part of Catholic health care ministry. Every effort should be made to have priests assigned to hospitals and health care institutions to celebrate the Eucharist and provide the sacraments to patients and staff.

13. Particular care should be taken to provide and to publicize opportunities for patients or residents to receive the sacrament of Penance.

14. Properly prepared lay Catholics can be appointed to serve as extraordinary ministers of Holy Communion, in accordance with canon law and the policies of the local diocese. They should assist pastoral care personnel—clergy, religious, and laity—by providing supportive visits, advising patients regarding the availability of priests for the sacrament of Penance, and distributing Holy Communion to the faithful who request it.

15. Responsive to a patient's desires and condition, all involved in pastoral care should facilitate the availability of priests to provide the sacrament of Anointing of the Sick, recognizing that through this sacrament Christ provides grace and support to those who are seriously ill or weakened by advanced age. Normally, the sacrament is celebrated when the sick person is fully conscious. It may be conferred upon the sick who have lost consciousness or the use of reason, if there is reason to believe that they would have asked for the sacrament while in control of their faculties.

16. All Catholics who are capable of receiving Communion should receive Viaticum when they are in danger of death, while still in full possession of their faculties.[12]

17. Except in cases of emergency (i.e., danger of death), any request for Baptism made by adults or for infants should be referred to the chaplain of the institution. Newly born infants in danger of death, including those miscarried, should be baptized if this is possible.[13] In case of emergency, if a priest or a deacon is not available, anyone can validly baptize.[14] In the case of emergency Baptism, the chaplain or the director of pastoral care is to be notified.

18. When a Catholic who has been baptized but not yet confirmed is in danger of death, any priest may confirm the person.[15]

19. A record of the conferral of Baptism or Confirmation should be sent to the parish in which the institution is located and posted in its baptism/confirmation registers.

20. Catholic discipline generally reserves the reception of the sacraments to Catholics. In accord with canon 844, §3, Catholic ministers may administer the sacraments of Eucharist, Penance, and Anointing of the Sick to members of the oriental churches that do not have full communion with the Catholic Church, or of other churches that in the judgment of the Holy See are in the same condition as the oriental churches, if such persons ask for the sacraments on their own and are properly disposed.

With regard to other Christians not in full communion with the Catholic Church, when the danger of death or other grave necessity is present, the four conditions of canon 844, §4, also must be present, namely, they cannot approach a minister of their own community; they ask for the sacraments on their own; they manifest Catholic faith in these sacraments; and they are properly disposed. The diocesan bishop has the responsibility to oversee this pastoral practice.

21. The appointment of priests and deacons to the pastoral care staff of a Catholic institution must have the explicit approval or confirmation of the local bishop in collaboration with the administration of the institution. The appointment of the director of the pastoral care staff should be made in consultation with the diocesan bishop.

22. For the sake of appropriate ecumenical and interfaith relations, a diocesan policy should be developed with regard to the appointment of non-Catholic members to the pastoral care staff of a Catholic health care institution. The director of pastoral care at a Catholic institution should be a Catholic; any exception to this norm should be approved by the diocesan bishop.

PART THREE

## The Professional-Patient Relationship

**Introduction**

A person in need of health care and the professional health care provider who accepts that person as a patient enter into a relationship that requires, among other things, mutual respect, trust, honesty, and appropriate confidentiality. The resulting free exchange of information must avoid manipulation, intimidation, or condescension. Such a relationship enables the patient to disclose personal information needed for effective care and permits the health care provider to use his or her professional competence most effectively to maintain or restore the patient's health. Neither the health care professional nor the patient acts independently of the other; both participate in the healing process.

Today, a patient often receives health care from a team of providers, especially in the setting of the modern acute-care hospital. But the resulting multiplication of relationships does not alter the personal character of the interaction between health care providers and the patient. The relationship of the person seeking health care and the professionals providing that care is an important part of the foundation on which diagnosis and care are provided. Diagnosis and care, therefore, entail a series of decisions with ethical as well as medical dimensions. The health care professional has the knowledge and experience to pursue the goals of healing, the maintenance of health, and the compassionate care of the dying, taking into account the patient's convictions and spiritual needs, and the moral responsibilities of all concerned. The person in need of health care depends on the skill of the health care provider to assist in preserving life and promoting

health of body, mind, and spirit. The patient, in turn, has a responsibility to use these physical and mental resources in the service of moral and spiritual goals to the best of his or her ability.

When the health care professional and the patient use institutional Catholic health care, they also accept its public commitment to the Church's understanding of and witness to the dignity of the human person. The Church's moral teaching on health care nurtures a truly interpersonal professional-patient relationship. This professional-patient relationship is never separated, then, from the Catholic identity of the health care institution. The faith that inspires Catholic health care guides medical decisions in ways that fully respect the dignity of the person and the relationship with the health care professional.

**Directives**

23. The inherent dignity of the human person must be respected and protected regardless of the nature of the person's health problem or social status. The respect for human dignity extends to all persons who are served by Catholic health care.

24. In compliance with federal law, a Catholic health care institution will make available to patients information about their rights, under the laws of their state, to make an advance directive for their medical treatment. The institution, however, will not honor an advance directive that is contrary to Catholic teaching. If the advance directive conflicts with Catholic teaching, an explanation should be provided as to why the directive cannot be honored.

25. Each person may identify in advance a representative to make health care decisions as his or her surrogate in the event that the person loses the capacity to make health care decisions. Decisions by the designated surrogate should be faithful to Catholic moral principles and to the person's intentions and values, or if the person's intentions are unknown, to the person's best interests. In the event that an advance directive is not executed, those who are in a position to

19

know best the patient's wishes—usually family members and loved ones—should participate in the treatment decisions for the person who has lost the capacity to make health care decisions.

26. The free and informed consent of the person or the person's surrogate is required for medical treatments and procedures, except in an emergency situation when consent cannot be obtained and there is no indication that the patient would refuse consent to the treatment.

27. Free and informed consent requires that the person or the person's surrogate receive all reasonable information about the essential nature of the proposed treatment and its benefits; its risks, side-effects, consequences, and cost; and any reasonable and morally legitimate alternatives, including no treatment at all.

28. Each person or the person's surrogate should have access to medical and moral information and counseling so as to be able to form his or her conscience. The free and informed health care decision of the person or the person's surrogate is to be followed so long as it does not contradict Catholic principles.

29. All persons served by Catholic health care have the right and duty to protect and preserve their bodily and functional integrity.[16] The functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available.[17]

30. The transplantation of organs from living donors is morally permissible when such a donation will not sacrifice or seriously impair any essential bodily function and the anticipated benefit to the recipient is proportionate to the harm done to the donor. Furthermore, the freedom of the prospective donor must be respected, and economic advantages should not accrue to the donor.

20

31. No one should be the subject of medical or genetic experimentation, even if it is therapeutic, unless the person or surrogate first has given free and informed consent. In instances of nontherapeutic experimentation, the surrogate can give this consent only if the experiment entails no significant risk to the person's well-being. Moreover, the greater the person's incompetency and vulnerability, the greater the reasons must be to perform any medical experimentation, especially nontherapeutic.

32. While every person is obliged to use ordinary means to preserve his or her health, no person should be obliged to submit to a health care procedure that the person has judged, with a free and informed conscience, not to provide a reasonable hope of benefit without imposing excessive risks and burdens on the patient or excessive expense to family or community.[18]

33. The well-being of the whole person must be taken into account in deciding about any therapeutic intervention or use of technology. Therapeutic procedures that are likely to cause harm or undesirable side-effects can be justified only by a proportionate benefit to the patient.

34. Health care providers are to respect each person's privacy and confidentiality regarding information related to the person's diagnosis, treatment, and care.

35. Health care professionals should be educated to recognize the symptoms of abuse and violence and are obliged to report cases of abuse to the proper authorities in accordance with local statutes.

36. Compassionate and understanding care should be given to a person who is the victim of sexual assault. Health care providers should cooperate with law enforcement officials and offer the person psychological and spiritual support as well as accurate medical information. A female who has been raped should be able to defend herself against a potential conception from the sexual assault. If, after appropriate testing, there is no evidence that conception has occurred

21

already, she may be treated with medications that would prevent ovulation, sperm capacitation, or fertilization. It is not permissible, however, to initiate or to recommend treatments that have as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum.[19]

37. An ethics committee or some alternate form of ethical consultation should be available to assist by advising on particular ethical situations, by offering educational opportunities, and by reviewing and recommending policies. To these ends, there should be appropriate standards for medical ethical consultation within a particular diocese that will respect the diocesan bishop's pastoral responsibility as well as assist members of ethics committees to be familiar with Catholic medical ethics and, in particular, these Directives.

PART FOUR

## Issues in Care for the Beginning of Life

**Introduction**

The Church's commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning, and with the dignity of marriage and of the marriage act by which human life is transmitted. The Church cannot approve medical practices that undermine the biological, psychological, and moral bonds on which the strength of marriage and the family depends.

Catholic health care ministry witnesses to the sanctity of life "from the moment of conception until death."[20] The Church's defense of life encompasses the unborn and the care of women and their children during and after pregnancy. The Church's commitment to life is seen in its willingness to collaborate with others to alleviate the causes of the high infant mortality rate and to provide adequate health care to mothers and their children before and after birth.

The Church has the deepest respect for the family, for the marriage covenant, and for the love that binds a married couple together. This includes respect for the marriage act by which husband and wife express their love and cooperate with God in the creation of a new human being. The Second Vatican Council affirms:

> This love is an eminently human one. . . . It involves the good of the whole
>
> person. . . . The actions within marriage by which the couple are united intimately
>
> and chastely are noble and worthy ones. Expressed in a manner which is truly

human, these actions signify and promote that mutual self-giving by which spouses enrich each other with a joyful and a thankful will.[21]

Marriage and conjugal love are by their nature ordained toward the begetting and educating of children. Children are really the supreme gift of marriage and contribute very substantially to the welfare of their parents. . . . Parents should regard as their proper mission the task of transmitting human life and educating those to whom it has been transmitted. . . . They are thereby cooperators with the love of God the Creator, and are, so to speak, the interpreters of that love.[22]

For legitimate reasons of responsible parenthood, married couples may limit the number of their children by natural means. The Church cannot approve contraceptive interventions that "either in anticipation of the marital act, or in its accomplishment or in the development of its natural consequences, have the purpose, whether as an end or a means, to render procreation impossible."[23] Such interventions violate "the inseparable connection, willed by God . . . between the two meanings of the conjugal act: the unitive and procreative meaning."[24]

With the advance of the biological and medical sciences, society has at its disposal new technologies for responding to the problem of infertility. While we rejoice in the potential for good inherent in many of these technologies, we cannot assume that what is technically possible is always morally right. Reproductive technologies that substitute for the marriage act are not consistent with human dignity. Just as the marriage act is joined naturally to procreation, so procreation is joined naturally to the marriage act. As Pope John XXIII observed:

The transmission of human life is entrusted by nature to a personal and conscious act and as such is subject to all the holy laws of God: the immutable and

inviolable laws which must be recognized and observed. For this reason, one

cannot use means and follow methods which could be licit in the transmission of

the life of plants and animals.[25]

Because the moral law is rooted in the whole of human nature, human persons, through

intelligent reflection on their own spiritual destiny, can discover and cooperate in the plan of the

Creator.[26]

**Directives**

38. When the marital act of sexual intercourse is not able to attain its procreative purpose,

assistance that does not separate the unitive and procreative ends of the act, and does not

substitute for the marital act itself, may be used to help married couples conceive.[27]

39. Those techniques of assisted conception that respect the unitive and procreative

meanings of sexual intercourse and do not involve the destruction of human embryos, or their

deliberate generation in such numbers that it is clearly envisaged that all cannot implant and

some are simply being used to maximize the chances of others implanting, may be used as

therapies for infertility.

40. Heterologous fertilization (that is, any technique used to achieve conception by the

use of gametes coming from at least one donor other than the spouses) is prohibited because it is

contrary to the covenant of marriage, the unity of the spouses, and the dignity proper to parents

and the child.[28]

41. Homologous artificial fertilization (that is, any technique used to achieve conception

using the gametes of the two spouses joined in marriage) is prohibited when it separates

procreation from the marital act in its unitive significance (e.g., any technique used to achieve

extracorporeal conception).[29]

42. Because of the dignity of the child and of marriage, and because of the uniqueness of the mother-child relationship, participation in contracts or arrangements for surrogate motherhood is not permitted. Moreover, the commercialization of such surrogacy denigrates the dignity of women, especially the poor.[30]

43. A Catholic health care institution that provides treatment for infertility should offer not only technical assistance to infertile couples but also should help couples pursue other solutions (e.g., counseling, adoption).

44. A Catholic health care institution should provide prenatal, obstetric, and postnatal services for mothers and their children in a manner consonant with its mission.

45. Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo. Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation. In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers.

46. Catholic health care providers should be ready to offer compassionate physical, psychological, moral, and spiritual care to those persons who have suffered from the trauma of abortion.

47. Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

48. In case of extrauterine pregnancy, no intervention is morally licit which constitutes a direct abortion.[31]

49. For a proportionate reason, labor may be induced after the fetus is viable.

50. Prenatal diagnosis is permitted when the procedure does not threaten the life or physical integrity of the unborn child or the mother and does not subject them to disproportionate risks; when the diagnosis can provide information to guide preventative care for the mother or pre- or postnatal care for the child; and when the parents, or at least the mother, give free and informed consent. Prenatal diagnosis is not permitted when undertaken with the intention of aborting an unborn child with a serious defect.[32]

51. Nontherapeutic experiments on a living embryo or fetus are not permitted, even with the consent of the parents. Therapeutic experiments are permitted for a proportionate reason with the free and informed consent of the parents or, if the father cannot be contacted, at least of the mother. Medical research that will not harm the life or physical integrity of an unborn child is permitted with parental consent.[33]

52. Catholic health institutions may not promote or condone contraceptive practices but should provide, for married couples and the medical staff who counsel them, instruction both about the Church's teaching on responsible parenthood and in methods of natural family planning.

53. Direct sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available.[34]

54. Genetic counseling may be provided in order to promote responsible parenthood and to prepare for the proper treatment and care of children with genetic defects, in accordance with Catholic moral teaching and the intrinsic rights and obligations of married couples regarding the transmission of life.

PART FIVE

## Issues in Care for the Seriously Ill and Dying

**Introduction**

Christ's redemption and saving grace embrace the whole person, especially in his or her illness, suffering, and death.[35] The Catholic health care ministry faces the reality of death with the confidence of faith. In the face of death—for many, a time when hope seems lost—the Church witnesses to her belief that God has created each person for eternal life.[36]

Above all, as a witness to its faith, a Catholic health care institution will be a community of respect, love, and support to patients or residents and their families as they face the reality of death. What is hardest to face is the process of dying itself, especially the dependency, the helplessness, and the pain that so often accompany terminal illness. One of the primary purposes of medicine in caring for the dying is the relief of pain and the suffering caused by it. Effective management of pain in all its forms is critical in the appropriate care of the dying.

The truth that life is a precious gift from God has profound implications for the question of stewardship over human life. We are not the owners of our lives and, hence, do not have absolute power over life. We have a duty to preserve our life and to use it for the glory of God, but the duty to preserve life is not absolute, for we may reject life-prolonging procedures that are insufficiently beneficial or excessively burdensome. Suicide and euthanasia are never morally acceptable options.

The task of medicine is to care even when it cannot cure. Physicians and their patients must evaluate the use of the technology at their disposal. Reflection on the innate dignity of human life in all its dimensions and on the purpose of medical care is indispensable for

formulating a true moral judgment about the use of technology to maintain life. The use of life-sustaining technology is judged in light of the Christian meaning of life, suffering, and death. In this way two extremes are avoided: on the one hand, an insistence on useless or burdensome technology even when a patient may legitimately wish to forgo it and, on the other hand, the withdrawal of technology with the intention of causing death.[37]

The Church's teaching authority has addressed the moral issues concerning medically assisted nutrition and hydration. We are guided on this issue by Catholic teaching against euthanasia, which is "an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated."[38] While medically assisted nutrition and hydration are not morally obligatory in certain cases, these forms of basic care should in principle be provided to all patients who need them, including patients diagnosed as being in a "persistent vegetative state" (PVS), because even the most severely debilitated and helpless patient retains the full dignity of a human person and must receive ordinary and proportionate care.

**Directives**

55. Catholic health care institutions offering care to persons in danger of death from illness, accident, advanced age, or similar condition should provide them with appropriate opportunities to prepare for death. Persons in danger of death should be provided with whatever information is necessary to help them understand their condition and have the opportunity to discuss their condition with their family members and care providers. They should also be offered the appropriate medical information that would make it possible to address the morally legitimate choices available to them. They should be provided the spiritual support as well as the opportunity to receive the sacraments in order to prepare well for death.

30

56. A person has a moral obligation to use ordinary or proportionate means of preserving his or her life. Proportionate means are those that in the judgment of the patient offer a reasonable hope of benefit and do not entail an excessive burden or impose excessive expense on the family or the community.[39]

57. A person may forgo extraordinary or disproportionate means of preserving life. Disproportionate means are those that in the patient's judgment do not offer a reasonable hope of benefit or entail an excessive burden, or impose excessive expense on the family or the community.

58. In principle, there is an obligation to provide patients with food and water, including medically assisted nutrition and hydration for those who cannot take food orally. This obligation extends to patients in chronic and presumably irreversible conditions (e.g., the "persistent vegetative state") who can reasonably be expected to live indefinitely if given such care.[40] Medically assisted nutrition and hydration become morally optional when they cannot reasonably be expected to prolong life or when they would be "excessively burdensome for the patient or [would] cause significant physical discomfort, for example resulting from complications in the use of the means employed."[41] For instance, as a patient draws close to inevitable death from an underlying progressive and fatal condition, certain measures to provide nutrition and hydration may become excessively burdensome and therefore not obligatory in light of their very limited ability to prolong life or provide comfort.

59. The free and informed judgment made by a competent adult patient concerning the use or withdrawal of life-sustaining procedures should always be respected and normally complied with, unless it is contrary to Catholic moral teaching.

60.     Euthanasia is an action or omission that of itself or by intention causes death in order to alleviate suffering. Catholic health care institutions may never condone or participate in euthanasia or assisted suicide in any way. Dying patients who request euthanasia should receive loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death.[42]

61. Patients should be kept as free of pain as possible so that they may die comfortably and with dignity, and in the place where they wish to die. Since a person has the right to prepare for his or her death while fully conscious, he or she should not be deprived of consciousness without a compelling reason. Medicines capable of alleviating or suppressing pain may be given to a dying person, even if this therapy may indirectly shorten the person's life so long as the intent is not to hasten death. Patients experiencing suffering that cannot be alleviated should be helped to appreciate the Christian understanding of redemptive suffering.

62. The determination of death should be made by the physician or competent medical authority in accordance with responsible and commonly accepted scientific criteria.

63. Catholic health care institutions should encourage and provide the means whereby those who wish to do so may arrange for the donation of their organs and bodily tissue, for ethically legitimate purposes, so that they may be used for donation and research after death.

64. Such organs should not be removed until it has been medically determined that the patient has died. In order to prevent any conflict of interest, the physician who determines death should not be a member of the transplant team.

65. The use of tissue or organs from an infant may be permitted after death has been determined and with the informed consent of the parents or guardians.

66. Catholic health care institutions should not make use of human tissue obtained by direct abortions even for research and therapeutic purposes.[43]

PART SIX

## Forming New Partnerships with Health Care Organizations and Providers

**Introduction**

Until recently, most health care providers enjoyed a degree of independence from one

another. In ever-increasing ways, Catholic health care providers have become involved with

other health care organizations and providers. For instance, many Catholic health care systems

and institutions share in the joint purchase of technology and services with other local facilities

or physicians' groups. Another phenomenon is the growing number of Catholic health care

systems and institutions joining or co-sponsoring integrated delivery networks or managed care

organizations in order to contract with insurers and other health care payers. In some instances,

Catholic health care systems sponsor a health care plan or health maintenance organization. In

many dioceses, new partnerships will result in a decrease in the number of health care providers,

at times leaving the Catholic institution as the sole provider of health care services. At whatever

level, new partnerships forge a variety of interwoven relationships: between the various

institutional partners, between health care providers and the community, between physicians and

health care services, and between health care services and payers.

On the one hand, new partnerships can be viewed as opportunities for Catholic health

care institutions and services to witness to their religious and ethical commitments and so

influence the healing profession. For example, new partnerships can help to implement the

Church's social teaching. New partnerships can be opportunities to realign the local delivery

system in order to provide a continuum of health care to the community; they can witness to a

responsible stewardship of limited health care resources; and they can be opportunities to provide to poor and vulnerable persons a more equitable access to basic care.

On the other hand, new partnerships can pose serious challenges to the viability of the identity of Catholic health care institutions and services, and their ability to implement these Directives in a consistent way, especially when partnerships are formed with those who do not share Catholic moral principles. The risk of scandal cannot be underestimated when partnerships are not built upon common values and moral principles. Partnership opportunities for some Catholic health care providers may even threaten the continued existence of other Catholic institutions and services, particularly when partnerships are driven by financial considerations alone. Because of the potential dangers involved in the new partnerships that are emerging, an increased collaboration among Catholic-sponsored health care institutions is essential and should be sought before other forms of partnerships.

The significant challenges that new partnerships may pose, however, do not necessarily preclude their possibility on moral grounds. The potential dangers require that new partnerships undergo systematic and objective moral analysis, which takes into account the various factors that often pressure institutions and services into new partnerships that can diminish the autonomy and ministry of the Catholic partner. The following directives are offered to assist institutionally based Catholic health care services in this process of analysis. To this end, the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops) has established the Ad Hoc Committee on Health Care Issues and the Church as a resource for bishops and health care leaders.

This new edition of the *Ethical and Religious Directives* omits the appendix concerning cooperation, which was contained in the 1995 edition. Experience has shown that the brief

articulation of the principles of cooperation that was presented there did not sufficiently forestall certain possible misinterpretations and in practice gave rise to problems in concrete applications of the principles. Reliable theological experts should be consulted in interpreting and applying the principles governing cooperation, with the proviso that, as a rule, Catholic partners should avoid entering into partnerships that would involve them in cooperation with the wrongdoing of other providers.

**Directives**

67. Decisions that may lead to serious consequences for the identity or reputation of Catholic health care services, or entail the high risk of scandal, should be made in consultation with the diocesan bishop or his health care liaison.

68. Any partnership that will affect the mission or religious and ethical identity of Catholic health care institutional services must respect church teaching and discipline. Diocesan bishops and other church authorities should be involved as such partnerships are developed, and the diocesan bishop should give the appropriate authorization before they are completed. The diocesan bishop's approval is required for partnerships sponsored by institutions subject to his governing authority; for partnerships sponsored by religious institutes of pontifical right, his *nihil obstat* should be obtained.

69. If a Catholic health care organization is considering entering into an arrangement with another organization that may be involved in activities judged morally wrong by the Church, participation in such activities must be limited to what is in accord with the moral principles governing cooperation.

70. Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization.[44]

71. The possibility of scandal must be considered when applying the principles governing cooperation.[45] Cooperation, which in all other respects is morally licit, may need to be refused because of the scandal that might be caused. Scandal can sometimes be avoided by an appropriate explanation of what is in fact being done at the health care facility under Catholic auspices. The diocesan bishop has final responsibility for assessing and addressing issues of scandal, considering not only the circumstances in his local diocese but also the regional and national implications of his decision.[46]

72. The Catholic partner in an arrangement has the responsibility periodically to assess whether the binding agreement is being observed and implemented in a way that is consistent with Catholic teaching.

# CONCLUSION

Sickness speaks to us of our limitations and human frailty. It can take the form of infirmity resulting from the simple passing of years or injury from the exuberance of youthful energy. It can be temporary or chronic, debilitating, and even terminal. Yet the follower of Jesus faces illness and the consequences of the human condition aware that our Lord always shows compassion toward the infirm.

Jesus not only taught his disciples to be compassionate, but he also told them who should be the special object of their compassion. The parable of the feast with its humble guests was preceded by the instruction: "When you hold a banquet, invite the poor, the crippled, the lame, the blind" (Lk 14:13). These were people whom Jesus healed and loved.

Catholic health care is a response to the challenge of Jesus to go and do likewise. Catholic health care services rejoice in the challenge to be Christ's healing compassion in the world and see their ministry not only as an effort to restore and preserve health but also as a spiritual service and a sign of that final healing that will one day bring about the new creation that is the ultimate fruit of Jesus' ministry and God's love for us.

# Notes

1. United States Conference of Catholic Bishops, *Health and Health Care: A Pastoral Letter of the American Catholic Bishops* (Washington, DC: United States Conference of Catholic Bishops, 1981).

2. Health care services under Catholic auspices are carried out in a variety of institutional settings (e.g., hospitals, clinics, outpatient facilities, urgent care centers, hospices, nursing homes, and parishes). Depending on the context, these Directives will employ the terms "institution" and/or "services" in order to encompass the variety of settings in which Catholic health care is provided.

3. *Health and Health Care,* p. 5.

4. Second Vatican Ecumenical Council, *Decree on the Apostolate of the Laity* (*Apostolicam Actuositatem*) (1965), no. 1.

5. Pope John Paul II, Post-Synodal Apostolic Exhortation *On the Vocation and the Mission of the Lay Faithful in the Church and in the World* (*Christifideles Laici*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 29.

6. As examples, see Congregation for the Doctrine of the Faith, *Declaration on Procured Abortion* (1974); Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* (1980); Congregation for the Doctrine of the Faith, *Instruction on Respect for Human Life in Its Origin and on the Dignity of Procreation: Replies to Certain Questions of the Day* (*Donum Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1987).

7. Pope John XXIII, Encyclical Letter *Peace on Earth* (*Pacem in Terris*) (Washington, DC: United States Conference of Catholic Bishops, 1963), no. 11; *Health and Health Care,* pp. 5, 17-18; *Catechism of the Catholic Church,* 2nd ed. (Washington, DC: Libreria Editrice Vaticana– United States Conference of Catholic Bishops, 2000), no. 2211.

8. Pope John Paul II, *On Social Concern, Encyclical Letter on the Occasion of the Twentieth Anniversary of "Populorum Progressio"* (*Sollicitudo Rei Socialis*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

9. United States Conference of Catholic Bishops, *Economic Justice for All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* (Washington, DC: United States Conference of Catholic Bishops, 1986), no. 80.

10. The duty of responsible stewardship demands responsible collaboration. But in collaborative efforts, Catholic institutionally based health care services must be attentive to occasions when the policies and practices of other institutions are not compatible with the Church's authoritative moral teaching. At such times, Catholic health care institutions should determine whether or to what degree collaboration would be morally permissible. To make that judgment, the governing boards of Catholic institutions should adhere to the moral principles on cooperation. See Part Six.

11. *Health and Health Care,* p. 12.

12. Cf. *Code of Canon Law,* cc. 921-923.

13. Cf. ibid., c. 867, § 2, and c. 871.

14. To confer Baptism in an emergency, one must have the proper intention (to do what the Church intends by Baptism) and pour water on the head of the person to be baptized, meanwhile pronouncing the words: "I baptize you in the name of the Father, and of the Son, and of the Holy Spirit."

15. Cf. c. 883, 3º.

16. For example, while the donation of a kidney represents loss of biological integrity, such a donation does not compromise functional integrity since human beings are capable of functioning with only one kidney.

17. Cf. directive 53.

18. *Declaration on Euthanasia,* Part IV; cf. also directives 56-57.

19. It is recommended that a sexually assaulted woman be advised of the ethical restrictions that prevent Catholic hospitals from using abortifacient procedures; cf. Pennsylvania Catholic Conference, "Guidelines for Catholic Hospitals Treating Victims of Sexual Assault," *Origins* 22 (1993): 810.

20. Pope John Paul II, "Address of October 29, 1983, to the 35th General Assembly of the World Medical Association," *Acta Apostolicae Sedis* 76 (1984): 390.

21. Second Vatican Ecumenical Council, *Pastoral Constitution on the Church in the Modern World* (*Gaudium et Spes*) (1965), no. 49.

22. Ibid., no. 50.

23. Pope Paul VI, Encyclical Letter *On the Regulation of Birth* (*Humanae Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1968), no. 14.

24. Ibid., no. 12.

40

25. Pope John XXIII, Encyclical Letter *Mater et Magistra* (1961), no. 193, quoted in Congregation for the Doctrine of the Faith, *Donum Vitae,* no. 4.

26. Pope John Paul II, Encyclical Letter *The Splendor of Truth* (*Veritatis Splendor*) (Washington, DC: United States Conference of Catholic Bishops, 1993), no. 50.

27. "Homologous artificial insemination within marriage cannot be admitted except for those cases in which the technical means is not a substitute for the conjugal act but serves to facilitate and to help so that the act attains its natural purpose" (*Donum Vitae,* Part II, B, no. 6; cf. also Part I, nos. 1, 6).

28. Ibid., Part II, A, no. 2.

29. "Artificial insemination as a substitute for the conjugal act is prohibited by reason of the voluntarily achieved dissociation of the two meanings of the conjugal act. Masturbation, through which the sperm is normally obtained, is another sign of this dissociation: even when it is done for the purpose of procreation, the act remains deprived of its unitive meaning: 'It lacks the sexual relationship called for by the moral order, namely, the relationship which realizes "the full sense of mutual self-giving and human procreation in the context of true love"'" (*Donum Vitae,* Part II, B, no. 6).

30. Ibid., Part II, A, no. 3.

31. Cf. directive 45.

32. *Donum Vitae,* Part I, no. 2.

33. Cf. ibid., no. 4. (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

34. Cf. Congregation for the Doctrine of the Faith, "Responses on Uterine Isolation and Related Matters," July 31, 1993, *Origins* 24 (1994): 211-212.

35. Pope John Paul II, Apostolic Letter *On the Christian Meaning of Human Suffering* (*Salvifici Doloris*) (Washington, DC: United States Conference of Catholic Bishops, 1984), nos. 25-27.

36. United States Conference of Catholic Bishops, *Order of Christian Funerals* (Collegeville, Minn.: The Liturgical Press, 1989), no. 1.

37. See *Declaration on Euthanasia.*

38. Ibid., Part II.

39. Ibid., Part IV; Pope John Paul II, Encyclical Letter *On the Value and Inviolability of Human Life* (*Evangelium Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1995), no. 65.

41

40. See Pope John Paul II, Address to the Participants in the International Congress on "Life-Sustaining Treatments and Vegetative State: Scientific Advances and Ethical Dilemmas" (March 20, 2004), no. 4, where he emphasized that "the administration of water and food, even when provided by artificial means, always represents a *natural means* of preserving life, not a *medical act*." See also Congregation for the Doctrine of the Faith, "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration" (August 1, 2007).

41. Congregation for the Doctrine of the Faith, Commentary on "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration."

42. See *Declaration on Euthanasia*, Part IV.

43. *Donum Vitae,* Part I, no. 4.

44. While there are many acts of varying moral gravity that can be identified as intrinsically evil, in the context of contemporary health care the most pressing concerns are currently abortion, euthanasia, assisted suicide, and direct sterilization. See Pope John Paul II's *Ad Limina* Address to the bishops of Texas, Oklahoma, and Arkansas (Region X), in *Origins* 28 (1998): 283. See also "Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" (*Quaecumqu Sterilizatio*), March 13, 1975, *Origins* 6 (1976): 33-35: "Any cooperation institutionally approved or tolerated in actions which are in themselves, that is, by their nature and condition, directed to a contraceptive end . . . is absolutely forbidden. For the official approbation of direct sterilization and, *a fortiori*, its management and execution in accord with hospital regulations, is a matter which, in the objective order, is by its very nature (or intrinsically) evil." This directive supersedes the "Commentary on the Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" published by the National Conference of Catholic Bishops on September 15, 1977, in *Origins* 7 (1977): 399-400.

45. See *Catechism of the Catholic Church*: "Scandal is an attitude or behavior which leads another to do evil" (no. 2284); "Anyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged" (no. 2287).

46. See "The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry," *Origins* 26 (1997): 703.

This fifth edition of the *Ethical and Religious Directives for Catholic Health Care Services* was developed by the Committee on Doctrine of the United States Conference of Catholic Bishops (USCCB) and approved as the national code by the full body of the USCCB at its November 2009 General Meeting. This edition of the *Directives*, which replaces all previous editions, is recommended for implementation by the diocesan bishop and is authorized for publication by the undersigned.

*Msgr. David J. Malloy, STD*
*General Secretary, USCCB*

In 2001 the National Conference of Catholic Bishops and United States Catholic Conference became the United States Conference of Catholic Bishops.

Excerpts from *The Documents of Vatican II,* ed. Walter M. Abbott, SJ, copyright © 1966 by America Press are used with permission. All rights reserved.

Scripture texts used in this work are taken from the *New American Bible,* copyright © 1991, 1986, and 1970 by the Confraternity of Christian Doctrine, Washington, D.C., 20017 and are used by permission of the copyright owner. All rights reserved.

Copyright © 2009, United States Conference of Catholic Bishops, Washington, D.C. All rights reserved. No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the copyright holder.

To obtain a catalog of USCCB titles, visit *www.usccbpublishing.org* or call toll-free 800-235-8722. In the Washington metropolitan area or from outside the United States, call 202-722-8716. Para pedidos en español, llame al 800-235-8722 y presione 4 para hablar con un representante del servicio al cliente en español.