# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-02611

LITTLE SISTERS OF THE POOR HOME FOR THE
AGED, DENVER, COLORADO, a Colorado non-profit
corporation, LITTLE SISTERS OF THE POOR,
BALTIMORE, INC., a Maryland non-profit corporation,
by themselves and on behalf of all others similarly situated,

CHRISTIAN BROTHERS SERVICES, a New Mexico
non-profit corporation, and

CHRISTIAN BROTHERS EMPLOYEE BENEFIT
TRUST,

       Plaintiffs,

  v.

KATHLEEN SEBELIUS, Secretary of the United States
Department of Health and Human Services,

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

THOMAS E. PEREZ, Secretary of the United States
Department of Labor,

UNITED STATES DEPARTMENT OF LABOR,

JACOB J. LEW, Secretary of the United States Department
of the Treasury, and

UNITED STATES DEPARTMENT OF THE
TREASURY,

       Defendants.

## PLAINTIFFS' RULE 56(d) MOTION

Defendants have moved for summary judgment on all of the Plaintiffs' claims. *See* Document 30. Because no discovery has yet been conducted in this case and Defendants have not yet filed an answer to the Complaint, Plaintiffs' request that the Court deny or defer Defendants' motion until Plaintiffs have had an adequate opportunity to seek discovery. pursuant to Fed. R. Civ. P. 56(d).

## ARGUMENT

On November 8, 2013, Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment pursuant to Federal Rules 12(b)(1), (6), and Federal Rule 56. Throughout their motion, Defendants cite to and rely on a voluminous appendix (Document 34) styled as an Administrative Record. *See* Document 28-1, Index of 187,805 page appendix. Because Defendants purport to rely on these voluminous materials outside the pleading, the motion "must" be treated as a motion for summary judgment, and Plaintiffs "must" be given an opportunity to conduct discovery before this Court rules on the motion:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

FED. R. CIV. P. 12(d).

Rule 56(d) gives Plaintiffs additional safeguards to ensure that summary judgment is not prematurely granted. Rule 56(d) is "designed to safeguard against a premature or improvident grant of summary judgment." *Guthrie v. Sawyer*, 970 F.2d 733, 738 (10th Cir. 1992) (quoting *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 833 (10th Cir. 1986)). Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1)   defer considering the motion or deny it;

1

 (2) allow time to obtain affidavits or declarations or to take discovery; or

 (3) issue any other appropriate order.

FED. R. CIV. P. 56(d).  Plaintiffs respectfully request that the Court deny Defendants' summary judgment as premature, or defer considering the motion until Plaintiffs have a reasonable time to obtain the necessary discovery, as contemplated under both Federal Rules 12(d) and 56(d).

 Rule 56(d) "invokes the trial Court's discretion," but "unless dilatory or lacking in merit," the motion should be "treated liberally." *Patty Precision v. Brown & Sharpe Mfg. Co.*, 742 F.2d 1260, 1264 (10th Cir. 1984)); *Comm. for the First Amendment v. Campbell*, 962 F.2d 1517, 1522 (10th Cir. 1992).  Indeed, a Rule 56(d) continuance of a motion for summary judgment "should be granted almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence." *Wichita Falls Office Assoc. v. Banc One Corp.*, 978 F.2d 915, 919 n.4 (5th Cir. 1992).

 Further, a grant of summary judgment is premature where discovery has not been undertaken and the plaintiff has not had the opportunity to discover information that is essential to his opposition. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986); *Dreiling v. Peugeot Motors of Am., Inc.*, 850 F.2d 1373, 1376 (10th Cir. 1988).  In this case, discovery has not yet been scheduled because of the early nature of the case; Defendants have not yet answered and a discovery scheduling order has not been issued.

 Additionally, the Tenth Circuit has noted that a summary judgment movant's exclusive control of information "is a factor weighing heavily in favor of relief under Rule 56([d])." *Price el rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000).  And if no discovery has yet taken place, "the party making the Rule 56([d]) motion cannot be expected to frame its motion with great specificity as to the kind of discovery likely to turn up useful information, as the ground for such specificity has not been laid." *Burlington N. Santa Fe R.R. Co. v. Assiniboine &*

*Sioux Tribes*, 323 F.3d 767, 774 (9th Cir. 2003); *Khan v. Am. Int'l Grp., Inc.*, 654 F. Supp. 2d 617, 624-25 (S.D. Tex. 2009).

### 1.      Premature Because Of Need For Discovery

A grant of summary judgment in Defendants' favor would be premature in this case because discovery has not been undertaken and Defendants' motion for summary judgment relies on the Plaintiffs' inability to prove facts to which they do not yet have access.

First, discovery is necessary for Plaintiffs to learn what government interest, if any, supports Defendants' current insistence that Plaintiffs participate in a contraceptive distribution scheme that Defendants insist does not work.  To date, Defendants have offered no explanation of *why* the government has any interest (let alone a compelling interest) in forcing the Little Sisters and other Plaintiffs to comply with the Mandate in light of the claimed inability to enforce that Mandate against TPAs.

Second, to grant summary judgment for Defendants on Plaintiffs' claims, the Court would have to find, among other things, that the Defendants did not intentionally discriminate against the Plaintiffs in crafting and enforcing the Mandate and its accommodation, and that the Defendants have satisfied strict scrutiny.  Indeed, Plaintiffs' claims under the Free Exercise Clause, the Establishment Clause, the First Amendment in furtherance of Freedom of Speech, the Fifth Amendment in furtherance of due process and equal protection, and the Administrative Procedure Act all implicate, to some degree, the factual question of intentional discrimination.[1]

---

[1] The majority of Plaintiffs' claims cannot be resolved against Plaintiffs without reaching the quintessential factual question of intentional discrimination:

> **Free Exercise.** "Proof of hostility or discriminatory motivation may be sufficient to prove that a challenged governmental action is not neutral, but the Free Exercise Clause is not confined to actions based on animus." *Shrum v. City of Coweta, Okla.*, 449 F.3d 1132, 1145 (10th Cir. 2006) (citation omitted).

Plaintiffs have already cited documents indicating that Defendants acted in a hostile manner towards religious objectors to the Mandate.[2]   Plaintiffs have also offered evidence that Defendants arbitrarily refused or failed to consider Plaintiffs' and similar organizations' objections to the Mandate.  For example, on April 8, 2013, Christian Brothers Services submitted comments to Defendants detailing how the "religious employer" exception and accommodation was unworkable.[3]   Little Sisters submitted their own comments on that same date.[4]   On that same

---

**Establishment Clause.** Intentional governmental discrimination against a particular religious group violates the First Amendment's command of neutrality. *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1257-58, 1260 (10th Cir. 2008).

**Free Speech.** "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). "[S]ingling out disfavored viewpoints for penalty" is forbidden viewpoint discrimination. *International Women's Day March Planning Committee v. City of San Antonio*, 619 F.3d 346, 362 (5th Cir. 2010).

**Equal Protection.** Intentional discrimination is often (but not always) an element of an Equal Protection claim. *See, e.g.*, *Wilson v. Birnberg*, 667 F.3d 591, 600 (5th Cir. 2012) (allegations of intentional discrimination in administering election rules required reversal of dismissal); *Weaver*, 534 F.3d at 1260 ("The intent to discriminate forbidden under the Equal Protection Clause is merely the intent to treat differently.") (internal quotation omitted).

**APA claims.** If a plaintiff establishes intentional discrimination after fact discovery, he will have both "arbitrary and capricious" and "not in accordance with law" claims based on that intentional discrimination. *See, e.g.*, *E&T Realty v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987) (noting that "purposeful discrimination" supports a claim of arbitrariness and capriciousness).

[2]   *See* Complaint ¶191 (William McGurn, Op-Ed., *The Church of Kathleen Sebelius*, Wall St. J., Dec. 13, 2011, *available at* http://online.wsj.com/article/SB10001424052970203518404577094631979925326.html (last visited Sept. 23, 2013)).

[3]   *See Complaint* ¶¶ 94-96.  On April 8, 2013, the Church Alliance, an organization composed of the chief executives of thirty-eight church benefit boards, covering mainline and evangelical Protestant denominations, two branches of Judaism, and Catholic schools and institutions, including Christian Brothers Services, submitted a 20-page comment letter on the NPRM, detailing how the expanded definition of "religious employer" excluded bona fide religious organizations, and how the proposed accommodation for "eligible organizations" was unworkable, particularly for self-insured church plans like the Christian Brothers Employee Benefit Trust.  A true and correct copy of the Church Alliance's comment letter is available at http://church-alliance.org/initiatives/comment-letters (last visited September 23, 2013) and attached hereto as an exhibit to the Declaration of Michael Quirk.  *See* Exhibit 2-A.

date, before the notice-and-comment period had ended and before Defendants had considered

Plaintiffs' comments, Defendant Sebelius answered questions about the contraceptive and

abortifacient services requirement in a presentation at Harvard University establishing that the

decision was preordained and that Defendants would not relieve Plaintiffs of the substantial

burden of the Mandate and accommodation:

> We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception.  Churches and church dioceses as employers are exempted from this benefit.   But Catholic hospitals, Catholic universities, other religious entities *will be providing coverage* to their employees starting August 1st . . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese *will be included* in the benefit package.

*See* Kathleen Sebelius, Remarks at The Forum at Harvard School of Public Health (Apr. 8,

2013), video clip *available at* http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius (starting at 51:20-52:00) (last visited Nov. 21, 2013) (emphasis added).

It is clear from the timing of these remarks (or, at the very least, there is a substantial fact

question) that Defendants gave no consideration to the comments submitted by Plaintiffs or

others in response to the proposed "accommodation," and were intentionally discriminating

against Plaintiffs and their religious beliefs.  *See* Rienzi Declaration, Ex. 1 ¶ 8.  Plaintiffs have

not had a chance to obtain any of the relevant evidence, through discovery, that would further

show that the Mandate and the accommodation were the result of this intentional discrimination.

---

[4]   The Little Sisters also submitted comments on the NPRM on April 8, 2013, stating essentially the same objections stated in this complaint.  (Document 1-5).  The Little Sisters asserted that "[t]he federal government should not force us to counteract through the health benefits for our employees the very same Gospel of Life that we attempt to live out in communion and solidarity with the needy elderly.  But under the proposed exemption and proposed accommodation, there is no way that we can comply with the Final Mandate without taking affirmative steps to change our health coverage arrangements to ensure coverage of female sterilization and all FDA-approved contraceptives, including abortifacient drugs and devices."

*See* Rienzi Declaration, Ex. 1 ¶¶ 3-5.  Although, Plaintiffs have pointed to specific facts that lead them to believe this intentional discrimination exists, actual discovery is necessary to further develop Plaintiffs' claims and respond to Defendants' summary judgment motion.  *See* Rienzi Declaration, Ex. 1 ¶ 5.

Plaintiffs are also entitled to discovery regarding the Defendants' argument that the challenged regulations satisfy strict scrutiny and are narrowly tailored to serve a compelling governmental interests.  Document 30 at p. 14.  Plaintiffs are specifically entitled to discovery regarding whether Defendants, in fact, used (or even considered) the least restrictive means to accomplish the alleged governmental interest.  *See* Rienzi Declaration, Ex. 1 ¶ 10.

Similarly, Defendants have presented no rational basis for the Mandate's distinguishing between churches and integrated auxiliaries on the one hand, and religious nonprofits like Plaintiffs on the other.   Without a chance to question Defendants through depositions, interrogatories, and document requests, the Plaintiffs will not have a full and fair chance to expose the faulty reasoning behind the distinction, and demonstrate that religious nonprofits were intentionally and unconstitutionally targeted.  *See* Rienzi Declaration, Ex. 1 ¶ 9.  In the attached declaration, counsel for Plaintiffs provides further detail about the kinds of evidence Plaintiffs expect to uncover in discovery. [5]  *See* Rienzi Declaration, Ex. 1 ¶¶ 6, 9-16.

## 2.    Fact Questions Arising From Defendants' Purported Certified Record

Additionally, significant defects in the Defendants' Certified Administrative Record (upon which Defendants rely for summary judgment) warrants relief under Rule 56(d).   A summary judgment movant's exclusive control of information "is a factor weighing heavily in

---

[5] Plaintiffs' Free Exercise Clause, Establishment Clause, Free Speech Clause, Equal Protection Clause, Due Process Clause, and Administrative Procedure Act claims all require factual development before the Court can consider granting summary judgment for Defendants on those claims.  For Defendants to win the case at this early juncture, they would need to demonstrate that Plaintiffs cannot succeed on any legal theory, including intentional discrimination.  However, in contrast, it is entirely possible that Plaintiffs can win on these claims without discovery because Plaintiffs are not required to prove intentional discrimination.

favor of relief under Rule 56([d]).” *Price el rel. Price v. W. Res., Inc.*, 232 F.3d 779, 783 (10th Cir. 2000).   In this case, Defendants have transmitted to the Court what they say is the “Administrative Record” (Document 34), along with a “Certification of Administrative Record” signed by Ms. Shawn Braxton (Document 28-2).   However, available evidence strongly suggests that there are substantial gaps in the Administrative Record submitted by Defendants.

Defendants appear to take the position that this Court cannot considering any evidence apart from their self-submitted “Administrative Record.”   (Document 30, p. 3 (“A party is entitled to summary judgment where the <u>administrative record</u> demonstrates ‘that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.’ Fed. R. Civ. P. 56(a).”) (underline emphasis added).   But this Court is not limited to the Defendants’ administrative record when deciding constitutional and RFRA claims. *See, e.g., Nat'l Med. Enters., Inc. v. Shalala*, 826 F. Supp. 558, 565 n.11 (D.D.C. 1993); *Rydeen v. Quigg*, 748 F. Supp. 900, 906 (D.D.C. 1990); *cf. McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 493 (1991) (administrative adjudication abuse-of-discretion "standard does not apply to constitutional or statutory claims, which are reviewed *de novo* by the courts.").

Moreover, the whole record rule forbids the government from submitting an incomplete picture of its decision-making, lest it mislead the Court.   Were courts to restrict their review “to whatever documents an agency submits,” they would “permit [the] agency to omit items that undermine its position.” *Am. Farm Bureau Fed'n v. EPA, 1:11-CV-0067,* 2011 WL 6826539, at *3 (M.D. Pa. Dec. 28, 2011) (internal quotation omitted).   Allowing agencies to artificially limit the court’s view of the record would thus “make a mockery of judicial review.” *Smith v. FTC,* 403 F. Supp. 1000, 1008 (D. Del. 1975). Instead, courts must “engage in an appropriate review to ensure that the full and complete administrative record has been submitted.” *Am. Farm Bureau Fed'n,* 2011 WL 6826539, at *3.

Until the Administrative Record is complete, Defendants may not rely on fragments of the record to support their summary judgment motion. Simply put, it is "improper for a district court to review only a "partial and truncated [administrative] record." *Stainback v. Sec'y of Navy,* 520 F. Supp. 2d 181, 185 (D.D.C. 2007) (quoting *Natural Res. Def. Council, Inc. v. Train,* 519 F.2d 287, 291 (D.C. Cir. 1975)). Until the Court is satisfied that the Administrative Record is accurate and complete, it should not consider that record or permit the Defendants to rely on it. Here, the evidence strongly suggests that the Administrative Record submitted by Ms. Braxton is fatally incomplete.

On the same day that Ms. Braxton certified the Administrative Record in this case (November 8, 2013) she gave a deposition regarding her certification protocol in parallel litigation challenging the Mandate in the Western District of Pennsylvania. *See Persico v. Sebelius,* Civ. No. 1:13-00303 (W.D. Pa.), Document 50 (Plaintiffs' Joint Motion to Strike the Certification of Ms. Shawn Braxton Concerning the Administrative Record, filed Nov. 11, 2013); Document 53-1 (Transcript of Deposition of Shawn L. Braxton, attached hereto as Exhibit 1-A).[6] The deposition revealed that Ms. Braxton has little to no knowledge of the Administrative Record's contents, how it was compiled, whether the information was complete, or why certain information was excluded from the record, among other failings. Indeed, Ms. Braxton testified that she served as little more than a repository for documents compiled and submitted to her by other, unnamed individuals.

Ms. Braxton's deposition reveals her total lack of knowledge of the process by which other persons (whom she could not identify) actually compiled the record, and her failure to take any action to establish a good faith basis for certifying its completeness and accuracy:

---

[6] Ms. Braxton has certified the same Administrative Record in multiple lawsuits challenging the Mandate. Compare Document 28-1, with Ex. 1-C and Ex. 1-D.

> Q. Do you understand that when you certify an administrative record, that it could be relied upon by a court in a litigation?
>
> A. Yes.

Exhibit 1-A, Tr. at 40:03-07.

> Q. Based on your certification alone, do you think that a court could find that the administrative record is complete?
>
> A. I can't answer that question.
>
> Q. Why not?
>
> A. I don't have the knowledge to be able to answer that.

*Id.*, 41:12-18.  Given such testimony, Ms. Braxton's certification is unreliable and underscores Plaintiffs' need to conduct adequate discovery in order to respond to Defendants' summary judgment motion.

Indeed, Ms. Braxton could not describe anything she did to ensure that documents assembled by unnamed "policy components" were complete or that all those who worked on the regulations were even asked to send their materials to her.  Ex. 1-A, Tr. at 28:13 – 9:24.  She knows nothing about the process the policy components use when collecting documents for a record.  *Id.*, Tr. at 26:14-18.  And she could not remember which "components" submitted materials for the record.  *Id.*, Tr. at 16:05-17:21.  Ms. Braxton even admitted that she did nothing to ensure that she had gathered all relevant documents from Defendant Department of Labor or Defendant Department of the Treasury.  *Id.*, Tr. at 20:2-13.  Ms. Braxton also testified that she has no way of knowing what might be omitted from the record, including:

- emails sent to or from HHS employees' work or personal email accounts communicating with third parties about the Mandate, *see id.,* Tr. at 25:23-26:13;

- communications between HHS personnel and the Institute of Medicine (the organization commissioned by Defendants to conduct the study that they primarily rely on to support the Mandate), *id.*, Tr. at 41:19-42:20; or

- documents withheld under claims of privilege, *id.*, Tr. at 18:16-19.

The following excerpts further typify Ms. Braxton's lack of knowledge of the process for compiling the administrative record:

> Q. Is it correct that you don't know what the components did with respect to collecting the documents that were included in the administrative record?
>
> A. No, I do not.

*Id.*, Tr. at 29:14-18.

> Q. [D]o you know what process the policy component goes through when collecting documents for the administrative record?
>
> A. No, I do not.

*Id.*, Tr. at 26:15-18.

> Q. So if someone withheld documents and didn't give them to the policy component, would you have any way of knowing that?
>
> A. No, I would not.

*Id.*, Tr. at 25:16-20.

> Q. [D]o you know if anybody asks employees if they have information in their personal e-mail accounts that they need to turn over?
>
> A. No.

*Id.*, Tr. at 26:09-13.

> Q. Do you know if documents are withheld from the administrative record based upon claims of privilege?
>
> A. No, I do not.
>
> Q. Do you know who would know that information?
>
> A. No, I don't.

*Id.*, Tr. at 18:16-22.

In addition to knowing virtually nothing about the record's compilation, Ms. Braxton took no steps to ensure that the underlying process was sound and thorough—gathering no

information to confirm that the policy components' submissions were complete and accurate. Indeed, she conducted no interviews and it appears that she did nothing to ensure that all who were supposed to submit responses in fact did so.  *Id.*, Tr. at 18:03-08. Nor did she search emails, shared drives, databases, or backup tapes.  *Id.*, Tr. at 18:09-15. She did nothing to audit the Administrative Record or otherwise independently verify that the record was complete and accurate.  *Id.*, Tr. at 15:02-08.  Moreover, she is not aware of anyone else who did any of these things. She could not remember how long her certification efforts took or whether she had the documents in hard copy or in electronic form. Tr. at 32:25-35:07. When asked what would cause her to refuse to certify a record, she could not think of any reason other than her inability to collect relevant public comments, Tr. at 91:07-16, or a "policy component's" complete failure to submit any materials at all, Tr. at 94:11-19. In other words, she simply accepts as complete any materials she receives from the people who draft rules and regulations.

Given her minimal involvement in the process, it is unsurprising that Ms. Braxton could not even recall whether she reviewed the record at all before certifying it in these parallel cases. *Id.*, Tr. at 35:16-37:11.  The following excerpts from Ms. Braxton's testimony further underscore why her certification should be given no weight in this case:

> Q.  Who provided the documents that are part of the administrative record to you prior to you signing the forms?
>
> A.  I don't recall the name.
>
> Q.  Do you remember how much time you spent reviewing the form prior to signing?
>
> A.  No, I do not.

*Id.*, Tr. at 30:21-31:04.

> Q.  Do you recall what the volume of documents were that constituted the administrative record?
>
> A.  Can you clarify volume.

Q.  The amount of pages.

A.  No, I do not recall the number of pages.

Q.  The amount of documents?

A.  No, I do not recall the number of documents.

Q.  Do you have a ball park recollection?

A.  No, sir.

Q.  And when you signed the certification on October 22nd, 2013, did you have the documents that constituted the administrative record in front of you?

A.  I don't recall.

*Id.*, Tr. at 33:20-34:13.

Q.  Ms. Braxton, October 22nd, 2013 is only about two weeks ago.  So is it your testimony that you don't recall whether or not you reviewed any documents in connection with the Persico case prior to executing the certification of the rule-making record form?

A.  Yes.

Q.  And the same with the Persico [Zubik] case?

A.  Yes.

*Id.*, Tr. at 37:02-11.

Q.  Well, what about going back to the policy components that you dealt with while compiling the administrative record in the Persico and Zubik cases.

A.  I don't recall the names of the pol -- all of the components that were in -- involved in that case.

Q.  Can you name any of the policy components?

A.  Not at this time.

*Id.*, Tr. at 46:05-14.

Q.  Just circling back to the communications that you had with the [HHS Office of General Counsel] prior to executing the certification in the Zubik and the Persico case, do you remember who you spoke with?

A.  I do not recall.

Q. And you don't recall even though this is approximately two weeks ago?

A. That is correct.

Q. Do you recall what you spoke about?

A. No, I do not.

Q. Can you tell us about any communications that you had with them regarding the Zubik and Persico certifications?

A. No.

Q. No, because you don't remember?

A. I don't recall.

*Id.*, Tr. at 88:06-24; *see* also Tr. at 13:19-24; 17:18-21; 19:08-11; 22:05-23:08; 28:18-29:03; 32:16-33:09; 35:24-36:19; 49:18-22; 53:09-20.

There is absolutely no reason to think that Ms. Braxton's protocol for certifying the Administrative Record in this case is any different from the parallel case in which she gave this deposition testimony. Indeed, Ms. Braxton certified the Administrative Record for this case on the same day that she gave the foregoing testimony – November 8, 2013. In sum, given Ms. Braxton's lack of familiarity with the record, her inability to confirm its accuracy, the certification submitted by the Defendants in this case is useless and hollow.

Defendant should not be allowed to use an unsubstantiated appendix of self-selected documents to seek summary judgment in this matter, when Plaintiffs have had no opportunity to seek even basic discovery.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request that the Court deny or defer Defendants' motion for summary judgment and allow discovery to be had in this case before considering summary judgment for Defendants.

Respectfully submitted this 22nd day of November, 2013.


  /s/ Carl C. Scherz
Mark Rienzi
  mrienzi@becketfund.org
Daniel Blomberg
  dblomberg@becketfund.org
Adele Keim
  akeim@becketfund.org
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street NW, Suite 220
Washington, DC 20007
Tel.:   (202) 955-0095
Fax:   (202) 955-0090

Carl C. Scherz
  cscherz@lockelord.com
Seth Roberts
  sroberts@lockelord.com
Locke Lord LLP
2200 Ross Avenue, Suite 2200
Dallas, TX 75201
Tel.:   (214) 740-8583
Fax:   (214) 756-8583

COUNSEL FOR PLAINTIFFS LITTLE
SISTERS OF THE POOR HOME FOR
THE AGED, DENVER, COLORADO;
LITTLE SISTERS OF THE POOR,
BALTIMORE, INC.; CHRISTIAN
BROTHERS SERVICES; AND
CHRISTIAN BROTHERS EMPLOYEE
BENEFIT TRUST

Kevin C. Walsh
  kwalsh@richmond.edu
University of Richmond School of Law
28 Westhampton Way
Richmond, VA 23173
Tel.:   (804) 287-6018

COUNSEL FOR PLAINTIFFS
LITTLE SISTERS OF THE POOR
HOME FOR THE AGED,
DENVER, COLORADO; AND
LITTLE SISTERS OF THE POOR,
BALTIMORE, INC.

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was filed through the Court's ECF filing system on counsel for Defendants on November 22, 2013.

 /s/ Carl C. Scherz
Carl C. Scherz

## CERTIFICATE OF CONFERRAL

I hereby certify that Mark Rienzi conferred with counsel for Defendants in an effort to resolve the disputed matter before filing this motion. Opposing counsel is opposed to the relief requested herein.

 /s/ Carl C. Scherz
Carl C. Scherz