# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:13-cv-02611-WJM-BNB

LITTLE SISTERS OF THE POOR HOME FOR THE AGED, DENVER, COLORADO, a Colorado non-profit corporation, LITTLE SISTERS OF THE POOR, BALTIMORE, INC., a Maryland non-profit corporation, by themselves and on behalf of all others similarly situated,

CHRISTIAN BROTHERS SERVICES, a New Mexico non-profit corporation, and

CHRISTIAN BROTHERS EMPLOYEE BENEFIT TRUST,

     Plaintiffs,

  v.

KATHLEEN SEBELIUS, Secretary of the United States Department of Health and Human Services,

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,

THOMAS E. PEREZ, Secretary of the United States Department of Labor,

UNITED STATES DEPARTMENT OF LABOR,

JACOB J. LEW, Secretary of the United States Department of the Treasury, and

UNITED STATES DEPARTMENT OF THE TREASURY,

     Defendants.

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

Introduction ................................................................................................................... 1

Response to Defendants' Statement of Material Facts ................................................. 2

Statement of Additional Facts ...................................................................................... 13

Argument ...................................................................................................................... 13

I.   All Plaintiffs Have Standing ................................................................................. 20

II.  Defendants' Motion Must Be Denied .................................................................. 22

    A.  The Mandate violates RFRA. ........................................................................ 22

    B.  The Mandate violates the Administrative Procedures Act. ........................... 24

        1.  The Final Rules are "not in accordance with law" because they
            purport to bind ERISA-exempt church plan TPAs. ............................... 24

        2.  The Final Rules are "arbitrary and capricious" because they
            force the Little Sisters Plaintiffs to comply with an unenforceable
            accommodation scheme. ....................................................................... 25

            a.  It is arbitrary and capricious to require the Little Sisters Plaintiffs
                to comply with the now-meaningless accommodation scheme. ..................... 25

            b.  It is arbitrary and capricious not to exempt the Little Sisters
                Plaintiffs from the contraceptive mandate altogether. ................................... 26

        3.  Defendants violated the APA by promulgating the HRSA Guidelines
            without notice, comment or publication in the Federal Register. ................ 27

    C.  The Mandate violates the Free Exercise Clause. .......................................... 29

    D.  The Establishment Clause claims cannot be resolved in Defendants' favor. ............. 34

    E.  The Mandate violates Plaintiffs' Free Speech rights. ................................... 35

    F.  The Mandate violates Plaintiffs' right to expressive association ................. 37

    G.  Defendants' motion for summary judgment is premature. ........................... 38

Conclusion .................................................................................................................... 38

# TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
  133 S. Ct. 2321 (2013) ............................................................................... 36

*Argo v. Blue Cross & Blue Shield of Kansas, Inc.*,
  452 F.3d 1193 (10th Cir. 2006) ..................................................................... 2

*Axson-Flynn v. Johnson*,
  356 F.3d 1277 (10th Cir. 2004) ............................................................... 32, 33

*Boy Scouts of America v. Dale*,
  530 U.S. 640 (2000) ................................................................................ 37, 38

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ........................................................................ 30, 31, 33

*City of Lakewood v. Plain Dealer Publ'g Co.*,
  486 U.S. 750 (1988) ................................................................................... 33

*Colo. Christian Univ. v. Weaver*,
  534 F.3d 1245 (10th Cir. 2008) ....................................................... 30, 34, 35

*Cressman v. Thompson*,
  719 F.3d 1139 (10th Cir. 2013) ............................................................... 20, 21

*FCC v. NextWave Pers. Commc'ns Inc.*,
  537 U.S. 293 (2003) .............................................................................. 24, 25

*Fraternal Order of Police v. City of Newark*,
  170 F.3d 359 (3d Cir. 1999) .............................................................. 31, 32, 33

*Gilardi v. HHS*,
  No. 13-5069, 2013 WL 5854246 (D.C. Cir. Nov. 1 2013) ...................... 11, 23, 24

*Gillette v. United States*,
  401 U.S. 437 (1971) ................................................................................... 35

*Goetz v. Glickman*,
  149 F.3d 1131 (10th Cir. 1998) ................................................................... 35

*Grace United Methodist Church v. City of Cheyenne*,
  451 F.3d 643 (10th Cir. 2006) ..................................................................... 32

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013) .............................................................. passim

*Hobby Lobby Stores, Inc.* v. *Sebelius*,
No. 12-6294 (10th Cir. filed Mar. 15, 2013) ............................................ 10

*Holy Land Found. for Relief and Dev't v. Ashcroft*,
333 F.3d 156 (D.C. Cir. 2003) .................................................................. 38

*Hydro Res., Inc. v. U.S. E.P.A.*,
608 F.3d 1131 (10th Cir. 2010) ........................................................ 21, 24

*In re Motor Fuel Temper. Sales Practice Litig.*,
641 F.3d 470 (10th Cir. 2011) .................................................................. 37

*Korte v. Sebelius*,
__F.3d__, 2013 WL 5960692 (7th Cir. Nov. 8, 2013) ............................. 24

*Larson v. Valente*,
456 U.S. 228 (1982) .................................................................................. 34

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
132 S. Ct. 2199 (2012) .............................................................................. 29

*Mission Grp. Kansas, Inc. v. Riley*,
146 F.3d 775 (10th Cir. 1998) .................................................................. 28

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................. 25, 26

*Nat'l Ski Areas Ass'n, Inc. v. U.S. Forest Serv.*,
910 F. Supp. 2d 1269 (D. Colo. 2012) ............................................... 28, 29

*Nat'l Collegiate Athletic Ass'n v. Califano*,
622 F.2d 1382 (10th Cir.1980) ................................................................. 21

*Olenhouse v. Commodity Credit Corp.*,
42 F.3d 1560 (10th Cir. 1994) ........................................................ 25, 26, 27

*Pleasant v. Lovell*,
876 F.2d 787 (10th Cir. 1989) .................................................................. 38

*Rumsfeld v. FAIR Inc.*,
547 U.S. 47 (2006) .................................................................................... 35

*Save Palisade FruitLands v. Todd*,
279 F.3d 1204 (10th Cir. 2002) ................................................................ 35

*SEC v. Wolfson*,
539 F.3d 1249 (10th Cir. 2008) ................................................................ 38

*Skull Valley Band of Goshute Indians v. Nielson*,
   376 F.3d 1223 (10th Cir. 2004) ........................................................ 22

*Sprint Comm's Co., L.P. v. APCC Servs., Inc.*,
   554 U.S. 269 (2008) ........................................................................ 21

*Summum v. City of Ogden*,
   297 F.3d 995 (10th Cir. 2002) ........................................................ 33

*Swanson v. Guthrie Independent School District*,
   135 F.3d 694 (10th Cir. 1998) ........................................................ 32

*Taniguchi v. Kan Pacific Saipan, Ltd.*,
   132 S. Ct. 1997 (2012) .................................................................... 29

*U.S. West, Inc. v. FCC*,
   182 F.3d 1224 (10th Cir. 1999) ...................................................... 36

*United States v. Cain*,
   583 F.3d 408 (6th Cir. 2009) .......................................................... 29

*United States v. O'Brien*,
   391 U.S. 367 (1968) ........................................................................ 12

*Zubik v. Sebelius*,
   No. 2:13-cv-01459-AJS (W.D. Pa. Nov. 21, 2013) ...................... passim

**Statutes**

26 U.S.C. § 4980D ............................................................................ 29

26 U.S.C. § 4980H ...................................................................... 21, 29

42 U.S.C. § 18023 ............................................................................ 30

42 U.S.C. § 300gg-13 ...................................................................... 29

5 U.S.C. § 553 .................................................................................. 29

5 U.S.C. § 706 .................................................................................. 25

Administrative Procedure Act ............................................................ 2

**Other Authorities**

Abortion Non-Discrimination Act of 2002
   (H.R. 4691, 107th Cong. 2002) ...................................................... 13

Kelly Wallace,
*Health and Human Services Secretary Kathleen Sebelius Tells iVillage 'Historic' New Guidelines Cover Contraception, Not Abortion*, (August 2, 2011) .......................................... 11

Robin Marty "Sebelius: 'We Are In A War'"
*RH Reality Check* (Oct. 6, 2011).............................................. 19

*Stedman's Medical Dictionary* (28th ed. 2006)....................................... 30

The Church Alliance Comment Letter........................................ 19, 28

The Forum, *A Conversation with Kathleen Sebelius, U.S. Secretary of Health & Human Services* (April 8, 2013).................................................... 20

## Rules

D.C.Colo.LCivR 56.1 ........................................................ 3

Fed. R. Civ. P. 12 ......................................................... 45

Fed. R. Evid. 802 ......................................................... 13

WJM Revised Practice Standards III(E)(4) ...................................... 3, 7, 13

## Regulations

10 C.F.R. § 20.1003 ....................................................... 12

26 C.F.R. § 54.9815-2713A ............................................... passim

29 C.F.R. § 2510.3-16.................................................... 17

29 C.F.R. § 2590.715–2713A .............................................. passim

45 C.F.R. § 147.130 ...................................................... 29

45 C.F.R. § 147.131 ...................................................... 34

7 C.F.R. § 247.9 ......................................................... 12

76 Fed. Reg. 46621 (Aug. 3, 2011)........................................... 29

78 Fed. Reg. 39870 (July 2, 2013)........................................... passim

78 Fed. Reg. 8456 (Feb. 6, 2013) ........................................... 35, 36

# Introduction

Plaintiffs have a sincere and unchallenged religious objection to participating in Defendants' contraceptive distribution scheme. If they persist in that religious exercise—and refuse to yield to Defendants' dictates and submit to their gag rule—Plaintiffs face massive penalties. Under *Hobby Lobby*, Defendants' impositions amount to a substantial burden under RFRA that Defendants may not impose unless they satisfy strict scrutiny.

Defendants rightly concede that they cannot satisfy strict scrutiny in light of *Hobby Lobby*. Defs' Br. 14. They further admit that they actually "lack authority" to impose their requirements on administrators of plans like the one at issue here. *Id.* at 2. In doing so, Defendants implicitly acknowledge that forcing the Plaintiffs to participate in their scheme is essentially a pointless exercise. *Id.* And they admit that they have exempted other religious organizations with the exact same religious objection to participating in the scheme. *Id.* at 6-7.

These concessions, combined with controlling law, doom Defendants' case. Defendants cannot avoid this result by seeking refuge in the law of standing because their scheme forces Plaintiffs to act now, creating an actionable injury. Nor can Defendants excuse their discrimination among religious institutions based on their speculation about the likely religious beliefs of Plaintiffs' employees. Defs' Br. 8. As Defendants have admitted elsewhere, they have *no evidence* to support that assumption. Such discrimination among religious institutions is forbidden by the First and Fifth Amendments and the Administrative Procedure Act ("APA").

For these reasons, and as set forth in more detail below, Defendants cannot force the Plaintiffs to comply with their scheme in violation of their religious beliefs. Accordingly, Defendants' Motion should be denied.

## Response to Defendants' Statement of Material Facts

*Preliminary Statement.* The factual claims set forth in the Defendants' Statement of Material Facts ("Defendants' Statement") largely consist of legal conclusions. This is improper, as the statement is supposed to contain "facts" not legal conclusions. *See* D.C.Colo.LCivR 56.1(a) (requiring statement of "facts"). Sections of the Federal Code and the Federal Register speak for themselves.

To the extent Defendants' Statement concerns actual facts, those facts are largely based on either (a) hearsay statements from the Defendants' own documents, and (b) hearsay statements from third parties (including the IOM report). This approach is improper. Factual assertions in the statement are supposed to be "accompanied by a specific reference to *admissible* material in the record which establishes the fact." WJM Revised Practice Standards III(E)(4). The court cannot rely on Defendants' inadmissible hearsay assertions for the truth of the matter asserted, either at trial, Fed. R. Evid. 802, or on summary judgment. *See Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (noting that, even when contained in affidavits, "courts should disregard inadmissible hearsay statements . . . as those statements could not be presented at trial in any form.").

Furthermore, any reliance on the purported administrative record before discovery begins would be improper for a second reason: Plaintiffs have not yet had the opportunity to conduct discovery to determine whether the proffered administrative record is complete and accurate. As set forth in Plaintiffs' Rule 56(d) Motion, serious questions have been raised about the lack of knowledge about those practices on the part of the witness who certified that record to this court. Pre-discovery summary judgment in reliance on the proffered record is premature.

Subject to and including the objections set forth above, Plaintiffs' further responses to particular statements are set forth below:

1.      Disputed and unsupported. The only related statement in these pages is a single survey "indicat[ing] that less than half of women are up to date with recommended preventive care screenings and services (Robertson and Collins, 2011)." AR 318. The Robertson and Collins survey, however, did not consider contraceptive coverage to be "preventive care," instead asking women "whether they had received a set of recommended preventive screening tests: blood pressure, cholesterol, cervical cancer, colon cancer (for ages 50 to 64) and breast cancer (for ages 50-64)." Robertson & Collins, *Findings from the Commonwealth Fund Biennial Health Insurance Survey of 2010* 8-9 (The Commonwealth Fund 2011); attached hereto as Exhibit P. The only study in the cited IOM pages pertaining to contraception concerns whether changes in cost structure for certain contraceptives can cause "a change in the mix of contraceptive methods prescribed and purchased." AR 407, 1359.

2.      Disputed and unsupported. See Response No. 1.

3.      Disputed and unsupported. Undisputed that the cited statute exists. The statute speaks for itself, and nothing in the citation provided indicates what the statute "seeks to" do, or its efficacy, reasonableness, or general applicability in pursuing its alleged goals.

4.      This is a legal conclusion, rather than a statement of fact. The cited statute, which is only partially quoted, speaks for itself.

5.      Disputed and unsupported. The IOM Report includes a statement of its charge from HHS and that statement does not include any discussion of coverage issues. AR 300. Rather, the HHS charge simply deals with assessing preventive health guidelines, and expressly excludes factors such as cost-effectiveness and community-based solutions. AR 300-01 ("The cost-effectiveness

of screenings or services could not be a factor for the committee to consider in its analyses leading to its recommendations."). IOM also acknowledged that it did *not* "conduct a USPSTF-style systematic review for any single preventable health condition or determinant of well-being." AR 294. Indeed, IOM expressly recommended to HHS that it should "establish a commission to recommend coverage of new preventive services for women to be covered under the ACA" and that commission should "[d]esign and implement a coverage decision making methodology to consider evidence review bodies (and other clinical guideline bodies) and coverage factors (e.g. cost, cost-effectiveness, legal, ethical)." AR 311.

Furthermore, Plaintiffs dispute: (1) the propriety of HHS abdicating its authority for creating preventive care guidelines by adopting IOM's recommendations wholesale even though those recommendations did not account for coverage-related issues like cost effectiveness; (2) the impartiality of the IOM committee that was formulated to recommend guidelines; (3) the methods the IOM committee employed; and (4) the merits of IOM's recommendations. Specifically, HHS outsourced deliberations to the IOM, which in turn created a "Committee on Preventive Services for Women" that invited presentations from several "pro-choice" groups, such as Planned Parenthood and the Guttmacher Institute (named for a former president of Planned Parenthood), without inviting presentations from groups with religious objections to forced participation in the distribution of contraceptives, sterilization, and abortion-inducing drugs. AR 516-19.

In addition, the dissent to IOM reports that the IOM committee was tasked to act on an "unacceptably short time frame" in which to conduct meaningful scientific review, and that the IOM committee should not have made recommendations simply to keep pace with "the ACA-mandated rapidity with which the committee was confronted." AR 529-530. "[T]he committee

process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee's composition. Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy." *Id.* Ultimately, "the committee erred [in] their zeal to recommend something despite the time constraints and a far from perfect methodology" and "failed to demonstrate [transparency and strict objectivity] in the Report." AR 530-31 (deeming evidence evaluation process a "fatal flaw" in the report).

6. Undisputed that the quoted text appears in the IOM Report, but disputed that IOM's review was "extensive" and "science-based." Plaintiffs incorporate their response to Paragraph 5 *supra*. The report did not recommend that "HRSA guidelines include" anything, but rather recommended the drugs, devices, procedures, and related advice "for consideration as a preventive service for women." AR 308.

7. Undisputed but incomplete. FDA-approved contraceptive methods also include, *inter alia*, sterilization. AR 402-03. Emergency contraceptives (specifically: ella, Plan B and certain IUDs) can induce abortion, *see* Paragraph 37, *infra*.

8. Disputed and unsupported. The cited pages of the IOM Report do not discuss coverage of contraception without cost-sharing at all, much less that such coverage is "necessary to increase access to such services" or avoid bad outcomes. AR 400-01; *see also* AR 1290 ("The scarcity of studies on [negative health effects of unintended pregnancy] is surprising, given that the prevention of unintended pregnancy has been a major rationale for the funding and provision of family planning"); AR 1291 ("The scarcity of studies on the effects of unintended pregnancy on the physical and mental health of men and women . . . must be noted.").

9.      Undisputed. This was done, however, via press release, *see* Dkt. 1-2, Ex. A,[1] and website announcement, *see* AR 283-84, and without following notice and comment rulemaking.

10.     This statement is a characterization of the law, not a statement of fact. The regulation speaks for itself. Undisputed that the 2011 final rule contained the four prongs described.

11.     This is a disputed proposition of law. Undisputed that HRSA's webpage and the C.F.R. contain provisions addressing this topic. Disputed that Defendants have employed a proper definition of "religious employer," in that Plaintiffs *are* religious employers and should be treated as such under the law. *See*, *e.g.*, Plaintiffs' Statement of Additional Facts ¶¶ 1-3, 8-10.

12.     Undisputed.

13.     Undisputed that the government undertook new rulemaking, but disputed that the rulemaking "accommodated" non-grandfathered non-profit religious organizations' religious objections to forced participation in the government's scheme. *See* Plaintiffs' Statement of Additional Facts ¶¶ 10-16 (noting that Plaintiffs cannot comply with new rule).

14.     Undisputed, but see Response 13.

15.     Disputed, unsupported, and argumentative. The "significance" of the "accommodation" and the "importan[ce]" of the government's policy goals are not facts, and Defendants' self-serving characterizations of their own documents are not "admissible evidence" establishing "facts." WJM Revised Practice Standards III(E)(4). Undisputed that the accommodation only helps "certain" religious non-profits. As evidenced by Defendants' opposition to Plaintiffs' request for even preliminary relief, the government continues to insist that Plaintiffs perform acts that violate their religious beliefs. *See* Plaintiffs' Statement of Additional Facts ¶¶ 10-16 (noting that Plaintiffs cannot comply with new rule).

---

[1] For ease of reference, all docket citations are to filings in *Little Sisters of the Poor v. Sebelius*, unless otherwise noted.

16.     Disputed and unsupported. Defendants have claimed that, at least as relevant to this case, the Mandate is not enforceable against Plaintiffs' third party administrators ("TPAs") and does not provide access to contraceptive coverage. Defs' Br. 2. Consequently, it facially does not advance the government's claimed interests. Plaintiffs do not dispute, however, that the goal of the regulations, and the reason for Defendants' insistence on Plaintiffs' immediate compliance with the system, is that such compliance is the government wants to promote use of and facilitate access to contraceptives. Dkt. 29, Defs' Opp. at 1, 3-5, 9-10.

17.     This is a disputed proposition of law, and is unsupported. As set forth in Plaintiffs' Complaint and supporting declarations, the regulations require Plaintiffs to take numerous steps to contract, arrange, pay for, or refer for the relevant coverage. *See, e.g.,* Mother Loraine Decl., Dkt. 15-1 ("Ex. I") ¶¶ 44-52, 64; Brother Quirk Decl., Dkt. 15-2 ("Ex. J.") ¶¶ 29-35, 57; *see also* Compl. ¶¶ 109-164.

18.     This is a legal conclusion, not a statement of fact. The regulation speaks for itself.

19.     This is a legal conclusion, not a statement of fact. The regulation speaks for itself.

20.     This is a legal conclusion, not a statement of fact. The regulation speaks for itself.

21.     This is a legal conclusion, not a statement of fact. The regulation speaks for itself.

22.     This is a legal conclusion, not a statement of fact. The regulation speaks for itself.

23.     This is a legal conclusion, not a statement of fact. The regulation speaks for itself. Disputed and unsupported. *See* Paragraph 17.

24.     This is a legal conclusion, not a statement of fact. Disputed and unsupported. *See* Paragraph 17. The regulation speaks for itself, and imposes additional requirements on Plaintiffs including, *inter alia*, a prohibition on asking or instructing a TPA not to provide payments for the objected-to services in connection with Plaintiffs' plan. *See* 26 C.F.R. § 54.9815-2713A

(Plaintiffs "must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements"). In addition, the self certification form requires Plaintiffs to authorize TPAs to provide such payments, and to inform TPAs of their obligation to provide such payments under federal law. *See* Dkt. 37-3, Ex. O. Plaintiffs are forbidden by their religion from taking these actions. *See* Plaintiffs' Statement of Additional Facts at ¶¶ 10-16.

25.     This is a characterization of the law, not a statement of fact. The regulation speaks for itself, and on its face contains no exemption for "self-insured church plan[s]." Instead, the regulation expressly requires that "if a third party administrator receives a copy of the [self] certification . . . the third party administrator shall provide or arrange payments for contraceptive services." 29 C.F.R. § 2590.715–2713A(b)(2); 26 C.F.R. § 54.9815–2713A(b)(2). "A third party administrator that receives a copy of the self-certification . . . *must* provide or arrange separate payments for contraceptive services for participants and beneficiaries in the plan." 78 Fed. Reg. 39870, 39880 (July 2, 2013) (emphasis added).

26.     This is a characterization of the law, not a statement of fact. The regulation speaks for itself. The statement is also incomplete, in that Defendants' Statement 25 claims there is an unspoken carve-out for self-insured church plans, but Statement 26 contains no similar statement addressing whether Defendants believe that TPAs of self-insured church plans will be reimbursed under the regulation.

27.     This is a characterization of the law, not a statement of fact. The regulation speaks for itself. The regulation contains no such exception on its face, and was issued under both ERISA and the Internal Revenue Code.

28.     This is a characterization of the law, not a statement of fact. The regulation speaks for itself.

29.     Disputed and unsupported. The assertion is inadmissible speculation. The cited materials contain no evidence (admissible or otherwise) for the government's speculation about the likely religious beliefs of people who work for different religious institutions. Nor have Defendants offered any reason to believe that they are legally permitted to engage in speculation about the religious beliefs of those who associate with particular religious institutions, or to discriminate among such institutions based on government predictions or preferences about what religious beliefs citizens and organizations may hold. Further, they have admitted in parallel litigation that they have no basis for their speculation. *Zubik v. Sebelius*, No. 2:13-cv-01459 (W.D. Pa. Nov. 21, 2013), Dkt. 51-1 at 34:9-24 (admitting there is "no evidence" for Defendants' speculation that employees of religious organizations like Plaintiffs "are more likely not to object to the use of contraceptives.") (Deposition Transcript of Gary M. Cohen, Defendants' Rule 30(b)(6) Designee, Director of the Center for Consumer Information and Insurance Oversight in the Centers for Medicare and Medicaid Services) (attached hereto as Exhibit Q). That court found Defendants' reasoning was found to be "speculative," "unsubstantiated," and "unpersuasive." *Zubik*, *supra*, Dkt. 75, Opinion and Order Granting Preliminary Injunction, at 57.[2]

30.     See Response 29.

31.     Disputed and unsupported. Undisputed that the rules contain the cited language, but the language is contradicted by the text of the rule, which provides that eligible organizations are prohibited from engaging in particular speech about their opposition to contraception. *See* 29 C.F.R. § 2590.715-2713A ("must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements").

---

[2] Plaintiffs filed the *Zubik* Opinion and Order with this Court at Dkt. 40-1. All future references to *Zubik* herein can be accessed via that docket entry.

32.     This is a legal conclusion, not a statement of fact. Disputed and unsupported. The words chosen in the statement—"improper attempt to interfere" and "threatening"—do not appear in the regulatory provision, which is in fact far broader. *See* 29 C.F.R. § 2590.715-2713A ("must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangements"). Defendants cannot edit the regulation via litigation.

33.     This is a legal conclusion, not a statement of fact. The statutory language continues and speaks for itself.

34.     This is a legal conclusion, not a statement of fact. The statutory language continues and speaks for itself.

35.     This is a legal conclusion, not a statement of fact. The statutory language speaks for itself. This statement is also speculative.

36.     This is a legal conclusion, not a statement of fact. The statutory language continues and speaks for itself.

37.     This is a legal conclusion, not a statement of fact. Disputed and unsupported. Defendants cannot rely on their own hearsay assertions to prove the facts in the statement. Plaintiffs believe that the intentional termination of pregnancy is an abortion and that all human life must be protected from the time of conception. *See* Plaintiffs' Statement of Additional Facts ¶¶ 10-11. By Defendants' own admission, the Mandate requires coverage of several FDA-approved drugs and devices that act in part by "inhibiting implantation." *See* Brief for Appellees at 9 n.6, *Hobby Lobby Stores, Inc.* v. *Sebelius*, No. 12-6294 (10th Cir. filed Mar. 15, 2013) (Doc. No. 90). Secretary Sebelius has given public interviews acknowledging this fact. *See* Kelly Wallace, *Health and Human Services Secretary Kathleen Sebelius Tells iVillage 'Historic' New Guidelines Cover Contraception, Not Abortion*, (August 2, 2011) available at

http://www.ivillage.com/kathleen-sebelius-guidelines-cover-contraception-not-abortion/4-a-369771(quoting Defendant Sebelius as indicating that "covered prescription drugs" include those that "are specifically those that are designed to prevent implantation."). The FDA's Birth Control Guide likewise acknowledges that these drugs and devices may work by preventing "attachment (implantation)" of a fertilized egg in the uterus. Dkt. 1-3 ("Ex. B") at 11-12.

38.     Undisputed, but incomplete. The list also includes other "emergency contraceptives" that can cause abortions. *See* Paragraph 37, *supra*.

39.     Undisputed that Defendants have made statements deeming these drugs to be contraceptives, rather than abortifacients, based on their view that pregnancy begins at implantation rather than conception. Defendants' own hearsay statements are not admissible facts. In any case, other provisions of federal law acknowledge that human life begins at conception.  *See, e.g.,* 10 C.F.R. § 20.1003 ("Embryo/fetus means the developing human organism from conception until the time of birth."); 7 C.F.R. § 247.9 ("(3) For a pregnant woman, the State agency must count each embryo or fetus in utero as a household member in determining if the household meets the income eligibility standards.").  Plaintiffs understand human life to begin at conception rather than implantation, and understand drugs and devices that kill human life after conception to be abortifacient. *See* Ex. I ¶¶ 22, 25, 29-43; Ex. J ¶¶ 17-26. Furthermore, while Defendants have made statements deeming these drugs "safe and effective," their hearsay assertions are not admissible to prove that fact.  *See* Fed. R. Evid. 802; WJM Revised Practice Standards III(E)(4)**;** *see also Gilardi v. HHS*, No. 13-5069, 2013 WL 5854246 (D.C. Cir. Nov. 1 2013) ("From the outset, we note the science is debatable and may actually undermine the government's cause. For the potential mother, as one amicus notes, the

World Health Organization classifies certain oral contraceptives as carcinogens, marked by an increased risk for breast, cervical, and liver cancers.").

40.     Undisputed that Defendants issued a memorandum, found on Defendant HHS's website, with the quoted language. The cited memorandum, however, says nothing about whether this language is "in light of this conclusion by the FDA" or has anything to do with whether emergency contraceptives can cause abortions.

41.     Disputed and unsupported. Defendants' self-serving snippets of individual Representatives' statements does not provide evidentiary support for the underlying factual statement. "What motivate[d] one legislator to make a speech about a statute [in 2002] is not necessarily what motivate[d] scores of others to enact it" in 2013. *United States v. O'Brien*, 391 U.S. 367, 384 (1968). Moreover, Defendants' quoted statements of Representative Weldon were in connection with the then-proposed Abortion Non-Discrimination Act of 2002 (H.R. 4691, 107th Cong. 2002)), which was never adopted.  See www.govtrak.us/congress/bills/107/hr4691 (last visited Nov. 21, 2013).

**Statement of Additional Facts**

1.      The Little Sisters of the Poor is an international Roman Catholic Congregation of Sisters that has provided loving care to needy elderly persons of any race, sex, or religion for 174 years. Ex. I ¶ 5.

2.      The Little Sisters engage in this mission because they are called by their Catholic faith to care for the needy elderly. Ex. I ¶¶ 22-27.

3.      While Catholic and committed to following Church teaching, the Little Sisters' homes are not under the civil legal ownership and control of the dioceses in which they are located.  Nor are they funded by those dioceses. Instead, the Little Sisters of the Poor own and control the homes themselves, through local corporations that are entirely within the civil legal control of the Little Sisters. Ex. I ¶¶ 13, 14.

4.      Little Sisters of the Poor, Baltimore, Inc. ("Little Sisters of Baltimore"), is a Maryland non-profit corporation that qualifies as a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code of 1986 ("the Code"). Little Sisters of Baltimore currently employs approximately 54 full-time employees. Ex. I ¶¶16-17.

5.      The Little Sisters of the Poor Home for the Aged, Denver, Colorado ("Little Sisters of Denver"), is a Colorado non-profit corporation that qualifies as a tax exempt organization under section 501(c)(3) of the Code. Little Sisters of Denver currently employs approximately 67 full-time employees.  Ex. I ¶¶ 18-19.

6.      Both Little Sisters of Baltimore and Little Sisters of Denver have adopted the Christian Brothers Employee Benefit Trust (the "Christian Brothers Trust" or "Trust") to provide medical benefits coverage for their employees. Ex. I ¶ 20.

7.     The Trust is a non-ERISA "church plan" that provides health and other welfare benefits for current and former employees of Catholic organizations throughout the United States that have adopted the Christian Brothers Trust.  Ex. J. ¶¶ 6-10.

8.     The Trust is administered by Christian Brothers Services, a Catholic organization designed to "serve the Catholic Church community and other faith-based organizations." Because Christian Brothers Services "understand[s] the unique dynamics of Church organizations and institutions," it serves those entities by helping them "to remain faithful to [their] mission and the universal mission of the Catholic Church." Christian Brothers Services' "incentive is to serve the Church, not profit." Ex J. ¶¶ 14-15.

9.     Together, the Christian Brothers entities provide health benefits for the employees of approximately 473 Catholic organizations that, like the Little Sisters, are "non-exempt" religious organizations.  *Id.* ¶¶ 40-42.

10.     Plaintiffs, including class members, are Catholic organizations operated in accordance with Catholic religious teachings. These teachings instruct that abortion, contraception, and sterilization are intrinsic evils, and prohibit encouraging or supporting their use. Ex. I ¶¶ 29-43; Ex. J ¶¶ 17-26.

11.     Plaintiffs believe that life begins at conception, that they have a religious obligation to respect that life, and that they are forbidden from participating in its destruction.  *See, e.g.,* Ex. I ¶¶ 22, 25, 32, 35, 40; Ex. J ¶¶ 16, 19, 22, 23.

12.     The Mandate includes drugs and devices that may work by preventing "attachment (implantation)" of a fertilized egg in the uterus. Ex. B at 11-12.

13.     Plaintiffs believe it would be sinful for them to intentionally facilitate the provision of contraceptives, abortifacients, sterilizations, and related education and counseling, for contraceptive purposes, as is required by the Mandate. Ex. I ¶ 42; Ex. J ¶¶ 27-34.

14.     Plaintiffs believe that they must avoid engaging in conduct that may lead others to do evil or think that Plaintiffs condone evil. Participating in conduct that violates Catholic teaching also poses a grave risk to Plaintiffs in their interactions with supporters, those who Plaintiffs serve, and others who share their beliefs. Ex. I ¶ 39, Ex. J ¶ 28-30.

15.     Rather, Plaintiffs must engage in conduct and associations that advocate for and reflect their Catholic beliefs, particularly as it relates to protecting human dignity and human life. Ex. I ¶ 36-37, Ex. J ¶ 29-30.

16.     Plaintiffs are also guided by Catholic beliefs to provide for the health and welfare of their employees by providing them with adequate health benefits.  Ex. I ¶ 41, Ex. J ¶ 35.

17.     Plaintiffs are prohibited by their religion from participating in the government's scheme to distribute, encourage, facilitate, and/or reduce the cost of contraceptives, sterilization, or drugs and devices that cause abortions. Ex. I ¶¶ 34-39, 44-52; Ex. J ¶¶ 30-34, 51-54; *see also* Ex. I ¶¶ 22-43 (setting forth underlying religious beliefs); Ex. J ¶¶ 16-30 (same).

18.     Plaintiffs are prohibited by their religion from signing, submitting, or facilitating the transfer of the government-required certification at issue in this case.  Ex. I ¶¶ 48-50; Ex. J., ¶¶ 32-34.

19.     Plaintiffs' religious beliefs about their obligation not to participate in the government's scheme have not changed in light of the government's recent statements that it cannot use ERISA to force TPAs to act on the certifications for non-ERISA plans. Mother Loraine Suppl. Decl., Dkt. 37-1 ("Ex. M") ¶¶ 8-9; Brother Quirk Suppl. Decl., Dkt. 37-2 ("Ex. N") ¶¶ 5, 8-9.

20.     On the back of the self-certification form, there is a "Notice to Third Party Administrators of Self-Insured Health Plans," which states that the form "constitutes notice to the third party administrator that . . . [t]he obligations of the third party administrator are set forth in 26 C.F.R. § 54.9815-2713A, 29 C.F.R. § 2510.3-16, and 29 C.F.R. § 2590.715-2713A," and that "[t]his certification is an instrument under which the plan is operated." Ex. O. It is these regulations require that TPAs shall provide or arrange payments for the complained of contraceptive services. Ex. N ¶ 7.

21.     Plaintiffs cannot provide such services or authorize someone else to do so; they must avoid participating in any system involving the provision of such services. Ex. I ¶¶ 34-39, 44-52; Ex. J ¶¶ 30-34, 51-54. It makes no difference whether those authorizations lead to payments that take place now or next year. Ex. M ¶¶ 8-9; Ex. N ¶ 8.

22.     Under Catholic religious principles, Plaintiffs cannot do the following and object to: Signing the self-certification form that on its face authorizes and mandates another organization to deliver contraceptives, sterilization, and abortifacients to employees and other beneficiaries now; Delivering the self-certification form to another organization that could then rely on it as an authorization to deliver these contraceptives, sterilization, and abortifacients to employees and beneficiaries, now or in the future; Agreeing to refrain from speaking to other organizations and instructing or asking them not to deliver contraceptives, sterilization, and abortifacients to employees; Creating a provider-insured relationship (between plan beneficiaries and Christian Brothers Services or any other third-party administrator), the sole purpose of which would be to provide contraceptives, sterilization, and abortifacients; Participating in a scheme, the sole purpose of which is to provide contraceptives, sterilization, and abortifacients to employees or other beneficiaries. Ex. M ¶¶ 8-9; Ex. N ¶ 8. Christian Brothers Trust and Christian Brothers

Services believe that it would be immoral and sinful for them to intentionally facilitate the provision of contraceptives, abortifacient drugs, sterilizations, and related education and counseling, as would be required by the Mandate. Ex. M ¶¶ 8-9; Ex. N ¶ 8. Similarly, it would be a violation of Christian Brothers Services' sincerely held Catholic beliefs for it to act as a "third party administrator" under the Mandate because it would have to contract for, arrange for or otherwise facilitate the provision of abortifacients, sterilizations and contraception in violation of Catholic teachings. Ex. M ¶¶ 8-9; Ex. N ¶ 8.

23. Express Scripts, Inc. ("ESI") provides on behalf of Christian Brothers Services certain administrative services in connection with pharmaceutical benefits under the Christian Brothers Trust. It is not clear to Plaintiffs whether ESI is a TPA under the Mandate for the Christian Brothers Trust. It is also not clear to Plaintiffs whether or not ESI will provide contraceptives to employees (and beneficiaries of such employees) of employers that have adopted the Christian Brothers Trust and provide ESI with a copy of a self-certification form pursuant to 26 U.S.C. § 54.9815-2713A before December 31, 2013, or thereafter. This great uncertainty with how contraceptive coverage may be handled under the Christian Brothers Trust is a matter of immediate and urgent concern for Plaintiffs. Ex. R ¶¶ 2-3.

24. If Plaintiffs fail to sign and submit the government-required certification at issue in this case, they face large penalties. For example, Little Sisters of Denver, which currently has approximately 67 full time employees, would incur penalties of approximately $6,700 per day and nearly $2.5 million per year unless it gives up its religious exercise and complies with the Mandate. Ex. I ¶ 56.

25. Little Sisters of Baltimore has approximately 54 full time employees and would face penalties of approximately $5,400 per day and nearly $2 million per year. *Id.* ¶ 58.

26.     Class members collectively face estimated penalties of $402,741,000 per year, while Christian Brothers Services and the Trust faces losses of $130,000,000 in medical plan contributions and $10,400,000 in net revenue per year if the class members are effectively forbidden from participating in the Trust because of their religious exercise. Ex. J ¶¶ 44, 53.

27.     Defendants estimate that plans covering an estimated 87 million people are in plans that are grandfathered. Dkt. 1-7, Ex. F at 7.

28.     Defendants estimate that approximately 34 million individuals work for employers with fewer than fifty employees.  Dkt. 1-9, Ex. H at 2.

29.     Defendant Sebelius said at a fundraiser in October 2011—shortly after the Mandate had been announced but before any of the exemptions had been announced—that "we are in a war" over emergency contraception. *See, e.g.*, Robin Marty "Sebelius: 'We Are In A War'" *RH Reality Check* (Oct. 6, 2011), *available at* http://rhrealitycheck.org/article/2011/10/06/sebelius-0/ (last visited Nov. 20, 2013).

30.     On April 8, 2013, the Church Alliance, an organization composed of the chief executives of thirty-eight church benefit boards, covering mainline and evangelical Protestant denominations, two branches of Judaism, and Catholic schools and institutions, including Christian Brothers Services, submitted a 20-page comment letter on the NPRM, detailing how the expanded definition of "religious employer" excluded bona fide religious organizations, and how the proposed accommodation for "eligible organizations" was unworkable, particularly for self-insured church plans like the Christian Brothers Employee Benefit Trust. The Church Alliance's comment letter is available at http://church-alliance.org/initiatives/comment-letters (last visited Nov. 22, 2013). *See also* AR 025526-45.

31.     The Little Sisters also submitted comments on the NPRM on April 8, 2013, stating essentially the same objections stated in this complaint. Dkt. 1-5, Ex. D. The Little Sisters asserted that "[t]he federal government should not force us to counteract through the health benefits for our employees the very same Gospel of Life that we attempt to live out in communion and solidarity with the needy elderly.  But under the proposed exemption and proposed accommodation, there is no way that we can comply with the Final Mandate without taking affirmative steps to change our health coverage arrangements to ensure coverage of female sterilization and all FDA-approved contraceptives, including abortifacient drugs and devices."

32.     Defendant Sebelius announced the content of the Final Rule the same day that the comment period closed, without taking the time to review—let alone consider—the many substantive objections to the Final Rule. In that presentation, Sebelius stated:

> We have just completed the open comment period for the so-called accommodation, and by August 1st of this year, every employer will be covered by the law with one exception.  Churches and church dioceses as employers are exempted from this benefit.  But Catholic hospitals, Catholic universities, other religious entities *will be providing coverage* to their employees starting August 1st . . . . [A]s of August 1st, 2013, every employee who doesn't work directly for a church or a diocese *will be included* in the benefit package.

 *See* The Forum, *A Conversation with Kathleen Sebelius, U.S. Secretary of Health & Human Services* (April 8, 2013) *available at* http://theforum.sph.harvard.edu/events/conversation-kathleen-sebelius/ (last visited Nov. 20, 2013) (see 51:30-52:00).

Argument

## I.  All Plaintiffs Have Standing

Article III standing requires (1) an injury in fact (2) fairly traceable to Defendants' actions, and (3) likely redressable by a favorable decision. *Cressman v. Thompson*, 719 F.3d 1139, 1144 (10th Cir. 2013). Defendants argue that they can force Plaintiffs to participate in their regulatory scheme, while Plaintiffs lack standing to seek this Court's protection, because Defendants "lack regulatory authority" to enforce part of the Mandate "at this time." Defs' Br. 11-12.

This argument fails for three reasons. First, Plaintiffs have standing because the Mandate forces them to take action against their will to avoid massive penalties. *Cressman*, 719 F.3d at 1145. To avoid massive penalties, they must provide either objectionable coverage that violates their religious beliefs or a self-certification which instructs their TPA to provide payments for abortion-inducing products, contraceptives, and sterilization procedures that also violates Plaintiffs' religious beliefs. *See* 26 C.F.R. § 54.9815–2713A; 29 C.F.R. § 2590.715–2713A; Ex. O.[3] Plaintiffs cannot sign or submit the self-certifications to their TPAs because such action would make them participate in Defendants' scheme. Indeed the forms expressly instruct the recipient to obey the regulations that require TPAs to provide or arrange for contraceptives services. *See* Ex. O. Moreover, it incorporates these instructions into Plaintiffs' health plan. *Id.* Furthermore, the gag rule prohibits the class members from "directly or indirectly" asking their TPA *not* to provide payments for the products at issue, 26 C.F.R. § 54.9815–2713A(b)(1)(iii). Defendants intend to enforce these requirements, which place enormous pressure on Plaintiffs to

---

[3] Plaintiffs cannot avoid this dilemma by discontinuing coverage. That would still violate their religious beliefs, Ex. I ¶ 41, Ex. J ¶ 35, and subject Plaintiffs with 50 or more full-time employees to other penalties. *See* 26 U.S.C. § 4980H.

violate their religious beliefs and compromise their religious missions. Ex. J ¶¶ 43-53; Ex. M ¶¶ 8-9; Ex. N ¶¶ 8-11.

Plaintiffs believe that taking these acts would violate their religious beliefs. But the Mandate forces Plaintiffs to take these actions before January 1st or be penalized, so Plaintiffs are confronted with a concrete, imminent violation of a legally protected interest that is directly traceable to the Defendants' Mandate that can be avoided by a favorable decision in this action. *See Cressman*, 719 F.3d at 1144.

Second, even aside from the actionable burden on Plaintiffs' exercise of religion from such requirements, Plaintiffs have standing based on the simple fact that compliance with the rules will require an expenditure of time and money. The government has conceded that "the total annual burden for preparing and providing the information in the self-certification" is approximately $41 and 50 minutes for "each eligible organization." *See* 78 Fed. Reg. 39890. This burden of time and expense establishes standing. *See*, *e.g.*, *Sprint Comm's Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008) (an interest of "only a dollar or two" could establish standing); *Cressman*, 719 F.3d at 1142, 1145 (license plate renewal fee of $16.50 was an "actual, concrete monetary injury" for standing purposes); *Hydro Res., Inc. v. U.S. E.P.A.*, 608 F.3d 1131, 1183 (10th Cir. 2010) (requirement to comply with permitting process establishes injury in fact); *Nat'l Collegiate Athletic Ass'n v. Califano,* 622 F.2d 1382, 1389 (10th Cir.1980) ("Certainly the cost of obeying the regulations constitutes injury.").

Third, Defendants' new ERISA-based litigation position does not change the regulations, which on their face apply to *all* TPAs, with no exception for church plan TPAs. The regulations—issued both by the Department of Labor under ERISA *and* by the Treasury Department under the Internal Revenue Code—provide that "if a third party administrator

receives a copy of the [self] certification . . . the third party administrator shall provide or arrange payments for contraceptive services." 29 C.F.R. § 2590.715–2713A(b)(2); 26 C.F.R. § 54.9815–2713A(b)(2); *see also* 78 Fed. Reg. 39879, 39880 (July 2, 2013) (TPA who receives a self-certification "must provide or arrange" payments). The "obligations and burdens imposed by [law] speak for themselves, and no additional evidence is necessary to establish standing." *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1235 (10th Cir. 2004).[4]

## II. Defendants' Motion Must Be Denied

### A.     The Mandate violates RFRA.

Plaintiffs' faith forbids them from participating in the government's scheme to subsidize and promote the use of sterilization, contraceptives, and abortifacients. Ex. I ¶¶ 45-52, 64-65; Ex. J ¶¶ 27-34, 56-57; Ex. M ¶¶ 8-9; Ex. N ¶¶ 8-11. Plaintiffs cannot provide these services themselves and cannot authorize someone else to provide them. Ex. I ¶¶ 46-50; Ex. J ¶¶ 32-34. Plaintiffs' religious beliefs require them to avoid participating in any system that could involve the provision of such services. Ex. I ¶¶ 34-39, ¶¶ 48-51; Ex. J ¶¶ 25-34, 51-54. This religious obligation to avoid participating in Defendants' scheme remains unchanged despite Defendants' new claim that part of the system is not yet fully operational with respect to one of the Plaintiffs. Ex. M ¶¶ 8-9; Ex. N ¶¶ 5, 8-9.

*Hobby Lobby* provides the required framework for RFRA analysis. First, a court must "identify the religious belief" at issue. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1140 (10th Cir. 2013). Second, it must "determine whether this belief is sincere." *Id*. Third, the court must determine "whether the government places substantial pressure on the religious believer."

---

[4] *See also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561-62 (1992) ("When the suit is one challenging the legality of government action," there is "ordinarily little question" that a plaintiff who is the object of the law has standing).

*Id*. Finally, if there is substantial pressure, Defendants' action will be upheld only if Defendants carry the burden of satisfying strict scrutiny. *Id*. at 1143.

Defendants effectively concede virtually every prong of this test. Defendants do not dispute the existence, religiosity, or sincerity of Plaintiffs' religious beliefs. And Defendants admit that *Hobby Lobby* requires rejection of their strict scrutiny argument. Def. Br. at 14.

Thus, the only part of the *Hobby Lobby* analysis that remains is whether the Mandate "places substantial pressure" on Plaintiffs to violate their beliefs. 723 F.3d at 1140. If Plaintiffs continue their religious exercises, they face the same penalties that constituted "substantial pressure" in *Hobby Lobby*. *Compare* Ex. I ¶¶ 54-59, *with* 723 F.3d at 1140; *see also Gilardi v. U.S. Dep't of Health & Human Srvs.*, __F.3d__, 2013 WL 5854246, at *7 (D.C. Cir. Nov. 1, 2013) (the Mandate burdens objectors by "pressur[ing] [them] to choose between violating their religious beliefs in managing their selected plan or paying onerous penalties"); *Zubik* at 49 (concluding that the accommodation "substantially burdens" the religious beliefs of non-profits by "asking Plaintiffs for documentation for what Plaintiffs sincerely believe is an immoral purpose.").

Defendants cannot avoid this conclusion by arguing that Plaintiffs really *should* be comfortable signing the self-certification form in light of Defendants' new litigation position. The questions of moral complicity in this case are religious, not legal, and Defendants have no authority to dictate when and whether Plaintiffs' involvement in the scheme is "too attenuated" to implicate their religion. *Hobby Lobby*, 723 F.3d at 1153-54. As *Hobby Lobby* instructed:

> [I]t is not for secular courts to rewrite the religious complaint of a faithful adherent, or to decide whether a religious teaching about complicity imposes "too much" moral disapproval on those only "indirectly" assisting wrongful conduct. Whether an act of complicity is or isn't "too attenuated" from the underlying wrong is sometimes itself a matter of faith we must respect.

*Id.*; *Gilardi*, 2013 WL 5854246, at *6 ("[I]t is not for courts to decide [what] severs [a religious objector's] moral responsibility") (internal citation omitted); *Korte v. Sebelius*, __F.3d__, 2013 WL 5960692, at *24 (7th Cir. Nov. 8, 2013) (rejecting Defendants' "'attenuation' argument" because it asks whether "th[e] [Mandated] coverage impermissibly assist[s] the commission of a wrongful act in violation of the moral doctrines of the Catholic Church," a question which "[n]o civil authority can decide"); *Zubik* at 28 ("Completion of the self-certification form would be akin to cooperating with/facilitating 'an evil' and would place the Diocese 'in a position of providing scandal' because 'it makes it appear as though [the Diocese] is cooperating with an objectionable practice that goes against [Church] teaching.'").

**B. The Mandate violates the Administrative Procedures Act.**

**1. The Final Rules are "not in accordance with law" because they purport to bind ERISA-exempt church plan TPAs.**

"The [APA] requires federal courts to set aside federal agency action that is 'not in accordance with law,' 5 U.S.C. § 706(2)(A)—which means, of course, any law, and not merely those laws that the agency itself is charged with administering." *FCC v. NextWave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003); *Hydro Res., Inc. v. E.P.A.*, 608 F.3d at 1145. The Final Rules are "not in accordance with" RFRA, the First Amendment, the ACA, or the Weldon Amendment, and they should be set aside on that basis. But they are also "not in accordance with law" because they conflict with federal laws exempting church benefit plans from ERISA. *See* Defs' Br. 11-12.

The Final Rules purport to bind all TPAs, including those affiliated with church plans. As amended, 26 C.F.R. § 54.9815–2713A flatly states that "if a [TPA] receives a copy of the self-certification . . . and agrees to enter into or remain in a contractual relationship with the eligible organization or its plan" then "the [TPA] *shall provide or arrange payments* for contraceptive

services[.]" (emphasis added); *see* 78 Fed. Reg. 39892-93 (promulgating regulation). Nothing on the face of this amended regulation indicates that it does *not* apply to TPAs of non-ERISA church plans.

Defendants now admit that they "lack authority" to regulate the TPAs of non-ERISA church plans in this way. Defs' Br. 11-12. But Defendants' position conflicts with the express requirements of the regulation, 26 C.F.R. § 54.9815–2713A, and "[a]fter-the-fact rationalization by counsel" cannot save their rule. *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1584 (10th Cir. 1994). Given Defendants' binding admission, their invalid regulation should be set aside as contrary to law. *NextWave*, 537 U.S. at 300; *Hydro Res.*, 608 F.3d at 1145.

### 2. The Final Rules are "arbitrary and capricious" because they force the Little Sisters Plaintiffs to comply with an unenforceable accommodation scheme.

Defendants' admission that the Final Rules do not bind non-ERISA church plan TPAs make continued enforcement of the self-certification requirement against the Little Sisters arbitrary and capricious. An "agency must cogently explain why it has exercised its discretion in a given manner," and "articulate . . . a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43-44 (1983); *Olenhouse*, 42 F.3d at 1584. Defendants offer no explanation for their insistence that the Little Sisters comply with step one of the Mandate despite Defendants' inability to enforce step two. Where, as here, an agency's explanation is "nonexistent," its actions are *necessarily* arbitrary and capricious. *Motor Vehicle Mfrs.*, 463 U.S. at 42-44.

### a. It is arbitrary and capricious to require the Little Sisters Plaintiffs to comply with the allegedly meaningless accommodation scheme.

The Mandate states that Defendants created the accommodation to "protect[] certain nonprofit religious organizations with religious objections to contraceptive coverage." 78 Fed.

Reg. 39873. "The purpose of the self-certification" is to "afford the third party administrator notice of obligations" under the Final Regulations, and to "designat[e] . . . the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." 78 Fed. Reg. 39879. Defendants now admit that a self-certification executed by the Little Sisters would serve neither of these purposes, because "at this time" Defendants lack authority to impose obligations on TPAs of non-ERISA church plans like the Christian Brothers Trust. Defs' Br. 11-12. But they continue to assert that the Little Sisters must comply with the accommodation by (1) executing the self-certification form; (2) "provid[ing] each third party administrator that will process claims for any contraceptive services . . . with a copy of the self-certification," and (3) refraining from seeking to "interfere with" or "influence" the TPA's decision to provide such services. *See id.*; *see also* 26 C.F.R. § 54.9815-2713A(a), (b) (stating the accommodation requirements).

Defendants give no reason for continuing to require the Little Sisters to execute and deliver self-certification forms that allegedly will not serve the purposes for which they were created, apart from the bald assertion that their regulations require it. Defs' Br. 11-12. Defendants' failure to explain is fatal to their rule. *Motor Vehicle Mfrs.*, 463 U.S. at 42-44.

> b. *It is arbitrary and capricious not to exempt the Little Sisters Plaintiffs from the contraceptive mandate altogether.*

The Final Rule is also arbitrary and capricious because Defendants' distinction between the Little Sisters and exempt religious employers is not supported by substantial evidence in the record. *Olenhouse*, 42 F.3d at 1584 ("[T]he 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record," and "will be set aside as arbitrary if it is unsupported by 'substantial evidence.'").

Defendants claimed in the Mandate that the limits they have imposed on the religious employer exemption are justified because objecting "[h]ouses of worship and their integrated auxiliaries . . . are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan." 78 Fed. Reg. 39874. Defendants' reasoning was nothing but "speculative," "unsubstantiated," and "unpersuasive." *Zubik* at 57. Furthermore, as the Defendants' 30(b)(6) witness in a parallel case has now admitted under oath, Defendants have *no evidence* that this assumption is correct.[5] In fact, the evidence before the agencies was to the contrary: during the rulemaking process, commenters pointed out that many non-exempt religious organizations hire employees that share their religious beliefs,[6] and that it would impose a significant burden on church benefit plans in particular to erect a dividing wall between religious organizations that share the same faith.[7]

Thus, Defendants now admit that their decision to exempt some religious organizations and "accommodate" others was based on a rationale that is wholly unsupported by the evidence before the agency. This is a quintessential abuse of discretion. *Olenhouse*, 42 F.3d at 1584.

### 3. Defendants violated the APA by promulgating the HRSA Guidelines without notice, comment or publication in the Federal Register.

"The APA requires agencies to adhere to three steps when they promulgate rules: (1) give notice of the proposed rulemaking in the Federal Register; (2) afford interested persons an

---

[5] *See* Plaintiffs' Response to Defendants' Statement, *supra*, at ¶ 29.

[6] CCCU NPRM Comments at 4-5 (Apr. 8, 2013), AR CMS-2012-0031-82670-A1 ("The CCCU is particularly frustrated by that rationale for the exemption-accommodation paradigm, **because a requirement for membership in the CCCU is that full-time administrators and faculty at our institutions share the Christian faith of the institution.** . . . Ironically, churches, on the other hand, some of which do not hire only Christians, remain exempt in this scheme.").

[7] *See, e.g.*, Church Alliance NPRM Comments (April 8, 2013), *available at* http://church-alliance.org/initiatives/comment-letters, AR 025526-45; *see also Zubik* at 57.

opportunity to participate through submission of written data, views, or arguments; and (3) explain the rule ultimately adopted." *Nat'l Ski Areas Ass'n, Inc. v. U.S. Forest Serv.*, 910 F. Supp. 2d 1269, 1279-80 (D. Colo. 2012) (Martinez, J.) (citing 5 U.S.C. § 553(b)–(c)). Congress gave HHS' sub-agency, HRSA, the authority to enact "comprehensive guidelines" for women's preventive health. *See* 42 U.S.C. § 300gg-13 (a)(4); 45 C.F.R. § 147.130 (a)(iv). Those guidelines are now binding on the Little Sisters, who must either adopt a health benefit plan that complies with HRSA's guidelines and HHS' exceptions, or face massive penalties. *See* 26 U.S.C. § 4980D, 4980H. This is a paradigmatic delegation of rulemaking authority,[8] but instead of following the requirements of the APA, HRSA simply adopted the recommendations of a nongovernmental body—IOM—in a press release. *See* Ex. A. HRSA then incorporated the IOM-provided guidelines without change in a fully binding Interim Final Rule that Defendants promulgated the *same day*. 76 Fed. Reg. 46621 (published Aug. 3, 2011); 45 C.F.R. § 147.130. Defendants did not explain why they adopted the IOM Report's recommendations as coverage requirements even though the IOM explicitly declined to consider many factors important for the formulation of coverage requirements, such as cost-effectiveness. Under the APA, this was an abuse of discretion.

Plaintiffs were prejudiced by this failure in at least two ways. First, they were harmed by HHS' failure to offer them the opportunity for public notice and comment, as required by the APA. *See Nat'l Ski*, 910 F. Supp. 2d at 1279-80. Second, they were harmed because the evidence

---

[8] "[W]hen Congress authorizes an agency to create standards, it is delegating legislative authority, rather than itself setting forth a standard which the agency might then particularize through interpretation." *Mission Grp. Kansas, Inc. v. Riley,* 146 F.3d 775, 781-85 (10th Cir. 1998) (internal quotations omitted). Therefore, legislative rules like the HRSA Guidelines must be promulgated in compliance with the APA notice and comment procedures. *Id.* at 782 (when an agency adopts a new rule, it "may not give it binding effect in the absence of compliance with APA notice and comment procedures[.]").

considered by the IOM was decidedly one-sided. IOM's invited presenters included a number of proponents of mandatory contraceptive coverage and of government-funded abortion. AR 516-19. No religious groups or other groups that oppose government-mandated coverage of contraception, sterilization, abortion, and related education and counseling were among the invited presenters. *Id.*; *United States v. Cain*, 583 F.3d 408, 420 (6th Cir. 2009) (stating that the APA requires public comments in part to "ensure fair treatment for persons to be affected by regulation"); Compl. ¶¶ 65-66. Moreover, as the IOM Report dissent observed, the drafting committee suffered from an "unacceptably short time frame," "lacked transparency and was largely subject to the preferences of the committee's composition," which "tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy." IOM Report at 231-32 (AR at 529-530). Under such circumstances, prejudice is clear. *Nat'l Ski*, 910 F. Supp. 2d at 1279-80.[9]

### C. The Mandate violates the Free Exercise Clause.

Defendants claim that the forced compliance with the Mandate cannot violate the Free Exercise Clause because it is "neutral and generally applicable." Defs' Br. 14. It is neither.

---

[9] Plaintiffs' Weldon Amendment/ACA claim survives as well. Plaintiffs have prudential standing because, as conscientious objectors to abortion, they are plainly within the "zone of interests" protected by both laws. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012). Defendants' next argument—that the IOM Report and a press release define "abortion" more narrowly than Plaintiffs—also fails. Defs' Br. 26. Defendants' interpretation is not entitled to deference because Congress empowered the "issuer of a qualified health plan," not HHS, to interpret "abortion" under the relevant section of the ACA, and they have no special expertise in interpreting appropriations laws like the Weldon Amendment. *See* 42 U.S.C. § 18023 (b)(1)(A)(ii). Defendants also cite a 2002 statement by Rep. Weldon—but that comment, made about an un-enacted bill eight years before the FDA approved *ella* in 2010, likewise sheds little light on the meaning of a law Congress passed in 2011. Relying on the "ordinary meaning" found in medical dictionaries, *Taniguchi v. Kan Pacific Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012), it is clear that emergency contraceptives qualify as "abortion." *See Stedman's Medical Dictionary* 4 (28th ed. 2006) (defining "abortion" as the "[e]xpulsion from the uterus of an embryo or fetus [before] viability."); *id.* at 1438 (defining "pregnancy" as "[t]he state of a female after conception and until the termination of the gestation").

The Mandate is not neutral because it expressly discriminates among religious objectors, creating a three-tiered system in which some are exempt (churches and "integrated auxiliaries"), some must comply with the "accommodation" and gag rule at issue here (non-exempt religious non-profits), and some receive no protection at all (religious believers who earn profits, *but see Hobby Lobby*, 723 F.3d 1114). Defendants openly admit that this facial discrimination among religious believers who have the same beliefs, and seek to engage in the same religious conduct, is based on the *government's* views of which religious exercises will or will not be compatible with the government-predicted religious beliefs of an organization's employees. Def. Br. 8.

This open discrimination among religious institutions fails even "the minimum requirement of neutrality" which requires that a law *not* discriminate on its face. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *Colo. Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir. 2008) ("[T]he First Amendment prohibits not only laws with 'the object' of suppressing a religious practice, but also '[o]fficial action that targets religious conduct for distinctive treatment.'") (quoting *Lukumi*, 508 U.S. at 534).

Defendants cannot justify this discrimination among religious organizations merely by claiming its "purpose is something other than the disapproval of a particular religion, or of religion in general." Defs' Br. 15. The Tenth Circuit has already expressly rejected this argument, rejecting the distinction between discrimination among religions and discrimination among religious institutions as "a puzzling and wholly artificial distinction." *Weaver*, 534 F.3d at 1259-60 ("[T]he constitutional requirement is of government *neutrality,* through the application of "generally applicable law[s]," not just of governmental avoidance of bigotry.").[10]

---

[10] Defendants cite *Lukumi* to argue that the Free Exercise Clause is not invoked because the Mandate does not target "*only*" religious conduct—secular institutions are also subject to it. Defs' Br. 15. But this oversimplification would excuse all but the most blatant attacks on

Nor is the Mandate generally applicable. The Mandate favors secular over religious values by granting broad exemptions for grandfathered and small-employer plans for secular reasons, while denying religious exemptions for non-church religious organizations. *Fraternal Order of Police v. City of Newark*, 170 F.3d 359, 365 (3d Cir. 1999) ("[I]t is clear from [*Smith* and *Lukumi*]" that government cannot decide "that secular motivations are more important than religious motivations."). These secular-value exemptions are quite large and severely undermine the government's claimed interest. *See Hobby Lobby*, 723 F.3d at 1143 ("[T]he interest here cannot be compelling because the contraceptive-coverage requirement presently does not apply to tens of millions of people. As noted above, this exempted population includes those working for private employers with grandfathered plans, for employers with fewer than fifty employees, and, under a proposed rule, for colleges and universities run by religious institutions."); *Zubik* at 56 ("If there is no compelling governmental interest to apply the contraceptive mandate to the religious employers who operate the 'houses of worship,' then there can be no compelling governmental interest to apply (even in an indirect fashion) the contraceptive mandate to the religious employers of the nonprofit, religious affiliated/related entities, like Plaintiffs in these cases."). Defendants nowhere explain *why* they can accept secular reasons for exemptions covering millions of people, but to refuse the modest religious exemption sought here.

Instead, Defendants cite Tenth Circuit cases to argue that "the existence of 'express exemptions for objectively defined categories of [entities],' . . . does not negate a law's general applicability." Defs' Br. 15-16. But the cases cited do not advance the proposition claimed. In

---

religion. Indeed, *Lukumi* itself warned against this extreme reading, noting that the "explicit[ ] target[ing]" in *Lukumi* made it "an easy [case]" and "that the First Amendment's protection of religion extends beyond those rare occasions on which the government explicitly targets religion (or a particular religion)." *Lukumi*, 508 U.S. at 577-78, 580 (Blackmun, J., concurring); *see also id.* at 564 (Souter, J., concurring) ("[T]his is far from a representative free-exercise case.").

*Swanson v. Guthrie Independent School District*, the purpose of the school's policy was to ensure state funding by prohibiting part-time attendance except for fifth year seniors and special-education students, which was based on the number of full-time students, plus fifth-year seniors and special-education students. 135 F.3d 694, 697, 701 (10th Cir. 1998). Thus, the "exceptions" were not really exceptions at all and did not destroy neutrality and general applicability.

Similarly, in *Grace United Methodist Church v. City of Cheyenne*, the court found no free exercise violation where a city board denied a variance for a church to run a daycare center in a residential zone. 451 F.3d 643, 647-48 (10th Cir. 2006). The court held that the zoning code was not "discriminatorily applied" merely because it permitted case-by-case exceptions for "churches, schools, and other similar uses." *Id*. at 654; *see also id*. at 650 & n.1. It was uncontroverted that the board "did not have the 'authority or discretion' to permit anyone to operate a daycare center in a residential zone." *Id*. at 653. The denial was "mandatory," not "discretionary." *Id*. at 654. Nor was there "evidence that secular daycare centers ha[d] been permitted to operate . . . , while religious organizations like the Church ha[d] been denied such an exception." *Id*. Thus, the court emphasized that "this [was] not a controversy in which the City made a 'value judgment in favor of secular motivations, but not religious motivations'" *Id*. (quoting and distinguishing *Fraternal Order of Police*, 170 F.3d at 365).

In *Axson-Flynn v. Johnson*, a university student alleged a Free Exercise violation after being pressured to withdraw from the drama department for refusing to use certain curse words. 356 F.3d 1277, 1280 (10th Cir. 2004). The university claimed that its "strict adherence to offensive script requirement was a 'neutral rule of general applicability.'" *Id*. at 1294. The court disagreed since the student had shown that the policy was "discriminatorily applied." *Id*. at 1294, 1298-99

(Jewish student "received permission to avoid doing an improvisational exercise on Yom Kippur"; university "sometimes granted [student] herself an exemption").

Here, the facts are analogous to those in *Fraternal Order of Police* and *Axson-Flynn*, not to those in *Swanson* or *Grace United*. The Mandate's "religious employers" exemption is wholly discretionary. 45 C.F.R. § 147.131(a) (agency "may" establish exemption). Defendants have already revised the exemption once, simply in response to public comment. *See* 78 Fed. Reg. 39873-74. Perhaps the best illustration of the exemption's discretionary nature is that it has been enacted only via footnote on an HHS website. *See* Ex. A.[11] Furthermore, the exemption explicitly discriminates among religious organizations, protecting only institutional churches and their integrated auxiliaries, while otherwise identical non-integrated organizations are excluded. *Cf. Axson Flynn*, 356 F.3d at 1293, 1298-99; *see also Zubik* at 50-53. And it favors secular motivations for grandfathered and small-employer exemptions, while eschewing exemptions for non-church religious organizations. *Cf. Fraternal Order of Police*, 170 F.3d at 365. Expressly adding these discriminatory exemptions to the law underscores, not ameliorates, their invidiousness. *Lukumi*, 508 U.S. at 542 ("categories of selection are of paramount concern"); *Fraternal Order of Police*, 170 F.3d at 365 ("concern is only further implicated when the government does not merely create a mechanism for individualized exemptions, but instead, actually creates a categorical exemption").[12]

---

[11] These facts also refute that the "unbridled discretion" claim (Count XI) may be dismissed. Defs' Br. at 16 & n.5. The creation in a website footnote of a religious employers exemption, revised at agency whim, and extending only to institutional churches, is a perfect example of unbridled discretion. *See, e.g.*, Dkt. 1-4, Ex. C. The "determination of who may" exercise First Amendment rights may not be "left to the unbridled discretion of a government official." *Summum v. City of Ogden*, 297 F.3d 995, 1007 (10th Cir. 2002) (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988)).

[12] The government's claim that "nearly every court" to consider a free exercise challenge "has rejected it," Defs' Br. 15 & n.4, is misleading. The vast majority of courts addressing challenges

**D. The Establishment Clause claims cannot be resolved in Defendants' favor.**

As with their Free Exercise arguments, Defendants' Establishment Clause arguments hinge on the discredited notion that the government may prefer some religious institutions over others, so long as the discrimination is based on their internal structure and assumed religiosity, rather than denomination. Defs' Br. at 16-17. But the Tenth Circuit has directly rejected that argument. In *Weaver*, the university challenged state regulations that provided scholarships for students to attend any college, secular or religious, unless the state deemed it "pervasively sectarian." 534 F.3d at 1250. Just like Defendants here, the state argued there was no Establishment Clause violation because the law only discriminated based on "types of institutions," not "types of religions." *Id*. at 1259. The court deemed this a "wholly artificial distinction," holding that "when the state passes laws that facially regulate religious issues, it must treat … religious institutions without discrimination or preference." *Id*. at 1257, 1259; *Larson v. Valente*, 456 U.S. 228, 247 n.23 (1982) (rejecting that a law's "disparate impact among *religious organizations* is constitutionally permissible when such distinctions result from application of secular criteria").

Moreover, the Mandate *does* discriminate among religious denominations: it favors those that consist primarily of "houses of worship," "integrated auxiliaries," or "religious orders," 78 Fed. Reg. 8456, 8461 (Feb. 6, 2013), and disfavors denominations that, like the Catholic Church, *also* exercise their religion via other ministries such as health care services. *See*, *e.g.*, Dkt. 15-4, Ex. L at 7-10. The law cannot prefer denominations that exercise religion mainly through "houses of

---

have, like the Tenth Circuit, held the Mandate unlawful under RFRA and so have not reached the free exercise claim.

worship[]," 78 Fed. Reg. 8461, while disfavoring those whose faith "move[s] [its adherents] to engage in" broader religious ministries. *Weaver*, 534 F. 3d at 1259.[13]

Defendants' reliance on *Gillette v. United States*, Opp. 12, further illustrates why their position is wrong. 401 U.S. 437 (1971). *Gillette* granted military conscientious-objector status based on the *nature of the conscientious objection*. *Id.* at 442 n.5 (granting exemption to those who object to "war in any form," not to those who object to only "a particular war"). The religious exemption was therefore available to all sincere objectors—regardless of their faith— who asserted the same objection and sought to engage in the same practice. *Id.* at 450-51. This equal treatment of objectors is precisely what the Mandate lacks, because it discriminates among institutions that engage in the exact same activity, and have the exact same religious objections.

### E. The Mandate violates Plaintiffs' Free Speech rights.

The Mandate forces the Little Sisters and class members to request and authorize others to provide their employees with contraceptives, sterilizations, and abortion-inducing drugs. *See*, *e.g.*, 26 C.F.R. § 54.9815-2713A(a)(4); Dkt. 15 at 11; Dkt. 37 at 9-11. Defendants insist that they can do this because it is "plainly incidental to the . . . regulation of conduct." Defs' Br. 19 (quoting *Rumsfeld v. FAIR Inc.*, 547 U.S. 47, 62 (2006)). But *FAIR* concerned a law that regulated what affected parties "must *do* . . . not what they may or may not *say*." 547 U.S. at 60 (emphases original). Here, the forced speech *is* the essential act that Defendants require. Such a

---

[13] Under the Fifth Amendment, since Plaintiffs have shown the Mandate infringes on their fundamental right to religion, the Mandate's religious classifications are also subject to "strict scrutiny." *Save Palisade FruitLands v. Todd*, 279 F.3d 1204, 1210 (10th Cir. 2002); *see also Goetz v. Glickman*, 149 F.3d 1131, 1140 (10th Cir. 1998). Not that the classifications can survive even rational basis review: Defendants discriminate between essentially identical religious organizations based solely on unfounded speculation about the likely religious beliefs of religious institutions' employees. *See* Plaintiffs' Response to Defendants' Statement, *supra*, ¶ 29. Such discriminatory assessment of religiosity is flatly illegal. *Weaver*, 534 F.3d at 1259 (banning "discrimination . . . expressly based on the degree of religiosity of the institution and the extent to which that religiosity affects its operations"). Thus, Counts VII and VIII remain viable.

"direct regulation of speech . . . plainly violate[s] the First Amendment." *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2327 (2013).

So Defendants switch tacks, arguing that the Little Sisters cannot contest being required to sign a form that, Defendants allege, has no effect. Defs' Br. 19. But Defendants get things backward: *they* must show why they may massively penalize the Little Sisters for declining to speak. If Defendants are "not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the[m]," *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 661 (2000), they certainly cannot compel speech *for no purpose at all*.

The Mandate also muzzles the Little Sisters from asking the TPAs not to be involved in the distribution of objectionable drugs and services. *See, e.g.*, 26 C.F.R. § 54.9815–2713A(b)(1)(iii); Dkt. 15 at 11; Dkt. 37 at 9-11. Defendants respond that the muzzle does no harm since the Little Sisters may tell everyone *but* the TPAs of their opposition to participating in the Mandate, and that the Christian Brothers will not provide the objectionable drugs anyway. But a ban on "speech tailored to a particular audience . . . cannot be cured simply by the fact that a speaker can speak to a larger indiscriminate audience." *U.S. West, Inc. v. FCC*, 182 F.3d 1224, 1232 (10th Cir. 1999) ("Effective speech has . . . a speaker and an audience. A restriction on either . . . is a restriction on speech"). Further, Defendants confuse Plaintiffs' religious liberty claims with their speech claims: the speech harm is not in the provision of the drugs, but in censorship itself. Also, in addition to the Christian Brothers, Defendants are censoring the Little Sisters from talking with ESI, which has not promised that it will not treat certification as a trigger. Ex. R ¶¶ 2-3.

### F. The Mandate violates Plaintiffs' right to expressive association.

Defendants also make a one-paragraph argument against Plaintiffs' expressive association claim. Defs' Br. 21. Defendants argue that the *only* possible infringement on expressive association is forced acceptance of unwanted members. However, unconstitutional burdens on expressive association "take many forms," just "one of which" is a "regulation that forces the group to accept members it does not desire." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000); *see*, *e.g.*, *In re Motor Fuel Temper. Sales Practice Litig.*, 641 F.3d 470, 479-81 (10th Cir. 2011) (associational rights can be infringed by, *inter alia*, expenditure caps, reporting requirements, and disclosure of internal communications). The appropriate inquiry is whether an association is expressive and, if so, whether the challenged law "impair[s] [the Plaintiffs'] expression." *Dale*, 530 U.S. at 648, 653. Courts must "give deference to" the Plaintiffs' views on both. *Id.*

Plaintiffs have a distinctive religious message that they share through their associations, and the Mandate impairs their message. The Little Sisters create homes built around the belief that every person should be treated as if he or she was Christ himself. Ex. I ¶ 22. Each home cares for the elderly poor in a way that "convey[s] a public witness of the respect for life," *id.* ¶ 25, and acts as a form of "advocacy for" people who are at "the margins of society," including the "unborn," *id.* ¶ 38. The Little Sisters' employees are "an important extension" of that witness, and so must agree to support it. *Id.* ¶ 28. The Little Sisters associate with the Christian Brothers because the Christian Brothers publicly "operate[] in a manner consistent with" their witness. *Id.* ¶ 21. These associations communicate to the elderly who entrust themselves to the Little Sisters, to the donors who provide roughly half of the Little Sisters' budget, and to the public that the Little Sisters are part of the "Culture of Life" and do not "condone evil." *Id.* ¶¶ 14, 25, 39, 69.

The Mandate impairs these expressive associations by forcing participation in the government's scheme. That participation conflicts with Plaintiffs' religious witness and thus with their associations built around that witness, thereby "intru[ding] into the internal structure or affairs of" those associations. *Dale*, 530 U.S. at 648; *accord Pleasant v. Lovell*, 876 F.2d 787, 795 (10th Cir. 1989) ("[I]nterfering with the internal workings of [an association]" can "infringe upon" the "right to associate … to promote a[] ... viewpoint"); Ex. I ¶ 51; Ex. J ¶¶ 28-30.

The Mandate similarly burdens the Christian Brothers Plaintiffs, which use their association with the Little Sisters and class members to share and express their Catholic beliefs respecting human life and dignity. *See*, *e.g.*, Ex. J at ¶¶ 17, 27. The Christian Brothers Plaintiffs are committed to operating consistent with Catholic faith; indeed, failing to do so would destroy their ability to associate with ministries, like class members, that want Catholic health services. *Id.* ¶¶ 15, 28-30. Thus, the Mandate imperils their *raison d'être*. Similarly, the Mandate burdens each of the class members' association with the Christian Brothers Plaintiffs. Ex. N ¶ 11.

### G. Defendants' motion for summary judgment is premature.

Defendants' motion is actually just a motion for summary judgment because the Court must consider materials outside the pleadings in order to resolve it. *See* Fed. R. Civ. P. 12(d); *SEC v. Wolfson*, 539 F.3d 1249, 1265 (10th Cir. 2008); *Holy Land Found. for Relief and Dev't v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (district court abused discretion by considering administrative record without converting Rule 12(b) motion to Rule 56 motion). Defendants' *de facto* summary judgment motion is premature as set forth in Plaintiffs' Rule 56(d) motion, which is incorporated herein.

### <u>Conclusion</u>

For the above reasons, Plaintiffs respectfully request that this court deny Defendant's motion to dismiss or, in the alternative, for summary judgment.

Respectfully submitted this 22nd day of November, 2013.


   /s/ *Mark Rienzi*
Mark Rienzi
  mrienzi@becketfund.org
Daniel Blomberg
  dblomberg@becketfund.org
Adele Keim
  akeim@becketfund.org
THE BECKET FUND FOR RELIGIOUS LIBERTY
3000 K Street NW, Suite 220
Washington, DC 20007
Tel.:    (202) 955-0095
Fax:    (202) 955-0090

Carl C. Scherz
  cscherz@lockelord.com
Seth Roberts
  sroberts@lockelord.com
Locke Lord LLP
2200 Ross Avenue, Suite 2200
Dallas, TX  75201
Tel.:    (214) 740-8583
Fax:    (214) 756-8583

COUNSEL FOR PLAINTIFFS LITTLE
SISTERS OF THE POOR HOME FOR
THE AGED, DENVER, COLORADO;
LITTLE SISTERS OF THE POOR,
BALTIMORE, INC.; CHRISTIAN
BROTHERS SERVICES; AND
CHRISTIAN BROTHERS EMPLOYEE
BENEFIT TRUST

Kevin C. Walsh
  kwalsh@richmond.edu
University of Richmond School of Law
28 Westhampton Way
Richmond, VA 23173
Tel.:    (804) 287-6018

COUNSEL FOR PLAINTIFFS
LITTLE SISTERS OF THE POOR
HOME FOR THE AGED,
DENVER, COLORADO; AND
LITTLE SISTERS OF THE POOR,
BALTIMORE, INC.

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed through the Court's ECF filing system on counsel for Defendants.

_/s/ *Mark Rienzi*_
Mark Rienzi