# EXHIBIT R

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:13-cv-02611-WJM-BNB

LITTLE SISTERS OF THE POOR HOME FOR THE
AGED, DENVER, COLORADO, a Colorado non-profit
corporation, LITTLE SISTERS OF THE POOR,
BALTIMORE, INC., a Maryland non-profit corporation,
by themselves and on behalf of all others similarly situated,

CHRISTIAN BROTHERS SERVICES, a New Mexico
non-profit corporation, and

CHRISTIAN BROTHERS EMPLOYEE BENEFIT
TRUST,

      Plaintiffs,

   v.

KATHLEEN SEBELIUS, Secretary of the United States
Department of Health and Human Services,

UNITED STATES DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

THOMAS E. PEREZ, Secretary of the United States
Department of Labor,

UNITED STATES DEPARTMENT OF LABOR,

JACOB J. LEW, Secretary of the United States Department
of the Treasury, and

UNITED STATES DEPARTMENT OF THE
TREASURY,

      Defendants.

## SECOND SUPPLEMENTAL DECLARATION OF BROTHER MICHAEL QUIRK

    I, Brother Michael Quirk, FSC, do hereby state and declare as follows:

    1.    My name is Michael Quirk.  I am of sound mind and competent to make this

declaration and swear to the matters herein.  I am over the age of 21 years and have never been

convicted of a felony or crime of moral turpitude.  The statements here are true and correct, and

they are based on my personal knowledge and/or a review of the business records of Christian Brothers Services and Christian Brothers Employee Benefit Trust (the "Christian Brothers Trust" or "Trust").  If I were called upon to testify to these facts, I could and would competently do so.

2.      Express Scripts, Inc. ("ESI") provides on behalf of Christian Brothers Services certain administrative services in connection with pharmaceutical benefits under the Christian Brothers Trust.  It is not clear to Plaintiffs whether ESI is a third party administrator under the Mandate for the Christian Brothers Trust.  It is also not clear to Plaintiffs whether or not ESI will provide contraceptives to employees (and beneficiaries of such employees) of employers that have adopted the Christian Brothers Trust and provide ESI with a copy of a self-certification form pursuant to 26 U.S.C. § 54.9815-2713A before December 31, 2013, or thereafter.

3.      This great uncertainty with how contraceptive coverage may be handled under the Christian Brothers Trust is a matter of immediate and urgent concern for Plaintiffs.

4.      On April 8, 2013, the Church Alliance, an organization composed of the chief executives of thirty-eight church benefit boards, covering mainline and evangelical Protestant denominations, two branches of Judaism, and Catholic schools and institutions, including Christian Brothers Services, submitted a 20-page comment letter on the proposed regulations published at 78 Fed. Reg. 8456 et seq. (Feb. 6, 2013) detailing how the expanded definition of "religious employer" excluded bona fide religious organizations, and how the proposed accommodation for "eligible organizations" was unworkable, particularly for self-insured church plans like the Christian Brothers Employee Benefit Trust.  A true and correct copy of the Church Alliance's comment letter is available at http://church-alliance.org/initiatives/comment-letters (last visited September 23, 2013) and attached hereto as Exhibit A.

2

PURSUANT TO 28 U.S.C § 1746, I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

EXECUTED ON NOVEMBER 22, 2013

_____

Br. Michael Quirk, FSC

# EXHIBIT A



**Chair:**
Ms. Barbara A. Boigegrain

**Secretary/Treasurer:**
Ms. Sarah S. Hirsen, Esquire

General Board of Pension and Health Benefits
of The United Methodist Church
1901 Chestnut Avenue
Glenview, Illinois 60025
(847) 866-4200

**Chair Emeritus:**
Mr. John G. Kapanke

**Members:**

Dr. K. Young Bae
Association of Unity Churches

Mr. Louis Barbarin
American Baptist Churches

Mr. J. Paul Bell
Associate Reformed Presbyterian Church

Ms. Barbara A. Boigegrain *
United Methodist Church

Mr. John H. Bolt
Christian Reformed Church in North America

Rev. Kenneth Bradsell
Reformed Church in America

Mr. David J. Brown
Community of Christ

Mr. Gary D. Campbell
Presbyterian Church in America

Mr. Elford H. Clark
International Church of the Foursquare Gospel

Mr. Michael A. Downs *
United Church of Christ

Mr. Nevin Dulabaum
Church of the Brethren

Dr. Craig A. Dunn
Wesleyan Church

Mr. James P. Hamlett *
Christian Church (Disciples of Christ)

Dr. O. S. Hawkins *
Southern Baptist Convention

Mr. Gerald B. Hindy
Assemblies of God

Mr. Jeffrey A. Jenness
Board of Pensions of the Church of God

Rev. Dr. Jeffrey J. Jeremiah
Evangelical Presbyterian Church

Mr. Del L. Johnson
General Conference of Seventh-Day Adventists

Mr. Mario J. Kaufman
MennoniteChurch

Mr. Robert M. Koppel*
Reform Pension Board

Mr. Ray Lewis
National Association of Free Will Baptists

Dr. Dean A. Lundgren
EvangelicalCovenantChurch

Mr. Robert W. Maggs Jr. *
Presbyterian Church (U.S.A.)

Rev. Ross I. Morrison
Evangelical Free Church of America

Rev. Richard Nugent
Unitarian Universalist Association

Mr. Joshua Peterman
Wisconsin Evangelical Lutheran Synod

Mr. John M. Preis*
Young Men's Christian Association

Br. Michael F. Quirk, FSC *
Christian Brothers Services

Mr. Arthur D. Rhodes
Church of God Benefits Board

Mr. Larry Robertsl
Free Methodist Church of North America

Mr. James F. Sanft*
Lutheran Church-Missouri Synod

Mr. Stephen Schultz
Baptist General Conference

Mr. Mitchell J. Smilowitz
Joint Retirement Board forConservative Judaism

Mr. Ray D. Stiles
Christian Churches Pension Plan

Rev. Jeffrey Thiemann*
Evangelical Lutheran Church in America

Mr. James P. Thomas, CPA
Churches of God, General Conference

Rev. Don L. Walter
Church of the Nazarene

Ms. Mary Kate Wold*
Episcopal Church

**\*  Steering Committee Members**

07/2012

**Counsel:**
K&L Gates LLP
1601 K Street NW
Washington D.C. 20006
Tel (202) 778-9000
Fax (202) 778-9100

April 8, 2013

**BY ELECTRONIC SUBMISSION**

Centers for Medicare & Medicaid Services
Department of Health and Human Services
Room 445-G, Hubert H. Humphrey Building
200 Independence Avenue, SW.
Washington, DC 20201

Re:    Notice of Proposed Rulemaking Regarding Preventive Services
CMS-9968-P
RIN 0938-AR42

Dear Sir or Madam:

The Church Alliance submits this comment in response to the notice of proposed rulemaking regarding preventive services ("NPRM") issued jointly by the Internal Revenue Service, the Department of Labor and the Department of Health and Human Services (HHS) (together, the "Departments") and published at 78 Fed. Reg. 8456 (Feb. 6, 2013).  The Church Alliance commented twice previously on the topic of preventive services ("Earlier Comments"), first on the then interim final rules published at 76 Fed. Reg. 46621 (Aug. 3, 2011) ("2011 Interim Final Rules"), and then on the advance notice of proposed rulemaking published at 77 Fed. Reg. 16501 (Mar. 21, 2012) ("ANPRM").[1]

**Executive Summary**

The Church Alliance appreciates the Departments' responsiveness and attentiveness to the Church Alliance's Earlier Comments in the NPRM to attempt to accommodate the religious beliefs of religious organizations.  However, for the reasons explained below, the expanded definition of "religious employer" continues to exclude bona fide religious organizations, and the proposed accommodation for "eligible organizations" is unworkable, particularly for self-insured church plans.  For these reasons the Church Alliance reiterates its suggestion in its Earlier Comments that the Departments abandon the employer-by-employer approach and adopt instead a broader plan-based exemption.

---

[1]   Copies of these Earlier Comments are available at http://church-alliance.org/initiatives/comment-letters (last visited April 3, 2013).

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 2

## I.   BACKGROUND ON THE CHURCH ALLIANCE

The Church Alliance is an organization composed of the chief executives of thirty-eight church benefit boards, covering mainline and evangelical Protestant denominations, two branches of Judaism, and Catholic schools and institutions.  The Church Alliance members, listed on the left of this letterhead, provide medical coverage to approximately one million participants (clergy and lay workers) serving over 155,000 churches, synagogues and affiliated organizations.  These medical programs are defined as "church plans" under section 3(33) of the Employee Retirement Income Security Act of 1974 ("ERISA") and section 414(e) of the Internal Revenue Code (the "Code").

All of the members of the Church Alliance share the common view that a church or an employer associated with a church should not have to face the choice of violating its religious tenets and beliefs or violating the law in order to maintain a health care plan for its workers.[2]  This is true even though most of the health care plans associated with the members of the Church Alliance do not impose any specific restrictions on contraception coverage.  A few programs, reflecting the religious beliefs of the churches with which they are associated, exclude coverage for all contraceptives.  Other programs whose associated churches do not object to contraception but hold fundamental convictions against abortion, exclude coverage for contraceptives that are or could be abortifacients, such as the so-called "morning-after pills" or "emergency contraceptives."

## II.   EXEMPTION IN THE FINAL REGULATIONS FOR "RELIGIOUS EMPLOYERS"

### A.   Exemption

In the NPRM, HHS proposed the addition of a new 45 C.F.R. §147.131(a), defining the term "religious employers", which will read as follows:

> § 147.131 Exemption and accommodations in connection with coverage of preventive health services.
>
> (a)   *Religious employers*. In issuing guidelines under § 147.130(a)(1)(iv), the Health Resources and Services Administration may establish an exemption from such guidelines with respect to a group health plan established or maintained by a religious employer (and health insurance coverage provided in connection with a group health plan established or maintained by a religious employer) with respect to any requirement to cover contraceptive services under such guidelines. For

---

[2]  If a religious employer, large or small, sponsors a medical plan for its employees, but the plan does not provide required contraception coverage, Code section 4980D will impose an excise tax equal to $100/day for each covered individual denied such coverage.  If a religious employer with an average of 50 or more full-time employees discontinues its plan to avoid violating its religious tenets and beliefs, it will be subject to a penalty under Code Section 4980H of $3,000/year for each full-time employee.

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 3

purposes of this paragraph (a), a ''religious employer'' is an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code of 1986, as amended.

## B.    Improved, But Further Improvement Necessary

The Church Alliance is grateful that the Departments considered and responded to comments received in response to the ANPRM, and that the criteria for the religious employer exemption have been amended by the Departments "to ensure that an otherwise exempt employer plan is not disqualified because the employer's purposes extend beyond the inculcation of religious values or because the employer serves or hires people of different religious faiths."[3]

The elimination of the first three prongs of the definition for "religious employer" contained in the 2011 Interim Final Rules is a significant improvement.   However, the exemption for "religious employers" continues to exclude bona fide religious organizations because it continues to reference statutory exemptions set out in Code sections 6033(a)(3)(A)(i) and (iii) that were crafted for another purpose – specifically, to exempt churches, their integrated auxiliaries, conventions or associations of churches and the exclusively religious activities of a religious order from the annual Form 990 filing requirement under Code section 6033.

As other commenters have noted, the Form 990 filing requirement – the requirement from which Code sections 6033(a)(3)(A)(i) and (iii) carve out exemptions – serves a two-fold purpose: it provides the IRS with information necessary to administer the tax laws, and it makes tax-exempt organizations financially accountable to the IRS and the general public.   The initial purpose of this filing requirement, in 1943, was to monitor organizations that were using an unrelated business income "loophole", to determine whether and how they should be taxed.[4]   The exemptions from filing the annual Form 990 reflect congressional sensitivity to the church-state entanglement issues inherent in mandating financial reporting and accountability for churches and religious organizations.

The Form 990 filing exemptions, however, are unduly narrow when applied to exempt religious employers from the contraception coverage requirement.   More importantly, they have no relevance whatsoever to church benefit plans (to which the contraception coverage requirement otherwise would apply), having been devised, as noted above, to serve an entirely different purpose.

The church-related organizations exempted by Code section 6033(a)(3)(A)(i) are described as "integrated auxiliaries."   Since the Form 990 discloses an organization's income, it was logical to

---

[3]  78 Fed. Reg. at 8459.

[4]  Gaffney, *Governmental Definition of Religion: The Rise and Fall of the IRS Regulations on an "Integrated Auxiliary of a Church"*, 25 VAL. U.L. REV. 203, 211 (1991), *available at* http://scholar.valpo.edu/vulr/vol25/iss2/3/ (last visited Mar. 29, 2013).

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 4

utilize a Form 990 filing exemption for integrated auxiliaries that is focused on the sources of the organizations' financial support.[5]   However, basing an exemption from the contraception coverage requirement on the level of an employer's financial support from the church or convention or association of churches with which it is affiliated ignores the historic boundaries of churches and church conventions and effectively divides them into two categories of employers – those who are entitled to the exemption and those who are only entitled to the accommodation.  This would be true despite the fact that they all share the same religious faith and beliefs with regard to the provision of contraception coverage.  There does not seem to be a rational basis for such a distinction.

As noted by the United States Conference of Catholic Bishops, the proposed test for deciding whether an organization is a "religious employer" bears no rational relationship to any legitimate governmental interest that the mandate or the exemption purports to advance.[6]  The Form 990 filing exemptions, which have no relevance whatsoever to church welfare or benefit plans, were never intended to protect against a government requirement that may violate religious tenets and beliefs entitled to First Amendment protection.  Additionally, the proposed exemption would run afoul of the Establishment Clause of the First Amendment because it would discriminate between various denominations depending on sources of financial support, which may depend on the denomination's polity (governance structure) or church members' affluence.[7]

We urge instead a plan-based exemption for all employers participating in "church plans" as defined in ERISA section 3(33) and Code section 414(e).  As noted in our Earlier Comments, exemptions based on "church plan" status have been in place for years under a variety of federal laws, including ERISA, the Code and federal securities laws.  Thus, a plan-based exemption would be much less likely to be challenged on the basis of constitutionality.

A plan-based exemption would simplify the administration of large denominational benefit plans.  Some of these plans have hundreds, some even thousands, of small religious employers. The plans are typically administered by a benefits board that strives to make the communications to employers and covered participants uniform across the country.  The plans often provide the same information about the benefits and procedures of the plan to all participants regardless of the type of participating employer for which they work.  A plan-based exemption, discussed above, would allow these practices to continue in an efficient manner.

---

[5]  TD 8640, 1996-1 C.B. 289.

[6]  *See*, comment by United States Conference of Catholic Bishops dated March 20, 2013, *available at* http://www.usccb.org/about/general-counsel/rulemaking/upload/2013-NPRM-Comments-3-20-final.pdf (last visited Apr. 2, 2013).

[7]  *See*, Lutheran Social Service of Minnesota v. United States, 758 F.2d 1283, 288 n.5 (8th Cir. 1985) ("We necessarily construe the word 'church' in section 6033 to include both organizational forms of churches with respect to "churches and their integrated auxiliaries."  Any other construction of the phrase—i.e., if "church" were construed as meaning only hierarchical churches such as the Catholic Church—would result in an unconstitutional construction of the statute because favorable tax treatment would be accorded to hierarchical churches while being denied to congregational churches, in violation of the first amendment.").

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 5

In the absence of a plan-based exemption, a few unintended consequences could result. First, the expenses that the benefit board would have to undertake to make the determination of which participating employers are eligible organizations, and the expenses of complying with the accommodation would be borne in part by each participating exempt religious employer. This would happen because the funds in multiple employer church plans are typically commingled among all participating employers in the plan. This unintentionally subjects some exempt religious employers to the expenses, though small, of complying with the accommodation for eligible organizations.

Second, the administrative burden of an employer-by-employer determination may also drive multiple employer church plans away from eligible organizations. Some benefit boards may be so concerned about contraception coverage that they may terminate the coverage of participating eligible organizations in favor of having a plan that only covers exempt religious employers. This may leave participating eligible organizations, and their employees, worse off. Alternatively, the benefit board maintaining a multiple employer plan, out of concern for the participating exempt religious organizations, may pass the cost of complying with the accommodation for eligible organizations on to those eligible organizations. This may cause friction between participating employers (exempt religious employers versus eligible organizations) or may cause participating eligible organizations, perhaps long participating in the multiple employer church plan, to depart the plan due to the higher cost, or may cause them to be more attracted to coverage through outside commercial insurance providers.

## C.     Continued Omission of Bona Fide Religious Organizations

The exclusion in Code section 6033(a)(3)(A)(i) has been defined in regulations as covering "a church, an interchurch organization of local units of a church, a convention or association of churches, or an integrated auxiliary of a church (as defined in paragraph (h) of this section)."[8] Other church-related organizations also are excluded from the Form 990 filing requirement, but may not be included within either section 6033(a)(3)(A)(i) or (iii). These organizations include:

- an educational organization (below college level) that is described in Code section 170(b)(1)(A)(i), that has a program of a general academic nature, and that is affiliated with a church or operated by a religious order,

- a mission society sponsored by or affiliated with one or more churches or church denominations, more than one-half of the activities of which society are conducted in or directed at persons in foreign countries,

- an organization described in Code section 6033(a)(3)(C), which is a religious organization described in Code section 501(c)(3), other than a private foundation, the gross receipts of which in each taxable year are normally not more than $5,000,

---

[8] Treas. Reg. §1.6033-2(g)(1)(i).

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 6

- an organization described in Code section 501(c)(3), with gross receipts that are normally not more than $5,000 annually, and that is operated, supervised or controlled by or in connection with a religious organization described in section 6033(a)(3)(C)(i), and

- an organization exempt from filing Form 990 under the authority of Revenue Procedure 96-10, 1996-1 C.B. 577, which includes organizations operated, supervised or controlled by one or more churches, integrated auxiliaries or conventions or associations of churches and that are engaged exclusively in financing, funding the activities of, or managing the funds of such organizations, or that maintain retirement insurance programs primarily for such organizations and their employees; and organizations engaged in financing, funding or managing assets used exclusively for religious activities that are operated, supervised or controlled by one or more religious orders.[9]

These additional exemptions were created because of First Amendment concerns about subjecting religious organizations to financial oversight by the IRS.  To the extent the religious employer exemption to the contraception coverage mandate continues to be based on the Form 990 filing exemptions, these same First Amendment concerns also justify the extension of the religious employer exemption to the above categories of religious organizations.

### D.   Additional Clarity Needed

Integrated auxiliaries are exempted from the Form 990 requirement under Code section 6033(a)(3)(A)(i).  However, the term "integrated auxiliary" is unclear and has been subject to much controversy over its history, including litigation.[10]  While the current regulatory definition of the term "integrated auxiliary" is more objective and less controversial than the prior definition used for that term, the "internal support" test within that definition remains hazy.  That definition states that an organization is internally supported, unless it both:

- offers admissions, goods, services or facilities for sale, other than on an incidental basis, to the general public (except goods, services, or facilities sold at a nominal charge or for an insubstantial portion of the cost); and

- normally receives more than fifty percent of its support from a combination of governmental sources, public solicitation of contributions, and receipts from the sale of admissions, goods, performance of services, or furnishing of facilities and activities that are not unrelated trades or businesses.

The internal support test must be met for an organization to be considered an "integrated auxiliary."  However, application of this test to some church-related organizations is unclear.

---

[9] Many organizations within the categories listed above (as outside section 6033(a)(3)(A)(i) or (iii)) also may qualify as integrated auxiliaries, and the inclusion of a religious organization in any of these categories is not intended to imply that the organization is not an integrated auxiliary.

[10] *See*, footnote 4, *supra.*

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 7

For some organizations, it is unclear whether their activities constitute an offer of sale and whether the receipts are from sales, such as when donations are requested in return for goods. At other times, it is unclear if items (especially in the case of intangible items) being "offered" are admissions, goods, services or facilities. And what is the "general public"? If the "offer" is being made to a very large church group that is open to the general public, is that an offer to the "general public"? Yet another question is whether contributions are received from a "public solicitation," when an appeal is made to the membership of a large church.

These questions on the definition of "integrated auxiliary" have existed for a number of years. However, in the near future, in addition to risking penalties for failure to file a Form 990 if the IRS deems an organization's interpretation of this term to be incorrect, the organization possibly may be subject to severe penalties for its "incorrect" interpretation, especially for those with self-insured plans, for which the requirements are still unclear.[11] So, for example, if the administrator of a large denominational benefit plan has determined that all employers participating in the plan are exempt religious employers, either as churches or integrated auxiliaries, and the IRS decides some of the employers are not exempt, severe penalties ($100 per day per participant) could be imposed for a plan's failure to meet the group health plan requirements imposed by section 2713 of the Public Health Service Act.[12] This seems especially severe when the test for exemption from the requirement is unrelated to the underlying requirement.

### E.  Comments Sought:  Proposed Additional Exemption

In the Supplementary Information to the NPRM, the Departments proposed making the accommodation or the religious employer exemption available on an employer-by-employer basis and sought comments on this approach, including comments on alternative approaches. For the reasons discussed in its Earlier Comments, the Church Alliance again urges the Departments to extend the religious employer exemption to all employers that maintain or participate in "church plans", as defined in Code section 414(e). The Departments' continuing struggle with an employer-by-employer based approach highlights once again the utility of a plan-based approach. Among the reasons discussed were that focusing the exemption on benefit plans rather than employers avoids entanglement problems. Indeed, for nearly 40 years the Internal Revenue Service, the Department of Labor and courts have been making determinations as to whether plans were "church plans" within the meaning of Code section 414(e) without involving any prohibited entanglement in religious issues. In addition, the proposed plan-based exemption recognizes that in many churches the plan is not at an individual employer level but may be at a local, state, regional or even national level. Depending on a church's polity as determined by its theological beliefs, some religious employers are required to participate in a multiple employer church plan while others may elect to do so.

---

[11]  *See*, footnote 2, *supra.*

[12]  U. S. Congressional Research Service, Enforcement of the Preventive Health Care Services Requirements of the Patient Protection and Affordable Care Act (RL 7-5700; February 24, 2012), by Jennifer Staman and John Shimabukuro,

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 8

However, if the Departments are concerned that such an exemption would be too broad, the Departments could draft the exemption more narrowly so that if the church plan is established or maintained by a religious employer, and substantially all of the employers in the church plan are either religious employers or eligible organizations (or substantially all of the participants are employees of religious organizations or eligible employers), all employers in the church plan would be treated as religious employers, exempt from the contraception coverage requirement. This approach would prevent the potential adverse consequence described in the Supplementary Information to the NPRM, which is the avoidance of the contraception coverage requirement by employers that are neither religious employers nor eligible organizations. At the same time, this approach would avoid the administrative challenges and possible governmental entanglement for the Departments or courts in determining whether religious organizations were religious enough to be categorized as religious employers or eligible organizations. In addition, this would allow one uniform set of benefits for plan participants and decrease the cost of plan administration for employees in church plans.

This approach would be narrower than an exemption based solely on Code section 414(e). It would result in some church plans being exempt (multiple employer church plans that only include employers that are closely tied to the church), while others, such as certain single employer church plans, not being exempt unless the individual employer satisfies the religious employer definition.

Applying the multiple employer church plan exemption in this manner would recognize the unique nature of multiple employer church plans, particularly the fact that such plans cover many houses of worship (often primarily covering clergy and employees at churches) but also cover some employers associated with the church that may not clearly be religious employers, but that clearly are eligible organizations.

## III.   ACCOMMODATION FOR "ELIGIBLE ORGANIZATIONS"

### A.   Definition of "Eligible Organization"

The NPRM requested comments on the proposed "accommodation" for "eligible organizations." Section 54.9815-2713A(a) of the Proposed Regulations defines an "eligible organization" as an organization that satisfies four requirements:

1.   The organization opposes providing coverage for some or all of the required contraceptive services;

2.   The organization is organized and operates as a nonprofit entity;

3.   The organization holds itself out as being a religious organization; and

4.   The organization self-certifies that it satisfies the requirements of paragraphs 1 through 3 and specifies the contraceptive services to which it objects.

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 9

The self-certification mechanism appears to operate so that an organization's determination that it is "religious" will not be challenged by regulators or others involved in the accommodation process. However, the Agencies noted that some commenters on the ANPRM urged the Departments to provide "enforcement mechanisms to monitor compliance with the criteria" for being an eligible organization.

If the Departments provide in final regulations that they will have oversight over accommodation eligibility, it will put them in the position of having to make determinations as to whether organizations are in fact "religious." Prior to the issuance of Revenue Procedure 86-23 and the revision of the integrated auxiliary regulations in 1995, the Internal Revenue Service was required to determine if organizations were "exclusively religious." The presence of such a requirement in these regulations proved problematic and was litigated in <u>Lutheran Social Service of Minnesota v. United States</u>, 583 F. Supp. 1298 (D.Minn. 1984), <i>rev'd</i> 758 F.2d 1283 (8th Cir. 1985), and <u>Tennessee Baptist Children's Homes, Inc. v. United States</u>, 604 F. Supp. 210 (M.D. Tenn. 1984), <i>aff'd</i>, 790 F.2d 534 (6th Cir. 1986). If such an enforcement approach is adopted, the Departments will also have to determine what it means for an organization to hold itself out as being religious. The NPRM does not provide any insight as to what would be required to constitute the required holding out.

The NPRM also requires that an organization be organized and operated as a nonprofit entity in order for the accommodation to be available. The Supplementary Information to the NPRM states that " . . . an organization is not considered to be organized and operated as a nonprofit entity if its assets or income accrue to the benefit of private individuals or shareholders" – however, the NPRM does not tell us what standard should be used for making the "no private benefit" determination. The IRS has issued regulations and other guidance on the "no private inurement" requirement applicable to Code section 501(c)(3) organizations. The IRS and the courts have also developed a broader "no private benefit" rule, also applicable to such organizations. Are these rules to be used to make the "no private benefit" determination for purposes of "eligible organization" status? And will even $1.00 of private benefit cause the requirement not to be met? To the extent that the self-certification process is "self-policing," securing answers to these questions is perhaps not as urgent. However, if the Departments will be involved in oversight and enforcement of eligible organization status, the need for clear guidance on these questions becomes extremely important.

### B.    Application of the Accommodation

#### 1.    Insured Plans

In the case of an insured plan, the NPRM attempts to accommodate religious employers that object to providing contraception coverage by having the insurer providing group coverage assume the responsibility by providing individual insurance policies that provide contraception coverage to plan participants and beneficiaries without cost sharing. This proposed structure is thought to avoid conflicts for a religious employer because the employer would have "no role in contracting, arranging, paying or referring for this separate contraception coverage." 78 Fed. Reg. at 8463. However, for the reasons explained below, the NPRM fails to address the religious

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 10

liberty concerns of religious organizations that object to providing contraception coverage on account of their religious beliefs.  The NPRM still requires an objecting eligible organization to violate its religious beliefs by requiring it to play a substantial role in the provision of contraception coverage to its employees or pay a penalty.[13]

> **a.**   **Eligible organizations will be paying for contraception coverage**

Other commenters have noted that contraception coverage, like lunch, is not free.  Since the eligible organizations (and plan participants in the case of contributory plans) are paying all the premiums, they must be paying for the contraception coverage.  The Departments appear to be of the view that group health insurers, not the eligible organizations or plan participants, will be providing the coverage, and that the insurers will do so because, when viewed together with the underlying group policy, the cost of contraception coverage will be less, or at least no more, than the cost of unplanned pregnancies.  The Church Alliance remains skeptical about this assumption for the reasons set forth in its prior comments.  However, even if true, religious organizations will still be paying for contraception coverage for the reasons set forth below.

First, the NPRM provides that the contraception coverage cannot be "reflected in the group health insurance premium."  78 Fed. Reg. at 8462.  It follows therefore that the insurer will charge the eligible organization <u>more</u> for its group coverage because of the increased cost of unplanned pregnancies resulting from the omission of contraception coverage.  Even if a group insurer could take the effect of individual contraception policies into account in setting the rates for an eligible organization's group policy,[14] the insurer will still charge more for the eligible group coverage it will be required to issue because of the increased cost of administering the individual policies (e.g., state policy approvals, separate mailings, printing costs, increased cost of coordinating benefits, etc.).

Second, even if one ignores the additional administrative costs and assumes that the contraception coverage is cost neutral, the coverage is neutral only in the short run.  Since the terms of group health insurance contracts rarely exceed more than 12 months in duration, the "cost" to one insurer for contraception coverage will often be recouped, if at all, in a subsequent plan year by a different insurer in the form of reduced unplanned pregnancies.  Insurers cannot be certain that their policies will be renewed.  Accordingly, in setting the premiums for any year, they will discount the future benefit of the upfront cost of provided contraception coverage.

---

[13] *See*, footnote 2, *supra*.

[14] We express no comment on whether under applicable state insurance laws the insurer can consider the individual policies in setting the rates for the group policies.  State insurance regulators are, of course, concerned about insurers setting rates too high.  However, they are also concerned about insurers setting rates too low since it could affect their solvency.

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 11

### b.   Employees of eligible organizations will be receiving contraception coverage by virtue of their employment

Due to the absence of cost sharing, employees of eligible organizations will be receiving contraception coverage by virtue of their employment for less – nothing, in fact – than they would have paid for the coverage elsewhere.  For plans that are covered by ERISA, this will cause the contraception coverage to be part of the group plan because the contraception coverage will be part of an employee benefit program "established or maintained by an employer."  29 U.S.C. §1002(1).

In an analogous situation, employers have been held to have contributed to the cost of an employee-pay-all plan, thus bringing the plan under ERISA, if the plan participants could not have obtained the same coverage elsewhere for the same cost, perhaps because of a group discount.  See, House v. Am. United Life Ins. Co., 499 F.3d 443, 449 (5th Cir. 2007); Tannebaum v. Unum Life Ins. Co., 2006 WL 26710405 (E.D. Pa.); McCann v. Unum Provident, Civ. Action No. 11–3241 (MCC) (D.N.J. 2013); Healy v. Minnesota Life Ins. Co., 2012 WL 566759 (W.D. Mo.); Moore v. Life Ins. Co. of North America, 708 F. Supp. 2d 597 (N.D. W.V. 2010); Chatterton v. Cuna Mut. Ins. Society, 2007 WL 4207395 (S.D. W.V.); Brown v. Paul Revere Life Ins. Co., 2002 WL 1019021 (E.D. Pa.) ("Where an employer provides the employee benefits they cannot receive as individuals, it has contributed to an ERISA plan."); and Kuehl v. Provident Life & Accident Ins. Co., 2000 U.S. Dist. LEXIS 21625, *10 (E.D. Wis. Apr. 20, 2000) (contribution exists where 10% discount available only to employees in group plans).  But see, Schwartz v. Provident Life & Acc. Ins. Co., 280 F. Supp. 2d 937 (D. Ariz. 2003) (discount in and of itself not sufficient to establish an employer plan under ERISA).

Similarly, Code section 4980B and ERISA section 601 generally require most employers with 20 or more employees that have or contribute to plans to provide COBRA continuation coverage if they maintain a group health plan.  Treasury Regulation §54.4980B-2 provides that "a group health plan is maintained by an employer … even if the employer does not contribute to it if coverage under the plan would not be available at the same cost to an individual but for the individual's employment-related connection to the employer …."

### c.   Eligible organizations will be facilitating the providing of contraception coverage

The NPRM provides that the contraception coverage provided through individual contraception policies will not be "offered by or through a group health plan." 78 Fed. Reg. at 8462.  Insurers will automatically provide contraception coverage for plan participants and beneficiaries.  78 Fed. Reg. at 8463 ("The issuer would automatically enroll plan participants and beneficiaries in a separate individual health insurance policy that covers recommended contraceptive services.")  However, eligible organizations remain free to determine who is eligible to participate in their group health plans.  Accordingly, by determining who will be eligible to participate in their group health plans, eligible organizations will be effectively determining who receives an individual policy providing contraception coverage.  For plans covered by ERISA, serving as such a gatekeeper has been held sufficient employer involvement to indicate the presence of an

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 12

"employee benefit plan established or maintained…by an employer" which is therefore covered by ERISA.  See, <u>Glass v. United Omaha Life Ins. Co.</u>, 33 F.3d 1341 (11th Cir. 1994); <u>Brundage – Peterson v. Compare Health Services Ins. Corp.</u>, 877 F.2d 509, 510-11 (7th Cir. 1989); and <u>Rengifo v. Hartford Life and Accident Ins. Co.</u>, Case No. 8:09-CV-1725-T-17MAP (M.D. FL 2010).

> **d.    The NPRM will limit eligible organizations' choice of group health insurers**

The NPRM provides that an insurance company issuing a group policy to an employer will provide to plan participants "contraception coverage under individual policies, certificates, or contracts of insurance (hereinafter referred to as individual health insurance policies)."  78 Fed. Reg. at 8462.  The NPRM apparently assumes that an insurer that has issued a group health policy to an eligible organization can legally issue such "individual health insurance policies" to any plan participant.  In some cases, an insurer cannot.

The NPRM notes that the individual contraception policies issued in connection with <u>self-insured</u> plans will be subject to all applicable state laws, including state insurance filing and rate review requirements.  78 Fed. Reg. at 8465.  As explained below, individual contraception policies issued in connection with <u>insured</u> plans will be treated as individual policies and therefore involve the laws not only of the state in which the group policy will be issued, but each state in which a plan participant resides.[15]

Although insurance involves interstate commerce, as the result of the federal McCarran-Ferguson Act, the right to regulate insurance companies has generally been relegated to the states.  State insurance regulators are charged with overseeing the regulation of the insurance industry to ensure that insurers remain solvent, and that the rules and requirements enacted by the state legislature are complied with.  The laws vary from state to state, but states generally require insurers doing business in a state to be licensed in a state.

In the case of group insurance, the insurance company frequently need only be licensed in the state in which the policy is issued.  For example, Alabama's unauthorized insurers law does not apply to "[t]ransactions in [Alabama] involving group…insurance…where the master policy or contract was lawfully issued and delivered in a state in which the insurer was authorized to transact business."  Ins. Code § 27-11-2(4).  Other states have similar provisions.  Thus, an insurance company can often issue a group health policy to an employer headquartered in one state even though the policy may cover employees residing in other states so long as the insurer is licensed in the state in which the employer is headquartered.  However, that changes when an insurance company issues individual policies.  Each state will require a company issuing individual policies to its residents to be licensed in that state.  Accordingly, an insurer issuing a group policy to an eligible organization may not be able to issue individual contraception

---

[15]  Certificates of insurance are generally treated as evidence of coverage under a group plan.  They do not expand the coverage provided under the group policy.

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 13

policies to each plan participant unless it is licensed in all the states in which plan participants reside and complies with the insurance laws of all those states. In addition to state filing and rate review requirements, those laws could include requirements regarding (i) provider access; (ii) utilization reviews, grievance reviews/internal appeals, and external reviews; (iii) prompt payment of claims; (iv) mandated benefits; (v) small group rating requirements; and (vi) handling of complaints. If an eligible organization is satisfied with its current insurer, it should not have to change insurers to an insurer that can issue individual contraception policies in each state in which a plan participant or beneficiary resides. The group health insurance market is already concentrated. Effectively limiting eligible organizations to large insurers that are licensed in all states, or at least in all the states in which plan participants reside, would severely limit eligible organizations' choice of insurers.

        **2.**    **Uninsured Plans**

            **a.**    **Alternative approaches for providing participants and beneficiaries in self-insured group health plans contraception coverage**

The Departments have not yet issued regulations on contraception coverage for self-insured group health plans. However, in the Supplementary Information to the NPRM, the Departments described three "alternative approaches for providing participants and beneficiaries in self-insured group health plans established or maintained by eligible organizations with contraception coverage at no additional cost, while protecting the eligible organizations from having to contract, arrange, pay, or refer for such coverage."

In the subsections that follow, the Church Alliance will comment on each of the three described approaches, particularly as they would apply to multiple employer church plans.

Under all three approaches, the Departments state that "if there is a third party administrator for the self-insured group health plan of the eligible organization, the eligible organization would provide the third party administrator with a copy of its self-certification." In addition, if "the plan uses a separate third party administrator for certain coverage, such as prescription drug coverage, the eligible organization would also provide a copy of its self-certification to the separate third party administrator" if the separate coverage includes coverage of any contraceptive service listed in the self-certification.

However, it is unclear, in the multiple employer church plan context, which entity would be considered the third party administrator, especially since the proposed regulations contain no definition of that term. With multiple employer church plans, the "denominational plan board"[16]

---

[16]  The term "denominational plan board" is intended to mean an organization that is described in Code section 414(e)(3)(A) as "an organization, whether a civil law corporation or otherwise, the principal purpose or function of which is the administration or funding of a plan or program for the provision of retirement benefits or welfare benefits, or both, for the employees of a church or a convention or association of churches, if such organization is controlled by or associated with a church or a convention or association of churches."

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 14

may perform many of the administrative functions that would be performed by an independent third party administrator in a single employer plan context, and is a "third party" in the sense that it is not the employer or participant.  So, in such situations, is the denominational plan board the third party administrator?  If the denominational plan board is the third party administrator, none of the approaches appear workable, because of the required involvement by the third party administrator, which is an exempt religious employer.

If there is a claims administrator that processes health benefits claims for a multiple employer church plan, is that claims administrator the third party administrator?  Does the answer change if a denominational plan board that performs much of the health plan administration utilizes multiple claims administrators, for multiple categories of claims that include contraceptive services (e.g. by type of benefit or claim (e.g., pharmaceutical or medical) or geographic area, including city)?   Can the answer change from year to year, depending on the level of administration by the denominational church plan board versus the claims administrator in the year in question?

With each of the three approaches, an adjustment would be made in the user fees that otherwise would be charged by an FFE to the issuer providing the contraception coverage.[17]   However, it is unclear how this would be administered if a church health plan uses multiple third party administrators, especially if they are affiliated with different issuers or none of them is affiliated with an issuer.   It also is unclear how any of the approaches would work if the third party administrator is located in a state without an FFE, and any issuer affiliated with that third party administrator also is located in that state.  Due to state licensing regulations, these affiliations may be extremely limited and, at the least, will require interstate coordination, which may not be allowable under state licensing requirements.  In addition, if the denominational plan board is the third party administrator, it is unlikely to be affiliated with an issuer.

### (i)      First Approach

Under this approach, a "third party administrator receiving the copy of the self-certification would have an economic incentive to voluntarily arrange for the separate individual health insurance policies for contraception coverage", because it would be compensated with a reasonable fee for automatically arranging for the contraception coverage.  Under this approach, the Supplementary Information to the NPRM describes the third party administrator's role in "automatically arranging for the contraception coverage" as "acting, not as the third party administrator to the self-insured plan of the eligible organization, but rather in its independent capacity apart from its capacity as the agent of the plan."

---

[17]  Because the FFE user fee adjustments do not begin until 2014, after the end of the temporary enforcement safe harbor for some plans pursuant to guidance issued by the Departments on February 10, 2012, and reissued on August 15, 2012, referred to in 78 Fed. Reg. at 8558 n. 6.  The safe harbor should be extended to cover this gap period.

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 15

It is difficult to envision how the third party administrator could provide this service "automatically" because of its relationship to the eligible organization and its employees, but be acting "in its independent capacity." In addition, how, exactly, could this "automatic" arrangement occur without some involvement on the part of the eligible organization? The eligible organization, first, would be required to provide the third party administrator with a copy of its self-certification. However, without any further involvement, how would the third party administrator have contact information and other necessary information to provide the contraception coverage? Even if the third party administrator had contact information for all employees covered by a multiple employer church plan, how will it distinguish between employees of eligible organizations and employees of exempt religious employers, without identification of those employees by either the eligible organizations or the denominational church plan board? The Supplementary Information to the NPRM requires that individual contraception policies be provided to both plan participants and <u>beneficiaries</u>. In multiple employer church plans, how will the third party administrator know which beneficiaries are connected to eligible organizations and which are connected to exempt religious employers, without involvement of the eligible organizations or denominational church plan board? How will the beneficiaries' addresses and other contact information be obtained? Since this coverage is only for women with reproductive capacity, how will those women be identified, and beginning at what age will the daughters of an eligible organization's employees begin receiving offers of this free coverage? How will the daughters' ages be determined so the offers of such coverage may be made? How will newly eligible employees and beneficiaries be identified, without the involvement of the eligible organization or denominational church plan board? How will employees and beneficiaries who no longer are eligible for such coverage be identified, or will the issuer need to rely on those individuals to report that they no longer are eligible for this free coverage (because of change of employer, change in hours, change in relationship to employee, etc.)? If the issuer must rely on such self-reporting by the individuals, the individuals will have little incentive to report they no longer are eligible for free coverage.

The Supplementary Information to the NPRM states that issuers providing contraception coverage "would be responsible for providing the notice of availability of such coverage to participants and beneficiaries . . . in self-insured group health plans of eligible organizations", and that this notice would be provided directly to plan participants and beneficiaries by the issuer, generally annually. Again, for multiple employer church plans, it is difficult to imagine how these notices would be provided, without the involvement of the eligible organizations or denominational church plan board, due to practical issues like identifying who is entitled to such notices, and their addresses.

Then, what would prevent the third party administrator from aggressively marketing to those employees and beneficiaries not only contraception coverage, but other services and products, on which the administrator could profit, including other services and products that are objectionable to the eligible organization? When the employer or denominational plan board is involved in services provided, it can retain some oversight, but not when it has "no involvement."

Finally, contraceptive services are unlikely to fit neatly into discrete categories, unrelated to other health services that are covered by a self-insured plan. How will such payments be

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 16

coordinated between the self-insured plan covering most health services and the third party administrator covering contraceptive services?  How will employees and beneficiaries know which plan covers what?  For multiple employer church plans with other similar types of coverage questions and coordination, the denominational church plan board resolves the issue.

### (ii)    Second Approach

Under this approach, coverage under the eligible organization's plan would comply with the requirement to provide contraception coverage <u>only</u> if the third party administrator automatically arranges for an issuer to assume sole responsibility for providing separate individual health insurance policies offering contraception coverage.  The third party administrator would not be automatically providing products that are objectionable to the eligible organization (and church, in the case of a multiple employer church plan).  However, the third party administrator engaged by the eligible organization still would be arranging for such coverage.  Ironically, if the third party administrator would fail to arrange for contraception coverage or the issuer would fail to provide such coverage, the eligible organization's plan coverage would fail to meet the requirements of section 2713 of the Public Health Service Act, which could subject the plan to severe penalties,[18] through inaction entirely outside the plan's control.

In addition, practical issues could arise with this approach, such as the necessity of individual participant and beneficiary information being provided to the issuer, privacy and security issues that could arise due to this second level of information transmission and questions about responsibility in the event of a breach involving this information.  Also, with multiple employer church plans, participants employed by exempt religious employers and those employed by eligible organizations would need to be separated, with only information on the employees (and their beneficiaries) in the latter group being provided to the issuer.  For a multiple employer church plan, difficulties are likely to be faced by a third party administrator being required to provide this on a nationwide basis, with separate issuers in different geographic locations, and no or possibly limited affiliation with any issuers.  Many of the practical issues raised about the first approach also apply to this approach.

### (iii)    Third Approach

Under this approach, "the third party administrator, receiving the copy of the self-certification would be directly responsible for automatically arranging for contraception coverage for plan participants and beneficiaries."  The "self-certification would have the effect of designating the third party administrator as the plan administrator under section 3(16) of ERISA solely for the purpose of fulfilling the requirement that the plan provide contraception coverage without cost sharing."  This approach is likely to be objectionable to most third party administrators, because it places the legal responsibility for ensuring compliance with section 2713 of the Public Health Service Act solely on the third party administrator, which could have legal implications under

---

[18] *See*, note 12, *supra*.

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 17

ERISA's reporting, disclosure, claims processing and fiduciary provisions for both the third party administrator and the eligible organization.[19]

The Supplementary Information to the NPRM states that "there would be no obligation on a third party administrator to enter into or continue a third party administration contract with an eligible organization if the third party administrator were to object to having to carry out this responsibility." If this approach would be chosen by the Departments, eligible organizations may be faced suddenly with a lack of a third party administrator or suddenly increased fees charged by the third party administrator.

### (iv)      Problems with all three approaches

For any multiple employer church plan established or maintained by a religious employer, with only religious employers and eligible organizations as employers in the plan, all three of the approaches create a multitude of practical issues. Any of the approaches would force the denominational church plan board or the eligible organization to become involved in arranging for contraception coverage and would require continuous involvement in obtaining, sorting and transmitting information, and coordinating coverage. For these reasons and the reasons previously stated, the Church Alliance respectfully requests the exemption of all such multiple employer church plans from the contraception coverage requirement.

All these approaches create particular problems for church plans that are self-administered, and therefore have no third party administrator. The Departments noted in the Supplementary Information to the NPRM that "[n]o comments were submitted in response to the ANPRM on the extent to which there are plans without a third party administrator." 78 Fed. Reg. at 8464. The absence of comments does not mean there are no such plans, especially since there was no guidance issued defining what constitutes a third party administrator. The Church Alliance did comment that the third party administrator approach for self-insured plans would not accommodate the religious objections of self-insured church plans using an affiliated religious organization as an administrator. If a religious organization cannot provide contraception coverage without violating its religious tenets and beliefs, neither can an affiliated religious organization.

Finally, perhaps the biggest question raised by the NPRM is whether insurance companies and third party administrators will in fact be willing to carry out the duties the Departments have assigned to them in the accommodation process, and in the manner contemplated by the NPRM. To date, there has been no indication that third party administrators will be willing to play such a role, nor has there be any firm indication that an insurance company or companies will be willing to provide a policy that only provides individual contraception coverage. Other commentators have pointed out that such a policy must be approved at the state level and would thus carry with it high administrative costs. It does not seem like an insurance company would be likely to

---

[19] We assume that it was not the Departments' intent to subject to ERISA's requirements church plans that have not elected under Code section 410(d) to be covered by ERISA.

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 18

approve a policy on which it will at best make only a small profit or, as some have suggested, lose money – and yet the entire structure of the NPRM seems to rest upon such an assumption – and on the assumption that third party administrators will also be willing to create an entirely new administration mechanism when they are not legally required to do so.

In addition to urging greater clarification of the three approaches for self-insured plans suggested in the NPRM, discussed above, the Church Alliance strongly suggests a plan-based approach to an exemption for self-insured plans of religious employers that are also self-administered, or are plans for which the third party administrator is itself a religious organization.  Essentially, the only workable solution for self-insured church plans of eligible organizations is a plan-based exemption.

**C.     Insured and Uninsured Plans Will be Forced to Facilitate Coverage for Abortions in Violation of Various Federal and State Laws**

The NPRM continues the Departments' failure to recognize that for some religious organizations, having to provide coverage for contraceptives approved by the Food and Drug Administration, including so-called emergency contraceptives, such as ella (ulipristal acetate) and Plan B (levonorgestrel), requires the coverage of abortifacient drugs, thus violating: (i) the Weldon amendment; (ii) ACA; and (iii) various state insurance laws.

**1.     Weldon amendment**

The Weldon amendment has been included in every federal appropriations law since 2004. Section 506 of the current Appropriations Act provides:

> (a)     None of the funds appropriated in this [Consolidated Appropriations] Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for any abortion;

> (b)     None of the funds appropriated in this Act, and none of the funds in any trust fund to which funds are appropriated in this Act, shall be expended for health benefits coverage that includes coverage of abortion.

In addition, Section 507(d) of the Act provides:

> None of the funds made available in this Act may be made available to a Federal agency or program, or to a State or local government, if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions.[20]

---

[20] Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, 125 Stat. 786, 1111.

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 19

### 2.    ACA Section 1303(b)(1)(A)

Section 1303(a)(1)(A) of ACA provides:

> Notwithstanding any other provision of this title … (i) nothing in this title … shall be construed to require a qualified health plan to provide coverage of [abortion services] as part of its essential health benefits for any plan year; and (ii) … the issuer of a qualified health plan shall determine whether or not the plan provides coverage of [abortion services] as part of such benefits for the plan year.

### 3.    State insurance laws

NPRM's requirement for the issuance of individual insurance policies providing coverage for abortifacient drugs without cost sharing conflicts with the laws of several states that prohibit the issuance or delivery of individual policies providing coverage for elective abortions unless a separate premium is charged for such coverage.  Kansas law, for example, provides:

> Any individual or group health insurance policy. . . delivered, issued for delivery, amended or renewed on or after July 1, 2011, shall exclude coverage for elective abortions, unless the procedure is necessary to preserve the life of the mother. Coverage for abortions may be obtained through an optional rider for which an additional premium is paid.  The premium for the optional rider shall be calculated so that it fully covers the estimated cost of covering elective abortions per enrollee as determined on an average actuarial basis." [21]

These state laws are unaffected by the general preemption provision in the Public Health Service, 42 U.S.C. §300gg-23(a)(1).  That section provides that the requirements of part A of title XXVII of that Act, which includes the preventive services requirement, are not to be:

> construed to supersede any provision of state law which establishes, implements, or continues in effect any standard or requirement solely relating to health insurance issuers in connection with individual or group health insurance coverage except to the extent that such standard or requirement prevents the application of a requirement of [part A of title XXVII of the PHS Act].

---

[21] Kan. Stat. Ann. §40-2,190.  *See also*, Ken. Rev. Stat. §304.5-160(1) ("No health insurance contracts, plans or policies delivered or issued for delivery in the state shall provide coverage for elective abortions except by an optional rider for which there must be paid an additional premium."); *and* Mo. Ann. Code §376.805 ("No health insurance contracts, plans, or policies delivered or issued for delivery in the state shall provide coverage for elective abortions except by an optional rider for which there must be paid an additional premium.") *and* R.I. Stat. §27-18-28 ("No health insurance contract, plan, or policy, delivered or issued for delivery in the state, shall provide coverage for induced abortions, except where the life of the mother would be endangered if the fetus were carried to term or where the pregnancy resulted from rape or incest, and except by an optional rider for which there must be paid an additional premium.").

Centers for Medicare & Medicaid Services
Department of Health and Human Services
April 8, 2013
Page 20

However, these state insurance laws do not prevent the application of the mandate.  Section 1303(c)(1) of ACA states that nothing in the Act preempts, or has any effect on, any State law regarding abortion coverage.

The Departments' are apparently of the view that emergency contraceptives are not abortifacients because the latest point at which they operate is to prevent implantation of a newly fertilized embryo in the uterus.[22]  However, as the Departments know, some religions sincerely believe that life begins at conception.  For organizations that are affiliated with these religions, emergency contraceptives that operate after fertilization are abortifacients.[23]  The Departments should accommodate these beliefs.  Just as the "power to tax involves the power to destroy,"[24] so too does the power to define.  Allowing religious organizations to define for themselves which contraceptives are abortifacients would be consistent with ACA section 1303(a)(1)(A) of ACA, which provides that "the issuer of a qualified health plan shall determine whether or not the plan provides coverage of [abortion services] as part of such benefits for the plan year."

Please contact the undersigned at 202-661-3882 if you have any questions or wish to discuss this matter further.

Sincerely,




Stephen H. Cooper
Government Affairs Counselor, K&L Gates
On Behalf of the Church Alliance

---

[22] *See, e.g.*, Kelly Wallace, Health and Human Services Secretary Kathleen Sebelius Tells iVillage "Historic" New Guidelines Cover Contraception, Not Abortion (Aug. 2, 2011), http://www.ivillage.com/kathleen-sebelius-guidelines-cover-contraception-not-abortion/4-a-369771 (last visited Mar. 28, 2013).

[23] There is some evidence that some emergency contraceptives operate after implantation.  If so, they would be abortifacients even under the Departments' view.

[24] McCulloch v. Maryland, 17 U.S. (4 Wheat) 316, 431 (1819) (J. Marshall).