**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 13-cv-2611-WJM-BNB

LITTLE SISTERS OF THE POOR HOME FOR THE AGED, DENVER, COLORADO, a
Colorado non-profit corporation,
LITTLE SISTERS OF THE POOR, BALTIMORE, INC., a Maryland non-profit
corporation, by themselves and on behalf of all others similarly situated, along with
CHRISTIAN BROTHERS SERVICES, a New Mexico non-profit corporation, and
CHRISTIAN BROTHERS EMPLOYEE BENEFIT TRUST,

      Plaintiffs,

v.

KATHLEEN SEBELIUS, Secretary of the United States Department of Health and
Human Services,
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,
THOMAS E. PEREZ, Secretary of the United States of Department of Labor,
UNITED STATES DEPARTMENT OF LABOR,
JACOB J. LEW, Secretary of the United States Department of the Treasury, and
UNITED STATES DEPARTMENT OF THE TREASURY,

      Defendants.

---

**ORDER DENYING IN PART DEFENDANTS' MOTION TO DISMISS AND
DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

In this case, Catholic religious organizations challenge the regulations

implementing the Patient Protection and Affordable Care Act, Pub. L. 111-148,

specifically the requirement that group health care plans provide all women coverage

for certain preventative contraception services without a co-payment or deductible.

Before the Court are the following: (1) Plaintiffs' Motion for Preliminary Injunction

(ECF No. 15); and (2) Defendants' Motion to Dismiss or, in the alternative, for Summary

Judgment (ECF No. 30).  For the reasons set forth below, the Court finds that Plaintiffs

have standing to bring this action and, therefore, the standing portion of the Motion to

Dismiss is denied. The remainder of the issues raised in the Motion to Dismiss remain

pending and will be ruled on by way of subsequent order.  The Court also denies

Plaintiffs' Motion for Preliminary Injunction.

## I.  BACKGROUND

**A.     History of the Challenged Regulations**

The Patient Protection and Affordable Care Act (the "ACA") requires that group

health insurance plans cover certain preventative medical services without cost-sharing,

*i.e.*, a co-payment or a deductible.  Among the preventative services that must be

covered are contraception, sterilization, and related counseling (the "Mandate").  As set

forth in more detail below, the Mandate results from extensive and complex

Congressional legislation and agency rulemaking by the Department of Labor ("DOL"),

the Department of the Treasury ("DOT"), and the Department of Health and Human

Services ("HHS") (collectively, the "Departments").

In March 2010, Congress enacted the ACA along with the Health Care and

Education Reconciliation Act.  These acts placed a variety of new requirements on

"group health plans," a term which encompasses both insured and self-insured

employer plans that provide health care coverage to employees.  *See* 42 U.S.C. §

300gg-91(a)(1) (defining "group health plan"); Interim Final Rules for Group Health

Plans and Health Insurance Issuers Relating to Coverage of Preventative Services

Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,726, 41,727

(July 19, 2010) ("Interim Final Rules") ("The term 'group health plan' includes both

2

insured and self-insured group health plans.").  The portion of these acts that is relevant to this action is the requirement that group health plans provide coverage—at no charge to the patient—for women's "preventative care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration[.]"  *See* 42 U.S.C. § 300gg-13(a)(4).

Because there were no existing guidelines concerning preventative care and screenings for women at the time of the Interim Final Rules, the Health Resources and Services Administration ("HRSA") commissioned the Institute of Medicine ("IOM"), a Congressionally-funded body, to conduct a study on preventive services necessary to women's health.  The IOM, in a report entitled "Clinical Preventive Services for Women: Closing the Gaps," recommended that "preventative care and screenings" include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  Women's Preventive Services: Required Health Plan Coverage Guidelines, health resources and services administration, http://www.hrsa.gov/womensguidelines/ (last visited December 19, 2013).  Among the FDA-approved contraceptive methods are diaphragms, oral contraceptive pills, emergency contraceptives, and intrauterine devices.

HRSA adopted the IOM's recommendations on August 1, 2011.  Two days later, the Interim Final Rules were amended to "provide HRSA additional discretion to exempt certain religious employers from the [HRSA] Guidelines where contraceptive services are concerned."  Group Health Plan and Health Insurance Issuers Relating to Coverage of Preventive Services under the Patient Protection and Affordable Care Act, 76 Fed.

Reg. 46,623 (Aug. 3, 2011); *see also* 45 C.F.R. § 147.130(a)(1)(iv)(A).  The amended

Interim Final Rules permitted HRSA to exempt a religious organization that: "(1) has the

inculcation of religious values as its purpose; (2) primarily employs persons who share

its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is

a non-profit organization under section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of

the [Internal Revenue] Code."  *Id*.

The Departments received over 200,000 comments on the amended Interim

Final Rules, including many submitted by religiously-affiliated institutions asserting that

the religious employer exemption was too narrow, and that the limited scope of the

exemption raised religious liberty concerns.  Group Health Plans and Health Insurance

Issuers Relating to Coverage of Preventative Services Under the Patient Protection and

Affordable Care Act, 77 Fed. Reg. 8,725, 8,726-27 (Feb. 15, 2012).  Despite these

comments, the Departments adopted the definition of religious employer set forth in the

Interim Final Rules.  *Id*. at 8,727.  However, the Departments created a "temporary

enforcement safe harbor" of one year during which they intended to "develop and

propose changes to these final regulations that would meet two goals—providing

contraceptive coverage without cost-sharing to individuals who want it and

accommodating non-exempt, non-profit organizations' religious objections to covering

contraceptive services[.]"  *Id*.

On March 21, 2012, the Departments published an advance notice of proposed

rule-making ("Advance Notice") outlining alternative plans to accommodate religious

organizations' objections to the Mandate.  *See* Certain Preventative Services under the

Affordable Care Act, 77 Fed. Reg. 16,501 (Mar. 21, 2012).  The Departments received

4

over 400,000 comments in response to the proposals set forth in the Advance Notice

and, in July 2013, issued rules finalizing the Mandate.  *See* Coverage of Certain

Services under the Affordable Care Act, 78 Fed. Reg. 39,870, 39,871 (July 2, 2013)

(the "Final Rules").

The Final Rules provide that they accommodate for employers with religious

objections to the Mandate in two ways.  First, the Final Rules revise the definition of

"religious employer" by eliminating the first three requirements contained in the Interim

Final Rules.  The Final Rules define "religious employer" as simply any non-profit

referred to in 26 U.S.C. § 6033(a)(3)(A)(i) or (iii), which includes churches, their

integrated auxiliaries, associations of churches, and the exclusively religious activities of

religious orders.  *See* 78 Fed. Reg. at 39,874.

Second, the Final Rules provide for an accommodation for "eligible

organizations" that do not meet the definition of "religious employer".  An "eligible

organization" is one that meets the following criteria:

> (1)    The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.
>
> (2)    The organization is organized and operates as a nonprofit entity.
>
> (3)    The organization holds itself out as a religious organization.
>
> (4)    The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this

5

> section applies. The self-certification must be
> executed by a person authorized to make the
> certification on behalf of the organization, and must
> be maintained in a manner consistent with the record
> retention requirements under section 107 of the
> Employee Retirement Income Security Act of 1974
> ["ERISA"].

45 C.F.R. § 147.131(b).  The Final Rules state that an eligible organization is not

required to "contract, arrange, pay, or refer for contraceptive coverage" to which it has a

religious objection. 78 Fed. Reg. at 39,874.  Instead, the eligible organization must

complete a self-certification form stating that it is an eligible organization, and provide a

copy of that form to its issuer (if the employer participates in an insured group health

plan) or to its third party administrator (if the employer participates in a self-insured

health plan).  *Id*.

Upon receipt of the self-certification form, a third party administrator for a self-

insured group health plan is required to provide or arrange for payments for

contraceptive services, a requirement imposed through the Department of Labor's

ERISA enforcement authority.  *See id.* at 39,879-80.  The Final Rules state that an

eligible organization's self-certification "will be treated as a designation of the third party

administrator(s) as plan administrator and claims administrator for contraceptive

benefits pursuant to section 3(16) of ERISA."  *Id*. at 39,879.

## B.    The Parties and the Procedural History of this Case

Plaintiff Little Sisters of the Poor Home for Aged, Denver, Colorado is a Colorado

non-profit corporation that was founded in 1916.  (Compl. (ECF No. 1) ¶ 11.)  Plaintiff

Little Sisters of the Poor, Baltimore, Inc. is a Maryland non-profit corporation that was

founded in 1869.  (*Id*. ¶ 12.)  Both homes are controlled by and associated with the

Little Sisters of the Poor, an international Congregation of Catholic Sisters who serve

needy elderly people.  (*Id*. ¶ 13.)  The Court will refer to these Plaintiffs together as

"Little Sisters".

Little Sisters has adopted the Christian Brothers Employee Benefit Trust ("Trust")

to provide medical coverage to their employees.  (*Id*. ¶ 15.)  Each Little Sisters home

employs more than fifty employees who are covered, along with their dependents,

under the Trust.  (*Id*. ¶ 16.)

The Trust is a "church plan" within the meaning of section 414(e) of the Internal

Revenue Code.  (*Id*. ¶ 21.)  The Trust is not subject to ERISA because it has not made

an election under section 410(d) of the Internal Revenue Code.  (*Id*. ¶ 22.)  The Trust is

a self-insured health plan and, therefore, does not contract with an insurance company

to provide health benefits to its beneficiaries.  (*Id*. ¶ 23.)  Consistent with Catholic

teachings, the Trust does not provide, and has never provided coverage for, or access

to, contraception, sterilization, abortifacients, and related education and counseling.

(*Id*. ¶ 25.)  The Trust is administered by Plaintiff Christian Brothers Services, a New

Mexico non-profit corporation affiliated with The Brothers of The Christian Schools, a

male religious order of the Catholic Church.  (*Id*. ¶ 28.)  Christian Brothers Services is a

third party administrator for the Trust.  (ECF No. 37-1 ¶ 5.)

Defendants are all appointed officials of the United States government and its

agencies charged with issuing and enforcing the regulations implementing the ACA.

(Compl. ¶ 31.)  Defendant Kathleen Sebelius is the Secretary of HHS; Defendant

Thomas E. Perez is Secretary of the DOL; and Defendant Jacob J. Lew is Secretary of the DOT.  (*Id.* ¶¶ 32-36.)

On September 24, 2013, Plaintiffs filed the instant action, which brings the following causes of action: (1) Violation of the Religious Freedom Restoration Act; (2) Violation of the First Amendment—Free Exercise Clause, Substantial Burden; (3) Violation of the First Amendment—Free Exercise Clause, Intentional Discrimination; (4) Violation of the First Amendment—Free Exercise and Establishments Clauses, Discrimination Among Religions; (5) Violation of the First Amendment—Establishment Clause, Selective Burden/Denominational Preference (*Larson v. Valente*); (6) Interference in Matters of Internal Religious Governance—Free Exercise and Establishment Clauses; (7) Violation of the First and Fifth Amendments—Establishment Clause and Due Process, Religious Discrimination; (8) Violation of the Fifth Amendment—Due Process and Equal Protection; (9) Violation of the First Amendment—Freedom of Speech; (10) Violation of the First Amendment—Freedom of Speech, Expressive Association; (11) Violation of the First Amendment—Free Exercise Clause and Freedom of Speech, Unbridled Discretion; (12) Violation of the Administrative Procedure Act—Lack of Good Cause and Improper Delegation; (13) Administrative Procedure Act—Arbitrary and Capricious Action; (14) Administrative Procedure Act—Agency Action without Statutory Authority; (15) Administrative Procedure Act—Agency Action Not in Accordance with the Law, Weldon Amendment/Religious Freedom Restoration Act/First Amendment to the United States Constitution; and (16) Administrative Procedure Act—Agency Action Not in Accordance with the Affordable Care Act.  (Compl. pp. 46-61.)

8

As preliminary relief, Plaintiffs request a preliminary injunction "prohibiting Defendants while this lawsuit is pending from enforcing the Final Mandate against the Plaintiffs . . . and prohibiting Defendants from charging or assessing penalties against the . . . Plaintiffs for failure to offer or facilitate access to contraceptives (including abortifacient contraceptives), sterilization procedures, and related education and counseling." (*Id*. p. 61.) As final relief, Plaintiffs seek a declaration that the Final Mandate violates the Religious Freedom Restoration Act, the First Amendment, the Fifth Amendment, and the Administrative Procedures Act, and therefore no penalties can be assessed against Plaintiffs for failure to offer or facilitate access to contraceptives, sterilization, or abortifacients. (*Id*. p. 63-4.)

On October 24, 2013, Plaintiffs filed a Motion for Preliminary Injunction asking the Court to grant the preliminary relief sought in their Complaint. (ECF No. 15.) The Court set an abbreviated briefing schedule on the Motion for Preliminary Injunction to permit the Court the opportunity to address the issues by January 1, 2014, the date by which Plaintiffs must comply with the Mandate. (ECF No. 18.) Defendants filed their response on November 8, 2013 (ECF No. 29), and Plaintiffs filed their reply on November 15, 2013 (ECF No. 37). Thus, Plaintiff's Motion for Preliminary Injunction is ripe for review. No party requested a hearing on the Motion for Preliminary Injunction[1],

---

[1] Plaintiffs' Complaint states that they "respectfully request that the Court set a hearing on this request for a preliminary injunction at the earliest possible time and, after hearing, grant Plaintiffs' request for preliminary injunction." (Compl. ¶ 336.) However, this request, buried in the middle of a sixty-five page Complaint violates WJM Revised Practice Standard III.B., which requires that "[a]ll requests for the Court to take any action, make any type of ruling, or provide any type of relief must be contained in a separate, written motion. A request of this nature contained within a brief, notice, status report or other written filing does not fulfill this Practice Standard." Plaintiffs' actual Motion for Preliminary Injunction (ECF No. 15) does not request a hearing.

and the Court finds that a hearing is not necessary to resolve the issues raised therein.

Contemporaneous with their Response to the Motion for Preliminary Injunction, Defendants filed a Motion to Dismiss or, in the alternative, for Summary Judgment. (ECF No. 30.)  The Motion to Dismiss contends that Plaintiffs lack standing to bring this action, and also moves to dismiss or for summary judgment on all of the substantive claims.  (*Id.*)  Because the Court must ordinarily address issues such as standing before ruling on the merits of an action, the Court ordered an abbreviated briefing scheduled on the Motion to Dismiss.  (ECF No. 33.)  Plaintiffs filed their response on November 22, 2013 (ECF No. 42), and Defendants filed their reply on November 27, 2013 (ECF No. 44.)  Thus, Defendants' Motion to Dismiss is ripe for review.[2]

## II.  STANDING

Defendants move to dismiss this action pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that the Court lacks subject matter jurisdiction because Plaintiffs have failed to demonstrate that they will suffer an injury in fact.[3]

### A.  Legal Standard

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter."  Fed. R. Civ. P. 12(b)(1).  Dismissal under Rule 12(b)(1) is not

---

[2]  Plaintiffs have filed a Rule 56(d) Motion arguing that, if the Court construes Defendants' Motion as one for summary judgment, Plaintiffs should be permitted to conduct discovery before the Court makes any substantive ruling.  (ECF No. 41.)  Because the Court only considers the standing argument in this Order, and rules in Plaintiffs' favor, the Court need not address Plaintiffs' Rule 56(d) Motion at this time.

[3]  In the interest of addressing Plaintiffs' Motion for Preliminary Injunction before the regulations take effect on January 1, 2014, this standing argument is the only portion of Defendants' Motion to Dismiss that will be addressed in this Order.

a judgment on the merits of a plaintiff's case.  Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint.  *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).  The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction.  *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974).  A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking."  *See id.*

A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971).  When considering a Rule 12(b)(1) motion, however, the court may consider matters outside the pleadings without transforming the motion into one for summary judgment.  *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).  Where a party challenges the facts upon which subject matter jurisdiction depends, a district court may not presume the truthfulness of the complaint's "factual allegations . . . [and] has wide discretion to allow affidavits, other documents, and [may even hold] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)."  *Id*.

**B.    Analysis**

Article III of the United States Constitution limits the jurisdiction of federal courts to "[c]ases" and "[c]ontrovers[ies]."  U.S. Const. art. III, § 2.  "No principle is more

fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37 (1976).

"[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Allen v. Wright*, 468 U.S. 737, 750 (1984) (holding that standing "is perhaps the most important of the [Article III] doctrines").  "The gist of the question of standing" is whether the plaintiffs have "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions."  *Baker v. Carr*, 369 U.S. 186, 204 (1962).

"[T]he irreducible constitutional minimum of standing contains three elements": (1) the plaintiff must have suffered a "concrete and particularized" injury that is "actual or imminent" (*i.e.*, an "injury in fact"); (2) there must be "a causal connection between the injury and the conduct complained of,"; and (3) it must be "likely . . . that the injury will be redressed by a favorable decision."  *Lujan*, 504 U.S. at 560-61 (quotation marks omitted); *see also Allen*, 468 U.S. at 751 ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.").

In evaluating a plaintiff's standing at the motion to dismiss stage, a court may consider not only the allegations in the complaint, but also factual averments made by declaration or affidavit.  In *Warth v. Seldin*, the United States Supreme Court stated,

12

> [In] ruling on a motion to dismiss for want of standing, [courts] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.  At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint *or by affidavits*, further particularized allegations of fact deemed supportive of plaintiff's standing.  If, after this opportunity, the plaintiff's standing does not adequately appear from *all materials of record*, the complaint must be dismissed.

422 U.S. at 501-02 (emphasis added).  Subsequent decisions by the Supreme Court and lower courts have reinforced this rule.  *See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay*, 484 U.S. 49, 65 (1987) ("[A] suit will not be dismissed for lack of standing if there are sufficient allegations of fact—not proof—in the complaint *or supporting affidavits*.") (emphasis added) (internal quotations omitted); *Sac & Fox Nation of Mo. v. Pierce*, 213 F.3d 566, 573 (10th Cir. 2000) ("The Tribes' uncontroverted affidavits, albeit conclusory, support their allegations of injury. . . .  [A] plaintiff may submit affidavits to particularize allegations of fact in support of its standing.").

In this case, Defendants argue that Plaintiffs have failed to meet their burden on the "injury in fact" prong of the standing analysis.  (ECF No. 30 at 11-12.)  Plaintiffs contend that they have standing "based on the simple fact that compliance with the rules will require an expenditure of time and money."  (ECF No. 42 at 27.)  The Tenth Circuit has held that "out-of-pocket cost to a business of obeying a new rule of government" is sufficient to constitute an injury in fact.  *Nat'l Collegiate Athletic Ass'n v. Califano*, 622 F.2d 1382, 1386 (10th Cir. 1980); *see also Hydro Res. Inc. v. EPA*, 608 F.3d 1131, 1144-45 (10th Cir. 2010) (business costs of undertaking permitting process are injury in fact).  The cost need not be large; all that is required is some concrete and

13

particularized injury.  *See, e.g., Cressman v. Thompson*, 719 F.3d 1139, 1145 (10th Cir.

2013) (cost of $16.50 for specialized license plate was a "concrete, actual monetary

injury" which established an injury in fact).

      The self-certification form created by Defendants in accordance with the Final

Rules states that it will take an average of fifty minutes for an employer to fill out the

required information.  (ECF No. 37-3.)  The basis for this statement comes from the

Administrative Record, which provides that "an organization will need approximately 50

minutes (30 minutes of clerical labor at a cost of $30.64 per hour, 10 minutes for a

manager at a cost of $55.22 per hour, 5 minutes for legal counsel at a cost of $83.10

per hour, and 5 minutes for a senior executive at a cost of $112.43 per hour) to execute

the self-certification."  78 Fed. Reg. 39,890.  "[T]he total annual burden for preparing

and providing the information in the self-certification is estimated to be approximately

$41 for each eligible organization."  *Id*.

      Additionally, with regard to the burden imposed on any third party administrator

that receives a self-certification form, the Administrative Record states that: "It is

estimated that each issuer or third party administrator will need approximately 1 hour of

clerical labor (at $31.64 per hour) and 15 minutes of management review (at $55.22 per

hour) to prepare the notices for a total cost of approximately $44."  78 Fed. Reg.

39,890.  As the third party administrator for the Little Sisters and the Trust, Christian

Brothers Services is likely to incur this cost upon receipt of these entities' self-

certification forms.

      Defendants insist that, to avoid incurring substantial fines, Little Sisters and the

Trust will be required to complete the self-certification forms and deliver these forms to

Christian Brothers Services.  (ECF No. 44 at 10-11.)  In fact, the Defendants base the standing portion of their Motion to Dismiss on the fact that execution of the form is <u>all</u> that is required of Plaintiffs, and that this is not sufficient injury for purposes of standing. (*Id*.)  However, Defendants utterly fail to address the real, actual costs that Plaintiffs will incur by completing and processing the self-certification forms.  (*Id*.)  The Court finds that Plaintiffs will incur the costs set forth above, and that these costs constitute an injury in fact for purposes of standing.  *See Califano*, 622 F.2d at 1386.  Therefore, Defendants' Motion to Dismiss is denied to the extent that it seeks dismissal of this action based on lack of standing.

### III.  INJUNCTIVE RELIEF

Plaintiffs ask the Court to enter an injunction that "prohibit[s] Defendants from enforcing the Mandate against Plaintiffs and class members, including their third party administrators, and from charging or assessing penalties against them for failure to offer or facilitate access to contraceptives."  (ECF No. 15 at 16.)

"A party seeking a preliminary injunction must prove that *all four* of the equitable factors weigh in its favor: specifically, prove that '(1) it is substantially likely to succeed on the merits; (2) it will suffer irreparable injury if the injunction is denied; (3) its threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.'"  *Sierra Club v. Bostick*, __ F. App'x __, 2013 WL 5539633, *2 (10th Cir. Oct. 9, 2013) (emphasis in original) (quoting *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)).  "[C]ourts have consistently noted that 'because a

showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for issuance of an injunction will be considered.'" *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (quoting *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir. 1990)).  Because, as set forth below, the Court finds that Plaintiffs have failed to show that they will suffer an irreparable injury if the proposed injunction is not granted, the Court's analysis begins and ends with this prong.

Plaintiffs contend that they have satisfied the irreparable harm prong because they have shown that the Final Rules likely violate the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb-1(a).  (ECF No. 15 at 13.)  The Tenth Circuit has held that "establishing a likely RFRA violation satisfies the irreparable harm factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013).  Thus, to determine whether Plaintiffs have shown an irreparable harm sufficient to warrant injunctive relief, the Court must examine whether Plaintiffs have shown that they are likely to suffer a RFRA violation in the absence of an injunction.

RFRA provides that the "Government shall not substantially burden a person's exercise of religion."  42 U.S.C. § 2000bb-1(a).  To prevail on their RFRA claim, Plaintiffs must show that they wish "to engage in (1) a religious exercise (2) motivated by a sincerely held belief, which exercise (3) is subject to a substantial burden imposed by the government."  *See Abdulhaseeb v. Calbone*,[4] 600 F.3d 1301, 1312-13 (10th Cir.

---

[4]  The Court recognizes that *Abdulhaseeb* involved the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1(a) ("RLUIPA"), which is a different statute

2010).  Thus, in evaluating Plaintiffs' RFRA claim, the Court must first identify the religious belief, then determine whether such belief is sincere, and finally decide whether the government has placed "substantial pressure on the religious believer." *Hobby Lobby*, 723 F.3d at 1140.

As set forth below, the parties here do not dispute Plaintiffs' sincere religious beliefs and, therefore, only the third prong of the RFRA claim merits significant discussion.  Plaintiffs contend that the Court's analysis of whether the Final Rules "substantially burden" their religious beliefs is governed by the Tenth Circuit's recent decision in *Hobby Lobby*.  (ECF No. 37 at 6.)  The Court agrees that Plaintiffs in this case share many of the same religious beliefs with the *Hobby Lobby* plaintiffs, at least the beliefs of the individual plaintiffs in that case.  However, as Defendants point out, Hobby Lobby operates on a "for-profit" basis, and is therefore neither a religious employer nor an eligible organization under the Final Rules.  *See Hobby Lobby*, 723 F.3d at 1140.  Thus, the Mandate required the *Hobby Lobby* plaintiffs to either provide contraceptive coverage for their employees, or face fines ranging between $26 million and $475 million dollars.  *Id*.  This "Hobson's choice" was sufficient to establish a substantial burden on their religious beliefs.  *Id*.

In this case, it is undisputed that Plaintiffs qualify as "eligible organizations" under the Final Rules.  Plaintiffs are not similarly situated to the *Hobby Lobby* plaintiffs because Little Sisters and the Trust can avoid the fines levied upon non-compliance

---

than RFRA.  However, the Tenth Circuit has applied the same legal standard to both RFRA and RLUIPA, and *Abdulhaseeb* was heavily relied upon by the Tenth Circuit in *Hobby Lobby*, which is a RFRA case. *See Hobby Lobby*, 723 F.3d at 1140.

with the Mandate by signing the self-certification form and providing it to Christian

Brothers Services, their third party administrator.  The *Hobby Lobby* court had no

occasion to consider the accommodation for "eligible organizations" in the Final Rules

or to decide whether such accommodation violates RFRA.  Thus, while *Hobby Lobby* is

instructive on a number of issues in this case, it is not dispositive of the issue of

whether, under the specific facts of this case, the Final Rules substantially burden these

Plaintiffs' religious beliefs.  The Court must therefore look at this issue anew.

In support of the Motion, Little Sisters has submitted multiple affidavits from

Mother Loraine Marie Claire Maguire, the Provincial Superior of the Province of

Baltimore for the Little Sisters of the Poor ("Mother Maguire") (ECF Nos. 15-1 & 37-1)

and Brother Michael Quirk, President of Plaintiff Christian Brothers Services ("Brother

Quirk") (ECF Nos. 15-2 & 37-2).   Mother Maguire attests that Little Sisters follows

Catholic religious teachings which affirm that life begins at conception, and that abortion

and post-conception contraception are "gravely contrary to moral law".  (Maguire Decl.

(ECF No. 15-1) ¶¶ 29-32 (quoting Sections 2270 and 2271 of the Catechism of the

Catholic Church (1994)).)  She states that church doctrine teaches that contraception

and sterilization are "intrinsic evils", and that "programs of 'economic assistance aimed

at financing campaigns of sterilization and contraception' are 'affronts to the dignity of

the person and the family.'"  (*Id*. ¶¶ 33-34 (quoting Section 234 of the Compendium of

the Social Doctrine of the Church (2004).)  Citing Section 91 of the *Evangulium Vitae*,

Mother Maguire attests that "Catholics may never 'encourage' the use of 'contraception,

sterilization, and abortion.'"  (*Id*. ¶ 35.)  She relates that directives issued by the United

States Conference of Catholic Bishops "prohibit providing, promoting, or condoning

18

abortions, abortion-inducing drugs, contraceptives, and sterilization", and specifically warn against partnering with other entities in a manner that would involve the provision of such "intrinsically immoral" services.  (*Id.* ¶ 36.)  Brother Quirk's declarations echo these beliefs.  (Quirk Decl. (ECF No. 15-2) ¶¶ 15-26.)

Little Sisters and the Trust contend that the Final Rules burden their religious beliefs by requiring that they:

• "participate in the provision of insurance coverage" or "provide health benefits to [their] employees" that include access to contraception, abortion, and sterilization; (Maguire Decl. ¶¶ 45-47; *see also* Quirk Decl. ¶ 31.)

• "designate any third party" or "make" or "facilitate" the "government-required certifications to a third party" that require the third party to provide their employees with access to sterilization, contraception, and abortion-inducing drugs and device;  (Maguire Decl. ¶¶ 48-49; *see also* Quirk Decl. ¶¶ 32-33.)

• "authorize anyone to arrange or make payments for contraceptives, sterilization, and abortifacients; take action that triggers the provision of contraceptive, sterilization, and abortifacients; or is the but-for cause of the provision of contraceptives, sterilization, and abortifacients."  (Maguire Supp. Decl. (ECF No. 37-1) ¶ 9; *see also* Quirk Supp. Decl. (ECF No. 37-2) ¶ 8.)

• "[s]ign the self-certification form that on its face authorizes another organization to deliver contraceptives, sterilization, and abortifacients to the Little Sisters' employees and other beneficiaries now."  (Maguire Supp. Decl. ¶ 9(A); *see also* Quirk Supp. Decl. ¶ 8.)

• "[d]eliver the self-certification form to another organization that could then rely on

it as an authorization to deliver those contraceptives, sterilization, and abortifacients to the Little Sisters' employees and beneficiaries, now or in the future." (Maguire Supp. Decl. ¶ 9(B); *see also* Quirk Supp. Decl. ¶ 8.)

• "[c]reate a provider-insured relationship (between the Little Sisters and Christian Brothers Services or any other third-party administrator), the sole purpose of which would be to provide contraceptives, sterilization, and abortifacients." (Maguire Supp. Decl. ¶ 9(D); *see also* Quirk Supp. Decl. ¶ 8.)

• "[p]articipate in a scheme, the sole purpose of which is to provide contraceptives, sterilization, and abortifacients to the Little Sisters' plan employees and other beneficiaries." (Maguire Suppl. Decl. ¶ 9(E); *see also* Quirk Supp. Decl. ¶ 8.)

Additionally, Christian Brothers Services contends that its religious beliefs are violated if it is required to "act as a 'third party administrator' under the Mandate because it would have to contract for, arrange for or otherwise facilitate the provision of abortifacients, sterilizations and contraception in violation of Catholic teachings." (Quirk Supp. Decl. ¶ 8.)

Defendants do not dispute that Plaintiffs hold the religious beliefs set forth above and that such beliefs are sincere. (ECF No. 29 at 8-9.) Rather, Defendants take issue with Plaintiffs' interpretation of how these religious beliefs will be impacted by the Mandate and the Final Rules. (*Id*.) Specifically, Defendants contend that "[t]he Little Sisters Plaintiffs are eligible for the accommodation, and thus, they need not contract, arrange, pay, or refer for contraceptive coverage." (*Id*. at 8.) Additionally, Defendants argue that, because Little Sisters participates in a self-funded "church plan", execution of the self-certification form does not trigger, facilitate, or provide access to care that

would violate Plaintiffs' religious beliefs.  (*Id*. at 8-9.)

In response, Plaintiffs argue that the Court cannot question Mother Maguire's and Brother Quirk's affirmations regarding the impact that compliance with the Final Rules would have on their religious beliefs.  (ECF No. 37 at 6.)  It is well-settled that "it is not for secular courts to rewrite the religious complaint of a faithful adherent, or to decide whether a religious teaching about complicity imposes 'too much' moral disapproval on those only 'indirectly' assisting wrongful conduct."  *Hobby Lobby*, 723 F.3d at 1153-54; *see also Korte v. Sebelius*, 735 F.3d 654, 685 (7th Cir. 2013) (holding "[n]o civil authority can decide" whether providing contraceptive coverage impermissibly assists the commission of a wrongful act under the moral doctrines of the Catholic Church).

Thus, Plaintiff's contention that the Court cannot look behind their statements about what offends their religious beliefs is well-supported.  However, the Court is under no such restriction with regard to Plaintiffs' construction of how the Final Rules operate, including the administrative burdens imposed on the parties by these regulations.  Statutory and regulatory interpretation is a question of law, and is a joint effort of the courts and the government agency charged with administering a law.  *See Negusie v. Holder*, 555 U.S. 511, 531 (2009).  Thus, it is true that this Court cannot question whether a particular act or conduct, allegedly caused by a challenged regulation, violates a party's religious belief.  This Court can, however, most certainly analyze the challenged regulations to determine whether their implementation will cause the allegedly harmful act to in fact occur.  *See O'Brien v. Health and Human*

*Servs.*, 894 F. Supp. 2d 1149, 1159 (E.D. Mo. 2012) (looking past plaintiff's contentions about how their religious beliefs would be affected by the challenged regulations and interpreting the regulations to discern what demands were placed on plaintiff). Accordingly, in the discussion below, the Court will examine each of the ways in which Plaintiffs contend their religious beliefs are substantially burdened by the Final Rules.

## A.    Direct Provision of Coverage for Contraceptive Care

Mother Maguire states that, based on Little Sisters' religious beliefs, they cannot not participate in the provision of insurance coverage for contraception, abortion and sterilization, and cannot provide health benefits that will include access to these services.  (ECF No. 15-1 ¶¶ 45-47.)  Brother Quirk echoes this statement on behalf of the Trust.  (ECF No. 15-2 ¶ 31.)  The Court accepts these religious beliefs as sincere, but does not find that the challenged regulatory scheme will substantially burden these beliefs.

Under the "eligible organizations" accommodation in the Final Rules, once Little Sisters and the Trust complete the self-certification form and deliver it to their third party administrator, they have satisfied the Mandate's requirements, and have no further obligations under the Mandate.  26 C.F.R. § 54.9815-2713A (stating that a self-insured group health plan complies with Mandate by contracting with a third party administrator and providing the third party administrator with the self-certification form).  Thus, by their very terms, the regulations do not require Little Sisters or the Trust to participate in the provision of contraceptive coverage or provide health benefits that include contraceptive coverage.

Christian Brothers Services contends that it cannot "act as a 'third party

administrator' under the Mandate because it would have to contract for, arrange for or otherwise facilitate the provision of abortifacients, sterilizations and contraception in violation of Catholic teachings." (Quirk Supp. Decl. ¶ 8.) However, Defendants' purported basis for the requirement that third party administrators for eligible organizations provide separate payments for contraceptive services arises from ERISA. *See* 78 Fed. Reg. 39,879-80. It is undisputed that the Trust is a self-insured "church" plan under 26 U.S.C. § 414(e), and as a consequence is not subject to ERISA, because it has not made an election under 26 U.S.C. § 410(d). (ECF No. 15-2 ¶¶ 8-10.) Because the Trust is not subject to ERISA, Defendants candidly admit that they lack the regulatory authority to require Christian Brothers Services, as the third party administrator for Little Sisters and the Trust, to administer or pay for contraceptive care. (ECF No. 40 at 10-12 (citing 29 U.S.C. § 1003(b)(2) (exempting "church plans" from ERISA).) Thus, the Final Rules do not in fact require Christian Brothers Services to contract, arrange for, or otherwise facilitate the provision of contraceptives, sterilization, or abortifacients.

Because the Final Rules do not require any of the Plaintiffs to provide, participate in, contract or arrange for, or otherwise facilitate the provision of contraceptives, sterilization, or abortifacients, the Court concludes that the Final Rules do not substantially burden Plaintiffs' religious beliefs which forbid such actions.

## B.     Authorization of Third-Party to Provide Coverage

Mother Maguire also states that it would violate Little Sisters' religious beliefs to designate or authorize any third party to provide their employees with access to sterilization, contraception, and abortion-inducing drugs and services. (ECF No. 15-1 ¶

23

48; 37-1 ¶ 9.)  She avers that Little Sisters cannot "[c]reate a provider-insured

relationship . . . the sole purpose of which would be to provide contraceptives,

sterilization, and abortifacients."  (ECF No. 37-1 ¶ 9(D).)  Brother Quirk makes the same

statements on behalf of the Trust.  (ECF No. 15-2 ¶ 33; ECF No. 37-2 ¶ 8.)  Again, the

Court does not question the sincerity of these religious beliefs.  However, as set forth

below, the Court finds that the Final Rules do not substantially burden such beliefs on

this separate basis as well.

To comply with the Mandate (and avoid the significant penalties that come with

non-compliance), an "eligible organization" must contract with a third party administrator

and provide that third party administrator with the completed self-certification form.  *See*

26 C.F.R. § 54.9815-2713A.  These are the only two acts required for an eligible

organization to comply with the Mandate.  *Id.*  Under Defendants' interpretation of the

regulations, whether this third party administrator is subject to ERISA is irrelevant to

whether an eligible organization has complied with the Mandate.  (*See* ECF No. 44 at

10-12.)

It is undisputed that Christian Brothers Services is the third party administrator

for the Trust.  (ECF No. 37-1 ¶ 5.)  Christian Brothers Services does not currently

provide the Trust's beneficiaries with access to sterilization, contraception, and

abortion-inducing drugs and services, and it does not intend to do so in the future.

(ECF No. 15-2 ¶ 27.)  Defendants concede that they have no regulatory authority to

require Little Sisters or the Trust to contract with a different third party administrator.

(ECF No. 44 at 11.)  Thus, the Final Rules do not require Little Sisters or the Trust to

designate, authorize, or create a provider-insured relationship with any third party that

24

will provide their employees with access to contraception, sterilization, or abortifacients.

The Court notes that the Final Rules could be construed to require an eligible organization to contract with a third party administrator that is willing to act as an ERISA plan administrator and claim administrator and take on all of the obligations set forth in 29 C.F.R. § 2510.3-16 and 26 C.F.R. § 54.9815-2713A.  The Final Rules state that an eligible organization must: (1) "contract[] with one or more third party administrator" and (2) "provide each third party administrator that will process claims for any contraceptive services required to be covered under [the Mandate] with a copy of the self-certification" form.  *See* 26 C.F.R. § 54.9815-2713A(b)(i) & (ii).  The self-certification form must provide notice that: (1) the eligible organization "will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services"; and (2) the "[o]bligations of the third party administrator are set forth in 29 C.F.R. § 2510.3-16 and 26 C.F.R. § 54.9815-2713A." *Id*. at § 54.9815-2713A(b)(ii)(A) & (B).  Reading these provisions together, an eligible organization could conclude that, to comply with the Mandate, it is required to contract with a third party administrator who is willing to take on the obligations set forth in 29 C.F.R. § 2510.3-16 and 26 C.F.R. § 54.9815-2713A.

However, in this litigation, Defendants have plainly taken the position that, under 26 C.F.R. § 54.9815-2713A, an eligible organization satisfies the Mandate by providing the self-certification form to their third party administrator, irrespective of whether that third party administrator is governed by ERISA, will act as a plan and claims administrator for contraceptive care, or will provide payments for contraceptive services. (ECF No. 44 at 10-12.)  As Defendants are the governmental authorities tasked with

issuing and enforcing the regulations implementing the ACA (ECF No. 1 ¶ 31), the

Court must defer to their reasonable interpretation of such regulations.[5]  *See Fed. Exp.*

*Corp. v. Holowecki*, 552 U.S. 389, 395 (2008) (citing *Chevron U.S.A. Inc. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837, 843-845 (1984)).  Defendants' position

that an eligible organization satisfies the Mandate by providing the self-certification form

to its third party administrator, even if that third party administrator is not governed by

ERISA, is a reasonable construction of the Final Rules.  As such, the Court is bound by

this interpretation.

Thus, under Defendants' interpretation of the regulations, to satisfy the Mandate

and avoid fines, Little Sisters and the Trust are required only to complete the self-

certification form and provide it to their third party administrator.  Whether this third

party administrator is subject to ERISA or willing to provide their employees with access

to contraceptive care is irrelevant to whether they have complied with the Mandate.

Accordingly, the Court finds that the challenged regulations do not require Little Sisters

or the Trust to designate, authorize, or contract with a third party administrator that will

provide their employees with access to sterilization, contraception, and abortion-

inducing drugs and services.

---

[5]  Plaintiffs' contention that this interpretation is not entitled to deference because it is just Defendants' litigation position finds no support in the record.  Defendants are offering their interpretation of a regulation that has yet to come into effect and, therefore, such interpretation is not a *post hoc* rationalization.  Defendants' interpretation is also their first interpretation of these regulations, and does not appear to simply be a convenient litigation position.  Therefore, the Court sees no reason that such interpretation should not be entitled to an appropriate level of deference.  *See Chase Bank USA, N.A. v. McCoy*, 131 S.Ct. 871, 880 (2011) (stating that the courts must defer to an agency's interpretation of its own regulation even when "advanced in a legal brief"); *see also Christopher v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2166 (2012) (listing examples of when an agency's interpretation brought forth during litigation would not be entitled to deference).

**C.      Completion and Distribution of the Self-Certification Form**

Plaintiffs next contend that the requirement that they complete the self-

certification form and deliver it to their third party administrator violates their religious

beliefs.  (ECF No. 37 at 6.)

The self-certification form ("Form") provides that it is "to be used to certify that

the health coverage established or maintained or arranged by the organization listed

below qualifies for an accommodation with respect to the federal requirement to cover

certain contraceptive services without cost sharing, pursuant to 26 CFR 54.9815-

2713A[6],

29 CFR 2590.715-2713A[7], and 45 CFR 147.131[8]."  (ECF No. 37-3 at 1.)  An

organization completing the Form must list its name, the name and title of the person

authorized to make the certification on behalf of the organization, and provide

identifying information for the person completing the certification.  (*Id.*)  The person who

signs the Form must "certify that, on account of religious objections, the organization

opposes providing coverage for some or all of any contraceptive services that would

_____

[6]  Part 54 of Title 26 contains regulations related to pension excises taxes implemented by the Internal Revenue Service.  As discussed in detail above, 26 CFR 54.9815-2713A defines the entities that qualify as "eligible organizations" and outlines what eligible organizations must do to comply with the Mandate.  This regulation does not specifically state that it applies to church plans, but also does not specifically exempt church plans.

[7]  This provision is identical to 26 CFR 54.9815-2713A but appears in part 54 of Title 29, which contains regulations related to group health plans implemented by the Employee Benefits Security Administration within the Department of Labor.

[8]  This provision defines an "eligible organization" (using the same definition contained in both 26 CFR 54.9815-2713A and 29 CFR 2590.715-2713A) and sets forth how an eligible organization who is insured under a group health plan complies with the Mandate.  It does not mention self-insured group health plans or church plans.

otherwise be required to be covered; the organization is organized and operates as a

non-profit entity; and the organization holds itself out as a religious organization." (*Id.*)

This person must also attest to the fact that all representations made on the Form are

true, correct, and complete, to the best of her knowledge and belief. (*Id.*)

On the back of the Form, there is a notice to third party administrators which

states:

> In the case of a group health plan that provides benefits on a self-insured basis, the provision this certification to a third-party administrator for the plan that will process claims for contraceptive coverage required under 26 CFR 54.9815-2713(a)(1)(iv) or 29 CFR 2713(a)(1)(iv) constitutes notice to the third party administrator that the eligible organization:
>
> (1)    Will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services; and
>
> (2)    The obligations of the third party administrator are set forth in 26 CFR 54.9815-2713A, 29 CFR 2510.3-16, and 29 CFR 2590.715-2713A.
>
> This certification is an instrument under which the plan is operated.

(ECF No. 37-3 at 2.)

In her Supplemental Declaration, Mother Maguire states that, because of their

religious beliefs, Little Sisters cannot "[s]ign the self-certification form that on its face

authorizes another organization to deliver contraceptives, sterilization, and

abortifacients to the Little Sisters' employees and other beneficiaries". (ECF No. 37-1 ¶

9(A).)  The Court finds that this contention reads too much into the language of the

Form, which requires only that the individual signing it certify that her organization

opposes providing contraceptive coverage and otherwise qualifies as an eligible organization.  (ECF No. 37-3 at 1.)  The Form contains a notice outlining the duties of third party administrators that receive the Form, but nothing on the face of the Form expressly authorizes the provision of contraceptive care, particularly with regard to church plans.

Additionally, as applied to the facts of this case, Little Sisters' execution of the Form does not authorize any organization to deliver contraceptive coverage to Little Sisters' employees.  The regulations cited in the notice direct the third party administrator to ERISA regulations outlining the obligations of a plan administrator under ERISA.  *See* 26 C.F.R. § 54.9815-2713A(b)(ii)(B) ("Obligations of the third party administrator are set forth in 29 CFR 2510.3-16 and 26 CFR 54.9815-2713A."); 29 C.F.R. § 2510.3-16 (an ERISA regulation which states that a third party administrator that receives a copy of a self-certification form from an eligible organization becomes "the plan administrator under section 3(16) of ERISA for any contraceptive services.").

Plaintiffs contend that, on its face, the Form does not make clear that only third party administrators governed by ERISA are responsible for making payments for contraceptive care.  (ECF No. 42 at 27-28.)  Plaintiffs also contend that the regulations make no exception for third party administrators of church plans.  (ECF No. 37-2 ¶ 12.) However, as Plaintiffs also acknowledge, church plans are categorically exempt from ERISA altogether.  (ECF No. 15-2 ¶ 9.)  Given this blanket exemption, it would be unreasonable to require Defendants to specifically exempt church plans each time they promulgate a new regulation under their ERISA authority.  Clearly, therefore, given this regulatory framework, the fact that church plans are not specifically exempted from the

requirements levied on third party administrators by the Final Rules does not mean that church plan third party administrators are bound to comply with these regulations.

Mother Maguire and Brother Quirk are aware that the Trust is a self-funded church plan, and that Christian Brothers Services is the third party administrator for the Trust.  (ECF No. 37-1 ¶ 5; ECF No. 15-2 ¶¶ 4, 8.)  Because a church plan and its third party administrator are not subject to ERISA, if these individuals complete the Form on behalf of their respective organizations, they know that they are not "authoriz[ing] another organization to deliver contraceptives, sterilization, and abortifacients to the Little Sisters' employees and other beneficiaries".

Mother Maguire also states that Little Sisters also cannot "[d]eliver the self-certification form to another organization that could then rely on it as an authorization to deliver these contraceptives, sterilization, and abortifacients to the Little Sisters' employees".  (*Id*. ¶ 9(B).)  However, as discussed above, Little Sisters is not required to deliver the Form to any organization other than its current third party administrator, Christian Brothers Services.  The record is clear that Christian Brothers Services has no intention of delivering contraceptive, sterilization, and abortifacients to Little Sisters' employees, and no intention of contracting with another entity that will provide such services.  (ECF No. 15-2 ¶¶ 27 & 32.)  Defendants have explicitly stated that they have no authority to require that Little Sisters and/or Christian Brothers Services contract with a third party provider who is subject to ERISA, or who is willing to provide contraceptive coverage to Little Sisters' employees.  (ECF No. 44 at 10-12.)  Thus, Plaintiffs' contention that their religious beliefs are substantially burdened because the Form executed by the Little Sisters' could be relied on by another organization to provide

contraceptive services to Little Sisters' employees is pure conjecture, one that ignores the factual and legal realities of this case.[9]

Finally, Mother Maguire contends that it would violate Little Sisters' religious beliefs if they are required to "[p]articipate in a scheme, the sole purpose of which is to provide contraceptives, sterilization, and abortifacients to the Little Sisters' plan employees or other beneficiaries."  (ECF No. 37-1 ¶ 9(E).)  Brother Quirk echoes these thoughts exactly.  (ECF No. 37-2 ¶ 8.)  Again, this statement ignores the realities of this case.  Christian Brothers Services has plainly stated that it has not and does not intend to facilitate the provision of contraceptives, sterilization, or abortifacients.  (ECF No. 37-2 ¶ 8.)  Therefore, if Mother Maguire executes the Form and delivers it to Christian Brothers Services—the only acts required of her under the "scheme" set forth in the Final Rules—Little Sisters' employees will not be provided contraceptives, sterilization, or abortifacients through their employer-sponsored health plan.  Similarly, if Brother Quirk executes the Form on behalf of the Trust and delivers it to Christian Brothers Services, as he is required to do, no beneficiary of health care through the Trust will be provided contraceptives, sterilization or abortifacients through the employer-sponsored health plan.

The purpose of Little Sisters and the Trust executing and delivering the Form to

---

[9]  Were Little Sisters required to deliver the completed Form to a major health insurance company, such as Blue Cross Blue Shield or Kaiser Permanente, then the situation would be vastly different, as these insurance companies could rely on the Form as authorization to deliver contraceptive care to Little Sisters' employees.  More likely, because these entities are subject to ERISA, they would be required to rely on the Form and act as plan and claims administrator for purposes of contraceptive care.  But, because the Trust is a church plan and Defendants lack the authority to require it to contract with an entity subject to ERISA, the Court need not consider these hypotheticals, as they relate to facts not before the Court in this case.

their third party administrator is not to provide contraceptives, sterilization, and

abortifacients to the Little Sisters' plan employees or other beneficiaries.  It is clear that

these services will not be offered to the employees regardless of whether the Form is

executed and delivered to Christian Brothers Services.  Instead, on the facts of this

case, the "sole purpose" of the execution and delivery of the Form is to comply with the

Mandate and avoid the substantial penalties for non-compliance.

Accordingly, on the facts of this case, the Court finds it will not substantially

burden Plaintiffs' religious beliefs for an authorized representative of these

organizations to execute the self-certification form and deliver it to their third party

administrator.  Nor are Plaintiffs being required to buy into a scheme that substantially

burdens their religious beliefs.

**D.     Irreparable Harm Conclusion**

To satisfy their burden of showing irreparable harm, the only argument Plaintiffs

make is that a RFRA violation is always irreparable harm.  (ECF No. 15 at 16.)  As set

forth in detail above, the Court finds that Plaintiffs have not demonstrated a likely RFRA

violation.  While the Court does not question the sincerity of Plaintiffs' beliefs, the Court

finds that the Final Rules will not function in a manner that substantially burden these

beliefs.  Because Little Sisters' employees receive their health care coverage through

the Trust, which is a self-insured church plan with a Catholic third party administrator,

these employees will not be provided access to contraception, sterilization, or

abortifacients through this health plan.  Defendants have freely admitted that they lack

the regulatory authority at this time to force a different result.

Plaintiffs repeatedly emphasize that the Defendants have only conceded that

they lack the authority "at this time" to require third party administrators of church plans to administer claims for contraceptive services.  (*See* ECF No. 15-2 ¶ 4.)  The Court acknowledges that the regulations implementing the ACA are in flux, and that Congress may, at some point in the future, grant Defendants some authority outside of ERISA to enforce the Mandate, and/or promulgate new regulations that apply to church plans.  Indeed, there is a story on the news almost daily about changes being made to the ACA regulations.  However, the Court cannot and will not hypothesize or speculate about how such future changes may impact Plaintiffs.

"To constitute irreparable harm, an injury must be certain, great, actual 'and not theoretical.'"  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *see also Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931) ("Injunction issues to prevent existing or presently threatened injuries.  One will not be granted against something merely feared as liable to occur at some indefinite time in the future.").  "[T]he party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001).  *Id*.

The Court finds that Plaintiffs have failed to meet this burden.  Plaintiffs ignore the fact that, as participants in a church plan, they fall outside of Defendants' current enforcement authority.  Plaintiffs would have the Court surmise that their self-certification form could be relied on by a hypothetical third party administrator to facilitate the provision of contraception, sterilization, and abortifacients to their

employees at some point in the future.  However, the Court is tasked with determining

only whether the regulations, as they currently stand, substantially burden Plaintiffs'

religious beliefs.  Given the current version of the regulations, as applied to the facts of

and parties to this case, the Court finds that Plaintiffs have failed to show that any

injunction is necessary to prevent an imminent harm.

## IV.  CONCLUSION

It is well settled that a preliminary injunction is an extraordinary remedy, and that

it should not be issued unless the movant's right to relief is "clear and unequivocal."

*Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001).  For the reasons set forth

above, the Court finds that Plaintiffs have failed to show a clear and unequivocal right to

injunctive relief.  As such, the Court ORDERS as follows:

1.     Plaintiffs' Motion for Preliminary Injunction (ECF No. 15) is DENIED;

2.     Defendants' Motion to Dismiss, or in the alternative, for Summary Judgment

(ECF No. 30) is DENIED to the extent it seeks dismissal of this case for lack of

standing.  The Court RESERVES RULING on the remainder of the issues raised

in the Motion to Dismiss.

Dated this 27th day of December, 2013.

BY THE COURT:

William J. Martinez
United States District Judge