FILED
United States Court of Appeals
Tenth Circuit

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

July 14, 2015

**FOR THE TENTH CIRCUIT**

Elisabeth A. Shumaker
Clerk of Court

_____

LITTLE SISTERS OF THE POOR HOME
FOR THE AGED, DENVER, COLORADO,
a Colorado non-profit corporation; LITTLE
SISTERS OF THE POOR, BALTIMORE,
INC., a Maryland non-profit corporation, by
themselves and on behalf of all others
similarly situated; CHRISTIAN BROTHERS
SERVICES, a New Mexico non-profit
corporation; CHRISTIAN BROTHERS
EMPLOYEE BENEFIT TRUST,

      Plaintiffs - Appellants,

v.

No. 13-1540

SYLVIA MATHEWS BURWELL, Secretary
of the United States Department of Health and
Human Services; UNITED STATES
DEPARTMENT OF HEALTH & HUMAN
SERVICES; THOMAS E. PEREZ, Secretary
of the United States Department of Labor;
UNITED STATES DEPARTMENT OF
LABOR; JACOB J. LEW, Secretary of the
United States Department of the Treasury;
UNITED STATES DEPARTMENT OF THE
TREASURY,

      Defendants - Appellees.
_____

SOUTHERN NAZARENE UNIVERSITY;
OKLAHOMA WESLEYAN UNIVERSITY;
OKLAHOMA BAPTIST UNIVERSITY;
MID-AMERICA CHRISTIAN
UNIVERSITY; REACHING SOULS
INTERNATIONAL, INC., an Oklahoma not

for profit corporation; TRUETT-
MCCONNELL COLLEGE, INC., a Georgia
nonprofit corporation, by themselves and on
behalf of all others similarly situated;
GUIDESTONE FINANCIAL RESOURCES
OF THE SOUTHERN BAPTIST
CONVENTION, a Texas nonprofit
corporation,

     Plaintiffs - Appellees.

v.                                                          Nos. 14-6026 & 14-6028

SYLVIA MATHEWS BURWELL, Secretary
of the United States Department of Health and
Human Services; UNITED STATES
DEPARTMENT OF HEALTH & HUMAN
SERVICES; THOMAS E. PEREZ, Secretary
of the United States Department of Labor;
UNITED STATES DEPARTMENT OF
LABOR; JACOB J. LEW, Secretary of the
United States Department of the Treasury;
UNITED STATES DEPARTMENT OF THE
TREASURY,

     Defendants - Appellants.
-------------------------------
67 CATHOLIC THEOLOGIANS AND
ETHICISTS; ALABAMA PHYSICIANS
FOR LIFE; AMERICAN ASSOCIATION
OF PRO-LIFE OBSTETRICIANS &
GYNECOLOGISTS; AMERICAN
ASSOCIATION OF UNIVERSITY
WOMEN; AMERICAN BIBLE SOCIETY;
AMERICAN CENTER FOR LAW AND
JUSTICE; AMERICAN CIVIL LIBERTIES
UNION OF COLORADO; AMERICAN
CIVIL LIBERTIES UNION OF
OKLAHOMA; AMERICAN CIVIL
LIBERTIES UNION; AMERICAN
FEDERATION OF STATE, COUNTY AND
MUNICIPAL EMPLOYEES (AFSCME);

AMERICAN PUBLIC HEALTH
ASSOCIATION; AMERICANS UNITED
FOR SEPARATION OF CHURCH AND
STATE; ASIAN & PACIFIC ISLANDER
AMERICAN HEALTH FORUM; ASIAN
AMERICANS ADVANCING JUSTICE |
AAJC; ASIAN AMERICANS ADVANCING
JUSTICE | LOS ANGELES; ASSOCIATION
OF AMERICAN PHYSICIANS &
SURGEONS; ASSOCIATION OF
CHRISTIAN SCHOOLS
INTERNATIONAL; ASSOCIATION OF
GOSPEL RESCUE MISSIONS; BLACK
WOMEN'S HEALTH IMPERATIVE;
CALIFORNIA WOMEN'S LAW CENTER,
NATIONAL WOMEN'S LAW CENTER;
CALIFORNIA WOMEN'S LAW CENTER;
CATHOLIC MEDICAL ASSOCIATION;
CHRISTIAN LEGAL SOCIETY;
CHRISTIAN MEDICAL ASSOCIATION;
CHRISTIE'S PLACE; CONCERNED
WOMEN FOR AMERICA; DR. R. ALBERT
MOHLER, JR.; ETHICS & RELIGIOUS
LIBERTY COMMISSION OF THE
SOUTHERN BAPTIST  CONVENTION;
FEMINIST MAJORITY FOUNDATION;
FORWARD TOGETHER; HIV LAW
PROJECT; IBIS REPRODUCTIVE
HEALTH; INSTITUTIONAL RELIGIOUS
FREEDOM ALLIANCE AND CHRISTIAN
LEGAL SOCIETY; INTERNATIONAL
MISSION BOARD OF THE SOUTHERN
BAPTIST CONVENTION; IPAS; LEGAL
MOMENTUM; LIBERTY COUNSEL;
LIBERTY UNIVERSITY; LIBERTY, LIFE,
AND LAW FOUNDATION; LUTHERAN
CHURCH - MISSOURI SYNOD; MERGER
WATCH; NARAL PRO-CHOICE
AMERICA; NARAL PRO-CHOICE
COLORADO; NARAL PRO-CHOICE
WYOMING; NATIONAL ASIAN PACIFIC
AMERICAN WOMEN'S FORUM;

- iii -

NATIONAL ASSOCIATION OF
CATHOLIC NURSES; NATIONAL
ASSOCIATION OF EVANGELICALS;
NATIONAL ASSOCIATION OF PRO LIFE
NURSES; NATIONAL CATHOLIC
BIOETHICS CENTER; NATIONAL
FAMILY PLANNING & REPRODUCTIVE
HEALTH ASSOCIATION; NATIONAL
HEALTH LAW PROGRAM; NATIONAL
LATINA INSTITUTE FOR
REPRODUCTIVE HEALTH; NATIONAL
ORGANIZATION FOR WOMEN (NOW)
FOUNDATION; NATIONAL
PARTNERSHIP FOR WOMEN AND
FAMILIES; NATIONAL WOMEN AND
AIDS COLLECTIVE; NATIONAL
WOMEN'S HEALTH NETWORK;
NATIONAL WOMEN'S LAW CENTER;
PLANNED PARENTHOOD
ASSOCIATION OF UTAH; PLANNED
PARENTHOOD OF KANSAS AND MID-
MISSOURI; PLANNED PARENTHOOD OF
THE HEARTLAND; PLANNED
PARENTHOOD OF THE ROCKY
MOUNTAINS, INC.; POPULATION
CONNECTION; PRISON FELLOWSHIP
MINISTRIES; RAISING WOMEN'S
VOICES FOR THE HEALTH CARE WE
NEED; SERVICE EMPLOYEES
INTERNATIONAL UNION (SEIU);
SEXUALITY INFORMATION AND
EDUCATION COUNCIL OF THE U.S.
(SIECUS); SOUTHERN BAPTIST
THEOLOGICAL SEMINARY; UNITED
STATES CONFERENCE OF CATHOLIC
BISHOPS,

     Amici Curiae.

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO (D.C. No. 1:13-CV-02611-WJM-BNB) &**

## THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA
### (D.C. Nos. 5:13-CV-01015-F & 5:13-CV-01092-D)

_____

Mark L. Rienzi, Becket Fund for Religious Liberty, Washington, DC (Daniel Blomberg and Adèle Auxier Keim, Becket Fund for Religious Liberty, Washington, DC; Carl C. Scherz and Seth Roberts, Locke Lord LLP, Dallas, Texas; and Kevin C. Walsh, University of Richmond Law School, Richmond, Virginia, with him on the briefs), appearing for Little Sisters of the Poor Home for the Aged, Little Sisters of the Poor, Baltimore, Inc., Christian Brothers Services, Christian Brothers Employee Benefit Trust, Reaching Souls International, Inc., Truett-McConnell College, Inc., and GuideStone Financial Resources of the Southern Baptist Convention.

Adam C. Jed, Attorney, Appellate Staff, Civil Division (Stuart F. Delery, Assistant Attorney General; Sanford C. Coats and John F. Walsh, United States Attorneys; Beth S. Brinkmann, Deputy Assistant Attorney General; Mark B. Stern, Alisa B. Klein, Patrick G. Nemeroff, and Megan Barbero, Attorneys, Appellate Staff Civil Division, with him on the briefs), United States Department of Justice, Washington, DC, appearing for Sylvia Mathews Burwell, United States Department of Health and Human Services, Thomas E. Perez, Jacob J. Lew, and United States Department of the Treasury.

Gregory S. Baylor, Alliance Defending Freedom, Washington, DC (Matthew W. Bowman, Alliance Defending Freedom, Washington, DC, David A. Cortman, Alliance Defending Freedom, Lawrenceville, Georgia, and Kevin H. Theriot, Alliance Defending Freedom, Leawood, Kansas, with him on the briefs), appearing for Southern Nazarene University, Oklahoma Wesleyan University, Oklahoma Baptist University, and Mid-America Christian University.

_____

Before **MATHESON**, **McKAY**, and **BALDOCK**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

## TABLE OF CONTENTS

Glossary .......................................................................................................................... vii

I.    Introduction..................................................................................................... 1

II.     *Hobby Lobby* and this case ............................................................................. 3

III.    Background ...................................................................................................... 4

  A.      Regulatory Background ............................................................................ 4

  1.   The ACA Mandate and the Religious Employer Exemption........................ 4

  2.   The Accommodation Scheme for Religious Non-Profit Organizations .......... 7

  a.  *EBSA Form 700* ...................................................................................... 9

  b.  *Alternative notice* .................................................................................. 11

  3.   The Mechanics of the Accommodation for Insured Plans, Self-Insured Plans, and Self-Insured Church Plans ............................................................................................... 13

  a.  *Insured plans*........................................................................................ 14

  b.  *Self-insured plans*................................................................................. 15

  c.  *Self-insured church plans* ..................................................................... 17

  d.  *Legal obligation to provide coverage after the accommodation* ....................... 17

  B.      The Plaintiffs ........................................................................................ 18

  1.   *Little Sisters of the Poor* ......................................................................... 18

  2.   *Southern Nazarene* ................................................................................. 20

  3.   *Reaching Souls* ...................................................................................... 22

  C.      Procedural History ................................................................................ 23

  1.   *Little Sisters of the Poor* ......................................................................... 23

  2.   *Southern Nazarene* ................................................................................. 25

  3.   *Reaching Souls* ...................................................................................... 26

IV.    Unusual Nature of Plaintiffs' Claim ................................................................ 27

V.     RFRA ............................................................................................................ 30

  A.      Legal Background .................................................................................. 33

  1.  Standard of Review.................................................................................. 33

  2.  RFRA and Free Exercise .......................................................................... 34

  3.  Elements of RFRA Analysis ..................................................................... 35

  4.  Courts Determine Substantial Burden ....................................................... 36

  5.  Accommodations Can Lessen or Eliminate Burden ..................................... 40

  B.      Substantial Burden Analysis ................................................................... 41

  1.  Plaintiffs' RFRA Arguments ..................................................................... 41

  2.  The Accommodation Scheme Eliminates Burdens on Religious Exercise ..................... 43

  3.  The Accommodation Scheme Does Not Impose a Substantial Burden............................ 45

  a.  *Opting out does not cause contraceptive coverage.* ........................................ 45

  *b. No substantial burden from complicity* ............................................................. 66

  *c. No burden from ongoing requirements* ............................................................ 72

 C.  Strict Scrutiny ............................................................................................ 75

 D.  Conclusion ................................................................................................. 75

VI. First Amendment ............................................................................................... 75

 A.  Free Exercise Clause ................................................................................. 77

  1. Legal Background ......................................................................................... 78

  2. The Mandate and Accommodation Scheme are Neutral ............................. 79

  3. The Mandate and Accommodation Scheme are Generally Applicable .......... 79

  4. The Mandate and Accommodation Scheme Have a Rational Basis ............... 81

 B.  Establishment Clause ................................................................................ 83

  1. Organizational Distinctions Well-Established in Federal Law ..................... 83

  2. Organizational Distinctions and Respecting the Religion Clauses ............... 85

  3. Organizational Distinctions Compatible with *Larson* and *Colorado Christian* ............... 86

  4. Plaintiffs' Argument Based on the Departments' Rationale ........................ 88

 C.  Free Speech Clause ................................................................................... 90

  1. Compelled Speech ....................................................................................... 91

  2. Compelled Silence ....................................................................................... 95

VII. Conclusion ........................................................................................................ 95

## GLOSSARY

  This opinion is heavily laden with terms from the applicable statute and

regulations, types of health insurance arrangements, and names of numerous entities.  We

appreciate the challenge this presents to the reader and provide this glossary to help

navigate the opinion.

*Legal and Regulatory Terms:*

ACA:  The Affordable Care Act, which encompasses the Patient Protection and
  Affordable Care Act, enacted on March 23, 2010, and the Health Care and Education
  Reconciliation Act, enacted on March 30, 2010.

Accommodation scheme:  A regulatory mechanism that allows religious non-profit
  organizations to relieve themselves of their obligation to provide contraceptive

coverage for employees by either (a) sending a form to their health insurance issuer or third-party administrator or (b) sending a notification to the Department of Health and Human Services.

ANPRM:  Advance Notice of Proposed Rulemaking, which an administrative agency may issue to notify the public it is contemplating rulemaking and to invite comments.

Departments:  The Department of Health and Human Services, Department of Labor, and Department of the Treasury, which collectively implement the ACA.

EBSA:  The Employee Benefits Security Administration, an agency within the Department of Labor.

ERISA:  The Employee Retirement Income Security Act, codified at 29 U.S.C. § 1001 *et seq.*, which is a federal law that sets minimum standards for certain employer-sponsored benefit plans.

Form 700:  A standardized notification that religious non-profit organizations may send to their health insurance issuer or third party administrator under the accommodation scheme to self-certify they object to providing contraceptive coverage.

HHS:  The Department of Health and Human Services, which is one of the three departments tasked with implementing the ACA and contraceptive coverage requirement.

HRSA:  The Health Resources and Services Administration, an agency within HHS, which issued guidelines requiring coverage of all FDA-approved contraceptive methods under the ACA.

IOM:  The Institute of Medicine, an independent body that reviewed evidence on women's preventive services and issued a report used by the HRSA in formulating its guidelines.

IRC:  The Internal Revenue Code, codified at 26 U.S.C. § 1 *et seq.*, which is a comprehensive compilation of the federal tax laws.

Mandate:  Regulations enacted under the ACA requiring employer-sponsored group health plans to cover contraceptive services for women as a form of preventive care.

RFRA: The Religious Freedom Restoration Act, codified at 42 U.S.C. § 2000bb-1 *et seq.*, which states that laws that substantially burden a person's exercise of religion are only permissible if they are the least restrictive means of furthering a compelling governmental interest.

RLUIPA:  The Religious Land Use and Institutionalized Persons Act, codified at 42 U.S.C. § 2000cc *et seq*., which states that laws that substantially burden religious exercise through land use restrictions or restrictions on prisoners are only permissible if they are the least restrictive means of furthering a compelling governmental interest.

Religious employers:  As defined by reference to §§ 6033(a)(3)(A)(i) or (iii) of the IRC, employers that are organized and operate as non-profit entities and are churches, their integrated auxiliaries, conventions or associations of churches, or the exclusively religious activities of any religious order.

Religious non-profit organizations:  Organizations that do not qualify as religious employers but are eligible for an accommodation from the contraceptive coverage requirement because they have religious objections to providing contraceptive coverage, are organized and operate as non-profit entities, hold themselves out as religious organizations, and self-certify that they satisfy these criteria.  The Plaintiffs in these cases are religious non-profit organizations.

*Health Insurance Terms:*

Group health plan:  A benefit plan established or maintained by an employer that provides health insurance to employees and their dependents either directly—a self-insured group health plan—or through a health insurance issuer—an insured group health plan.

Health insurance issuer:  A health insurance company, service, or organization that must be licensed to engage in the insurance business and is subject to state laws regulating insurance.

Insured group health plan:  A benefit plan in which the employer employs a health insurance issuer to assume the risk of providing health insurance.

Plan participants and beneficiaries:  Individuals who are covered by a group health plan.

Self-insured group health plan:  A benefit plan in which the employer assumes the risk of providing health insurance.

Self-insured church plan:  A self-insured group health plan established by a church or association of churches covering the church or association's employees, which is not subject to regulation under ERISA unless it has elected to opt in to ERISA's provisions.

TPA:  A third-party administrator, which is an entity that processes insurance claims and provides administrative services for employers with self-insured group health plans.

*Plaintiffs and Related Entities:*

<u>Little Sisters of the Poor:</u>

Little Sisters of the Poor:  A religious non-profit organization that provides health care to employees through the Christian Brothers Employee Benefit Trust.

Christian Brothers Employee Benefit Trust:  A self-insured church plan that is not subject to ERISA and uses Christian Brothers Services as its TPA.

Christian Brothers Services:  The TPA for the Christian Brothers Employee Benefit Trust.

<u>Southern Nazarene:</u>

Southern Nazarene University:  A religious non-profit organization that is self-insured up to $100,000 and provides health care to employees through Blue Cross Blue Shield for claims above $100,000.

Oklahoma Baptist University:  A religious non-profit organization insured by Blue Cross Blue Shield of Oklahoma.

Oklahoma Wesleyan University:  A religious non-profit organization insured by Community Care of Oklahoma.

Mid-America Christian University:  A religious non-profit organization that provides health care to employees through plans provided by GuideStone Financial Resources.

<u>Reaching Souls:</u>

Reaching Souls:  A religious non-profit organization that provides health care to employees through the GuideStone Plan.

Truett-McConnell College:  A religious non-profit organization that provides health care to employees through the GuideStone Plan.

GuideStone Financial Resources:  A religious non-profit organization that sponsors the GuideStone Plan and has arranged for TPAs to provide claims administration under that plan.

GuideStone Plan:  A self-insured church plan that is not subject to ERISA and uses entities like Connecticut General Life Insurance Company, Highmark Health Services, and Express Scripts, Inc. as its TPAs.

## I.  INTRODUCTION

When Congress passed the Affordable Care Act ("ACA") in 2010, it built upon the widespread use of employer-based health insurance in the United States.[1]  The ACA and its implementing regulations require employers who provide health insurance coverage to their employees to include coverage for certain types of preventive care without cost to the insured.  The appeals before us concern the regulations that require group health plans to cover contraceptive services for women as a form of preventive care ("Mandate").[2]

In response to religious concerns, the Departments implementing the ACA—Health and Human Services ("HHS"), Labor, and Treasury—adopted a regulation that exempts religious employers—churches and their integrated auxiliaries—from covering contraceptives.  When religious non-profit organizations complained about their omission from this exemption, the Departments adopted a regulation that allows them to opt out of

---

[1] A majority of the nonelderly population in the United States receives health insurance as a job benefit through an employer.  *See* Melissa Majerol, Vann Newkirk & Rachel Garfield, *The Uninsured: A Primer – Key Facts About Health Insurance and the Uninsured in America*, The Kaiser Commission on Medicaid and the Uninsured, 1 (Jan. 2015), http://files.kff.org/attachment/the-uninsured-a-primer-key-facts-about-health-insurance-and-the-uninsured-in-america-primer.

[2] We use "Mandate" as shorthand for the ACA's employer mandate, which requires employers who offer health benefits to comply with the coverage requirements detailed in the ACA and its implementing regulations.  This Mandate is distinct from the individual mandate at issue in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012), which generally requires individuals to maintain health insurance.

providing, paying for, or facilitating contraceptive coverage.[3]  Under this regulation, a religious non-profit organization can opt out by delivering a form to their group health plan's health insurance issuer or third-party administrator ("TPA") or by sending a notification to HHS.

The Plaintiffs in the cases before us are religious non-profit organizations.  They contend that complying with the Mandate or the accommodation scheme imposes a substantial burden on their religious exercise.  The Plaintiffs argue the Mandate and the accommodation scheme violate the Religious Freedom Restoration Act ("RFRA") and the Religion and Speech Clauses of the First Amendment.[4]

Although we recognize and respect the sincerity of Plaintiffs' beliefs and arguments, we conclude the accommodation scheme relieves Plaintiffs of their obligations under the Mandate and does not substantially burden their religious exercise under RFRA or infringe upon their First Amendment rights.  Exercising jurisdiction

---

[3] Plaintiffs object to the term "opt out" because their accommodation from the Mandate involves an act on their part—self-certification—that they deem objectionable. We believe "opt out" is accurate.  Self-certifying for the accommodation expressly relieves Plaintiffs of their obligation to provide, pay for, or facilitate contraceptive coverage, and does so without substantially burdening their religious exercise.  Under these conditions, the self-certification is accurately characterized as an "opt out."  By definition, all opt-out mechanisms require some affirmative act by objecting parties.

[4] RFRA applies to all subsequent federal statutes absent a specific exemption by Congress.  *See* 42 U.S.C. § 2000bb-3(b) ("Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.").  The ACA, enacted in 2010, did not contain a specific exemption and is subject to RFRA.  *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1157 (10th Cir. 2013).

under 28 U.S.C. § 1292(a), we affirm the district court's denial of a preliminary injunction to the plaintiffs in *Little Sisters of the Poor Home for the Aged v. Sebelius*, 6 F. Supp. 3d 1225 (D. Colo. 2013), and reverse the district courts' grants of a preliminary injunction to the plaintiffs in *Southern Nazarene University v. Sebelius*, No. CIV-13-1015-F, 2013 WL 6804265 (W.D. Okla. Dec. 23, 2013), and *Reaching Souls International, Inc. v. Burwell*, No. CIV-13-1092-D, 2013 WL 6804259 (W.D. Okla. Dec. 20, 2013).

## II.   *HOBBY LOBBY* AND THIS CASE

Last year, the Supreme Court decided *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), in which closely-held for-profit corporations challenged the Mandate under RFRA.  The difference between *Hobby Lobby* and this case is significant and frames the issue here.  In *Hobby Lobby*, the plaintiff for-profit corporations objected on religious grounds to providing contraceptive coverage and could choose only between (1) complying with the ACA by providing the coverage or (2) not complying and paying significant penalties.  *Id.* at 2759-60.  In the cases before us, the plaintiff religious non-profit organizations can avail themselves of an accommodation that allows them to opt out of providing contraceptive coverage without penalty.  Plaintiffs contend the process to opt out substantially burdens their religious exercise.

In other words, unlike in *Hobby Lobby*, the Plaintiffs do not challenge the general obligation under the ACA to provide contraceptive coverage.  They instead challenge the process they must follow to get out of complying with that obligation.  The Plaintiffs do

not claim the Departments have not tried to accommodate their religious concerns.  They claim the Departments' attempt is inadequate because the acts required to opt out of the Mandate substantially burden their religious exercise.  As we discuss more fully below, however, the accommodation relieves Plaintiffs of their obligation to provide, pay for, or facilitate contraceptive coverage, and does so without substantially burdening their religious exercise.

## III.  BACKGROUND

We begin by providing background information on the ACA and its implementing regulations, the Plaintiffs objecting to the accommodation scheme, and the procedural history of the three cases before us.

### A.  *Regulatory Background*

The regulations at issue in these cases have evolved in significant ways since their initial promulgation.  We review:  (1) the exemption from the ACA's contraceptive coverage requirement for churches and integrated auxiliaries, (2) the accommodation scheme for religious non-profit organizations, and (3) the mechanics of the accommodation scheme for different types of group health plans.

### 1.  The ACA Mandate and the Religious Employer Exemption

Under the ACA, employer-sponsored group health plans must meet minimum coverage requirements.  As part of these requirements, both group health plans and health insurance issuers must cover preventive health care services and cannot require plan participants and beneficiaries to share the costs of these services through co-payments,

deductibles, or co-insurance.  42 U.S.C. § 300gg-13.  On July 19, 2010, the Departments issued interim final rules implementing the ACA's requirements for preventive services. Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,726 (July 19, 2010).

Among the services required by the ACA are preventive care and screenings for women "as provided for in comprehensive guidelines supported by the Health Resources and Services Administration" ("HRSA"), a federal agency within HHS.  42 U.S.C. § 300gg-13(a)(4).  On August 1, 2011, after receiving recommendations from the Institute of Medicine ("IOM"), the HRSA issued its guidelines for women's preventive health services.  The guidelines include coverage of "[a]ll Food and Drug Administration [("FDA")] approved contraceptives, sterilization procedures, and patient education and counseling for all women with reproductive capacity," as prescribed by a health care provider.  HRSA, Women's Preventive Services Guidelines, http://www.hrsa.gov/womensguidelines (last visited Mar. 25, 2015).

In accordance with the HRSA's guidelines, the Departments require coverage of the full range of FDA-approved contraceptive services.  *See* 26 C.F.R. § 54.9815-2713(a)(1)(iv); 29 C.F.R. § 2590.715-2713(a)(1)(iv); 45 C.F.R. § 147.130(a)(1)(iv).  Not all employers, however, are required to comply with the Mandate.

First, employers with 50 or fewer employees are exempt from the Mandate because they are not required to offer insurance under the ACA.  *See* 26 U.S.C.

- 5 -

§§ 4980H(c)(2)(A), 4980D(d).

Second, "grandfathered" plans are exempt from the Mandate because the ACA allows individuals to temporarily maintain the health coverage they possessed before the ACA was enacted. *See* 42 U.S.C. § 18011.[5]

Third, and the most relevant here, is the exemption for religious employers. In response to concerns from religious organizations, the Departments amended the interim final regulations to give the HRSA authority to exempt group health plans established or maintained by religious employers. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 76 Fed. Reg. 46,621, 46,623 (Aug. 3, 2011). The Departments defined a "religious employer" as one that: "(1) Has the inculcation of religious values as its purpose; (2) primarily employs persons who share its religious tenets; (3) primarily serves persons who share its religious tenets; and (4) is a nonprofit organization described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code." *Id.* The cited sections "refer to churches, their integrated auxiliaries, and conventions or associations of churches, as well as the exclusively religious activities of

---

[5] The exception for grandfathered plans is temporary and transitional. A health plan loses its grandfathered status—and is subject to the Mandate—when it eliminates benefits, increases cost sharing requirements, or changes the terms of employer contributions. *See* 45 C.F.R. § 147.140(g). In 2011, 56 percent of individuals who receive health care from their employer were covered by grandfathered plans; in 2014, only 26 percent were covered by grandfathered plans. *See* Kaiser Family Foundation & Health Research & Educational Trust, *Employer Health Benefits: 2014 Annual Survey*, 7 (2014), http://files.kff.org/attachment/2014-employer-health-benefits-survey-full-report.

any religious order." *Id.* The Departments noted the definition was intended "to reasonably balance the extension of any coverage of contraceptive services under the HRSA Guidelines to as many women as possible, while respecting the unique relationship between certain religious employers and their employees in certain religious positions." *Id.*[6] They invited comments on the proposed definition of "religious employer" and potential alternatives. *Id*.

The Departments received more than 200,000 responses to their request for comments from a variety of entities both supporting and opposing expansion of the proposed exemption. *See* Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 77 Fed. Reg. 8725, 8726 (Feb. 15, 2012). After reviewing these comments, they published final regulations on February 15, 2012, adopting their proposed definition of "religious employer." *Id.* at 8727. They also created a one-year safe harbor for religious non-profit organizations, during which the Departments would not enforce the Mandate against them. *Id.* at 8728.

2. **The Accommodation Scheme for Religious Non-Profit Organizations**

In response to religious groups that were dissatisfied with the scope of the proposed religious employer exemption, the Departments issued an advance notice of

---

[6] A number of states have laws that require employers to cover contraceptive services but excuse some religious employers from complying. The Departments developed their definition to accord with these existing state laws. *See* 76 Fed. Reg. at 46,623.

proposed rulemaking ("ANPRM") in anticipation of creating additional accommodations for non-exempt religious non-profit organizations.  *Certain Preventive Services Under the Affordable Care Act*, 77 Fed. Reg. 16,501 (Mar. 21, 2012).  After reviewing the comments received from the ANPRM, the Departments published proposed rules creating an accommodation for a wider range of religious non-profit organizations.  *Coverage of Certain Preventive Services Under the Affordable Care Act*, 78 Fed. Reg. 8456 (Feb. 6, 2013).

The Departments received over 400,000 comments on the proposed rules, and finalized two notable changes.  *Coverage of Certain Preventive Services Under the Affordable Care Act*, 78 Fed. Reg. 39,870, 39,871 (July 2, 2013).  First, the Departments simplified and clarified the existing exemption for religious employers by eliminating the first three elements of the definition, thereby defining "religious employer" as "an employer that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the [Internal Revenue] Code [("IRC")]."  *Id.* at 39,874. Second, they created an accommodation for religious non-profit organizations that did not meet this simplified definition of a religious employer.  *Id.*

The regulations state a religious non-profit organization can receive this accommodation if it:  (1) has religious objections to "providing coverage for some or all of the contraceptive services required to be covered" under the Mandate, (2) "is organized and operates as a nonprofit entity," (3) "holds itself out as a religious organization," and (4) "self-certifies that it satisfies the first three criteria."  *Id*.  The

accommodation is available for both (1) insured group health plans, under which an employer contracts with a health insurance issuer to assume the risk of providing benefits to employees, and (2) self-insured group health plans, under which the employer itself assumes the risk of providing benefits to employees. *Id.* at 39,875-80.[7]  As we explain below, religious non-profit organizations can self-certify their religious objection and receive the accommodation either by notifying their health insurance issuer or TPA or by notifying HHS directly.

  a. *EBSA Form 700*

To self-certify under the accommodation scheme, the Departments initially required religious non-profit organizations to use the Employee Benefits Security Administration's ("EBSA") Form 700 ("Form").[8]  Objecting organizations are relieved from complying with the Mandate by delivering the executed Form to their health insurance issuer or TPA.  The Form notifies the health insurance issuer or TPA that the organization self-certifies as exempt from the Mandate because it has a religious objection to providing coverage for some or all contraceptive services to its employees, and identifies the relevant federal regulations under which the organization is permitted to opt out of that obligation.  *See* Dep't of Labor, EBSA Form 700 (Aug. 2014),

---

[7] Employers with self-insured group health plans typically employ a TPA to coordinate logistics and deliver benefits.  Cong. Budget Office, *Key Issues in Analyzing Major Health Insurance Proposals*, 6 (Dec. 2008), http://www.cbo.gov/sites/default/files/12-18-keyissues.pdf.

[8] A copy of the Form appears at the end of this opinion.

http://www.dol.gov/ebsa/preventiveserviceseligibleorganizationcertificationform.doc

(citing 26 C.F.R. § 54.9815-2713A(a); 29 C.F.R. § 2590.715-2713A(a); 45 C.F.R.

§ 147.131(b)).

The back of the Form notifies TPAs of their obligations.[9]  Form at 2.  It informs

the TPA that the eligible organization "[w]ill not act as the plan administrator or claims

administrator with respect to claims for contraceptive services, or contribute to the

funding of contraceptive services."  Form at 2.  It identifies regulations requiring the TPA

to provide contraceptive coverage without cost sharing to plan participants and

beneficiaries if the TPA agrees to continue providing administrative services for a group

health plan.  *Id.* (citing 26 C.F.R. § 54.9815-2713A; 29 C.F.R. § 2510.3-16; 29 C.F.R. §

2590.715-2713A).  A TPA that receives the Form from an objecting employer is eligible

for a government payment to cover the costs of providing contraceptive coverage.  *See* 45

C.F.R. § 156.50(d)(5).

As part of this scheme, the regulations initially included a non-interference

provision, which specified that objecting religious non-profit organizations "must not,

directly or indirectly, seek to influence the third party administrator's decision" whether

to provide coverage for contraceptives.  26 C.F.R. § 54.9815-2713A(b)(iii) (2013).

When the Plaintiffs filed their suits, they sought a preliminary injunction relieving them

---

[9] The notice of regulatory requirements on the back of the Form is specifically addressed to TPAs.  *See* Form at 2.  The legal obligations of health insurance issuers are evident from the text of the ACA itself.  *See* 42 U.S.C. § 300gg-13.

from complying with this version of the accommodation scheme, arguing delivery of the Form to their health insurance issuer or TPA constituted a substantial burden on their religious exercise in violation of RFRA and the First Amendment.

     *b. Alternative notice*

     In response to litigation by Plaintiffs and others, the Departments have since expanded the accommodation scheme.[10] The Supreme Court granted injunctions pending appeal in two suits brought by religious non-profit organizations, including the Little Sisters, that objected to the accommodation scheme. *See Wheaton Coll. v. Burwell*, 134 S. Ct. 2806 (2014); *Little Sisters of the Poor Home for the Aged, Denver, Colo. v. Sebelius*, 134 S. Ct. 1022 (2014). In a third suit, the Court declined to recall or stay a circuit court mandate in favor of the Government, but granted an injunction to religious non-profit organizations pending final disposition of their petition for certiorari. *See Zubik v. Burwell*, Nos. 14A1065, 14-1418, 2015 WL 3947586, at *1 (U.S. June 29, 2015). The injunctions allowed the organizations to notify HHS directly of their religious objection to the Mandate rather than sending the Form to their health insurance issuers or TPAs. In response to the injunction in *Wheaton College*, the Departments issued an interim final rule on August 27, 2014, creating an alternative accommodation for religious non-profit organizations. Coverage of Certain Preventive Services Under the

---

     [10] As we explain in this section, the Departments did not expand the pool of actors who could claim an accommodation and obtain relief from the Mandate. They expanded the accommodation scheme by offering objecting organizations an alternative method of self-certification.

Affordable Care Act, 79 Fed. Reg. 51,092, 51,092 (Aug. 27, 2014).[11]

These regulations relieve a religious non-profit organization from complying with the Mandate if it notifies HHS in writing of its religious objection to the provision of some or all contraceptive services.  *Id.* at 51,094.  The notice may be sent by letter or email, and must contain (1) "the name of the eligible organization and the basis on which it qualifies for an accommodation," (2) "its objection based on sincerely held religious beliefs to providing coverage of some or all contraceptive services," including any particular subset to which it objects; (3) the name and type of the group health plan; and (4) the name and contact information for any of the plan's TPAs and/or health insurance issuers.  *Id.* at 51,094-95.  According to the Departments, these requirements constitute "the minimum information necessary for the Departments to determine which entities are covered by the accommodation, to administer the accommodation, and to implement the

---

[11] We discuss the procedural history of the cases before us below, but note that this alternative accommodation is akin to the accommodation granted by the Supreme Court in the cases mentioned above—*Little Sisters*, 134 S. Ct. 1022; *Wheaton College*, 134 S. Ct. 2806; and *Zubik*, 2015 WL 3947586:

> If the applicant informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services, the respondents are enjoined from enforcing against the applicant the challenged provisions of the Patient Protection and Affordable Care Act and related regulations pending final disposition of appellate review.  To meet the condition for injunction pending appeal, the applicant need not use the form prescribed by the Government, EBSA Form 700, and need not send copies to health insurance issuers or third-party administrators.

*Wheaton Coll.*, 134 S. Ct. at 2807.

policies in the July 2013 final regulations." *Id.* at 51,095.

The revised regulations also repeal the non-interference provision by deleting language prohibiting organizations from interfering with or seeking to influence their TPA's decision to cover contraception. *Id.*[12]

We note again that the entirety of this accommodation scheme for religious non-profit organizations—using either the Form or the alternative notice to HHS—was not available to the for-profit corporate plaintiff in *Hobby Lobby*. Here, an accommodation is available to Plaintiffs. In the cases before us, we consider whether their taking advantage of that accommodation to opt out of the Mandate is itself a substantial burden on their religious exercise.

3. **The Mechanics of the Accommodation for Insured Plans, Self-Insured Plans, and Self-Insured Church Plans**

The Plaintiffs use different types of employer-sponsored group health plans, which the Departments treat differently within the accommodation scheme. By its own terms,

---

[12] The regulations explain the rationale for this change:

The Departments interpret the July 2013 final regulations solely as prohibiting the use of bribery, threats, or other forms of economic coercion in an attempt to prevent a third party administrator from fulfilling its independent legal obligations to provide or arrange separate payments for contraceptive services. Because such conduct is generally unlawful and is prohibited under other state and federal laws, and to reduce unnecessary confusion, these interim final regulations delete the language prohibiting an eligible organization from interfering with or seeking to influence a third party administrator's decision or efforts to provide separate payments for contraceptive services.

79 Fed. Reg. at 51,095.

the ACA obligates both group health plans and health insurance issuers to provide contraceptive coverage.  42 U.S.C. § 300gg-13 ("A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph."); 26 C.F.R. § 54.9815-2713(a)(1); 29 C.F.R. § 2590.715-2713(a)(1); 45 C.F.R. § 147.130(a)(1).  Because the differences among these arrangements are relevant to our discussion of the merits of Plaintiffs' claims, we consider it helpful to explain how the Mandate and accommodation scheme affect insured plans, self-insured plans, and self-insured church plans.

### a.  Insured plans

When a religious non-profit organization offers its employees an insured plan, the statutory language not only requires the group health plan to cover contraception, but also obligates the plan's health insurance issuer to ensure plan participants and beneficiaries receive contraceptive coverage.  *See* 42 U.S.C. §§ 300gg-13; 300gg-22.  Thus, even if a religious non-profit organization does not self-certify that it has an objection, its health insurance issuer is obligated to provide contraceptive coverage to plan participants and beneficiaries and charge the organization for the cost.  *See Priests for Life v. U.S. Dep't of Health & Hum. Servs.*, 7 F. Supp. 3d 88, 95-96 & n.2 (D.D.C. 2013).  The organization can free itself from complying with the Mandate and paying for that coverage, however,

- 14 -

"if the eligible organization or group health plan provides either a copy of the self-certification to each issuer providing coverage in connection with the plan or a notice to the Secretary of Health and Human Services." 26 C.F.R. § 54.9815-2713AT(c)(1); 29 C.F.R. § 2590.715-2713A(c)(1); 45 C.F.R. § 147.131(c)(1). When an organization submits the Form expressing an objection to providing contraceptive coverage, "the issuer has sole responsibility for providing such coverage in accordance with § 147.130." 45 C.F.R. § 147.131(c)(1)(i); *see also* 26 C.F.R. § 54.9815-2713AT(c)(1)(i) (requiring coverage in accordance with § 54.9815-2713); 29 C.F.R. § 2590.715-2713A(c)(1)(i) (requiring coverage in accordance with § 2590.715-2713). Similarly, when an organization notifies HHS, the Department of Labor will send a separate notification to the organization's issuer informing it of that notice and describing its regulatory obligations. 45 C.F.R. § 147.131(c)(1)(ii); *see also* 26 C.F.R. § 54.9815-2713AT(c)(1)(ii); 29 C.F.R. § 2590.715-2713A(c)(1)(ii).

In the context of insured plans, health insurance issuers are generally responsible for paying for contraceptive coverage when a religious non-profit organization opts out. *See* 45 C.F.R. § 156.50. The Departments expect this will be cost-neutral for issuers because of the cost savings that accompany improvements in women's health and lower pregnancy rates. *See* 78 Fed. Reg. at 39,877.

b. *Self-insured plans*

When a religious non-profit organization offers its employees a self-insured plan, the accommodation works in a slightly different fashion. A self-insured group health

plan complies with the regulatory requirements and is excused from providing contraceptive coverage if "[t]he eligible organization or its plan contracts with one or more third party administrators" and "[t]he eligible organization provides either a copy of the self-certification to each third party administrator or a notice to the Secretary of Health and Human Services that it is an eligible organization and of its religious objection to coverage of all or a subset of contraceptive services."  26 C.F.R. § 54.9815-2713AT(b)(1); 29 C.F.R. § 2590.715-2713A(b)(1).

Although the text of the ACA does not specify a role for TPAs, it expressly requires group health plans to include contraceptive coverage, and federal regulations impose obligations on TPAs that administer self-insured group health plans.  *See* 42 U.S.C. § 300gg-13; 26 C.F.R. § 54.9815-2713AT(b); 29 C.F.R. § 2590.715-2713A(b). The regulations require a TPA administering a group health plan to provide or arrange for contraceptive coverage without cost sharing with the organization or its beneficiaries when it:  (1) receives a notification that an eligible employer has opted out of providing coverage and (2) decides to remain in a relationship with that employer or its plan to provide administrative services for the plan.  26 C.F.R. § 54.9815-2713AT(b)(2); 29 C.F.R. § 2590.715-2713A(b)(2).  The TPA's obligations are enforceable under the Employee Retirement Income Security Act ("ERISA").  *See* 78 Fed. Reg. at 39,879-80.

In the context of self-insured plans, a TPA may seek reimbursement if it has received the Form or a notification from the government and "provides or arranges payments for contraceptive services."  *See* 26 C.F.R. § 54.9815-2713AT(b)(3); 29 C.F.R.

§ 2590.715-2713A(b)(3); 45 C.F.R. § 156.50(d)(2)(ii)-(iii).  TPAs do so by working

through health insurance issuers, who receive adjustments to fees they pay to the

government under the ACA and pass along the reimbursements to TPAs.  *See* 45 C.F.R.

§ 156.50(d).

### c.  *Self-insured church plans*

Although federal regulations impose certain requirements on TPAs, the

Departments concede they lack authority to enforce those requirements as to self-insured

"church plans," which are group health plans established by a church or association of

churches covering the church's or association's employees.  29 U.S.C. § 1002(33).

Organizations that provide health care coverage for employees through self-insured

church plans are exempt from regulation under ERISA.  29 U.S.C. § 1003(b)(2).  Unless

a church plan has made an election under 26 U.S.C. § 410(d), which opts plans into

provisions of ERISA, the Departments concede they lack authority to compel church plan

TPAs to provide contraceptive coverage, and may not levy fines against those TPAs for

failing to provide it.

### d.  *Legal obligation to provide coverage after the accommodation*

Although the accommodation is available for both insured and self-insured group

health plans, the source of the legal obligation to provide contraceptive coverage after a

religious non-profit organization has opted out differs based on the type of insurance

arrangement the organization uses.  When an organization takes advantage of the

accommodation, the ACA requires health insurance issuers to provide coverage for

- 17 -

insured group health plans, while federal regulations adopted pursuant to the ACA require TPAs to arrange coverage for self-insured group plans that are subject to ERISA. As we discuss below, these distinctions shape the claims advanced by different Plaintiffs in the cases before us.

## B.   *The Plaintiffs*

The Plaintiffs[13] in this litigation object to both means to receive an accommodation—sending the Form to their health insurance issuer or TPA or sending a notification to HHS.  The Plaintiffs differ from each other in ways that are relevant to the Departments' authority to require employers to provide contraceptive coverage and relieve objecting religious non-profit organizations from the Mandate when they use the accommodation scheme.

### 1.   *Little Sisters of the Poor*

The Little Sisters of the Poor Home for the Aged, Denver, Colorado and Little Sisters of the Poor, Baltimore ("Little Sisters") belong to an order of Catholic nuns who devote their lives to care for the elderly.  The Little Sisters provide health insurance coverage to their employees through the Christian Brothers Employee Benefit Trust ("Trust"), a self-insured church plan that is not subject to ERISA.  The Trust uses Christian Brothers Services ("Christian Brothers"), another Catholic organization, as its TPA.

---

[13] When we refer to the plaintiffs in all three cases collectively, we use "Plaintiffs."  When we refer to a subset of the plaintiffs, we use "plaintiffs."

The Little Sisters have always excluded coverage of sterilization, contraception, and abortifacients from their health care plan in accordance with their religious belief that deliberately avoiding reproduction through medical means is immoral.  The Little Sisters "believe that it is wrong for them to intentionally facilitate the provision of these medical procedures, drugs, devices, and related counseling and services."  LS Br. at 10.  They cite "well-established Catholic teaching that prohibits encouraging, supporting, or partnering with others in the provision of sterilization, contraception, and abortion."  LS Br. at 9-10.  The Little Sisters contend they "cannot provide these things, take actions that directly cause others to provide them, or otherwise appear to participate in the government's delivery scheme," as the mere appearance of condoning these services "would violate their public witness to the sanctity of human life and human dignity and could mislead other Catholics and the public."  LS Br. at 10.

The Little Sisters are subject to the Mandate unless they take advantage of the accommodation scheme by delivering the Form to the Christian Brothers, their TPA, or notifying HHS of their religious objection.  If they do not take one of these steps and do not provide contraceptive coverage, they estimate a single Little Sisters home could incur penalties of up to $2.5 million per year, and allege the Trust could lose up to $130 million in plan contributions.  The *Little Sisters* plaintiffs object that the accommodation scheme violates their sincerely held religious beliefs because they cannot take actions that directly cause others to provide contraception or appear to participate in the Departments' delivery scheme.

2. ***Southern Nazarene***

Southern Nazarene University, Oklahoma Wesleyan University, Oklahoma Baptist University, and Mid-America Christian University are "Christ-centered institutions of higher learning." SN Br. at 1-2. Southern Nazarene is partially self-insured; it generally assumes the risks of providing coverage but contracts with a health insurance issuer to pay all claims over $100,000. For its insured employee coverage, it uses Blue Cross Blue Shield of Oklahoma. It offers separate coverage to students through an insured plan. Oklahoma Baptist is an insured university. It uses Blue Cross Blue Shield of Oklahoma, and offers separate coverage to students through an insured plan. Oklahoma Wesleyan is an insured university. It uses Community Care of Oklahoma. Mid-America Christian is a self-insured university on a church plan that is not subject to ERISA. It uses plans provided by GuideStone Financial Resources.[14]

---

[14] The descriptions of Mid-America Christian's insurance arrangements in the record before us are inconsistent. Before the district court, counsel described Mid-America Christian's plan as "insured by GuideStone," App. in SN at A32, and suggested it would be obligated, like Oklahoma Baptist and Oklahoma Wesleyan, to deliver the Form to its health insurance issuer to opt out of the Mandate. In its opening brief on appeal, counsel described Mid-America Christian's plan as "self-insured," and suggested it would be obligated, like Southern Nazarene, to deliver the Form to its TPA. SN Br. at 2, 18. In a supplemental brief and at oral argument, counsel now indicates Mid-America Christian has a self-insured church plan and is more akin to the *Reaching Souls* plaintiffs. SN Supp. Br. II at 9 n.2; Oral Arg. in SN at 20:24-20:32.

We treat Mid-America Christian's plan as a self-insured church plan. The parties in *Southern Nazarene* stipulated as fact that Mid-America Christian's group health plan is provided by GuideStone Financial Resources. *Southern Nazarene*, 2013 WL 6804265, at *2. Because we understand GuideStone Financial Resources to be a sponsor of self-insured church plans and not an insurer, we assume the latest characterization on appeal

Continued . . .

The universities have brought suit collectively, but they are in slightly different positions insofar as Mid-America Christian University uses a church plan and contracts with a TPA, Oklahoma Baptist University and Oklahoma Wesleyan use health insurance issuers, and Southern Nazarene contracts with a TPA but uses a health insurance issuer for student coverage and employee claims above $100,000.

The universities believe "it would be sinful and immoral for them to participate in, pay for, facilitate, enable, or otherwise support access to abortion, abortion-inducing drugs and devices, and related counseling." SN Br. at 1-2. They object to the provision of contraceptives they consider abortifacients. The universities currently offer health plans to students and employees that do not cover the contraceptives the universities find objectionable.

The universities are subject to the Mandate, but they may take advantage of the accommodation scheme by delivering the Form or notifying HHS of their religious objections to relieve themselves of the obligation to provide contraceptive coverage. They object to the accommodation, however, because they believe it requires them to expressly or functionally offer contraceptive coverage through their group health plan, interferes with the spiritual development of their communities, and requires them to facilitate behavior they consider sinful. If they do not take advantage of the

_____

Cont.

is correct and treat Mid-America Christian's group health plan as a self-insured church plan that is not subject to ERISA.

accommodation, each university must either provide coverage or incur penalties of $100 per employee per day.

### 3.   *Reaching Souls*

Reaching Souls is a non-profit corporation founded by a Southern Baptist minister and based in Oklahoma.  The organization trains pastors and evangelists and provides care to orphans in Africa, India, and Cuba.  Truett-McConnell College is a private liberal arts college based in Georgia.  Both Reaching Souls and Truett-McConnell use the GuideStone Plan, a self-insured church plan that is not subject to ERISA.  GuideStone Financial Resources, a Texas non-profit corporation, established the GuideStone Plan and holds the assets funding it in trust.  GuideStone Financial Resources has entered into agreements with other entities to provide claims administration as TPAs under the GuideStone Plan, including Connecticut General Life Insurance Company, Highmark Health Services, and Express Scripts, Inc.

Reaching Souls believes life begins at conception and objects to four of the twenty FDA-approved methods of contraception that Reaching Souls characterizes as abortifacients.  Truett-McConnell has adopted the Southern Baptist Convention's statement of faith and objects to the same four methods of contraception.  GuideStone Financial Resources, as an arm of the Southern Baptist Convention, also opposes coverage of contraception methods it believes to be abortifacients.  The organizations ground their beliefs in the sanctity of human life and opposition to elective abortion in the religious teachings of the Southern Baptist Convention.

Both Reaching Souls and Truett-McConnell College are subject to the Mandate, but they may take advantage of the accommodation scheme by delivering the Form or notifying HHS of their religious objections. If they do, GuideStone Financial Resources would have to pass the information to the TPAs of the GuideStone Plan to effectuate the coverage. The plaintiffs believe this would violate their religious beliefs "by making them complicit in the government's scheme to provide abortifacients." RS Br. at 4. If the organizations do not take advantage of the accommodation scheme or provide coverage, they contend they will incur millions of dollars in fines, which "would crush the ministries and force a mass exodus from GuideStone." RS Br. at 3.

### C.  *Procedural History*

The district courts reached different results in the three cases before us, denying a preliminary injunction to the plaintiffs in *Little Sisters* but granting a preliminary injunction to the plaintiffs in *Southern Nazarene* and *Reaching Souls*. Reviewing the reasoning behind their determinations clarifies the claims before us on appeal.

### 1.  *Little Sisters of the Poor*

In *Little Sisters*, the district court determined that complying with the accommodation scheme would not impose a substantial burden on the Little Sisters' or Christian Brothers' religious exercise. 6 F. Supp. 3d at 1239-45. The court's analysis of the preliminary injunction factors began and ended by examining whether the plaintiffs would suffer irreparable injury if the requested relief were denied. *Id.* at 1236. After determining it was the court's duty to determine how the regulations operate as a matter

of law, *id.* at 1239, the court concluded the accommodation scheme does not require the Little Sisters to provide contraceptive coverage or to participate in the provision of contraceptive coverage, *id.* at 1239-42.

The court noted that the Little Sisters—unlike the plaintiffs in *Hobby Lobby*—could be relieved of the obligation to provide coverage by signing and delivering the Form to their TPA, the Christian Brothers. *Id.* at 1237.[15]  The court underscored that, while the Departments could require the Little Sisters to sign and deliver the Form to their TPA to avoid the Mandate, the Departments lacked enforcement authority under ERISA to levy fines or otherwise force the Christian Brothers to provide contraceptive coverage as the TPA for a self-insured, ERISA-exempt church plan. *Id.* at 1243-44.  The court concluded that requiring the Little Sisters to sign and deliver the Form to opt out did not constitute a substantial burden on their religious exercise and declined to issue a preliminary injunction. *Id.* at 1242-45.

The Little Sisters next asked the Tenth Circuit for an injunction pending appeal, which this court denied.  The Supreme Court subsequently granted their request for an injunction pending appeal, allowing the Little Sisters to notify HHS of their religious objection instead of sending the Form to their TPA as the regulations at the time required.

_____

[15] At the time the district courts decided all three of the cases before us, the interim final rules allowing Plaintiffs to opt out by notifying HHS of their religious objection had not yet been issued.  The district court decisions therefore focus on the Form and do not consider the expanded accommodation scheme in August 2014's interim final rules.  In supplemental briefing to this court, the Plaintiffs argue the expanded scheme does not adequately address the religious liberty concerns they have raised in this litigation.

*See Little Sisters*, 134 S. Ct. 1022.  The Little Sisters now appeal the district court's

denial of a preliminary injunction.

2.  ***Southern Nazarene***

In *Southern Nazarene*, the district court granted a preliminary injunction to the

plaintiffs.  2013 WL 6804265, at *11.  The court's analysis focused mainly on the

plaintiffs' likelihood of success on the merits.[16]  *Id.* at *7-10.  The court characterized the

Form as "in effect, a permission slip which must be signed by the institution to enable the

plan beneficiary to get access, free of charge, from the institution's insurer or third party

administrator, to the products to which the institution objects."  *Id.* at *8.  It determined

the Form imposed a substantial burden on the plaintiffs' sincere religious exercise and the

Government had not articulated a compelling state interest or argued its approach was the

least restrictive means of advancing that interest.  *Id.* at *7-10.

---

[16] The district court noted that, unlike in the recently decided *Priests for Life*, 7 F. Supp. 3d 88, the parties in *Southern Nazarene* "stipulated that the *act of signing the certification* is contrary to the religious beliefs to which these institutions subscribe." *Southern Nazarene*, 2013 WL 6804265, at *8.  The court's characterization paraphrases the stipulation, which addresses only the litigation position taken by the *Southern Nazarene* plaintiffs.  The parties specifically stipulated:  "The Universities believe that, within the operation of the regulations, completing and delivering the self-certification to their issuers or third party administrators would violate the Universities' sincere religious beliefs." *Id.* at *5.  The Government accepts that the *Southern Nazarene* plaintiffs take the position that completing the self-certification would violate their religious beliefs—a fairly straightforward characterization of their litigation position—but has never conceded that completing the self-certification actually would violate their religious beliefs.

The court concluded the plaintiffs had shown they were likely to succeed on the merits. *Id.* After reaching this conclusion, it briefly reviewed the other preliminary injunction factors and entered a preliminary injunction that prevented the Departments from enforcing the Mandate, requiring self-certification to opt out, or levying penalties. *Id.* at *10-11. The Government now appeals the district court's ruling.

3. ***Reaching Souls***

Like the district court in *Southern Nazarene*, the district court in *Reaching Souls* granted a preliminary injunction to the plaintiffs. 2013 WL 6804259, at *8. The court primarily analyzed the likelihood of plaintiffs' success on the merits. *Id.* at *6-8. It characterized the Government's substantial burden argument as "simply another variation of a proposition rejected by the court of appeals in *Hobby Lobby*," likening it to the argument that the Mandate was not a substantial burden on for-profit employers because it required intervening acts by third parties—employees deciding whether to acquire contraception. *Id.* at *7. It emphasized that regardless of whether the Form actually triggers the provision of contraceptive services, the plaintiffs believe that signing it would signal their tacit support or cooperation. *Id.*

The court thus determined "the accommodation scheme applies substantial pressure on Plaintiffs to violate their belief that participating in or facilitating the accommodation is the moral equivalent of directly complying with the contraceptive mandate." *Id.* at *8. It briefly reviewed the other preliminary injunction factors and enjoined the Government from requiring the plaintiffs to comply with the Mandate and

accommodation scheme or penalizing the plaintiffs for noncompliance. *Id*. The Government now appeals the district court's ruling.

## IV. **UNUSUAL NATURE OF PLAINTIFFS' CLAIM**

Before we present our analysis of the issues, we wish to highlight the unusual nature of Plaintiffs' central claim, which attacks the Government's attempt to accommodate religious exercise by providing a means to opt out of compliance with a generally applicable law.

Most religious liberty claimants allege that a generally applicable law or policy without a religious exception burdens religious exercise, and they ask courts to strike down the law or policy or excuse them from compliance. Our circuit's three most recent RFRA cases fall into this category. In *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) (en banc), *aff'd sub nom. Hobby Lobby*, 134 S. Ct. 2751, the ACA required the plaintiffs to provide their employees with health insurance coverage of contraceptives against their religious beliefs. In *Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014), a prison policy denied the plaintiff access to a sweat lodge, where he wished to exercise his Native American religion. In *Abdulhaseeb v. Calbone*, 600 F.3d 1301 (10th Cir. 2010), a prison policy denied the plaintiff a halal diet, which is necessary to his Muslim religious exercise. In each instance, the law or policy failed to provide an exemption or accommodation to the plaintiff(s).

The Supreme Court's recent ruling in *Holt v. Hobbs*, 135 S. Ct. 853 (2015), which concerned a prison ban on inmates' growing beards, is another recent example of the

more common RFRA claim.  The plaintiff in *Holt* sought to grow a beard in accordance with his Muslim faith.  In *Holt*, like in *Hobby Lobby*, the government defendants insisted on a complete restriction and did not attempt to accommodate the plaintiff's religious exercise.  The plaintiff in *Holt* proposed a compromise—he would be allowed to grow only a half-inch beard—which the prison refused.  135 S. Ct. at 861.  The Court ultimately approved this compromise in its ruling.  *Id.* at 867.

In the cases before us, by contrast, the Departments have developed a religious accommodation rather than leaving it for the courts to fashion judicial relief.  Plaintiffs not only challenge a law that requires them to provide contraceptive coverage against their religious beliefs, they challenge the exception that the law affords to them.  The precedents Plaintiffs cite are instructive in some respects, but none of them involve a situation where the government offers religious objectors an accommodation.[17]  The Supreme Court and this circuit have suggested such accommodations might have eliminated or lessened burdens we otherwise deemed substantial.  *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2759 (observing the accommodation scheme "constitutes an

---

[17] The accommodation adds an additional consideration that makes this unlike the typical RFRA case.  In *Hobby Lobby*, *Yellowbear*, *Abdulhaseeb*, and *Holt*, the government either required or prohibited acts of religious significance to the plaintiffs.  In the cases before us, the government has freed Plaintiffs from the responsibility to perform the act they consider religiously objectionable—namely, providing contraceptive coverage.  Nonetheless, the Plaintiffs argue an act they do not consider objectionable in itself—completing a form or writing to HHS—becomes objectionable because it either causes the provision of contraceptive coverage or renders them complicit in the provision of contraceptive coverage.  Therefore, unlike the aforementioned cases, we are in the slightly different position of considering whether an otherwise unobjectionable act, understood in context, constitutes a substantial burden on Plaintiffs' religious exercise.

alternative that achieves all of the Government's aims while providing greater respect for religious liberty"); *Yellowbear*, 741 F.3d at 56 (underscoring that the case "isn't a situation where the claimant is left with some degree of choice in the matter and we have to inquire into the degree of the government's coercive influence on that choice").  Until now, however, we have not squarely considered a RFRA challenge to a religious accommodation.

The closest Tenth Circuit case we have found is *United States v. Friday*, 525 F.3d 938 (10th Cir. 2008), in which defendant Winslow Friday argued his conviction for shooting a bald eagle without a permit violated RFRA because he shot the eagle for use in a tribal religious ceremony.  The Bald and Golden Eagle Protection Act forbids killing a bald eagle, but an applicant can obtain a permit to "take" a live eagle for a religious ceremony.  *See* 16 U.S.C. §§ 668, 668a.  We recognized the potential question of "whether it substantially burdens Mr. Friday's religion to require him to obtain a permit in advance of taking an eagle."  *Friday*, 525 F.3d at 947.  We said we were "skeptical that the bare requirement of obtaining a permit can be regarded as a 'substantial burden' under RFRA," *id.*, but Mr. Friday did not make that specific argument, and we decided the permit accommodation otherwise met RFRA's strict scrutiny element, *id.* at 948.

We spoke favorably of the government's accommodation scheme in *Friday*, even though "[t]hat accommodation may be more burdensome than the [religious objectors] would prefer, and may sometimes subordinate their interests to other policies not of their choosing."  *Id.* at 960.  As we noted in conclusion:  "Law accommodates religion; it

cannot wholly exempt religion from the reach of the law." *Id.*  We therefore turn to uncharted Tenth Circuit terrain.

*   *   *   *

The Plaintiffs in the three cases before us assert claims against the Mandate and accommodation scheme under RFRA and the First Amendment's Free Exercise, Establishment, and Free Speech Clauses.[18]  Because we determine the accommodation scheme relieves Plaintiffs from complying with the Mandate and does not substantially burden their religious exercise under RFRA or infringe upon their First Amendment rights, we affirm the district court's denial of a preliminary injunction to the plaintiffs in *Little Sisters* and reverse the district courts' grants of a preliminary injunction to the plaintiffs in *Southern Nazarene* and *Reaching Souls*.

## V.  **RFRA**

Under RFRA, the government "shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless "it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1.

Plaintiffs argue the ACA and its implementing regulations violate RFRA because

---

[18] We refer to "Plaintiffs" throughout the discussion, but in the First Amendment context, "Plaintiffs" refers only to the plaintiffs in *Little Sisters* and *Reaching Souls*.  *See infra* note 51.

they substantially burden their religious exercise by forcing them to do one of three

things:  (a) comply with the Mandate and provide contraceptive coverage, (b) take

advantage of the accommodation scheme, or (c) pay steep fines for non-compliance.[19]

We conclude that the accommodation scheme relieves Plaintiffs of complying with the

Mandate or paying fines and does not impose a substantial burden on Plaintiffs' religious

exercise for the purposes of RFRA.

To explain why the accommodation is permissible under RFRA, we first review

the RFRA framework and consider how religious accommodations may lessen or

eliminate the substantiality of a burden on religious exercise.  We then apply this

framework to the accommodation scheme before us, which exempts religious non-profits

---

[19] The Government identifies a fourth option:  by declining to sponsor a group health plan, Plaintiffs could avoid complying with the Mandate, using the accommodation, or paying the fines.  The Government frames the Plaintiffs' provision of health insurance as an economic expenditure, and notes that regulations may make a business activity more expensive or onerous without violating the freedom of religion. *See Tony & Susan Alamo Found. v. Sec. of Labor*, 471 U.S. 290, 303-05 (1985); *Braunfeld v. Brown*, 366 U.S. 599, 605-06 (1961); *but see Hobby Lobby*, 134 S. Ct. at 2777.  Plaintiffs respond that they consider the provision of health insurance a religious obligation, not merely an economic expenditure.  Plaintiffs "believe they have a religious obligation to care for the employees who join in their ministry, and they cannot throw those people off their insurance policies without violating that obligation and harming their ministry."  LS Reply Br. at 8.

Because we determine the accommodation scheme is not a substantial burden, we need not decide whether this fourth option constitutes a substantial burden on religious exercise—or, if it does, whether it survives strict scrutiny.

For similar reasons, we need not address the safe harbor provision detailed in the June 2013 regulations, which indicates organizations with self-insured group health plans that bring administration of their plans in-house and thereby do not use third-party administrators currently are not subject to enforcement of the contraceptive coverage requirement.  78 Fed. Reg. at 39,880-81.

from providing contraceptive coverage and instead assigns that task to health insurance issuers and TPAs.

We conclude the accommodation does not substantially burden Plaintiffs' religious exercise. The accommodation relieves Plaintiffs from complying with the Mandate and guarantees they will not have to provide, pay for, or facilitate contraceptive coverage. Plaintiffs do not "trigger" or otherwise cause contraceptive coverage because federal law, not the act of opting out, entitles plan participants and beneficiaries to coverage. Although Plaintiffs allege the administrative tasks required to opt out of the Mandate make them complicit in the overall delivery scheme, opting out instead relieves them from complicity. Furthermore, these *de minimis* administrative tasks do not substantially burden religious exercise for the purposes of RFRA.

The dissent parts ways with our majority opinion on the self-insured plaintiffs' RFRA claims. It stresses that, by opting out, the self-insured plaintiffs would cause the legal responsibility to provide contraceptive coverage to shift to their TPAs.[20] We agree. As we observe below, the regulations are clear on that point.[21] But shifting legal

---

[20] Plaintiffs make causation the centerpiece of their RFRA claim. They allege that opting out of the Mandate would cause or make them complicit in providing contraceptive coverage, and thus substantially burdens their religious exercise. Much of our opinion assesses and ultimately rejects the merits of this claim.

[21] Indeed, this is an unremarkable feature of the accommodation scheme. An opt out religious accommodation typically contemplates that a non-objector will replace the religious objector and take over any legal responsibilities.

responsibility to provide coverage away from the plaintiffs relieves rather than burdens their religious exercise. The ACA and its implementing regulations entitle plan participants and beneficiaries to coverage whether or not the plaintiffs opt out. And the government has established a scheme where, if the law is followed, self-insured plaintiffs that opt out are relieved of providing, paying for, and facilitating coverage; the government assigns that responsibility to their TPAs; and plan participants and beneficiaries receive the coverage to which they are entitled by federal law. Such an arrangement is among the common and permissible methods of religious accommodation in a pluralist society, and does not constitute a substantial burden under RFRA.

### A. *Legal Background*

1. **Standard of Review**

Each appeal before us seeks review of a district court order granting or denying a preliminary injunction. We review orders granting or denying a preliminary injunction for abuse of discretion. *See Hobby Lobby*, 723 F.3d at 1128; *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 (10th Cir. 2006).

A preliminary injunction may be granted if the party seeking it shows: "(1) a likelihood of success on the merits; (2) a likely threat of irreparable harm to the movant; (3) the harm alleged by the movant outweighs any harm to the non-moving party; and (4) an injunction is in the public interest." *Hobby Lobby*, 723 F.3d at 1128. A district court abuses its discretion by granting or denying a preliminary injunction based on an error of law. *See id.*; *Aid for Women*, 441 F.3d at 1115.

2.  **RFRA and Free Exercise**

RFRA was enacted in 1993 in response to *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), in which the Supreme Court held that burdens on religious exercise are constitutional under the Free Exercise Clause if they result from a neutral law of general application and have a rational basis. *Id.* at 878-80; *United States v. Hardman*, 297 F.3d 1116, 1126 (10th Cir. 2002). Congress enacted RFRA to restore the pre-*Smith* standard, which permitted legal burdens on an individual's religious exercise only if the government could show a compelling need to apply the law to that person and that the law did so in the least restrictive way. *Smith*, 494 U.S. at 882-84; *see also Hobby Lobby*, 134 S. Ct. at 2792-93 (Ginsburg, J., dissenting). Congress specified the purpose of RFRA was to restore this compelling interest test as it had been recognized in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972). *See* 42 U.S.C. § 2000bb(b)(1).

By restoring the pre-*Smith* compelling interest standard, Congress did not express any intent to alter other aspects of Free Exercise jurisprudence. *See id.*; *Hobby Lobby*, 723 F.3d at 1133 ("Congress, through RFRA, intended to bring Free Exercise jurisprudence back to the test established before *Smith*. There is no indication Congress meant to alter any other aspect of pre-*Smith* jurisprudence . . . ."). Notably, pre-*Smith* jurisprudence allowed the government "wide latitude" to administer large administrative programs, and rejected the imposition of strict scrutiny in that context. As the Supreme Court indicated in *Bowen v. Roy*,

> In the enforcement of a facially neutral and uniformly applicable requirement for the administration of welfare programs reaching many millions of people, the Government is entitled to wide latitude. The Government should not be put to the strict test applied by the District Court; that standard required the Government to justify enforcement of the use of Social Security number requirement as the least restrictive means of accomplishing a compelling state interest.

476 U.S. 693, 707 (1986). As we discuss at greater length below, the pre-*Smith* standards restored by RFRA permitted the Government to impose *de minimis* administrative burdens on religious actors without running afoul of religious liberty guarantees.

## 3. **Elements of RFRA Analysis**

RFRA analysis follows a burden-shifting framework. "[A] plaintiff establishes a prima facie claim under RFRA by proving the following three elements: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion." *Kikumura v. Hurley*, 242 F.3d 950, 960 (10th Cir. 2001); *see* 42 U.S.C. § 2000bb-1(a).[22] The burden then shifts to the government to demonstrate its law or policy advances "a compelling interest implemented through the least restrictive means available." *Hobby Lobby*, 723 F.3d at 1142-43. The government must show that the "compelling interest test is satisfied through application of the challenged law 'to the person'—the particular

---

[22] RFRA originally defined "exercise of religion" as "the exercise of religion under the First Amendment to the Constitution." In 1999, the Religious Land Use and Institutionalized Persons Act ("RLUIPA") amended RFRA, and redefined "exercise of religion" by reference to 42 U.S.C. § 2000cc-5(7)(A). 42 U.S.C. § 2000bb-2(4). Section 2000cc-5(7)(A) expanded the phrase to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A); *see Kikumura*, 242 F.3d at 960.

claimant whose sincere exercise of religion is being substantially burdened." *Id.* at 1126 (quotations and citation omitted). "This burden-shifting approach applies even at the preliminary injunction stage." *Id.*

We have previously stated "a government act imposes a 'substantial burden' on religious exercise if it:  (1) requires participation in an activity prohibited by a sincerely held religious belief, (2) prevents participation in conduct motivated by a sincerely held religious belief, or (3) places substantial pressure on an adherent to engage in conduct contrary to a sincerely held religious belief." *Hobby Lobby*, 723 F.3d at 1125-26 (quotations and alterations omitted); *see also Yellowbear*, 741 F.3d at 55 (applying this framework to RLUIPA); *Abdulhaseeb*, 600 F.3d at 1315 (same).  As we discuss in the next section, whether a law substantially burdens religious exercise in one or more of these ways is a matter for courts—not plaintiffs—to decide.

4. **Courts Determine Substantial Burden**

To determine whether plaintiffs have made a prima facie RFRA claim, courts do not question "whether the petitioner . . . correctly perceived the commands of [his or her] faith." *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 716 (1981); *see Hobby Lobby*, 723 F.3d at 1138-40.  But courts do determine whether a challenged law or policy substantially burdens plaintiffs' religious exercise.  RFRA's statutory text and religious liberty case law demonstrate that courts—not plaintiffs—must determine if a law or policy substantially burdens religious exercise.

RFRA states the federal government "shall not substantially burden a person's

exercise of religion." 42 U.S.C. § 2000bb-1(a). We must "give effect . . . to every clause and word" of a statute when possible. *United States v. Menasche*, 348 U.S. 528, 538-39 (1955). Drafts of RFRA prohibited the government from placing a "burden" on religious exercise. Congress added the word "substantially" before passage to clarify that only some burdens would violate the act. 139 Cong. Rec. S14352 (daily ed. Oct. 26, 1993) (statements of Sen. Kennedy and Sen. Hatch).

We therefore consider not only whether a law or policy burdens religious exercise, but whether that burden is substantial. If plaintiffs could assert and establish that a burden is "substantial" without any possibility of judicial scrutiny, the word "substantial" would become wholly devoid of independent meaning. *See Menasche*, 348 U.S. at 538-39. Furthermore, accepting any burden alleged by Plaintiffs as "substantial" would improperly conflate the determination that a religious belief is sincerely held with the determination that a law or policy substantially burdens religious exercise.

Every circuit that has addressed a RFRA challenge to the accommodation scheme at issue here has concluded that whether the government has imposed a "substantial burden" is a legal determination. *See E. Tex. Baptist Univ. v. Burwell*, Nos. 14-20112, 14-10241, 14-40212, 14-10661, 2015 WL 3852811, at *3-5 & n.33 (5th Cir. June 22, 2015); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 612 (7th Cir. 2015); *Geneva Coll. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 778 F.3d 422, 436 (3d Cir. 2015); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 247-49 (D.C. Cir. 2014); *Mich. Catholic Conf. & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 385 (6th

Cir. 2014), *vacated and remanded*, 135 S. Ct. 1914 (2015).  This is consistent with our

determination that we review *de novo* "what constitutes [a] substantial burden . . . and the

ultimate determination as to whether the RFRA has been violated."  *United States v.

Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996); *see also Yellowbear*, 741 F.3d at 56

(determining "a reasonable finder of fact could conclude the prison has substantially

burdened Mr. Yellowbear's religious exercise").  Thus, we "accept[] as true the factual

allegations that [Plaintiffs'] beliefs are sincere and of a religious nature—but not the legal

conclusion, cast as a factual allegation, that [their] religious exercise is substantially

burdened."  *Kaemmerling v. Lappin*, 553 F.3d 669, 679 (D.C. Cir. 2008); *see Mahoney v.

Doe*, 642 F.3d at 1112, 1121 (D.C. Cir. 2011); *Henderson v. Kennedy*, 253 F.3d 12, 17

(D.C. Cir. 2001).[23]

    We have cautioned that substantiality does not permit us to scrutinize the

"theological merit" of a plaintiff's religious beliefs—instead, we analyze "the intensity of

_____

[23] Plaintiffs cite *Thomas* to argue we must accept their belief that they cannot
participate in the accommodation whether or not that belief is "acceptable, logical,
consistent, or comprehensible."  LS Br. at 47; RS Br. at 39 (quoting *Thomas*, 450 U.S. at
714).  *Thomas* concerned the denial of unemployment benefits to a claimant who quit his
job because his religious beliefs prohibited him from producing armaments to be used for
war.  *Thomas* prevents courts from scrutinizing the theological merit of a plaintiff's
sincere religious belief, but not from assessing whether a challenged law or policy
amounts to a substantial burden on religious exercise.  *See Hernandez v. Comm'r*, 490
U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of
particular beliefs or practices to a faith, or the validity of particular litigants'
interpretations of those creeds.  We do, however, have doubts whether the alleged burden
imposed by the deduction disallowance on the Scientologists' practices is a substantial
one." (citing *Thomas*, 450 U.S. at 716)).

- 38 -

the coercion applied by the government to act contrary to those beliefs." *Hobby Lobby*, 723 F.3d at 1137 (emphasis omitted). "Our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief." *Id.*[24] In determining whether a law or policy applies substantial pressure on a claimant to violate his or her beliefs, we consider how the law or policy being challenged actually operates and affects religious exercise. *See Geneva Coll.*, 778 F.3d at 436 ("We may consider the nature of the action required of the appellees, the connection between that action and the appellees' beliefs, and the extent to which that action interferes with or otherwise affects the appellees' exercise of religion—all without delving into the appellees' beliefs."); *see also* 139 Cong. Rec. S14352 (daily ed. Oct. 26, 1993) (statement of Sen. Kennedy) (observing that RFRA would not impose strict scrutiny for "governmental actions that have an incidental effect on religious institutions").

When evaluating RFRA claims, we have therefore recognized that not all burdens alleged by plaintiffs amount to substantial burdens. *See Abdulhaseeb*, 600 F.3d at 1321 ("We are not willing to conclude, however, that every single presentation of a meal an inmate considers impermissible constitutes a substantial burden on an inmate's religious exercise."); *Grace United Methodist Church v. City of Cheyenne*, 451 F.3d 643, 654 (10th Cir. 2006) ("[W]e are not persuaded by Grace United's assertion that the Board's

---

[24] The Government does not dispute the sincerity of Plaintiffs' religious beliefs. *See Little Sisters*, 6 F. Supp. 3d at 1237; *Southern Nazarene*, 2013 WL 6804265, at *5; *Reaching Souls*, 2013 WL 6804259, at *4.

denial of a zoning variance for its proposed daycare operation constitutes more than an incidental burden on religious conduct."); *Kikumura*, 242 F.3d at 961 (requiring evidentiary proof from the plaintiff that an alleged burden was "substantial" and remanding to the district court). Furthermore, as we discuss in the following section, the existence of an accommodation may affect whether a law or policy burdens religious exercise and whether that burden is substantial.

5. **Accommodations Can Lessen or Eliminate Burden**

We finally note that accommodations function to lessen or eliminate the burden of a generally applicable law. In *Hobby Lobby*, this court said the stark choice between providing contraceptive coverage and paying steep fines constitutes a sufficiently substantial burden to warrant relief under RFRA. *Hobby Lobby*, 723 F.3d 1114. Religious objectors are not always put to such a stark choice. When, as here, plaintiffs are offered an accommodation to a law or policy that would otherwise constitute a substantial burden, we must analyze whether the accommodation renders the potential burden on religious exercise insubstantial or nonexistent such that the law or policy that includes the accommodation satisfies RFRA.

Accommodations may eliminate burdens on religious exercise or reduce those burdens to *de minimis* acts of administrative compliance that are not substantial for RFRA purposes. The Supreme Court recognized this point in *Hobby Lobby* when it suggested an accommodation to exempt the plaintiff corporations from complying with the Mandate could satisfy RFRA concerns. *Hobby Lobby*, 134 S. Ct. at 2782 ("At a

minimum, [the accommodation] does not impinge on the plaintiffs' religious belief that

providing insurance coverage for the contraceptives at issue here violates their religion,

and it serves HHS's stated interests equally well."); *see also id.* at 2786-87 (Kennedy, J.,

concurring).  The D.C. Circuit observed that "[a] burden does not rise to the level of

being substantial when it places an inconsequential or *de minimis* burden on an

adherent's religious exercise." *Priests for Life*, 772 F.3d at 246 (quotations, citations, and

alterations omitted).  Were it otherwise, our substantial burden inquiry would become a

blunt tool incapable of recognizing the meaningful difference between forcing

organizations to provide or pay for contraceptives and allowing them to opt out of that

requirement.  To determine whether the accommodation scheme in these cases renders

the alleged burden on Plaintiffs' religious exercise nonexistent or insubstantial, we turn to

the merits of Plaintiffs' RFRA arguments.

## B.  *Substantial Burden Analysis*

### 1.  **Plaintiffs' RFRA Arguments**

The cases before us turn on whether complying with the accommodation

constitutes a substantial burden.  The Government does not dispute the sincerity of

Plaintiffs' religious belief that they may not provide, pay for, or facilitate contraceptive

coverage.  The parties dispute whether the accommodation scheme substantially burdens

the Plaintiffs' exercise of religion.

Plaintiffs oppose completing the Form or notifying HHS because they believe they

are being asked to play a causal role in the delivery of contraceptive coverage and would

be complicit or perceived to be complicit in the overall contraceptive delivery scheme by virtue of their opting out.  They also allege their continuing involvement in the regulatory scheme is a substantial burden.[25]

The Government responds that completing the Form or notification does not involve Plaintiffs in the delivery of contraceptive coverage.  The accommodation relieves Plaintiffs of their obligations under the Mandate, and when that occurs, federal law authorizes and obligates a health insurance issuer or TPA to provide or arrange for the delivery of contraceptive coverage to plan participants and beneficiaries who are entitled to that coverage under the ACA.  The Government therefore argues the accommodation

---

[25] The *Little Sisters* and *Reaching Souls* plaintiffs clarify that they "have never objected to merely identifying themselves so that the government can leave them alone." LS Supp. Br. II at 2 n.2; RS Supp. Br. II at 2 n.2.  They have expressed satisfaction with the Supreme Court's injunctions pending appeal in *Little Sisters* and *Wheaton College*. LS Supp. Br. II at 1-2; RS Supp. Br. II at 2, 12; Oral Arg. in LS at 12:10-12:40.  They nevertheless object to the recent modified accommodation promulgated by the Departments—the opt out letter to HHS—both because the self-certification requires more information about their group health plan than the aforementioned notice the Supreme Court proposed, and because of the "collateral consequences" that follow after they opt out.  Oral Arg. in LS at 12:10-13:53.

The *Little Sisters* and *Reaching Souls* plaintiffs have not convincingly explained how the notice to HHS promulgated by the Departments would substantially burden their religious exercise but the notice crafted by the Supreme Court does not.  In *Wheaton College*, the Supreme Court emphasized the plaintiffs had functionally notified the Departments they met the necessary requirements to obtain an accommodation, and said "[n]othing in this order precludes the Government from relying on this notice, to the extent it considers it necessary, to facilitate the provision of full contraceptive coverage under the Act."  134 S. Ct. at 2807; *see also Zubik*, 2015 WL 3947586.

The *Southern Nazarene* plaintiffs object to affirmatively voicing a religious objection, including the type of notice described in *Wheaton College*.  *See* Oral Arg. in SN at 24:30-25:20.  They appear to believe that exemption from the Mandate—like the exemption for religious employers—is the only proper result under RFRA.

does not substantially burden Plaintiffs' religious exercise as a matter of law.

2. **The Accommodation Scheme Eliminates Burdens on Religious Exercise**

Under the accommodation scheme, the act of opting out relieves objecting

religious non-profit organizations from complying with the Mandate and excuses them

from participating in the provision of contraceptive coverage.  The Departments designed

the accommodation so that, upon receipt of the Form or a notification from the

government, health insurance issuers and TPAs—not the objecting religious non-profit

organization—provide contraceptive coverage and ensure the organization will not be

required to provide, pay for, or otherwise facilitate that coverage.  *See Mich. Catholic

Conf.*, 755 F.3d at 391.  We review this feature of the accommodation scheme to show

how it eliminates burdens Plaintiffs otherwise would face, similar to the burdens the for-

profit plaintiffs faced in *Hobby Lobby*.

First, the regulations specify a health insurance issuer must handle contraceptive

coverage separately from the insurance provided under the religious non-profit

organization's plan.

> A group health insurance issuer that receives a copy of the self-certification
> or notification . . . must (A) Expressly exclude contraceptive coverage from
> the group health insurance coverage provided in connection with the group
> health plan; and (B) Provide separate payments for any contraceptive
> services required to be covered under § 147.130(a)(1)(iv) for plan
> participants and beneficiaries for so long as they remain enrolled in the
> plan.

45 C.F.R. § 147.131(c)(2)(i).[26]

Second, after a religious non-profit organization opts out, a health insurance issuer

may not share the costs of providing contraception with the employer or employees.

> With respect to payments for contraceptive services, the [health insurance]
> issuer may not impose any cost-sharing requirements (such as a copayment,
> coinsurance, or a deductible), or impose any premium, fee, or other charge,
> or any portion thereof, directly or indirectly, on the eligible organization,
> the group health plan, or plan participants or beneficiaries.  The issuer must
> segregate premium revenue collected from the eligible organization from
> the monies used to provide payments for contraceptive services.

45 C.F.R. § 147.131(c)(2)(ii); *see also* 26 C.F.R. § 54.9815-2713A(c)(2)(ii); 29 C.F.R.

§ 2590.715-2713A(c)(2)(ii).  TPAs are subject to similar requirements.  *See* 26 C.F.R.

§ 54.9815-2713AT(b)(2); 29 C.F.R. § 2590.715-2713A(b)(2).

Finally, a health insurance issuer or TPA must, in communicating with plan

participants or beneficiaries, send separate notice regarding contraceptive coverage from

other plan notifications and make clear the employer neither administers nor funds

contraceptive benefits.  A health insurance issuer or TPA

> must provide to plan participants and beneficiaries written notice of the
> availability of separate payments for contraceptive services
> contemporaneous with (to the extent possible), but separate from, any
> application materials distributed in connection with enrollment (or re-
> enrollment) in group health coverage that is effective beginning on the first
> day of each applicable plan year.  The notice must specify that the eligible
> organization does not administer or fund contraceptive benefits, but that the
> third party administrator or issuer, as applicable, provides separate

---

[26] TPAs are not subject to this provision.  Instead, a TPA that receives the Form or
a notification from the government must provide or arrange for contraceptive coverage
for plan participants and beneficiaries if it wishes to remain the TPA for the group health
plan.  *See* 26 C.F.R. § 54.9815-2713AT(b)(2); 29 C.F.R. § 2590.715-2713A(b)(2).

payments for contraceptive services, and must provide contact information for questions and complaints.

26 C.F.R. § 54.9815-2713A(d); 29 C.F.R. § 2590.715-2713A(d); *see also* 45 C.F.R. § 147.131(d).

All of the foregoing remove the objecting religious non-profit organizations from providing contraceptive coverage, but Plaintiffs argue these protections of their religious liberty are insufficient because they still must deliver a Form or notify HHS to opt out of the Mandate. They contend this act substantially burdens their religious exercise because it "triggers" the provision of contraceptive coverage, makes them complicit in the larger delivery scheme, and demands their ongoing involvement. We disagree. The accommodation relieves Plaintiffs of their statutory obligation to provide contraceptive coverage to their plan participants and beneficiaries, and as we discuss below, taking advantage of that accommodation is not a substantial burden on religious exercise.

3. **The Accommodation Scheme Does Not Impose a Substantial Burden**

To explain why the accommodation scheme does not substantially burden Plaintiffs' religious exercise, we look at the theories argued by the Plaintiffs and why they fail.

   a. *Opting out does not cause contraceptive coverage.*

Although the accommodation scheme frees Plaintiffs from providing, paying for, or facilitating contraceptive coverage, they contend that, by delivering the Form or notifying HHS, they nevertheless "trigger" or cause contraceptive coverage. They do not. As we explain below, Plaintiffs' causation argument misconstrues the statutory and

regulatory framework.  Federal law, not the Form or notification to HHS, provides for

contraceptive coverage without cost sharing to plan participants and beneficiaries.

Because the mechanics of the accommodation scheme differ slightly for different types of

plans, we examine how the regulations work for insured plans, self-insured plans, and

self-insured church plans.  But in each circumstance, Plaintiffs' causation argument fails

to establish any burden on Plaintiffs' religious exercise.

       i.   <u>Insured Plans</u>

The plaintiffs with insured plans deal directly with a health insurance issuer and

do not use a TPA.[27]  They argue the accommodation scheme levies a substantial burden

on their religious exercise because "insurance issuers will sell [them] plans that either (a)

*expressly* include abortifacients; or (b) *functionally* include abortifacients by guaranteeing

separate payments for them upon [their] execution and conveyance of the self-

certification to the issuer."  SN Br. at 18.  We disagree.

The regulations do not burden the religious exercise of employers using insured

plans.  The ACA obligates both group health plans and health insurance issuers to

provide contraceptive coverage.  A religious non-profit organization may comply with

the Mandate and provide coverage to its employees, opt out using the accommodation, or

not comply with the law and pay fines.  But in each instance, the health insurance issuer

---

[27] The plaintiffs with insured plans are Oklahoma Wesleyan University and
Oklahoma Baptist University.  Southern Nazarene also has an insured plan for students
and claims above $100,000.

must ensure the organization's employees receive contraceptive coverage.

By delivering the Form or notifying HHS, an organization with an insured plan does not enable coverage—to the contrary, it simply notifies its health insurance issuer the organization will not be providing coverage.  The health insurance issuer then has an independent and exclusive obligation to provide that coverage without cost sharing.  The relevant regulation states:  "When a self-certification is provided directly to an issuer, the issuer has sole responsibility for providing such coverage in accordance with § 147.130." 45 C.F.R. § 147.131(c)(1)(i).  Because the ACA obligates health insurance issuers to provide contraceptive coverage, they must meet this obligation independently and irrespective of the notification.  The self-certification does not impose any responsibility; it merely makes it the issuer's *sole* responsibility rather than one shared with the group health plan itself.

Because federal law requires the health insurance issuer to provide coverage and the accommodation process removes an objecting organization from participating, plaintiffs with insured plans fail to show the accommodation burdens their religious exercise.  The insured plaintiffs are not burdened when they are relieved of their responsibility and their insurers provide coverage as required by independent obligations set out in the ACA.

ii.   Self-Insured Plans

The accommodation scheme permits religious non-profit organizations with self-insured plans to opt out by delivering the Form to their TPA or notifying HHS that they

have a religious objection and will not comply with the Mandate.  When the objecting organization opts out, the TPA that administers its group health plan is responsible for providing contraceptive coverage if it wishes to remain a TPA for the plan.  In this section, we address this self-insured arrangement.  In the next section, we consider the subset of self-insured plaintiffs having church plans over which the government lacks enforcement authority under ERISA to compel the TPA to comply with its legal obligations.

### 1)  Plaintiffs' argument

The only plaintiff with a self-insured plan subject to ERISA is Southern Nazarene.  Southern Nazarene argues the accommodation scheme substantially burdens its religious exercise because the scheme requires it to "comply with the Mandate by either (a) setting up a self-insured plan that includes abortifacients; or (b) setting up a self-insured plan that functionally includes abortifacients by guaranteeing separate payments for them by the TPA upon the entity's execution of the self-certification."  SN Br. at 18.  Self-insured plaintiffs with ERISA-exempt church plans make similar claims.

Plaintiffs and the dissent emphasize that the TPA may arrange or provide coverage only after a religious non-profit organization opts out.[28]  We consider this to be an

---

[28] In *University of Notre Dame*, Judge Posner said:  "By refusing to fill out the form Notre Dame would subject itself to penalties, but Aetna and Meritain would still be required to provide the services to the university's students and employees."  *Univ. of Notre Dame*, 786 F.3d at 614.

We understand the mechanics of the accommodation to work differently.  Aetna, as a health insurance issuer for Notre Dame's students, would be obligated to provide

Continued . . .

uncontested and unremarkable feature of the accommodation scheme.[29]  The regulations state that when a religious non-profit organization opts out of providing contraceptive coverage, the TPA is notified that the organization will not administer or pay for contraceptive coverage, and that it must provide or arrange for contraceptive coverage without cost sharing if it wishes to continue administering the plan.  26 C.F.R. § 54.9815-2713AT(b)(2); 29 C.F.R. § 2590.715-2713A(b)(2).  The TPA is authorized and obligated to provide the coverage guaranteed by the ACA only if the religious non-profit organization that has primary responsibility for contraceptive coverage opts out of providing it.

Plaintiffs suggest this shift in legal responsibility for contraceptive coverage substantially burdens their religious exercise under RFRA.  They argue their opting out would trigger, cause, or offer a "permission slip" for the delivery of contraception by allowing their TPA to provide the coverage.  *Southern Nazarene*, 2013 WL 6804265, at

_____

Cont.

contraceptive coverage under the ACA whether or not Notre Dame delivered the Form or notification to HHS.  *See* 42 U.S.C. § 300gg-13.  Meritain, a TPA, would be obligated to provide contraceptive coverage only after Notre Dame delivered the Form or notification to HHS and opted out of the Mandate.  *See* 26 C.F.R. § 54.9815-2713AT(b)(2); 29 C.F.R. § 2590.715-2713A(b)(2).

[29] Even the dissent in *Wheaton College* recognized that a TPA need only provide the legally required contraceptive coverage when a religious non-profit organization takes advantage of the accommodation scheme.  As Justice Sotomayor observed, "a third-party administrator bears the legal obligation to provide contraceptive coverage only upon receipt of a valid self-certification."  *Wheaton Coll.*, 134 S. Ct. at 2814 n.6 (Sotomayor, J., dissenting from grant of injunction pending appeal).

*8.  We disagree.

### 2)  Opting out does not cause coverage

The ACA requires all group health plans to cover preventive services, including contraception, without cost sharing.  Because a group health plan must include contraceptive coverage under the ACA, the accommodation scheme requires a TPA that administers a self-insured religious non-profit organization's group health plan to provide coverage if the organization opts out.  The TPA must then arrange coverage for plan participants and beneficiaries if it wishes to continue functioning as the TPA for the objecting organization.  This arrangement allows religious non-profit organizations to opt out and ensures plan participants and beneficiaries will receive the contraceptive coverage to which they are entitled by law.

Under this framework, the plaintiffs' argument does not identify a substantial burden on religious exercise.  The opt out does not "cause" contraceptive coverage; it relieves objectors of their coverage responsibility, at which point federal law shifts that responsibility to a different actor.  The ACA and its implementing regulations have already required that group health plans will include contraceptive coverage and have assigned legal responsibilities to ensure such coverage will be provided when the religious non-profit organization opts out.  *See Wheaton College v. Burwell*, No. 14-2396, 2015 WL 3988356, at *4 (7th Cir. July 1, 2015); *E. Tex. Baptist Univ.*, 2015 WL 3852811, at *5-6; *Univ. of Notre Dame*, 786 F.3d at 613-14; *Geneva Coll.*, 778 F.3d at

437-38; *Priests for Life*, 772 F.3d at 254-55.[30]  This arrangement is typical of religious

objection accommodations that shift responsibility to non-objecting entities only after an

objector declines to perform a task on religious grounds.[31]  Although a religious non-

profit organization may opt out from providing contraceptive coverage, it cannot preclude

---

[30] To the extent Plaintiffs are specifically concerned about the language on the Form, that concern can be alleviated by taking advantage of the expanded accommodation and notifying HHS in writing.  Plaintiffs need not use any terms they consider morally charged, like "certify," in their letter or email to HHS.

We further note the notification to HHS requires self-insured plaintiffs only to register their objection and identify their TPA—it does not require them to inform their TPA of any legal responsibilities to provide contraceptive coverage.  When the opt out is submitted to HHS, the plaintiffs are relieved of their responsibilities.  The government then takes steps to ensure that coverage is provided—HHS notifies the Department of Labor of the objection, and the Department of Labor then contacts the TPA to inform it of its duties under the ACA.

[31] Analogizing the opt out to conscientious objections to war, *see, e.g.*, *Priests for Life*, 772 F.3d at 245-46; *Univ. of Notre Dame*, 786 F.3d at 623-24 (Hamilton, J., concurring), should not overshadow the diverse array of mechanisms that federal, state, and local governments have used to accommodate objectors.  Many religious objection schemes require an affirmative opt out before another person is required to step in and assume responsibility, and may require the objector to identify a replacement in the process.  *See, e.g.*, 2015 Utah Laws Ch. 46 (accommodating religious objections to same-sex marriage of those working in county clerks' offices by requiring that "[a] county clerk shall . . . establish policies to ensure that the county clerk, or a designee of the county clerk who is willing, is available during business hours to solemnize a legal marriage for which a marriage license has been issued"); *Stormans Inc. v. Selecky*, 844 F. Supp. 2d 1172 (W.D. Wash. Feb. 22, 2012) (reinstating a "refuse and refer" approach where pharmacies need not provide contraception so long as they refer patients to alternative providers); Conn. Agencies Regs. § 19a-580d-9 (requiring health care providers who object to implementing a do-not-resuscitate order to "turn over care of the patient without delay to another provider who will implement the DNR order"); Internal Revenue Service, Tax Guide for Churches & Religious Organizations 18 (2013), www.irs.gov/pub/irs-pdf/p1828.pdf (explaining that a church may opt out of paying Social Security and Medicare taxes for religious reasons, shifting that responsibility to their employees to pay those taxes as though they were self-employed).

the government from requiring others to provide the legally required coverage in its stead.[32]   In short, the framework established by federal law, not the actions of the religious objector, ensures that plan participants and beneficiaries will receive contraceptive coverage.[33]

---

[32] Plaintiffs argue that, under the accommodation scheme, organizations with self-insured plans participate in the delivery of contraceptive coverage because their TPAs cannot arrange for that coverage unless and until plaintiffs deliver the Form or notification to HHS.  We discuss above why this characterization of the accommodation scheme is incorrect, but we note here that this concern is specific to self-insured plans subject to ERISA.  Plaintiffs could avoid the situation they deem objectionable by employing an insured plan, employing a self-insured church plan where the Departments lack authority to enforce the Mandate against their TPA, or administering the self-insured plan on their own in-house without using a TPA.  Although the dissent notes that in-house administration is complex, Dissent at 22-23, Plaintiffs have not demonstrated it would be a substantial burden under RFRA.  The fact that this alternative may be more expensive or difficult for plaintiffs does not necessarily make it a substantial burden.  *See Braunfeld*, 366 U.S. at 605-06.

[33] In this regard, the accommodation scheme here is comparable to a conscientious objector accommodation scheme, which provides for someone to replace the objector when he opts out of military service.  *See Priests for Life*, 772 F.3d at 245-46; *see also Univ. of Notre Dame*, 786 F.3d at 623-24 (Hamilton, J., concurring).  Indeed, the conscientious objector scheme is administratively more burdensome than filing the Form or notifying HHS to opt out of the Mandate.  A conscientious objector must register in the Selective Service System before being able to apply for an exemption, must complete an application and appear for an in-person interview, and, if the exemption is granted, must perform two years of service for the government in lieu of military service.  *See* 50 U.S.C. § 456j.
The dissent points to differences between the religious accommodation here and the conscientious objector scheme.  But the comparison is apt.  Courts have recognized that, to opt out of military service for religious reasons, a conscientious objector must notify the government of his objection knowing that someone else will take his place.  *See Trans World Airlines v. Hardison*, 432 U.S. 63, 96 n.13 (1977) (Marshall, J., dissenting) (recognizing that "the effect of excusing conscientious objectors from military conscription is to require a nonobjector to serve instead, yet we have repeatedly upheld this exemption"); *Sheridan v. United States*, 483 F.2d 169, 174 (8th Cir. 1973)

Continued . . .

### 3) Response to dissent

The dissent argues that our reasoning fails to appreciate the difference between insured and self-insured plans.  With insured plans, the health insurance issuer bears legal responsibility to provide contraceptive coverage whether or not the religious non-profit has opted out.  With self-insured plans, the TPA shoulders legal responsibility for coverage only after the religious non-profit has opted out.

_____

Cont.

(acknowledging that when the plaintiff evaded induction, "another person had to be called in his place"); *McKenzie v. Schuppener*, 415 F.2d 1056, 1058 (5th Cir. 1969) (characterizing a conscientious objection application as "the situation where appellant must go to Vietnam or someone else go in his place").  Similarly, to opt out of the Mandate, the self-insured religious objector must notify the government knowing that a TPA will take its place.

And historically, it is not unprecedented to require an objector to identify a substitute for military service.  To the contrary, the first federal draft statute permitted a draftee to avoid service only by either providing a substitute or paying $300.  *See* Act of March 3, 1863, ch. 75, § 13, 12 Stat. 731, 733 (1863).  As the dissent observes, the Civil War Enrollment Act sparked riots, Dissent at 14-15 n.7, but these were triggered by opposition to the draft itself, the inability of working class people to pay the $300 exemption, and anxiety about freed slaves entering the labor market after the war—not the fact that the draft law allowed draftees to name a substitute in their place.  *See* Leslie M. Harris, In the Shadow of Slavery: African Americans in New York City, 1626-1863, at 279-88 (2003).  Although Congress later eliminated the $300 commutation fee (except for conscientious objectors), it retained the provision allowing enrollees to supply a substitute.  *See* Act of July 4, 1864, ch. 237, §§ 2, 10, 11, 13 Stat. 379, 379-80 (1864).  To the extent the dissent suggests Chief Justice Taney's thoughts on the topic are relevant, Dissent at 14-15 n.7, we note that he considered conscription itself unconstitutional, not the substitution provision.  *See* Leon Friedman, *Conscription and the Constitution: The Original Understanding*, 67 Mich. L. Rev. 1493, 1546-48 (1969).  In fact, Chief Justice Taney paid $100 to excuse his "body servant" from the draft.  *See* Bernard C. Steiner, Life of Roger Brooke Taney: Chief Justice of the United States Supreme Court 511-12 (1922).

We agree this is a distinction between these types of plans, but the dissent overplays its importance. *See* Dissent at 5 (deeming the difference between insured and self-insured plans "the critical distinction").[34]  In both contexts, the ACA requires that group health plans cover contraceptive services, and a plaintiff knows coverage will be provided when it opts out.  Plaintiffs do not dispute plan participants and beneficiaries' right to contraceptive coverage, nor do they contest the government's ability to require TPAs and health insurance issuers to arrange for such coverage when a religious non-profit organization opts out.  The only question before us is whether the plaintiffs are substantially burdened when they notify the government of their objection with the knowledge that another party will be required to provide coverage in their stead.  The answer is no.

A religious accommodation tries to reconcile religious liberty with the rule of law. When faced with an unavoidable conflict between following the law or religious belief, RFRA provides a religious objector a means to challenge a generally applicable law and seek an exception to avoid following that law without having to break it.  A statutory accommodation, as we have here, serves the same purpose.  As noted above, this case is

---

[34] Although the Mandate in the insured plan context assigns responsibility to provide contraceptive coverage to both the religious non-profit organization and its health insurance issuer, we do not believe this is the only permissible arrangement to permit religious accommodation.  Requiring all accommodations to follow this model would be duplicative, costly, and impractical, and would foreclose a wide range of pragmatic arrangements that bring in substitutes when and only when a religious objector opts out of performing a task.  *See, e.g.*, *supra* note 31.

unusual because the Plaintiffs do not seek an accommodation where none exists, but instead challenge a statutory accommodation and argue that the process for seeking refuge in it substantially burdens their religious exercise.  As to the self-insured plaintiffs, the dissent contends that if they opt out and transfer their duty to provide contraceptive coverage to the TPA, they necessarily cause such coverage.  We disagree.

By opting out, the self-insured plaintiffs shift their duty to provide coverage to a TPA, but they do not change their plan participants and beneficiaries' entitlement to contraceptive coverage under federal law.[35]  The dissent suggests, however, that because the plaintiffs can stymie coverage to their employees by breaking the law and incurring fines, and because opting out ultimately results in the TPAs' providing coverage, the plaintiffs' opting out therefore would cause contraceptive coverage.  But this misconstrues the purpose of religious accommodation:  to permit the religious objector both to avoid a religious burden and to comply with the law.  If the plaintiffs wish to avail themselves of a legal means—an accommodation—to be excused from compliance

---

[35] The dissent attempts to distinguish between health plan beneficiaries' entitlement to coverage and their actual receipt of coverage.  This distinction breaks down under inspection.  If a religious non-profit complies with the law by providing coverage, the beneficiaries are entitled to and receive coverage.  If the non-profit opts out as the law allows, the beneficiaries likewise are entitled to and receive coverage, they just do not receive it from the non-profit.  Only if the non-profit disobeys the law and refuses either to provide coverage or opt out would the beneficiaries not receive coverage (though they would still be entitled to it).  If the opt out were not part of the law, the plaintiffs would be in the same position as the for-profits in *Hobby Lobby*—without a legal option to avoid providing coverage.  But the accommodation scheme gives the plaintiffs a legal avenue to avoid providing coverage as opposed to non-compliance with the law with the attendant financial penalties.

with a law, they cannot rely on the possibility of their violating that very same law to challenge the accommodation.

In making this argument, the dissent focuses almost exclusively on whether the plaintiffs' opt out is a but-for cause of the TPAs' authority to provide contraceptive coverage.[36]  It does, but this approach misses the mark.  Although opting out is necessarily a but-for cause of someone else—the TPA—providing contraceptive coverage, that is the point of an accommodation—shifting a responsibility from an objector to a non-objector.  That is how a legislative policy choice—here, to afford women contraceptive coverage—can be reconciled with religious objections to that policy.  We do not "den[y] the existence of any causation."  Dissent at 10.  We instead correctly identify the effect of opting out.  The effect is to shift legal responsibility from the self-insured plaintiff to its TPA and relieve the plaintiff of the duty it considers objectionable.  The effect is not the provision of contraceptive coverage, which would be afforded under the law whether or not the plaintiff opts out.

---

[36] Plaintiffs and the dissent characterize the self-certification as giving the TPA "permission" to provide contraceptive coverage.  Dissent at 9.  This characterization ignores that the self-certification specifically registers an objection to providing coverage, relieves the plaintiffs of their obligation to provide it, and affirmatively distances the plaintiffs in numerous ways from providing coverage to plan participants and beneficiaries.  *See supra* Section V.B.2.  Equating the opt out to a permission slip is akin to "disregard[ing] the difference between a 'No Trespassing' sign and a welcome mat." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 245 (1995) (Stevens, J., dissenting). The government is not compelling the plaintiffs to endorse or license something they consider objectionable; instead, the government is allowing them to decline a legal responsibility while requiring another party to perform it in their stead.

The ACA requires that either the religious non-profit organization or the TPA must provide contraceptive coverage for a self-insured group health plan, and the accommodation must be evaluated with that provision in mind. The scheme allows the religious non-profit organization to opt out of the responsibility of providing coverage and assigns that duty to the TPA administering the group health plan. Crucially, it does not change or expand contraceptive coverage beyond what federal law has already guaranteed. As the Supreme Court said in *Hobby Lobby*, the effect of the accommodation on employees "would be precisely zero. Under that accommodation, these women would still be entitled to all FDA-approved contraceptives without cost sharing." 134 S. Ct. at 2760.

The government has designed the accommodation so plaintiffs that opt out are freed from providing, paying for, or facilitating contraception, and the TPA's responsibility to provide coverage in their stead stems from federal law. Because this arrangement does not substantially burden the plaintiffs when they comply with the law, it does not matter whether the plaintiffs could prevent plan participants and beneficiaries from receiving coverage by violating the law. The dissent seems to suggest the ACA and its implementing regulations give self-insured plaintiffs discretion to decide whether their employees receive contraceptive coverage. The ACA and its implementing regulations do not, and the plaintiffs do not contend that they do. To the contrary, federal law generally requires that all people must have health insurance and that all health insurance must include preventive services, including contraceptive coverage. *See* 42 U.S.C.

§ 300gg-13.[37]  And "although [the ACA] does not specifically mention third-party administrators, they administer 'group health plans,' which must include coverage. Nothing suggests the insurers' or third-party administrators' obligations would be waived if the plaintiffs refused to apply for the accommodation."  *E. Tex. Baptist Univ.*, 2015 WL 3852811, at *5 (alterations omitted).  The accommodation scheme does not give plaintiffs discretion to thwart their employees' right to contraceptive coverage by refusing to provide coverage and also refusing to register their objection so the government can make alternative arrangements to free them from providing coverage.[38]  Because Congress has created a federal entitlement to contraceptive coverage and formulated a framework to guarantee that coverage will be provided even if plaintiffs decline to provide it, self-insured plaintiffs do not "cause" contraceptive coverage by exercising their ability to opt out.

4)  No cause of substantial burden

In sum, the self-insured plaintiffs' causal analysis falters regarding the effect of opting out, which is to shift legal responsibility to provide contraceptive coverage from

---

[37] The dissent asks, "if the self-insured plaintiffs do not opt out, who will provide the coverage for their plan participants and beneficiaries?"  Dissent at 8.  The answer is the self-insured plaintiffs, if they comply with the law.  But this is the reason for the opt out:  to allow the plaintiffs a legal means to avoid providing coverage.

[38] In the absence of any such discretionary power or responsibility, plaintiffs are not faced with the Hobson's choice the dissent describes.  Dissent at 7-8, 12, 23.  To the contrary, the accommodation eliminates any Hobson's choice by allowing plaintiffs to opt out of providing coverage.

plaintiffs to their TPAs.  When the government establishes a scheme that anticipates religious concerns by allowing objectors to opt out but ensuring that others will take up their responsibilities, plaintiffs are not substantially burdened merely because their decision to opt out cannot prevent the responsibility from being met.

To establish a claim under RFRA, about which the dissent says little, a plaintiff must show the government substantially burdens its sincere religious exercise.  The ACA states group health plans must cover contraception, and the regulations state that if a religious non-profit organization opts out, that coverage will be provided by a TPA.  Opting out does not cause the coverage itself; federal law does, by establishing a scheme that permits plaintiffs to opt out of their legal responsibility while simultaneously ensuring that plan participants and beneficiaries receive the coverage to which they are legally entitled.  Allowing plaintiffs to opt out is not a substantial burden under RFRA.[39]

---

[39] The dissent's theory of causation is not viable for the reasons discussed above. We also fail to see how it comports with the Supreme Court's orders in *Wheaton College*, 134 S. Ct. 2806, and *Zubik*, 2015 WL 3947586.  In Part II.B.1, the dissent objects that "a third party's legal authority (*i.e.* permission) to provide the coverage is wholly dependent upon (*i.e.* caused by) the self-insured non-profit opting out."  Dissent at 9.  But that would be equally true of the arrangement proposed in the Supreme Court's orders in *Zubik*, which enjoined the Mandate only "[i]f the applicants ensure that the Secretary of Health and Human Services is in possession of all information necessary to verify applicants' eligibility under 26 CFR §54.9815-2713A(a) or 29 CFR §2590.715-2713A(a) or 45 CFR §147.131(b) (as applicable)," 2015 WL 3947586, at *1, and *Wheaton College*, which enjoined the Mandate only "[i]f the applicant informs the Secretary of Health and Human Services in writing that it is a nonprofit organization that holds itself out as religious and has religious objections to providing coverage for contraceptive services," 134 S. Ct. at 2807.  (The plaintiffs in *Zubik* are self-insured and use TPAs.  *See Geneva College*, 778 F.3d at 433.  Wheaton College employs various insurance arrangements, but uses a TPA to deliver a portion of its coverage—specifically, its prescription drug

Continued . . .

iii.   <u>Self-Insured Church Plans</u>

The foregoing analysis of self-insured plans applies to the subset of self-insured church plans.  We address additional reasons here to reject the church plan plaintiffs' RFRA claims.

The plaintiffs with self-insured church plans are in a unique position.[40]  A TPA cannot be compelled to provide or arrange for contraceptive coverage if it administers a church plan under 26 U.S.C. § 414(e) that has not elected to comply with provisions of ERISA under 26 U.S.C. § 410(d)—which describes the self-insured church plans in the cases before us.  The Departments concede they lack authority under ERISA to force these church plan TPAs to perform their regulatory responsibility.  *See* 29 U.S.C. § 1003(b)(2).  As a result, the Government can require the plaintiffs with self-insured church plans to use the Form or notify HHS to register their objection and opt out, but it has no enforcement authority to compel or penalize those plaintiffs' TPAs if they decline

_____

Cont.

coverage.  *See Wheaton College v. Burwell*, 50 F. Supp. 3d. 939, 944 (N.D. Ill. 2014).)  Wheaton College had already submitted a notice of its objection to the government, but the Supreme Court did not limit the injunction to that factual scenario.  As Justice Sotomayor observed, "because Wheaton is materially indistinguishable from other nonprofits that object to the Government's accommodation, the issuance of an injunction in this case will presumably entitle hundreds or thousands of other objectors to the same remedy."  *Wheaton College*, 134 S. Ct. at 2814 n.6 (Sotomayor, J., dissenting).

[40] The plaintiffs with self-insured church plans include the Little Sisters, Reaching Souls, Truett-McConnell, and Mid-America Christian.  The analysis in this section also applies to the plaintiffs that operate or administer self-insured church plans, which include the Christian Brothers Employee Benefit Trust, Christian Brothers Services, and GuideStone Financial Resources.

to provide or arrange for contraceptive coverage.[41]

The lack of enforcement authority makes any burden on plaintiffs with church plans even less substantial than the burden on plaintiffs with self-insured plans that are subject to ERISA.  Nonetheless, plaintiffs with church plans offer the following arguments as to why the accommodation scheme might still burden their religious exercise.  First, the Departments could decide to alter the regulations and assert authority over church plans under ERISA.  Second, the mere act of signing the Form or delivering the notification may involve them in the provision of contraception, either by cooperating with the Departments or by providing authorization to a TPA, which then decides it wants to provide contraceptive coverage after all.  Third, their opting out incentivizes TPAs to provide coverage even if they are exempt from ERISA.  Fourth, the Government has not demonstrated why the plaintiffs must complete the self-certification if their TPAs can decline to provide contraceptive coverage.  In addition to the reasons self-insured plans in general are not substantially burdened by the accommodation scheme, we

---

[41] If TPAs for self-insured church plans decide not to provide contraceptive coverage, plan participants and beneficiaries would not get the coverage to which they are otherwise entitled under the ACA.  The dissent suggests it is paradoxical to maintain the ACA ensures plan participants and beneficiaries will receive contraceptive coverage and also acknowledge TPAs for self-insured church plans may in fact decline to provide that coverage.  Dissent at 11 n.4.  The positions are consistent.  The ACA requires all group health plans to provide contraceptive coverage, but because it can only enforce that requirement through ERISA, church plans that are exempt from ERISA do not face any consequences if they fail to meet it.  Put differently, the ACA creates a legal duty for *all* group health plans, but the Government cannot enforce that duty against a narrow subset of self-insured church plans.  The inability to enforce that duty does not mean the duty does not exist.

conclude the plaintiffs with self-insured church plans have failed to identify a substantial

burden on religious exercise.

### 1)  Hypothetical regulation

The plaintiffs argue the Departments could assert authority over church plans

under ERISA at some point in the future.  We assess the regulations as they currently

exist, not amendments to ERISA's implementing regulations the Department of Labor

may hypothetically promulgate.  An "[i]njunction issues to prevent existing or presently

threatened injuries.  One will not be granted against something merely feared as liable to

occur at some indefinite time in the future." *Connecticut v. Massachusetts*, 282 U.S. 660,

674 (1931).  Should the Departments assert ERISA authority over church plans at some

later date, plaintiffs may then seek a preliminary injunction to prevent the Departments

from enforcing the Mandate.  Unless and until the Departments change their position,

however, plaintiffs' speculative argument does not warrant a preliminary injunction.  *See

Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011).

### 2)  No causation from church plan TPA notification

The plaintiffs contend completing the self-certification would be a substantial

burden because it would allow TPAs to provide coverage to their group health plan

participants and beneficiaries, even if the Departments cannot compel the TPA to do so

under ERISA.  But plaintiffs with self-insured church plans are not substantially

burdened by the requirement that they complete the Form or notification to HHS.  As we

explained in the previous section on self-insured plans, when a religious non-profit

organization opts out of the Mandate, the requirement that the group health plan include

contraceptive coverage is a product of federal law, not the product of the organization's

opting out.  Opting out frees plaintiffs from their obligation to provide contraceptive

coverage under the ACA. The lack of substantial burden is especially evident when the

group health plan is administered by a TPA that has made clear it will not provide

contraceptive coverage on religious grounds.  The Little Sisters' TPA, for example, is

Christian Brothers, their co-plaintiff in this case.  It is clear Christian Brothers need not,

and will not, provide contraceptive coverage if the Little Sisters opt out of the Mandate.[42]

### 3)  No incentive from church plan TPA notification

Even when TPAs for self-insured church plans indicate they may comply with the

Mandate, the TPAs make that decision, and the objecting religious non-profit

organization is not substantially burdened.  The plaintiffs in *Reaching Souls* argue one of

their TPAs, Highmark, has indicated it will provide contraceptive coverage if they opt out

of the Mandate.  The *Reaching Souls* plaintiffs argue their act of opting out would not

only provide Highmark with permission to provide contraceptive coverage, but would

incentivize it to do so because Highmark could then seek reimbursement from the

government.

Plaintiffs fail to demonstrate the reimbursement provision actually gives TPAs an

incentive to provide coverage.  They claim a TPA that receives the Form or a letter from

---

[42] Plaintiff TPAs that administer church plans are not substantially burdened for similar reasons.  In the absence of any enforcement power, the Government cannot levy fines against them for declining to provide contraceptive coverage.

the government "becomes eligible for government payments that will both cover the
TPA's costs and include an additional payment (equal to at least 10% of costs) for the
TPA's margin and overhead."  LS Br. at 16.  At a hearing in *Reaching Souls*, counsel for
the Government seemed to accept this characterization.  But the regulations themselves
expressly contradict this reading.  They state the payment for margin and overhead goes
to health insurance issuers who act as intermediaries for the reimbursement, and need not
go to TPAs.[43]  *See* 45 C.F.R. § 156.50(d)(5) (specifying health insurance issuers must
reimburse TPAs for "the portion of the adjustment attributable to the total dollar amount
of the payments for contraceptive services submitted by the third party administrator" but
that "[n]o such payment is required with respect to the allowance for administrative costs
and margin").

Moreover, even if TPAs were to receive a payment for margin and overhead—set
at 15% of costs for 2014—plaintiffs do not demonstrate this allowance actually functions
as an incentive to provide contraceptive coverage rather than repayment for the
administrative costs TPAs incur by stepping in to arrange for or provide coverage.
Plaintiffs have not demonstrated the allowance for administrative overhead actually

_____

[43] The Departments credit the health insurance issuer for (1) the total dollar
amount of the TPA's payments for contraceptive coverage, and (2) an allowance of at
least 10% for administrative costs and margin.  *See* 45 C.F.R. § 156.50(d)(3).  The health
insurance issuer then pays the TPA for the total dollar amount of the TPA's payments for
contraceptive coverage, but is not required to pay the TPA the allowance for
administrative costs and margin.  *See* 45 C.F.R. § 156.50(d)(5).  As a result, the
regulations require only that a TPA receive repayment for what it has actually spent
providing contraceptive coverage.  A reimbursement solely for costs incurred would not
generate a profit or offer any incentive to provide contraceptive coverage.

generates a profit for TPAs, nor have they demonstrated that the allowance would
incentivize TPAs to provide coverage where they otherwise would not.

### 4)  The Government may require affirmative objection

Plaintiffs finally argue that if the Departments lack ERISA enforcement authority
against TPAs of self-insured church plans, the Government has no reason to require
religious non-profit organizations to comply with the accommodation scheme and deliver
the Form or notify HHS.  It is the plaintiffs' burden, however, to state a prima facie case
under RFRA.  Because they cannot establish that signing the Form or notifying HHS
constitutes a substantial burden on their religious exercise, we do not question the
Departments' interest in requiring them to opt out of the Mandate to avoid penalties for
failure to provide contraceptive coverage.[44]

*   *   *   *

We conclude the Plaintiffs' causation arguments do not establish a burden on their
religious exercise, much less a substantial burden, because opting out would not trigger,

---

[44] The Departments have a sound reason to require an affirmative opt out—not all
religious organizations share the beliefs of the Little Sisters, Reaching Souls, Truett-
McConnell, and Mid-America Christian.  The parties agree that the Departments can
require non-objecting employers to provide contraceptive coverage under their group
health plans.  To enforce that general requirement, the Departments may require
objecting employers to affirmatively voice their objection instead of assuming all
religious non-profit organizations share the plaintiffs' beliefs.

incentivize, or otherwise cause the provision of contraceptive coverage.[45]   We therefore turn to Plaintiffs' argument that the act of opting out and the administrative requirements associated with the accommodation make them feel or appear complicit in the overall contraceptive coverage scheme.

> ### e.  *No substantial burden from complicity*

The accommodation relieves Plaintiffs from providing, paying for, or facilitating contraceptive coverage, and federal law requires health insurance issuers and TPAs to provide contraceptive coverage when religious non-profit organizations take advantage of the accommodation.  Plaintiffs argue the act of opting out would nevertheless substantially burden their religious exercise because they believe delivering the Form or notification to HHS would make them complicit in the overall scheme to deliver contraceptive coverage.  They wish to play no part in it.  We find this argument unconvincing for a number of reasons.

<u>First</u>, the purpose and design of the accommodation scheme is to ensure that Plaintiffs are *not* complicit—that they do not have to provide, pay for, or facilitate contraception.  Plaintiffs' concern that others may believe they condone the Mandate is unfounded.  Opting out sends the unambiguous message that they *oppose* contraceptive coverage and refuse to provide it, and does not foreclose them from objecting both to

---

[45] Under these circumstances, as the Third Circuit observed, "the burden is not merely attenuated at the outset but totally disconnected from the appellees."  *Geneva Coll.*, 778 F.3d at 442.

contraception and the Mandate in the strongest possible terms.

Second, to the extent Plaintiffs assert that completing the Form or notification violates their religious beliefs, they state a necessary but not a sufficient predicate for a RFRA claim. Under RFRA, they must establish that completing the Form or notification substantially burdens their religious exercise; otherwise, this argument could be used to avoid almost any legal obligation that involves a form. Plaintiffs do not object to signing forms and paperwork generally—they object to the Form or notification to HHS, and they do so because they believe it involves them in directly or indirectly providing, paying for, or facilitating contraceptive coverage, which they oppose as a matter of religious conviction. As we have explained, the Plaintiffs misstate their role in the accommodation scheme. RFRA does not require us to defer to their erroneous view about the operation of the ACA and its implementing regulations.[46]

---

[46] Plaintiffs cite *Thomas* for the proposition that we cannot question the theological merit of their religious beliefs. *See Thomas*, 450 U.S. at 715 ("We see, therefore, that Thomas drew a line, and it is not for us to say that the line he drew was an unreasonable one."). We agree with that proposition, but we may—indeed, we must—determine whether the accommodation scheme substantially burdens their religious exercise.

In *Thomas*, Mr. Thomas believed he could not participate in the production of war materials. *Id.* at 709. The government argued Mr. Thomas's beliefs did not warrant protection by suggesting those beliefs were inconsistent and not shared by his co-religionists. *Id.* at 714-15. The Supreme Court specifically rejected these attempts to impeach Mr. Thomas's religious beliefs, *id.* at 715-16, but the Court was not confronted with the question of whether those beliefs were substantially burdened. Both the Supreme Court and the Tenth Circuit have indicated that accepting a plaintiff's religious belief does not foreclose an inquiry into whether religious exercise has been substantially burdened. *See, e.g.*, *Hernandez*, 490 U.S. at 699; *Kikumura*, 242 F.3d at 961.

Continued . . .

Third, because the accommodation does not involve them in providing, paying for,

facilitating, or causing contraceptive coverage, Plaintiffs' only involvement in the scheme

is the act of opting out.  Plaintiffs are not substantially burdened solely by the *de minimis*

administrative tasks this involves.  All opt-out schemes require some affirmative act to

free objectors from the obligations they would otherwise face.  The Plaintiffs' logic

would undermine conscientious objection schemes that require the objection to be made,

relieve objectors of their obligations, but assign those obligations to other, non-objecting

actors in their stead.  *See, e.g.*, *Gillette v. United States*, 401 U.S. 437 (1971)

(acknowledging a petitioner must complete an exemption application to obtain

_____

Cont.

      The Government does not question Plaintiffs' religious beliefs that contraception is sinful and they cannot be involved in providing, paying for, or facilitating contraceptive coverage.  But Plaintiffs go beyond *Thomas* when they insist that we cannot question whether opting out makes them complicit in providing contraceptive coverage.  We may properly consider that opting out excuses them from providing coverage, does not cause that coverage to be extended to plan participants and beneficiaries, and involves only routine administrative tasks that are not substantial burdens under RFRA.  *See Little Sisters*, 6 F. Supp. 3d at 1239 ("Thus, Plaintiff's contention that the Court cannot look behind their statements about what offends their religious beliefs is well-supported.  However, the Court is under no such restriction with regard to Plaintiffs' construction of how the Final Rules operate, including the administrative burdens imposed on the parties by these regulations.").

      For these reasons, *Thomas* is inapposite when the inquiry focuses on whether a burden is substantial.  It does not preclude courts from examining the relationship between a sincerely held religious belief and the alleged burden imposed by the Government.  This important distinction prevents the Government from having to survive strict scrutiny whenever a plaintiff misunderstands the burden being placed upon them— for example, if Mr. Thomas had been required to produce equipment for farming and sincerely, but incorrectly, believed that equipment was being produced for war.  *See, e.g.*, *Priests for Life*, 772 F.3d at 249 n.14.

- 68 -

conscientious objector status in wartime); *Welsh v. United States*, 398 U.S. 333 (1970) (same).[47]  Having to file paperwork or otherwise register a religious objection, even if one disagrees with the ultimate aim of the law at issue, does not alone substantially burden religious exercise.

The Government may therefore require religious objectors to complete *de minimis* administrative tasks to opt out.  Filing the Form or notifying HHS easily fits within this category.  The Departments have made opting out of the Mandate at least as easy as obtaining a parade permit, filing a simple tax form, or registering to vote—in other words, a routine, brief administrative task.  The purpose of the Form or notification to HHS is to extricate Plaintiffs from their legal obligation to provide contraceptive coverage.  Opting out ensures they will play no part in the provision of contraceptive coverage, prohibits TPAs and health insurance issuers from sharing the costs of providing coverage with them, and requires notice to employees that they do not administer or fund contraceptive services.

---

[47] As other courts have observed, invalidating the accommodation scheme would run contrary to many other laws allowing objectors to opt out of government programs and requirements.  *See Priests for Life*, 772 F.3d at 245 (deeming Plaintiffs' argument against the accommodation scheme "extraordinary and potentially far reaching"); *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 557 (7th Cir. 2014), *vacated and remanded sub nom.*, *Univ. of Notre Dame v. Burwell*, 135 S. Ct. 1528 (2015) ("The novelty of Notre Dame's claim—not for the exemption, which it has, but for the right to have it without having to ask for it—deserves emphasis. . . .  What makes this case and others like it involving the contraception exemption paradoxical and virtually unprecedented is that the beneficiaries of the religious exemption are claiming that the exemption process itself imposes a substantial burden on their religious faiths.").

The notification to HHS is especially minimal, as it requires Plaintiffs only to register their objection with HHS and does not require any contact with their health insurance issuers or TPAs.  Although Plaintiffs must tell HHS which health insurance issuer or TPA they use to opt out of the Mandate, this is not a substantial burden on religious exercise.[48]  It is the kind of administrative task the Departments can require of religious believers in the administration of governmental programs.  *See Priests for Life*, 772 F.3d at 246; *Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 305-06 (1985); *see also Jimmy Swaggart Ministries v. Bd. of Equaliz. of Cal.*, 493 U.S. 378, 395 (1990); *Hernandez*, 490 U.S. at 696-97.  When understood in light of the ACA's requirement that group health plans and health insurance issuers provide contraceptive coverage and the manner in which the accommodation relieves Plaintiffs of providing

---

[48] Plaintiffs using the Form need only enter the name of the objecting organization, name and title of the individual authorized to make the certification on behalf of the organization, and the mailing address, email address, and phone number of that individual.  That person signs, dates, and sends the form to their TPA or health insurance issuer.  Employers are required to keep the Form on file for six years.  The Plaintiffs have leeway in drafting a notification to HHS, which need only include

> the name of the eligible organization and the basis on which it qualifies for an accommodation; its objection based on sincerely held religious beliefs to providing coverage of some or all contraceptive services (including an identification of the subset of contraceptive services to which coverage the eligible organization objects, if applicable); the plan name and type (i.e., whether it is a student health insurance plan within the meaning of 45 CFR 147.145(a) or a church plan within the meaning of ERISA section 3(33)); and the name and contact information for any of the plan's third party administrators and health insurance issuers.

79 Fed. Reg. at 51,094-95.

that coverage, identifying one's TPA in a letter to HHS is at most a minimal burden and certainly not a substantial one.

Finally, Plaintiffs are not substantially burdened when, after they opt out and are relieved of their obligations under the Mandate, health insurance issuers or TPAs must provide contraception to plan participants and beneficiaries.  Plaintiffs sincerely oppose contraception, but their religious objection cannot hamstring government efforts to ensure that plan participants and beneficiaries receive the coverage to which they are entitled under the ACA. "Religious objectors do not suffer substantial burdens under RFRA where the only harm to them is that they sincerely feel aggrieved by their inability to prevent what other people would do to fulfill regulatory objectives after they opt out." *Priests for Life*, 772 F.3d at 246.  Pre-*Smith* case law and RFRA's legislative history underscore that religious exercise is not substantially burdened merely because the Government spends its money or arranges its own affairs in ways that plaintiffs find objectionable.  *See Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-54 (1988); *Bowen*, 476 U.S. at 699-700; *Tony & Susan Alamo Found.*, 471 U.S. at 303; S. Rep. No. 103-111, at 9 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1898 ("[P]re-*Smith* case law makes it clear that strict scrutiny does not apply to government actions involving only management of internal Government affairs or the use of the Government's own property or resources.").  RFRA does not prevent the Government from reassigning obligations after an objector opts out simply because the objector strongly opposes the ultimate goal of the generally applicable law.

Plaintiffs' complicity argument therefore fails.  Opting out would eliminate their complicity with the Mandate and require only routine and minimal administrative paperwork, and they are not substantially burdened by the Government's subsequent efforts to deliver contraceptive coverage in their stead.

### f.   *No burden from ongoing requirements*

As a final argument, Plaintiffs deny the act of opting out would free them from further involvement in the provision of contraceptive coverage.  They argue the accommodation scheme would require their ongoing participation, and give two examples to support this claim.

First, Plaintiffs argue they would remain involved because the Departments are commandeering their group health plans to provide contraceptive coverage to their employees.  They note their TPA or health insurance issuer can provide coverage only as long as plan participants and beneficiaries remain employed with the religious non-profit organization.

Plaintiffs have not shown, assuming they opt out, how the provision of coverage to plan participants and beneficiaries through the health insurance issuer or TPA would substantially burden their religious exercise.  Plaintiffs' plan participants and beneficiaries are not guaranteed contraceptive coverage without cost sharing because they work for the Plaintiffs; they are guaranteed contraceptive coverage under the ACA.  The ACA mandates health insurance that includes contraceptive coverage.  *See* 42 U.S.C. § 300gg-13(a)(4).  Plaintiffs' theory would not only relieve them of complying with the

Mandate, it would prevent health insurance issuers and TPAs from stepping in under the ACA to provide plan participants and beneficiaries with the coverage they are entitled to receive under federal law.

Second, Plaintiffs object that they must (a) notify their TPA or health insurance issuer when employees join or leave their broader health insurance scheme, and (b) complete the self-certification or notification to HHS when they create or terminate a relationship with a TPA or health insurance issuer.  As to the first requirement, employers already must notify their TPA or health insurance issuer when they hire or fire employees.  The communication with the TPA or health insurance issuer regarding general health insurance coverage for entering or exiting plan participants and beneficiaries would occur regardless of any legal obligation under the accommodation scheme.  The latter requirement, however, is an obligation specific to the accommodation scheme.  An insured or self-insured employer using the Form must send it to "each" TPA or health insurance issuer as the employer forms contractual relationships with them.  26 C.F.R. § 54.9815-2713AT(b)(1)(ii); 29 C.F.R. § 2590.715-2713A(b)(1)(ii).  If the employer instead uses the notification process, the regulations state:  "If there is a change in any of the information required to be included in the notice, the organization must provide updated information to the Secretary of Health and Human Services."  26 C.F.R. § 54.9815-2713AT(b)(1)(ii)(B); 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B).

Once again, this does not constitute a substantial burden.  The only new requirement is that employers must complete the Form or notify HHS of their objection

when they contract with a new health insurance issuer or TPA.  Plaintiffs do not argue the

time, cost, or energy required to comply with this requirement constitutes a substantial

burden; they argue it is the moral significance of their involvement which burdens their

religious exercise.[49]  If the first self-certification is not a substantial burden, a second or

third self-certification would not be substantially burdensome given the extremely

minimal administrative requirements of the Form or notification.  As we have discussed

above, *de minimis* administrative requirements do not themselves amount to substantial

burdens on religious liberty.  *See Tony & Susan Alamo Found.*, 471 U.S. at 305-06; *see*

*also Jimmy Swaggart Ministries*, 493 U.S. at 394-95; *Hernandez*, 490 U.S. at 696-97.  If

the actual delivery of the Form or notification is not a substantial burden, a contingent

administrative requirement to update the Form or notification is not either.

The regulations require the Plaintiffs to complete the Form or deliver the

notification if they wish to opt out.  But this ministerial act to opt out is not a substantial

burden on religious exercise, nor are the collateral requirements of the scheme.  The

Departments have allowed Plaintiffs to opt out of a neutral and generally applicable

requirement imposed by federal law, and have done so in a manner that affirmatively

distances those organizations from the provision of contraceptive coverage that other

employers must provide.  It is not a substantial burden to require organizations to provide

---

[49] The interim final rules estimate "the total annual burden for preparing and providing the information in the self-certification or notice to HHS will require approximately 50 minutes for each eligible organization with an equivalent cost burden of approximately $53."  79 Fed. Reg. at 51,097.

minimal information for administrative purposes to take advantage of that accommodation.

### C.   Strict Scrutiny

Because we determine Plaintiffs have failed to demonstrate a substantial burden on their religious exercise, we need not address whether the Departments have shown a compelling state interest and adopted the least restrictive means of advancing that interest.[50]

### D.   Conclusion

In the absence of a substantial burden, Plaintiffs have not demonstrated a strong likelihood of success on the merits of their RFRA claim, nor have they demonstrated they will suffer irreparable injury if an injunction is denied.  Accordingly, a preliminary injunction on RFRA grounds is inappropriate.

## VI.  FIRST AMENDMENT

Although the district courts focused almost exclusively on RFRA, Plaintiffs also

---

[50] We recognize third-party rights and interests are at stake in this litigation—namely, that plan participants and beneficiaries are entitled by law to contraceptive coverage without cost sharing.  When evaluating RFRA and Free Exercise claims, courts properly consider the impact of religious liberty claims on pre-existing rights holders. *Hobby Lobby*, 134 S. Ct. at 2760 (emphasizing "[t]he effect of the HHS-created accommodation on the women employed by Hobby Lobby and the other companies involved in these cases would be precisely zero"); *see Cutter v. Wilkinson*, 544 U.S. 709, 720 (2005); *Estate of Thornton v. Caldor, Inc.*, 472 U.S. 703, 709-10 (1985); *Yoder*, 406 U.S. at 230; *Sherbert*, 374 U.S. at 409; *Braunfeld*, 366 U.S. at 604-05.  Because we determine Plaintiffs have not demonstrated a substantial burden on their religious exercise, we do not reach the strict scrutiny analysis where the rights and interests of third parties are properly weighed.

raised constitutional claims. They argue the accommodation scheme violates the Free

Exercise and Establishment Clauses of the First Amendment by exempting religious

employers from the Mandate but requiring religious non-profit organizations to seek an

accommodation.[51] Plaintiffs also argue the accommodation scheme simultaneously

---

[51] In this discussion of First Amendment claims, "Plaintiffs" refers only to the plaintiffs in *Little Sisters* and *Reaching Souls*, and not *Southern Nazarene*. All of the plaintiffs raised First Amendment claims in their complaints, but only the *Little Sisters* and *Reaching Souls* plaintiffs preserved these claims in their subsequent motions for a preliminary injunction and briefs on appeal. App. in LS at 57a-66a, 136a-38a; App. in RS at A65-74, A145-49.

The district courts in *Little Sisters* and *Reaching Souls* did not reach the First Amendment claims. In *Little Sisters*, the court found the plaintiffs' assertion of irreparable harm—which they were required to show to obtain a preliminary injunction, *see Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009)—was based only on RFRA. *See Little Sisters*, 6 F. Supp. 3d at 1245. In *Reaching Souls*, the court determined it did not need to reach First Amendment claims because it granted a preliminary injunction on RFRA grounds. *See Reaching Souls*, 2013 WL 6804259, at *8 n.9.

On appeal, we consider the First Amendment claims in both cases. First, the *Little Sisters* plaintiffs made a sufficient argument before the district court. They expressly sought a preliminary injunction on First Amendment as well as RFRA grounds. App. in LS at 136a-138a. They did not elaborate on their First Amendment claims in the irreparable harm analysis, but "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura*, 242 F.3d at 963 (quotations omitted). Second, although we reverse the district court's grant of a preliminary injunction on RFRA grounds in *Reaching Souls*, plaintiffs there raised the question whether that preliminary injunction is appropriate on First Amendment grounds. "If the district court fails to analyze the factors necessary to justify a preliminary injunction, this court may do so if the record is sufficiently developed." *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009); *see also Hobby Lobby*, 723 F.3d at 1145 ("The record we have is the record the parties chose to create below—it is the record they deemed sufficient for the district court to decide the preliminary injunction question. For each element, we believe this record suffices for us to resolve each of the remaining preliminary injunction factors."). Because the First Amendment claims in both *Little Sisters* and *Reaching Souls* are legal questions that have

Continued . . .

compels and silences their speech in violation of the Free Speech Clause of the First Amendment.  We disagree and conclude the accommodation scheme comports with the First Amendment.  We note that the same standard of review we identified for the RFRA claim applies to the First Amendment claims.

### A.   *Free Exercise Clause*

Plaintiffs contend the ACA and its implementing regulations violate the Free Exercise Clause by exempting some religious objectors—churches and their "integrated auxiliaries"—from the Mandate, while requiring others—specifically, religious non-profit organizations—to comply with the Mandate, seek an accommodation, or pay substantial fines.  They have not explained how their Free Exercise claim differs from their Establishment Clause claim, nor do they explain how they could prevail under the standard in *Smith* if they are unlikely to succeed under RFRA.  Because we conclude the

_____

Cont.

been fully briefed on appeal, we resolve those questions in this opinion rather than remanding them to the district courts and prolonging this litigation.

By contrast, the *Southern Nazarene* plaintiffs included First Amendment claims in their complaint, but did not assert them in their motion for a preliminary injunction or accompanying memorandum of law.  As a result, the district court did not reach any First Amendment claims in its decision.  *See Southern Nazarene*, 2013 WL 6804265.  Moreover, the *Southern Nazarene* plaintiffs do not make First Amendment claims in their opening brief on appeal.

Although we believe our First Amendment analysis applies to all group health plans and does not depend on whether they are insured, self-insured, or self-insured church plans, we note *Little Sisters* and *Reaching Souls* involve only self-insured church plans that are not subject to ERISA, and the insured and self-insured plans discussed in *Southern Nazarene* are not before us.

Mandate and accommodation scheme are neutral and generally applicable laws, they are subject only to rational basis review, which they survive.

1. **Legal Background**

The First Amendment's religion clauses state: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. 1. To resolve challenges under the Free Exercise Clause, we use a well-established framework. If a law is neutral and generally applicable, it does not violate the Free Exercise Clause "even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *see Smith*, 494 U.S. at 878-80. "A law is neutral so long as its object is something other than the infringement or restriction of religious practices." *Grace United*, 451 F.3d at 649-50. A law that is facially neutral may nevertheless fail the neutrality test if it covertly targets religious conduct for adverse treatment. *Lukumi Babalu*, 508 U.S. at 534.

To determine whether a law is generally applicable, we ask if the "legislature decide[d] that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* at 542-43. "[A] law that is both neutral and generally applicable need only be rationally related to a legitimate governmental interest to survive a constitutional challenge." *Grace United*, 451 F.3d at 649.

2.  **The Mandate and Accommodation Scheme are Neutral**

The Mandate and the accommodation scheme are neutral laws.  *See Priests for Life*, 772 F.3d at 267-69; *Mich. Catholic Conf.*, 755 F.3d at 393-94.  The Mandate is facially neutral with regard to employers, and neither the history nor the text of the ACA and its implementing regulations suggest the Mandate was targeted at a particular religion or religious practice.  Plaintiffs cannot show Congress or HHS "had as their object the suppression of religion."  *Lukumi Babalu*, 508 U.S. at 542.  To the contrary, the Mandate arose from concerns about the personal and social costs of barriers preventing women from receiving preventive care, including reproductive health care.  *See* IOM, *Clinical Preventive Services for Women: Closing the Gaps* 102-03 (2011), *available at* www.nap.edu/catalog.php?record_id=13181.  The accommodation scheme was developed to facilitate the free exercise of religion, not to target religious groups or burden religious practice.  To that end, the Departments expanded the religious employer exemption and religious non-profit organization accommodation to respond to the concerns of religious groups.  The Plaintiffs' apparent dissatisfaction with the accommodation offered to them does not mean the Mandate or the accommodation scheme is non-neutral.

3.  **The Mandate and Accommodation Scheme are Generally Applicable**

The Mandate and the accommodation scheme are also generally applicable.  *See Priests for Life*, 772 F.3d at 267-69; *Mich. Catholic Conf.*, 755 F.3d at 393-94.  Plaintiffs cannot show Congress or the Departments sought to impose the Mandate only against

religious groups; to the contrary, the Mandate applies to all employers with more than fifty employees using non-grandfathered health plans.[52]  "The exemptions do not render the law so under-inclusive as to belie the government's interest in protecting public health and promoting women's well-being or to suggest that disfavoring Catholic or other pro-life employers was its objective."  *Priests for Life*, 772 F.3d at 268.  Plaintiffs fail to demonstrate the accommodation scheme targets religious conduct or was created with the objective of disfavoring particular faiths.  *Lukumi Babalu*, 508 U.S. at 542-43.  To the contrary, the Mandate was enacted as part of a larger program of health care reform, and both the exemption for religious employers and the accommodation for religious non-profit organizations demonstrate federal deference to religious liberty concerns and were promulgated to facilitate rather than inhibit the free exercise of religion.

---

[52] *Smith* stated that "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of religious hardship without compelling reason."  *Smith*, 494 U.S. at 884 (quotations and citation omitted).  But as we noted in *Grace United*, "we have already refused to interpret *Smith* as standing for the proposition that a secular exemption automatically creates a claim for a religious exemption."  *Grace United*, 451 F.3d at 651.  We have instead held:

> a system of individualized exemptions is one that gives rise to the application of a subjective test.  Such a system is one in which case-by-case inquiries are routinely made, such that there is an individualized governmental assessment of the reasons for the relevant conduct that invites considerations of the particular circumstances involved in the particular case.

*Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004) (quotations and citations omitted).  None of the categorical exemptions enacted by the ACA and its implementing regulations establish a system of individualized objections.  And for the reasons detailed above, we believe the accommodation scheme effectively relieves objecting religious non-profit organizations of their obligations.

4.  **The Mandate and Accommodation Scheme Have a Rational Basis**

Rather than make an argument based on the rational relationship standard, Plaintiffs instead contend our decision in *Hobby Lobby* precludes us from finding that public health and gender equality, without greater specificity, constitute compelling governmental interests.  But, as we have explained, the compelling interest test does not apply; the rational basis test does.  *Grace United*, 451 F.3d at 649.  The Government observes that in the cases before us, the accommodation scheme rationally serves the twin interests of facilitating religious exercise and filling coverage gaps resulting from accommodating that religious exercise.

On rational basis review, these interests are sufficient.  Alleviating governmental interference with religious exercise, which the accommodation scheme does, is a permissible legislative purpose.  *Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 335 (1987).  And we need not scrutinize whether the Government's interest in public health and gender equality is more compelling in this case than in *Hobby Lobby*.  We need only determine that public health and gender equality are *legitimate* state interests.  We believe they meet this more permissive standard, which is not foreclosed by our compelling interest analysis in *Hobby Lobby*.  *See, e.g.*, *Hobby Lobby*, 723 F.3d at 1143 (determining public health and gender equality are too broad to satisfy the compelling interest test but noting "[w]e recognize

the importance of these interests").[53]  The accommodation scheme advances both the free

exercise of religion and the Government's legitimate interests in public health and gender

equality.  *See Hobby Lobby*, 134 S. Ct. at 2759 ("We therefore conclude that [the

accommodation] system constitutes an alternative that achieves all of the Government's

aims while providing greater respect for religious liberty.").

Furthermore, when applying the rational basis test, we are not limited to interests

specifically articulated by the Departments.  We may look to any conceivable legitimate

governmental interest, and "the burden is upon the challenging party to negative any

reasonably conceivable state of facts that could provide a rational basis."  *Bd. of Trs. of

Univ. of Ala. v. Garrett*, 531 U.S. 356, 367 (2001) (citations and internal quotations

omitted).  The more specific governmental interest in health by ensuring access to

contraception without cost sharing, which we did not specifically address in *Hobby

Lobby*, would constitute a legitimate interest conceivably advanced by the

accommodation scheme.  *See Hobby Lobby*, 723 F.3d at 1160 (Bacharach, J., concurring)

("[T]he plurality does not mention the public interest that the government had relied on at

---

[53] *See also Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549
(1987) (identifying "a compelling interest in eliminating discrimination against women");
*Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984) ("Assuring women equal access to
such goods, privileges, and advantages clearly furthers compelling state interests.");
*Prince v. Massachusetts*, 321 U.S. 158, 165-67 (1944) (upholding child labor laws
against a free exercise challenge on health and welfare grounds); *Jacobson v.
Massachusetts*, 197 U.S. 11, 25 (1905) (upholding a mass vaccination program against a
liberty challenge on health and welfare grounds); *see also Bob Jones Univ. v. United
States*, 461 U.S. 574, 604 (1983) (determining a compelling interest in eradicating racial
discrimination "substantially outweighs whatever burden denial of tax benefits places on
petitioners' exercise of their religious beliefs").

the preliminary-injunction hearing: the health reasons for promoting employee access to emergency contraceptives."). The Departments' recognized interest in the uniformity and ease of administration of its programs would also meet this standard. *See, e.g.*, *Bowen*, 476 U.S. at 707; *Hernandez*, 490 U.S. at 682; *United States v. Lee*, 455 U.S. 252, 258-59 (1982).

The Mandate and accommodation scheme easily pass the rational basis test. Because the Mandate is both neutral and generally applicable and supported by a rational basis, Plaintiffs fail to make out a plausible claim under the Free Exercise Clause.

### B. *Establishment Clause*

Plaintiffs contend that exempting churches and integrated auxiliaries from the Mandate but requiring religious non-profit organizations to seek an accommodation violates the Establishment Clause. We disagree. Because the Departments have chosen to distinguish between entities based on neutral, objective organizational criteria and not by denominational preference or religiosity, the distinction does not run afoul of the Establishment Clause.

### 1. **Organizational Distinctions Well-Established in Federal Law**

Federal law distinguishes between different types of religious organizations, and as we discuss below, this differentiation is constitutionally permissible. Under the ACA and its implementing regulations, a religious employer "is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (a)(3)(A)(iii) of the Internal Revenue Code of 1986, as amended." 45 C.F.R. § 147.131(a). The regulations

at issue in this case draw on the tax code's distinction between houses of worship and religious non-profits, a "longstanding and familiar" distinction in federal law. *Priests for Life*, 772 F.3d at 238; *see also Geneva Coll.*, 778 F.3d at 443 (determining it was permissible for the Departments to base the exemption on the IRC's provision "because that provision was a bright line that was already statutorily codified and frequently applied").

Exempting churches while requiring other religious objectors to seek an accommodation is standard practice under the tax code. The IRC and other regulations award benefits to some religious organizations—typically, houses of worship—based on articulable criteria that other religious organizations do not meet. *See* 26 U.S.C. § 6033(a)(3)(A)(i), (iii). Churches, their integrated auxiliaries, and conventions or associations of churches are automatically considered tax exempt and need not notify the government they are applying for recognition, but other religious non-profit organizations must apply for tax-exempt status if their annual gross receipts are more than $5,000. *See id.* § 508(a), (c)(1)(A). Similarly, churches, their integrated auxiliaries, conventions or associations of churches, and the exclusively religious activities of any religious order need not file tax returns, but religious non-profit organizations with gross receipts above $5,000—even if they are tax-exempt—must file annually. *Id.* § 6033(a). Congress has placed special limitations on tax inquiries and examinations of churches, but not integrated auxiliaries, church-operated schools, or religious non-profit organizations. *See id.* § 7611.

Congress has used similar organizational distinctions in the realm of religious

accommodations.  Churches and qualified church-controlled organizations that object to

paying Social Security and Medicare taxes for religious reasons may opt out of paying

them by filing a form with the IRS, but other religious non-profit organizations may not.

*See id.* § 3121(w).

## 2.  **Organizational Distinctions and Respecting the Religion Clauses**

Distinctions based on organizational form enable the government to

simultaneously respect both the Free Exercise Clause and Establishment Clause and

permit the construction of accommodation schemes that pass constitutional muster.  The

Supreme Court has concluded

> [t]he general principle deducible from the First Amendment and all that has
> been said by the Court is this:  that we will not tolerate either
> governmentally established religion or governmental interference with
> religion.  Short of those expressly proscribed governmental acts there is
> room for play in the joints productive of a benevolent neutrality which will
> permit religious exercise to exist without sponsorship and without
> interference.

*Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 669 (1970); *see also Catholic*

*Charities of Diocese of Albany v. Serio*, 859 N.E.2d 459, 469 (N.Y. 2006) (observing the

Plaintiffs' argument here "would call into question any limitations placed by the

Legislature on the scope of any religious exemption—and thus would discourage the

Legislature from creating any such exemptions at all," and thus concluding "[a]

legislative decision not to extend an accommodation to all kinds of religious

organizations does not violate the Establishment Clause").  We recognize the

Government enjoys some discretion in fashioning religious accommodations, and believe doing so on the basis of organizational form comports with the Establishment Clause.

### 3. **Organizational Distinctions Compatible with *Larson* and *Colorado Christian***

The Departments have offered the accommodation to Plaintiffs based on their organizational form.  Plaintiffs rely on the decisions in *Larson v. Valente*, 456 U.S. 228 (1982), and *Colorado Christian University v. Weaver*, 534 F.3d 1245 (10th Cir. 2008), to support their Establishment Clause claim.  But those cases do not hold that distinctions based on organizational type are impermissible.

*Larson* involved an Establishment Clause challenge to a Minnesota law that imposed registration and reporting requirements on religious organizations that received less than half of their contributions from members or affiliated organizations.  *Larson*, 456 U.S. at 231.  The legislature drew this distinction to discriminate against particular religions, which was evident in the legislative history.  *Id.* at 253-54 ("[T]he history of [the challenged law] demonstrates that the provision was drafted with the explicit intention of including particular religious denominations and excluding others.").  *Colorado Christian* differentiated institutions based on intrusive inquiries into their degree of religiosity.  534 F.3d 1259.  In *Colorado Christian*, we concluded Colorado's exclusion of "pervasively sectarian" institutions from state scholarship programs violated the First Amendment "for two reasons:  the program expressly discriminates among religions without constitutional justification, and its criteria for doing so involve unconstitutionally intrusive scrutiny of religious belief and practice."  *Id.* at 1250.

Neither of these two concerns in *Colorado Christian* is applicable here.

*Larson* and *Colorado Christian* prohibit preferences based on denomination (e.g., Catholic, Jewish, Islamic, etc.) and religiosity (e.g., pervasively sectarian, moderately sectarian, non-sectarian, etc.), but do not prohibit distinctions based on organizational type (e.g., church, non-profit, university, etc.).  As *Larson* noted:  "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."  456 U.S. at 244.  In *Colorado Christian*, we determined that "defendants supply no reason to think that the government may discriminate between 'types of institution' on the basis of the nature of the religious practice these institutions are moved to engage in."  534 F.3d at 1259.  As a result, Establishment Clause jurisprudence clearly indicates denominational preferences expressed by the government are subject to strict scrutiny.  *See id.*  Religiosity distinctions are subject to strict scrutiny as well because they involve the government in scrutinizing and making decisions based on particular expressions of religious belief.  *See id.* at 1256 (invalidating Colorado law because it "expressly discriminates *among* religions, allowing aid to 'sectarian' but not 'pervasively sectarian' institutions, and it does so on the basis of criteria that entail intrusive governmental judgments regarding matters of religious belief and practice").

Plaintiffs cite no case holding that organizational distinctions, as opposed to those based on denomination or religiosity, run afoul of the Establishment Clause.  Unlike *Awad v. Ziriax*, 670 F.3d 1111, 1128-29 (10th Cir. 2012), which concerned a state constitutional amendment forbidding courts from considering or using Sharia law,

evidence of animus or favoritism aimed at a denomination or degree of religiosity is absent here.  "Because the law's distinction does not favor a certain denomination and does not cause excessive entanglement between government and religion, the framework does not violate the Establishment Clause."  *Mich. Catholic Conf.*, 755 F.3d at 395; *see also Priests for Life*, 772 F.3d at 272-74.

Neither *Larson* nor *Colorado Christian* supports Plaintiffs' claim that distinctions between churches and other religious entities is impermissible.  As we concluded in *Colorado Christian*, "if the State wishes to choose among otherwise eligible institutions, it must employ neutral, objective criteria rather than criteria that involve the evaluation of contested religious questions and practices."  534 F.3d at 1266.  This is what the Departments have done with the accommodation scheme in compliance with the First Amendment's Establishment Clause.

4.  **Plaintiffs' Argument Based on the Departments' Rationale**

Plaintiffs seize on the Departments' rationale for the distinction that religious non-profit organizations are more likely than churches to employ individuals who do not share their employers' beliefs but are nevertheless entitled to contraceptive coverage under the ACA.  *See* 78 Fed. Reg. at 39,874 ("Houses of worship and their integrated auxiliaries that object to contraceptive coverage on religious grounds are more likely than other employers to employ people of the same faith who share the same objection, and who would therefore be less likely than other people to use contraceptive services even if such services were covered under their plan.").  Plaintiffs argue some denominations are

less likely to carry out ministry functions through a church or integrated auxiliary than others, and that the workforces of some non-profit institutions may be more religiously homogenous than the workforces of some established churches.

The Departments' rationale may not be perfectly accurate, but it does not make the accommodation scheme unconstitutional.  The class of religious non-profit organizations encompasses a vast array of religiously affiliated universities, hospitals, service providers, and charities, some of them employing thousands of people.  Of course, some religious non-profit organizations may be more likely than some churches to employ co-religionists, but the Departments may reasonably recognize that, on the whole, churches are more likely to employ those who share their beliefs.  *Priests for Life*, 772 F.3d at 272. The Departments originally exempted religious employers to "respect[] the unique relationship between a house of worship and its employees in ministerial positions."  76 Fed. Reg. at 46,623.  We recognize that relationship between houses of worship and ministerial employees has been given special solicitude under the First Amendment.  *See Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 712-13 (2012).  The Departments must avoid inquiries that involve them in "excessive entanglement" between religion and government, *see Colorado Christian*, 534 F.3d at 1261-62, and the general notion that houses of worship are more likely than religious non-profit organizations to employ people of the same faith avoids impermissible

scrutiny into the beliefs of religious entities and their employees.[54]

\*   \*   \*   \*

Drawing a distinction between religious employers and religious non-profit organizations is a neutral and reasonable way for the Departments to pursue their legitimate goals in a constitutional manner.  It gives special solicitude to churches to facilitate the liberties guaranteed by the Free Exercise Clause, and offers the accommodation scheme to relieve religious non-profit organizations of their obligation to provide contraceptive coverage under the Mandate without imposing a substantial burden on their religious exercise.  The accommodation scheme does not violate the Establishment Clause.

### C.   *Free Speech Clause*

Plaintiffs finally contend the accommodation scheme violates the Free Speech Clause of the First Amendment, which states that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. 1, by compelling them both to speak and remain silent, *see Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-97 (1988).  First, they argue that requiring them to sign and deliver the Form or the notification to HHS constitutes compelled speech.  Second, they argue that prohibiting

---

[54] The original definition of "religious employer" required that the employer "primarily employs persons who share its religious tenets [and] primarily serves persons who share its religious tenets."  76 Fed. Reg. at 46,623.  In response to religious entities that argued these requirements might involve excessive entanglement with religion, the Departments eliminated three of the four criteria and based the definition solely on organizational form.  78 Fed. Reg. at 8459.  Plaintiffs now contend that simplified definition makes unfounded assumptions about who religious employers employ.

them from influencing their TPAs' provision of contraceptive coverage compels them to

be silent.  Both arguments fail.

1.  **Compelled Speech**

The compelled speech claim fails.  To the extent such a claim requires government

interference with the plaintiff's own message, *see Johanns v. Livestock Mktg. Ass'n*, 544

U.S. 550, 557 (2005) (stating a compelled speech claim arises when "an individual is

obliged personally to express a message he disagrees with, imposed by the government"),

the regulations do not require an organization seeking an accommodation to engage in

speech it finds objectionable or would not otherwise express.  The only act the

accommodation scheme requires is for religious non-profit organizations with group

health plans to sign and deliver the Form or notification expressing their religious

objection to providing contraceptive coverage.  The Sixth Circuit reasoned:  "Even

assuming the government is compelling this speech, it is not speech that the appellants

disagree with and so cannot be the basis of a First Amendment claim."  *Mich. Catholic

Conf.*, 755 F.3d at 392; *see also Geneva Coll.*, 778 F.3d at 438-39 ("If anything, because

the appellees specifically state on the self-certification form that they *object* on religious

grounds to providing such coverage, it is a declaration that they will *not be complicit* in

providing coverage.").  Plaintiffs cannot point to speech they are required to express and

find objectionable.[55]

---

[55] In *Axson-Flynn*, we recognized that a compelled speech claim may apply to
non-ideological speech.  We held a University of Utah theater student had alleged a

Continued . . .

Indeed, Plaintiffs have not shown any likelihood that their sending in the Form or the notification would convey a message of support for contraception.  Plaintiffs do not demonstrate their TPA, their health insurance issuer, or HHS—any one of which would be the sole recipient of the Form or notification—would view it as anything other than an objection to providing contraception.  *Rumsfeld v. Forum for Academic & Inst. Rights, Inc.* ("*FAIR*"), 547 U.S. 47 (2006), is instructive.  In *FAIR*, a group of law schools challenged the Solomon Amendment, a federal statute that denied federal funding to universities that barred military recruiters from their campuses.  At that time, the military did not permit gay, lesbian, and bisexual individuals to serve.  The schools claimed a First Amendment compelled speech violation, arguing their compliance with the Solomon Amendment would signal their agreement with this policy.  The Supreme Court rejected the argument, noting compliance did not signal agreement with the military's positions, and the Solomon Amendment did not prevent the schools from making their own position clear.  *FAIR*, 547 U.S. at 65.

This point is even stronger in the instant case, where Plaintiffs would send the Form or notification to convey their *opposition* to providing contraception, and the ACA and implementing regulations do not prevent them from expressing that opposition widely.  Plaintiffs remain free to express opposition to contraception; "[n]othing in the[]

_____

Cont.

compelled speech violation because she was required to utter certain swear words as part of a script and objected to doing so on religious grounds.  356 F.3d at 1284 n.4.

final regulations prohibits an eligible organization from expressing its opposition to the use of contraceptives." 78 Fed. Reg. at 39,880 n.41. With the passage of the interim final rule, Plaintiffs also have the option to send a letter or email to HHS expressly objecting to any provision of contraception. They can fully explain their position in that notification. We are especially unconvinced that this option, freed from the text of the Form and permitting greater self-expression, forces Plaintiffs to engage in unwanted speech. Plaintiffs have not suggested the notification must be conveyed or communicated to any third parties or wider audience aside from the Departments themselves.

Even if Plaintiffs could identify speech they disagreed with—for example, identifying the name of their TPA or health insurance issuer—the argument that they are forced to send a message they do not wish to send is unavailing. The First Amendment does not—and cannot—protect organizations from having to make any and all statements "they wish to avoid." The cases cited by Plaintiffs are not about routine administrative burdens akin to complying with the accommodation scheme. These cases instead concern compelled ideological expression such as salutes to the flag, *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943); messages on license plates, *Wooley v. Maynard*, 430 U.S. 705, 715 (1977), *Cressman v. Thompson*, 719 F.3d 1139, 1152 (10th Cir. 2013); wearing school slogans, *Frudden v. Pilling*, 742 F.3d 1199, 1203-04 (9th Cir. 2014); and taking a political stance on commercial sex, *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2331 (2013).

"Compelling an organization to send a form to a third party to claim eligibility for an exemption 'is simply not the same as forcing a student to pledge allegiance, or forcing a Jehovah's Witness to display the motto "Live Free or Die," and it trivializes the freedom protected in *Barnette* and *Wooley* to suggest that it is.'" *Priests for Life*, 772 F.3d at 271 (quoting *FAIR*, 547 U.S. at 62).   "That would be the equivalent of entitling a tax protester to refuse on First Amendment grounds to fill out a 1099 form and mail it to the Internal Revenue Service." *Wheaton College*, 2015 WL 3988356, at *8.   None of the cases cited by Plaintiffs involve compliance with the administrative requirements of a government program, and especially not a government program designed to exempt and distance an organization from activity it finds objectionable.

We finally note that Plaintiffs' signature and delivery of the Form or notification to HHS is "plainly incidental to the . . . regulation of conduct" and thus is not protected speech. *FAIR*, 547 U.S. at 62.   The act of signing and delivering the Form or notification to HHS is required to opt out of the Mandate.   The Supreme Court has "rejected the view that 'conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.'   Instead, we have extended First Amendment protection only to conduct that is inherently expressive." *Id.* at 65-66 (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)).   The fact that Plaintiffs must complete the Form or notification to HHS to opt out of coverage does not render the act inherently expressive. *See id.* at 62.

For the foregoing reasons, we reject Plaintiffs' compelled speech claim.

## 2.  **Compelled Silence**

We further reject the claim that the accommodation scheme compels Plaintiffs'

silence.  Like the Sixth and Seventh Circuits, we note Plaintiffs have made only general

claims objecting to the non-interference regulation and have failed to indicate how it

precludes speech in which they wish to engage.  *Mich. Catholic Conf.*, 755 F.3d at 392-

93; *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 561 (7th Cir. 2014), *vacated and

remanded sub nom.*, *Univ. of Notre Dame v. Burwell*, 135 S. Ct. 1528 (2015).  After the

issuance of the interim final rule repealing the non-interference regulation, we do not

believe this question is before us.  We agree with the Government and the D.C. Circuit

that the repeal of the non-interference rule renders Plaintiffs' claims regarding compelled

silence moot.  *See Priests for Life*, 772 F.3d at 242 n.8.

## VII.   **CONCLUSION**

We have reviewed the district courts' decisions to grant or deny a preliminary

injunction to Plaintiffs in the three cases before us.  Because we determine the ACA and

its implementing regulations do not substantially burden Plaintiffs' religious exercise or

violate the Plaintiffs' First Amendment rights, Plaintiffs have not established a likelihood

of success on the merits or a likely threat of irreparable harm as required for a

preliminary injunction.  *See Hobby Lobby*, 723 F.3d at 1128.

We therefore affirm the district court's denial of a preliminary injunction in *Little

Sisters*, 6 F. Supp. 3d 1225, and reverse the district courts' grant of a preliminary

injunction in *Southern Nazarene*, 2013 WL 6804265, and *Reaching Souls*, 2013 WL 6804259.

| **EBSA FORM 700-- CERTIFICATION** | |
|---|---|
| (revised August 2014) | |
| This form may be used to certify that the health coverage established or maintained or arranged by the organization listed below qualifies for an accommodation with respect to the federal requirement to cover certain contraceptive services without cost sharing, pursuant to 26 CFR 54.9815-2713A, 29 CFR 2590.715-2713A, and 45 CFR 147.131.  Alternatively, an eligible organization may also provide notice to the Secretary of Health and Human Services. | |
| Please fill out this form completely.  This form should be made available for examination upon request and maintained on file for at least 6 years following the end of the last applicable plan year. | |
| Name of the objecting organization | |
| Name and title of the individual who is authorized to make, and makes, this certification on behalf of the organization | |
| Mailing and email addresses and phone number for the individual listed above | |

I certify the organization is an eligible organization (as described in 26 CFR 54.9815-2713A(a), 29 CFR 2590.715-2713A(a); 45 CFR 147.131(b)) that has a religious objection to providing coverage for some or all of any contraceptive services that would otherwise be required to be covered.

Note: An organization that offers coverage through the same group health plan as a religious employer (as defined in 45 CFR 147.131(a)) and/or an eligible organization (as defined in 26 CFR 54.9815-2713A(a); 29 CFR 2590.715-2713A(a); 45 CFR 147.131(b)), and that is part of the same controlled group of corporations as, or under common control with, such employer and/or organization (within the meaning of section 52(a) or (b) of the Internal Revenue Code), is considered to meet the requirements of 26 CFR 54.9815-2713A(a)(3), 29 CFR 2590.715-2713A(a)(3), and 45 CFR 147.131(b)(3).

*I declare that I have made this certification, and that, to the best of my knowledge and belief, it is true and correct.  I also declare that this certification is complete.*

_____
Signature of the individual listed above

Appellate Case: 13-1540   Document: 01019459253   Date Filed: 07/14/2015   Page: 107

_____
Date

---

The organization or its plan using this form must provide a copy of this certification to the plan's health insurance issuer (for insured health plans) or a third party administrator (for self-insured health plans) in order for the plan to be accommodated with respect to the contraceptive coverage requirement.

<u>Notice to Third Party Administrators of Self-Insured Health Plans</u>

In the case of a group health plan that provides benefits on a self-insured basis, the provision of this certification to a third party administrator for the plan that will process claims for contraceptive coverage required under 26 CFR 54.9815-2713(a)(1)(iv) or 29 CFR 2590.715-2713(a)(1)(iv) constitutes notice to the third party administrator that the eligible organization:

(1) Will not act as the plan administrator or claims administrator with respect to claims for contraceptive services, or contribute to the funding of contraceptive services; and

(2) The obligations of the third party administrator are set forth in 26 CFR 54.9815-2713A, 29 CFR 2510.3-16, and 29 CFR 2590.715-2713A.

As an alternative to using this form, an eligible organization may provide notice to the Secretary of Health and Human Services that the eligible organization has a religious objection to providing coverage for all or a subset of contraceptive services, pursuant to 26 CFR 54.9815-2713A(b)(1)(ii)(B) and (c)(1)(ii), 29 CFR 2590.715-2713A(b)(1)(ii)(B) and (c)(1)(ii), and 45 CFR 147.131(c)(1)(ii). A model notice is available at: http://www.cms.gov/cciio/resources/Regulations-and-Guidance/index.html#Prevention.

This form or a notice to the Secretary is an instrument under which the plan is operated.

---

PRA Disclosure Statement

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 1210-0150. An organization that seeks to be recognized as an eligible organization that qualifies for an accommodation with respect to the federal requirement to cover certain contraceptive services without cost sharing may complete this self-certification form, or provide notice to the Secretary of Health and Human Services, in order to obtain or retain the benefit of the exemption from covering certain contraceptive services. The self-certification form or notice to the Secretary of Health and Human Services must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974, which generally requires records to be retained for six years. The time required

Appellate Case: 13-1540   Document: 01019459253   Date Filed: 07/14/2015   Page: 108

to complete this information collection is estimated to average 50 minutes per response, including the time to review instructions, gather the necessary data, and complete and review the information collection.  If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: U.S. Department of Labor, Employee Benefits Security Administration, Office of Policy and Research, 200 Constitution Avenue, N.W., Room N-5718, Washington, DC 20210 or email ebsa.opr@dol.gov and reference the OMB Control Number 1210-0150.

*Little Sisters et al. v. Burwell*, Nos. 13-1540, 14-6026, 14-6028

**BALDOCK**, Circuit Judge, dissenting in part.

Today the Court holds, among other things, that the ACA contraceptive Mandate's accommodation scheme does not substantially burden religious non-profits that object to facilitating contraceptive or abortifacient coverage because opting out does not cause, authorize, or otherwise facilitate such coverage.[1]  The Court's opinion provides perhaps the most thorough explanation of the accommodation scheme's nuanced mechanics that I have yet read.  And for argument's sake, I follow its holding as to the *insured* plaintiffs' and *Little Sisters* plaintiffs' RFRA claims.[2]  But I cannot join the Court's holding as to the other *self-insured* plaintiffs' RFRA claims, as that holding contradicts the Court's own reasoning and thorough explanation of the accommodation scheme.

In reality, the accommodation scheme forces the self-insured plaintiffs to perform an act that causes their beneficiaries to receive religiously objected-to coverage.  The fines the government uses to compel this act thus impose a substantial burden on the self-insured plaintiffs' religious exercise.  Moreover, less restrictive means exist to achieve the government's contraceptive coverage goals here.  I must therefore dissent in part.

---

[1]  For consistency, I adopt the Court's glossary.

[2]  As I explain below, the *Little Sisters* plaintiffs, though self-insured, have not shown that their opting out will necessarily cause their plan participants and beneficiaries to receive contraceptive coverage.  Accordingly, my use of the term "self-insured plaintiffs" does not refer to the Little Sisters unless otherwise stated.

## I.   WHEN IS A BURDEN ON RELIGIOUS EXERCISE "SUBSTANTIAL?"

The first step of a RFRA claim requires plaintiffs to show (1) that the federal government has imposed a substantial burden on a (2) sincere (3) exercise of religion. *See* 42 U.S.C. § 2000bb-1(a).   The unique threshold question we and so many other courts are currently grappling with, however, is how to determine whether a substantial burden exists where a law compels religious adherents to perform an act they sincerely oppose when this opposition might be based on a faulty understanding of the law.   *See, e.g.*, *E. Tex. Baptist Univ. v. Burwell*, 2015 WL 3852811, at *3 (5th Cir. June 22, 2015).

Several learned judges have argued compellingly that, under *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014), the amount of coercion the government uses to force a religious adherent to perform an act she sincerely believes is inconsistent with her understanding of her religion's requirements is the only consideration relevant to whether a burden is "substantial" under RFRA.   *See, e.g.*, *Priests For Life v. U.S. Dep't of Health & Human Servs.*, No. 13-5368, slip op. at 17–22 (D.C. Cir. May 20, 2015) (Brown, J., dissenting from the denial of rehearing en banc); *id.* at 35 (Kavanaugh, J., dissenting from the denial of rehearing en banc); *Univ. of Notre Dame v. Burwell*, 786 F.3d 606, 628 (7th Cir. 2015) (Flaum, J., dissenting); *Eternal Word Television Network, Inc. v. Sec'y, Dep't of Health & Human Servs.*, 756 F.3d 1339, 1340 (11th Cir. 2014) (Pryor, J. specially concurring); *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1137 (10th Cir. 2013) ("Our only task is to determine whether the claimant's belief is sincere, and if so, whether the government has applied substantial pressure on the claimant to violate that belief."); *cf. E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S.

2

Ct. 2028, 2031–33 (2015) (analyzing a plaintiff's exercise as a "religious practice" under Title VII where the act was motivated by "her understanding of her religion's requirements").

These judges assert that whether religious objectors properly understand the legal significance of the compelled act has no bearing on the substantial burden analysis. *E.g. Priests For Life.*, No. 13-5368, slip op. at 35 (Kavanaugh, J., dissenting) ("But what if the religious organizations are misguided in thinking that this scheme . . . makes them complicit in facilitating contraception or abortion?  That is not our call to make under the first prong of RFRA.").  And *Hobby Lobby* supports this position well, as questioning a religious adherent's understanding of the significance of a compelled action comes dangerously close to questioning "whether the religious belief asserted in a RFRA case is reasonable"—a "question that the federal courts have no business addressing." *Hobby Lobby*, 134 S. Ct. at 2778.

Under this understanding of RFRA, the accommodation scheme substantially burdens any religious non-profit that objects to performing an act that would cause or otherwise make it complicit in providing contraceptive coverage simply because the scheme uses substantial fines to compel an act that the non-profit sincerely believes would have that effect.  The actual legal significance of the compelled act is irrelevant to the substantial burden analysis.  And because the government has conceded (2) the sincerity of (3) the religious exercise at issue, the only issue left to address is whether the government has shown that the accommodation scheme survives strict scrutiny.  The judges who take this position, so far, all agree that the government has not made this

showing. *Priests For Life.*, No. 13-5368, slip op. at 22–25 (Brown, J., dissenting); *id.* at 46–51 (Kavanaugh, J., dissenting); *Notre Dame*, 786 F.3d at 629–30 (Flaum, J., dissenting); *Eternal Word Television Network*, 756 F.3d at 1348–49 (Pryor, J. specially concurring).

Notwithstanding the strength of those positions, I will proceed under the following assumptions to highlight an even deeper problem lurking within the self-insured accommodation scheme: First, I will assume that whether a burden on religious exercise is "substantial" turns not only on the amount of coercion the government uses to compel an act (no one disputes the substantiality of the fines at issue here), but also on "how the law or policy being challenged actually operates and affects religious exercise." Slip Op. at 39. Second, I will assume this Court may tell a religious adherent she does not face a substantial burden on her religious exercise if her understanding of the law is flawed. Third, I will assume that any burden the accommodation scheme imposes on Plaintiffs— who object to performing any act that would cause or otherwise make them complicit in providing various forms of contraceptive coverage—cannot be substantial unless they show, for example, how their compelled act causes that coverage. *See* Slip Op. at 45–66.

The Court tells Plaintiffs they cannot make this showing "because opting out would not trigger, incentivize, or otherwise cause the provision of contraceptive coverage." Slip Op. at 65. If showing this causation is a prerequisite to establishing a substantial burden, the Court properly rejects the *insured* plaintiffs' RFRA claim, as their action or inaction will not affect whether their plan beneficiaries receive objected-to coverage. But the *self-insured* plaintiffs' inaction will prevent their plan beneficiaries

4

from receiving the coverage. If their beneficiaries receive this coverage, it is only because the self-insured plaintiffs, by opting out, *caused that effect*. Thus, the self-insured plaintiffs have shown how their opting out would cause the provision and receipt of objected-to coverage and established a substantial burden on their religious exercise.

## II.   THE CRITICAL DISTINCTION IN THIS CASE

I have nothing to add to the Court's summary of the background in these cases, and very little to add to its explanation of the detailed mechanics of the ACA accommodation scheme. But a critical distinction within scheme bears repeating. Under the ACA accommodation scheme, in the *insured* health plan context, "a health insurance issuer . . . would be obligated to provide contraceptive coverage under the ACA whether or not [the insured non-profit] delivered the Form or notification to HHS." Slip Op. at 48 n.28 (citing 42 U.S.C. § 300gg-13). But in the *self-insured* context, a TPA would be "*authorized* and obligated to provide the coverage . . . *only if* the religious non-profit . . . opts out." Slip Op at 49 (emphases added); *see also* 26 C.F.R. § 54.9815-2713AT(b)(2); 29 C.F.R. § 2590.715-2713A(b)(2).

The Fifth, Sixth, and Seventh Circuits failed to recognize this distinction. *See E. Tex. Baptist*, 2015 WL 3852811, at *5; *Notre Dame*, 789 F.3d at 614; *Mich. Catholic Conference & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 387 (6th Cir. 2014) *cert. granted*, *judgment vacated* 135 S. Ct. 1914 (2015). The Third and D.C. Circuits failed to appreciate its significance. *See Geneva Coll. v. Sec'y U.S. Dep't of Health & Human Servs.*, 778 F.3d 422, 438 (3d Cir. 2015); *Priests For Life v. U.S. Dep't of Health & Human Servs.*, 772 F.3d 229, 254–56 (D.C. Cir. 2014). This Court considers the

distinction "unremarkable."  Slip Op. at 49.  I disagree.  The distinction makes a difference, and juxtaposing the insured plaintiffs and self-insured plaintiffs forces that difference into bold relief.

### A.  The Insured Plaintiffs

Assuming causation is key, I agree the accommodation scheme does not substantially burden the *insured* plaintiffs' religious exercise.  As the Court explains, even total inaction on the part of an insured non-profit still results in its plan participants and beneficiaries receiving the coverage to which they are entitled under the ACA because the government has independently obligated a third party (insurance issuers) to provide it.[3]  *See* Slip Op. at 46–47.  Opting out in the insured context does not cause the receipt of contraceptive coverage; rather, it merely absolves the eligible insured non-profit of any responsibility for the contraceptive coverage its plan participants and beneficiaries will receive *whether it opts out or not*.  Thus, assuming Plaintiffs must show how opting out causes coverage, the accommodation scheme does not substantially burden the *insured* plaintiffs' exercise of religion.  The insured accommodation is more akin to traditional conscientious objector schemes: the government can and will conscript the actors it needs to achieve its goals whether objectors opt out or not.

The same cannot be said of the self-insured plaintiffs, however.

---

[3]  Even the government's proffered fourth option—declining to sponsor a group health plan—would not interfere with contraceptive coverage for the insured plaintiffs' plan beneficiaries.  Without an employer-sponsored plan, these beneficiaries would have to find other health insurance.  *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2664 (2012) (Scalia, J., dissenting).  And that insurance would likely cover contraceptives.  *See* 42 U.S.C. § 300gg-13.

### B.  The Self-Insured Plaintiffs

Unlike the *insured* plaintiffs, the ACA leaves the *self-insured* plaintiffs in a position where, by refusing to opt out, they can prevent their plan beneficiaries from receiving the objected-to coverage the beneficiaries are entitled to and would otherwise receive under the ACA.  In other words, their plan participants and beneficiaries will receive the coverage *only if* they opt out as the government commands.  This makes their opting out a but-for cause of the receipt of the coverage.

The Court views this ability to prevent contraceptive coverage by inaction as nothing more than the ability to disobey the law.  *See* Slip Op. at 54–55 & n.35.  But that is the same limited ability the plaintiffs in *Hobby Lobby* possessed, and it goes to the heart of the substantial burden the self-insured plaintiffs face here.  "In *Hobby Lobby*, the plaintiff[s] . . . could choose only between (1) complying with the ACA by providing the coverage or (2) not complying and paying significant penalties."  Slip Op. at 3 (citing *Hobby Lobby*, 134 S. Ct. at 2759–60).  Similarly, these self-insured plaintiffs must choose between (1) complying with the ACA by taking an action that ultimately causes their beneficiaries to receive this coverage or (2) not complying and paying significant penalties.  This is a Hobson's choice, which we have long held imposes a substantial burden under RFRA.  *See Abdulhaseeb v. Calbone*, 600 F.3d 1301, 1315 (10th Cir. 2010) ("We conclude that a religious exercise is substantially burdened under [RFRA] 42 U.S.C. § 2000cc–1(a) when a government . . . presents the plaintiff with a Hobson's choice—an illusory choice where the only realistically possible course of action trenches on an adherent's sincerely held religious belief."); *Hobby Lobby*, 723 F.3d at 1141 (10th

Cir. 2013) (explaining that the choice between compromising religious beliefs and paying fines under the ACA "is precisely the sort of Hobson's choice described in *Abdulhaseeb*").

### 1.  The Obvious Causal Connection

If causation is key to showing a substantial burden, *see* Slip Op. at 32–33, 45–66, the self-insured plaintiffs have surely shown that burden.  Certainly, a shifting legal responsibility alone may not necessarily create a causal relationship.  But here, the self-insured plaintiffs' opt out causes the coverage because (1) the government cannot force plaintiffs themselves to provide the coverage, *Hobby Lobby*, 134 S. Ct. at 2785, and (2) the government cannot shift the ability (let alone the responsibility) to provide the coverage to non-objectors unless the self-insured plaintiffs opt out.  *See* 29 C.F.R. § 2590.715-2713A(b)(2); Slip Op. at 48–49.  Opting out is thus the only way their plan participants and beneficiaries may receive the coverage.

Put another way, if the self-insured plaintiffs do not opt out, who will provide the coverage for their plan participants and beneficiaries?  The answer: no one.  The self-insured plaintiffs cannot do so per their faith; the TPAs cannot do so per the law.  Thus, the self-insured accommodation renders any duty to provide, and any entitlement to receive, contraceptive coverage wholly unenforceable and thus illusory—unless and until the self-insured plaintiffs opt out.  *Cf. Pennington v. Northrop Grumman Space & Mission Sys. Corp.*, 269 F. App'x 812, 819 (10th Cir. 2008) (unpublished) ("[W]hen a promise, in reality, promises nothing—it is illusory." (Internal marks and citation omitted)).

To fully understand why no one can or will provide this objected-to coverage unless the self-insured plaintiffs perform a compelled act, one must view the ACA Mandate and accommodation scheme in light of *Hobby Lobby*.  *Hobby Lobby* clearly holds forcing religious employers to provide objected-to contraceptive coverage violates RFRA.  134 S. Ct. at 2785.  So, if any entity is to provide the coverage, it must be a third party.  The *insured* accommodation independently conscripts third parties to provide the coverage.  But as this Court points out, the *self-insured* accommodation was drafted such that no third party can provide the coverage in the self-insured context unless and until the objecting religious employer opts out.  Slip Op. at 48–49; *see also Eternal Word Television Network*, 756 F.3d at 1347 (Pryor, J., specially concurring) (explaining that, without the Form or letter, a TPA "has no legal authority to step into the shoes of the [non-profit] and provide contraceptive coverage to the employees and beneficiaries of the [non-profit]").  As such, a third party's legal authority (*i.e.* permission) to provide the coverage is wholly dependent upon (*i.e.* caused by) the self-insured non-profit opting out.

The Court believes we should focus on the fact that the ACA "entitle[s] plan participants and beneficiaries to coverage whether or not the plaintiffs opt out" and imposes a duty on "either the religious non-profit organization or the TPA" to provide that coverage.  Slip Op. at 33, 57.  But this reasoning (1) fails to consider the ACA Mandate in light of the limitations *Hobby Lobby* already imposed, and (2) confuses legal concepts (duty and entitlement) with real-world effects (provision and receipt).

First, the Court's focus on the ACA's requirement that "either the religious non-profit organization or the TPA" provide the coverage, Slip Op. at 57,  ignores the fact that

the government cannot require the religious non-profit to provide the coverage under *Hobby Lobby*.   By ignoring the limitation *Hobby Lobby* imposes on the government, the Court simultaneously acknowledges that "opting out is necessarily a but-for cause of someone else—the TPA—providing contraceptive coverage," Slip Op. at 56, and nevertheless rejects the self-insured plaintiffs' RFRA claims for lack of causation.   Slip Op. at 64–65.   But again, *Hobby Lobby* forbids the government from placing this requirement on the non-profits themselves.   So if opting out is necessarily a but-for cause of someone else providing the coverage, it is necessarily a but-for cause of anyone providing the coverage *at all*.   Essentially, the Court concedes but-for cause and then turns around and denies the existence of any causation.   What?

Second, the Court asserts that the self-insured plaintiffs' opt out will not cause the actual provision and receipt of objected-to coverage because the ACA creates an independent, albeit illusory, duty and entitlement related to that coverage.   True, opting out does not cause *entitlement* to contraceptive coverage—the ACA entitles all health plan beneficiaries to contraceptive coverage.   But these beneficiaries will not *receive* that coverage unless the self-insured plaintiffs do something to cause its provision from a third party.   In other words, the ACA may independently say "someone" has a *duty* to provide contraceptive coverage, *see* 29 C.F.R. § 2590.715–2713, but no one can or will honor that duty and *provide* the coverage unless the self-insured plaintiffs opt out.   No self-insured plaintiff will honor it because the government cannot force them to under *Hobby Lobby*, and no third party can honor it because no third party has authority to do so without an opt out.   Based on this error, the Court concludes that "federal law, not the

10

actions of the religious objector, ensures that plan participants and beneficiaries will *receive* contraceptive coverage." Slip Op. at 52 (emphasis added). But that is simply wrong. As explained above, federal law alone does not ensure receipt of the coverage from the self-insured plaintiffs; and it does not even allow, let alone ensure, receipt of that coverage from a third party unless the self-insured plaintiffs opt out. Rather, federal law, *only in conjunction with the self-insured plaintiffs' opt out*, allows plan participants and beneficiaries to receive contraceptive coverage.[4]

These errors, taken together, cause the Court to reject a straw man rather than the self-insured plaintiffs' RFRA claims. The self-insured plaintiffs do not claim a RFRA violation based on the fact that the ACA created an entitlement to contraceptive coverage; they object to the causal role they must play in providing that coverage.[5]

---

[4] Even with the opt-out, federal law does not always *ensure* receipt of the coverage. For example, the Court asserts "the ACA ensures plan participants and beneficiaries will *receive* contraceptive coverage" but simultaneously contradicts itself by acknowledging that TPAs for self-insured church plans may in fact decline to *provide* that coverage, in which case "plan participants and beneficiaries would not get the coverage to which they are otherwise entitled." Slip Op. at 61 & n.41 (emphases added).

The Court's attempt to paint these contradictory positions as consistent suffers from the same logical flaw highlighted above; that is, it confuses the actual *provision* and *receipt* of coverage with a concededly unenforceable *entitlement* and *duty* to provide it. If the law cannot force an unwilling TPA to provide contraceptive coverage, the TPA will not provide it, and the plan beneficiaries will not receive it. *Cf. Mach Mining, LLC v. E.E.O.C.*, 135 S. Ct. 1645, 1652–53 (2015) (acknowledging that even the government may violate the law, "especially so when [it faces] no consequence"). Thus, the existence of an unenforceable duty to provide contraceptive coverage does not ensure receipt, as this Court seems to believe.

[5] The Court also asserts that religious non-profits "cannot preclude the government from requiring others to provide the legally required coverage in its stead," Slip Op. at 51–52, and "cannot hamstring government efforts to ensure that plan participants and beneficiaries receive the coverage to which they are entitled under the ACA," Slip Op. at

A proper accommodation may relieve otherwise substantial burdens on religious exercise, but this accommodation fails to do so, at least in the self-insured context. And to be sure, "[a] burden does not rise to the level of being substantial when it places an inconsequential or de minimis burden on an adherent's religious exercise." Slip Op. at 41 (quoting *Priests for Life*, 772 F.3d at 246). But here, the accommodation scheme foists upon the self-insured plaintiffs a choice with dire consequences. Either (1) they refuse to act, which would avoid causing their plan beneficiaries to receive objected-to coverage but trigger crippling fines for violating the law or (2) they act, which would cause the receipt of this coverage and violate their faith. If "the purpose of religious accommodation" was to permit religious objectors "to avoid a religious burden and to comply with the law," *see* Slip Op. at 55, it fails to achieve that purpose. Rather, the accommodation foists upon the self-insured plaintiffs a Hobson's choice and thus a substantial burden on their exercise of religion. *Abdulhaseeb*, 600 F.3d at 1315.

### 2.  This is Not a Conscientious Objector Accommodation Scheme

The Court believes this accommodation scheme akin to the conscientious objector schemes used for military conscription. *See* Slip Op. at 52 n.33. Not so. The

---

71.  I agree that this *should not* be the case but, unfortunately, the government drafted the self-insured accommodation such that the self-insured plaintiffs *can*, by inaction, do exactly that. As explained above, that is precisely why their opting out causes the receipt of objected-to coverage.

Moreover, to the extent this language connotes dissatisfaction with the problems created by the self-insured accommodation, such dissatisfaction is irrelevant to whether the law imposes a substantial burden under RFRA. Our job is not to "add words to the law to produce what is thought to be a desirable result." *Abercrombie & Fitch*, 135 S. Ct. at 2033.

accommodation scheme may *function* like a conscientious objector scheme in some regards, but it ultimately forces objectors to play a very different and causal role.

Military conscription law generally requires male citizens to register for the draft and allows the President to draft a certain number of men from that pool of candidates into active duty in the Armed Forces.[6]  *See, e.g.*, *Arver v. United States*, 245 U.S. 366, 375–76 (1918) (allowing the President to draft up to two groups of 500,000 men).  After registering, conscientious objectors can opt out of serving in combat.  50 App. U.S.C. § 456(j).  But they cannot reduce the number of men the President ultimately drafts.  Whether objectors lawfully register and opt out, or register and then choose unlawfully to avoid induction, or even choose unlawfully not to register at all, the President can and will draft the same number of men needed for war.  *See* Lawrence M. Baskir & William A. Strauss, Chance and Circumstance: The Draft, The War, and The Vietnam Generation 14–28 (1978) (explaining that the government's Vietnam draft policies "did not care who was drafted as long as enough people were drafted").

Indeed, the Court's reliance on *Sheridan v. United States*, 483 F.2d 169 (8th Cir. 1973), highlights this difference.  In *Sheridan*, the defendant registered for the draft but did not lawfully opt out.  Instead, he simply refused to be inducted.  *Id.* at 170.  But the result under conscription law was the same: "another person [was] called in his place."  *Id.* at 174.  In other words, like the *insured* plaintiffs, no matter what conscientious objectors do or refuse to do, the government can and will achieve its military draft goals.

---

[6]  Currently, "every male citizen of the United States . . . between the ages of eighteen and twenty-six" must register in order to facilitate any eventual conscription into the Armed Forces.  50 App. U.S.C. § 453(a).

The opposite result occurs under the self-insured accommodation scheme. If a *self-insured* plaintiff simply refuses to provide coverage and does not opt out, the government cannot call a third party in its place. The accommodation scheme thus places the self-insured plaintiffs in a very different position vis-à-vis helping the government achieve its religiously objectionable goals. Conscientious objectors cannot prevent the government from conscripting their replacements; but the self-insured plaintiffs can *completely* prevent the government from even authorizing their TPAs to provide objected-to coverage. Conscientious objectors also need not identify a related third party to serve in their stead; but the self-insured plaintiffs must identify a related third party through a form or letter. And this form or letter is the *only means* by which the government can authorize that third party to serve in their stead. Under conscientious objector schemes, the government may independently draft non-objecting Americans into combat to further its war efforts; conscientious objectors have no power to stop it. But under the self-insured accommodation scheme the government needs the self-insured plaintiffs to commit an act to further its contraceptive coverage efforts; their beneficiaries will not receive this coverage unless they commit that act and cause that result. Such a conscientious objector scheme—where the government could draft a replacement soldier *only if* the initial conscientious objector opted out *and* identified a previously ineligible relative to serve in his stead—would be immensely problematic, to say the least.[7]

---

[7] The Court attempts to counter this point by referencing the Enrollment Act of 1863, which "permitted a draftee to avoid service only by either providing a substitute or paying $300." Slip Op. at 52 n.33 (quoting Act of March 3, 1863, ch. 75, § 13, 12 Stat. 731, 733 (1863)). But this act was a short-lived experiment that did not even survive to

In relying on conscientious objector schemes the Court commits the same error it levies against this dissent: it fails to appreciate the broader structures of both the accommodation and conscientious objector schemes.  In comparing the two schemes, the Court focuses only on the acts the objector must perform to opt out, and what happens if the objector performs those acts.  The comparison totally ignores the broader and more critical difference between the two schemes: what happens if the objector refuses to perform those acts?  Conscription law requires that "someone" go to war, and in the end "someone" *will* go to war.  The law is such that the government can and will shift this legal duty to a non-objector regardless of the objector's action or inaction.  Conversely, the ACA says "someone" must provide contraceptive coverage, but the self-insured accommodation was drafted such that if the self-insured plaintiffs choose to do nothing rather than opt out, no one will actually provide that coverage.  Again, the government cannot force the plaintiffs to provide the coverage, and it cannot shift the duty to provide the coverage unless the self-insured plaintiffs choose to opt out.  If the government could independently shift this duty (as conscription law allows) or eliminate the need to shift the duty at all (as the insured accommodation does) that might eliminate the causal role

---

the end of that war.  Moreover, resentment over the Enrollment Act and its opt-out provision triggered the "New York City draft riot, the largest [and deadliest] civil insurrection in American history apart from the South's rebellion itself."  ERIC FONER, RECONSTRUCTION: AMERICA'S UNFINISHED REVOLUTION 1863–1877 at 32 (1988).  "No case questioning the Civil War draft was heard by the Supreme Court, but it is known that Chief Justice Roger Taney prepared a rough outline of an opinion declaring the act unconstitutional."  Leon Friedman, *Conscription and the Constitution*, 67 MICH. L. REV. 1493, 1546 (1969).  Indeed, one eminent historian called the substitution provision a "grotesque monstrosit[y]" and stated "[t]he government could hardly have devised a worse law."  BRUCE CATTON, THE CIVIL WAR 208 (1987).  I would call that problematic.

Appellate Case: 13-1540   Document: 01019459253   Date Filed: 07/14/2015   Page: 124

the self-insured plaintiffs currently face.  But presently, the law forces the self-insured plaintiffs into gatekeeping positions and then uses fines to force them to open the gates.

### 3.  The Supreme Court's *Little Sisters* and *Wheaton College* Orders

The Court also believes the accommodation scheme does not impose a substantial burden on self-insured non-profits because the government's new alternative notice accommodation—which forces an objecting non-profit to write a letter to HHS opting out and identifying its TPAs and/or health insurance issuers—is essentially akin to the Supreme Court's injunctions pending appeal in *Little Sisters of the Poor Home for the Aged, Denver, Colorado v. Sebelius*, 134 S. Ct. 1022 (2014), *Wheaton College v. Burwell*, 134 S. Ct. 2806 (2014), and most recently *Zubik v. Burwell*, Nos. 14A1065, 14-1418, 2015 WL 3947586, at *1 (U.S. June 29, 2015).  *See* Slip Op. at 42 n.25, 59 n.39. But the Court's reliance on these interim orders appears to be based on two flawed assumptions: (1) that the notices required by these orders were sufficient to authorize a TPA to provide coverage it could not provide before, and (2) even assuming this dubious interpretation of the orders, that they approved of compelling religious non-profits to play this causal role under RFRA's first step (no substantial burden) as opposed to approving of such compulsion only where it satisfies RFRA's second step (strict scrutiny).

As to the first assumption, the *Little Sisters* order nowhere contemplates allowing the government to use the Little Sisters' interim written notice to facilitate coverage by alternative means.  And the *Wheaton College* order did not allow the government to rely on Wheaton's interim written notice, either.  Rather, it allowed the government to rely on preexisting knowledge that Wheaton qualified for exemption and would not provide

16

certain contraceptive coverage. *See Wheaton Coll.*, 134 S. Ct. at 2807 ("But [Wheaton] *has already notified the Government*—without using EBSA Form 700—that it meets the requirements for exemption from the contraceptive coverage requirement on religious grounds. Nothing in this order precludes the Government from relying on *this notice*, to the extent it considers it necessary, to facilitate the provision of full contraceptive coverage under the Act." (emphases added)). Moreover, as Justice Sotomayor's dissent in *Wheaton College* shows, the written notices required in *Wheaton College*, *Little Sisters*, and *Zubik* were insufficient to authorize TPA coverage under the then-effective accommodation, and may remain insufficient even under the new alternative accommodation. *See Wheaton Coll.*, 134 S. Ct. at 2814 n.6 (Sotomayor, J., dissenting).[8]

To the extent *Wheaton College* allows the government to rely on its knowledge of Wheaton's objection, this merely tracks the Supreme Court's decision in *Bowen v. Roy*, where the Court rejected a Free Exercise challenge to the government's *use* of a social security number it *already possessed* and concluded that the First Amendment does not "require the government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." 476 U.S. at 693, 699 (1986). But importantly:

---

[8] That is, even under the new alternative notice scheme, the "information necessary to verify applicants' eligibility under 26 CFR §54.9815-2713A(a)," *see Zubik*, 2015 WL 3947586, at *1, does not contain all the information required by the regulations and thus might not qualify as a valid opt out sufficient to trigger TPA coverage, *see* 29 C.F.R. § 2590.715-2713A(b)(1)(ii)(B) (requiring the self-insured organization to provide, among other things "the plan name and type . . . and the name and contact information for any of the plan's third party administrators"); *Wheaton Coll.*, 134 S. Ct. at 2814 n.6 (Sotomayor, J., dissenting).

a majority of justices [in *Roy*] indicated that the requirement that applicants *furnish* a social security number was a different matter. Five justices either concluded or strongly suggested that the government could not require an applicant to provide the number on a benefits application if the applicant had a sincere religious objection to doing so.

*Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 567 (7th Cir. 2014) (Flaum, J., dissenting) (emphasis in original), *cert. granted*, *judgment vacated sub nom. Univ. of Notre Dame v. Burwell*, 135 S. Ct. 1528 (2015); *see Roy*, 476 U.S. at 714–16 (Blackmun, J., concurring in part), 732 (O'Connor, J., concurring in part and dissenting in part) ("The rise of the welfare state was not the fall of the Free Exercise Clause."), 733 (White, J., dissenting).

Moreover, the Court may well have expressly allowed for this reliance in *Wheaton College* because, unlike the Little Sisters, Wheaton provides insurance through both self-insured plans *and* insured plans subject to the Mandate. *See Wheaton Coll. v. Burwell*, 50 F. Supp. 3d 939, 944 (N.D. Ill. 2014) (Wheaton "offers its health insurance pursuant to six plans: two insured HMO plans, a [grandfathered] PPO plan, two self-funded prescription drug plans, and an insured student health plan." (footnote omitted)). Thus, unlike the wholly self-insured Little Sisters, the government might independently ensure that an issuer from at least one of these insured health plans provides full contraceptive coverage to at least some of Wheaton's various plan beneficiaries under the current ACA regime without forcing Wheaton to play a causal role in the receipt of that coverage.

Thus, the *Little Sisters*, *Wheaton College*, and *Zubik* orders allow religious non-profits to simply notify the government that they qualify for exemption and will not provide contraceptive coverage.  The government may use its knowledge of these

18

objections when choosing between *independently* available alternative means to ensure coverage is provided (as the conscientious objector and *insured* schemes do).  But these orders do not allow the government to compel religious non-profits to furnish the document that is essential to cause their plan beneficiaries to receive objected-to coverage.

And yet, suppose these orders could be read to say that the written notices they required were legally sufficient to authorize a previously ineligible TPA to provide objected-to coverage.  Under that dubious interpretation, the orders would indeed force self-insured religious objectors to perform an act that causes the ultimate provision of the coverage, as they would make the provision of the coverage wholly contingent upon the religious objectors' acts of providing HHS with that notice.  For all the reasons discussed above, that interpretation of the orders would impose a substantial burden on the self-insured plaintiffs' exercise of religion.

So, turning to the Court's second assumption, even under its dubious interpretation of the orders, the orders nowhere say that forcing religious non-profits to play this sort of causal role avoids imposing a substantial burden on their religious exercise.  Instead, assuming the Court's interpretation of these orders is correct, these orders would impose a substantial burden under RFRA's first step and therefore must comply with RFRA's second step (strict scrutiny).  Indeed, Judge Kavanaugh has compellingly argued that these orders simply set forth a less restrictive means of achieving the government's compelling interest in facilitating access to contraceptive coverage.  *See Priests For Life*, No. 13-5368, slip op. at 46–51 (Kavanaugh, J., dissenting).  These orders do not require

religious non-profits to identify related third parties for the government to authorize and possibly conscript in their stead.  Rather, they only require the non-profits to inform HHS that they qualify for exemption and will not provide objected-to coverage.  As discussed above regarding conscientious objector schemes, a significant difference exists between asking a religious objector to say simply "no" and compelling that objector to identify a related entity to serve as a scapegoat where no one else can.[9]

### 4.  ERISA-Bound Plans v. ERISA-Exempt Church Plans

The burden the self-insured plaintiffs face is most salient with regards to Southern Nazarene, whose TPA is subject to ERISA enforcement and therefore will be not only authorized but also required to provide contraceptives to the participants and beneficiaries of Southern Nazarene's self-insured plan *only if* Southern Nazarene opts out.  *See* 29 C.F.R. § 2590.715-2713A(b)(2).  Southern Nazarene's opt out will thus clearly cause someone to provide contraceptive coverage where no one would or could before.

But the lack of an enforcement mechanism as to ERISA-exempt church plans does not itself remove the causal role and substantial burden that the accommodation scheme foists upon the church-plan plaintiffs.  For example, the Guidestone Plan is an ERISA-exempt church plan, but at least one of its TPAs, Highmark, has indicated it will provide full contraceptive coverage for those self-insured organizations that use the Guidestone Plan and validly opt out.  And plaintiffs Reaching Souls, Truett-McConnell College, and

---

[9]  Moreover, this less restrictive means of achieving the same goal necessarily dooms the current self-insured accommodation scheme under strict scrutiny.  *See infra* Part III.

Mid-America Christian University are all self-insured plaintiffs that use the Guidestone Plan.  Slip Op. at 21; SN Supp. Br. II at 9 n.2.  So even though their opting out might not trigger an *enforceable* duty to provide objected-to coverage, these church plan plaintiffs have established that their opting out will actually cause Highmark to provide the coverage—coverage it cannot provide unless they opt out.

True, given the repeal of the accommodation scheme's non-interference provision, church plans like the Guidestone Plan might try to fire TPAs like Highmark and replace them with TPAs that promise not to provide coverage for objected-to contraceptives, and those plaintiffs that use the Guidestone Plan might be able to fire Guidestone if it refuses to do so.  *See* RS Oral at 12:57–13:10.  Thus, by economic coercion, these plaintiffs might be able to ultimately stop the provision of the coverage they were initially forced to cause.  But, the government maintains that "such conduct is generally unlawful and is prohibited under . . . state and federal laws."  *See* 79 Fed. Reg. at 51,095.  And none of this changes the present fact that if plaintiffs who use the Guidestone Plan opt out, they will cause Highmark to perform a religiously objected-to act on their behalf where Highmark previously could not do so.  Thus, those self-insured plaintiffs that use the Guidestone Plan have shown "presently threatened injuries" warranting injunctive relief. *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931).

The *Little Sisters* plaintiffs, on the other hand, have not established this causal connection.  The Little Sisters' primary TPA, Brothers Services, is not bound by ERISA and has promised not to provide contraceptive coverage even if Little Sisters opts out.  Little Sisters asserts that Brothers Trust also uses other TPAs who might choose to

Appellate Case: 13-1540   Document: 01019459253   Date Filed: 07/14/2015   Page: 130

provide contraceptive coverage if they opt out, but they have not sufficiently developed this theory to bear the burden of establishing that their opting out will presently cause someone to provide contraceptive coverage to their plan beneficiaries.

The Court also suggests self-insured non-profits "could relieve themselves of any lingering doubts they may have about causation by [1] employing an insured plan, [2] employing a self-insured church plan where the Departments lack authority to enforce the Mandate against their TPA, or [3] administering the self-insured plan on their own in-house without using a TPA." Slip Op. at 52 n.32. But none of these options alleviate the substantial burden the accommodation scheme imposes. First, choosing to switch from a self-insured plan, where no coverage can be provided without an opt out, to an insured plan, where coverage will be provided by a third party, would simply mean choosing to cause that coverage by switching plans rather than opting out. Second, as discussed above, even in the church plan context, opting out may still cause a TPA to provide the coverage. Third, no plaintiff in this case administers its plan in-house. So to the extent the Court opines on the legal effect the ACA Mandate might have on a plan not at issue in this case, the Court impermissibly exceeds its jurisdiction by "advising what the law would be upon a hypothetical state of facts." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

Given that we do not have jurisdiction to pass on this hypothetical, the self-insured plaintiffs should not have to rebut it to prove a present substantial burden under RFRA. But, because the Court goes there, administering a self-insured plan in-house without a TPA can be prohibitively complex, limit options for managing care, and create legal

pitfalls that many non-profits simply cannot afford to handle.  *See* Thomas R. McLean &

Edward P. Richards, *Health Care's "Thirty Years War": The Origins and Dissolution of*

*Managed Care*, 60 N.Y.U. ANN. SURV. AM. L. 283, 313 (2004); *see generally* Rhonda D.

Orin and Daniel J. Healy, *Self-Administering, Insuring and Funding Benefit Plans*, 197–

213 in HUMAN RESOURCES (Thompson 2007 Summer Edition).

### C.  Summing Up the Substantial Burden On the Self-Insured Plaintiffs

The Court concludes that the Plaintiffs' causation arguments fail because "opting

out would not trigger, incentivize, or otherwise cause the provision of contraceptive

coverage."  Slip Op. at 65–66.  This conclusion is correct in the *insured* context.  But the

*self-insured* plaintiffs, with the exception of Little Sisters, have shown exactly how their

act of opting out will cause someone to provide contraceptive coverage where their

refusal to act would prevent that result.  Unfortunately, the Court fails to see this obvious

causal relationship because it ignores the clear holding of *Hobby Lobby* and fails to

comprehend the difference between unenforceable entitlement and actual receipt.  The

government has left self-insured plaintiffs in a position where they must decide whether

their beneficiaries will actually *receive* objected-to contraceptive coverage.   The

accommodation does not absolve these plaintiffs of this responsibility.  Instead, it forces

them to either (1) violate their sincere religious beliefs by performing an action that will

cause their beneficiaries to receive objected-to coverage, or (2) violate the law and incur

steep fines to obey those religious beliefs.  Again, this is a Hobson's choice and thus a

substantial burden on their religious exercise under RFRA.  *Abdulhaseeb*, 600 F.3d at

1317; *Hobby Lobby*, 723 F.3d at 1141.

23

### III.   STRICT SCRUTINY

Because the government has imposed a substantial burden on at least the self-insured plaintiffs' religious exercise, under RFRA it must demonstrate that this burden is "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1. Our precedent currently holds the government has no compelling interest in contraceptive coverage. *See Hobby Lobby*, 723 F.3d at 1143. But even assuming such a compelling interest, *see Hobby Lobby*, 134 S. Ct. at 2780 (assuming the same), 2785–86 (Kennedy, J., concurring), 2799 (Ginsburg, J., dissenting), the government cannot show this scheme is the least restrictive means of furthering that interest. As discussed above, the Supreme Court's interim orders in *Little Sisters*, *Wheaton College*, and *Zubik*, even when interpreted so as to force self-insured non-profits to play a necessary causal role in contraceptive coverage, provide a less restrictive means of achieving the same goal. *See Priests For Life*, No. 13-5368, slip op. at 46–51 (Kavanaugh, J., dissenting). The existence of this less restrictive means dooms the current accommodation scheme under strict scrutiny. *Hobby Lobby*, 134 S. Ct. at 2781–82.

### IV.   CONCLUSION

"Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty," *Hobby Lobby*, 134 S. Ct. at 2760, a liberty essential to our country's constitutional tradition, albeit with boundaries difficult to define, *see id.* at 2785 (Kennedy, J., concurring). The Court today makes causation one of those boundaries. Even assuming this boundary, however, the self-insured plaintiffs in this case, with the

exception of the *Little Sisters* plaintiffs, have clearly shown how their compelled act will cause their plan beneficiaries to receive objected-to coverage that they could not otherwise receive.   Therefore, I dissent from the Court's holding regarding these self-insured plaintiffs.   Even assuming a causation requirement, I would still hold these self-insured plaintiffs have shown a substantial likelihood of success on the merits of their RFRA claim and that the other requirements for a preliminary injunction are met.   I would therefore affirm the district court's denial of a preliminary injunction in *Little Sisters*, 6 F. Supp. 3d 1225, affirm the district court's grant of a preliminary injunction in *Reaching Souls*, 2013 WL 6804259, and affirm in part (as to the self-insured plaintiffs: Southern Nazarene University and Mid-America University) and reverse in part (as to the insured plaintiffs: Oklahoma Baptist University and Oklahoma Wesleyan University) the district court's grant of a preliminary injunction in *Southern Nazarene*, 2013 WL 6804265.